UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; COMMERCE STREET INVESTMENTS, LLC; PARK PLACE COMMERCE INVESTMENTS, LLC; PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P.; PRUCO LIFE INSURANCE COMPANY; PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY; PRUDENTIAL ANNUITIES LIFE ASSURANCE CORPORATION; PRUDENTIAL INVESTMENT PORTFOLIOS 2; THE PRUDENTIAL INVESTMENT PORTFOLIOS, INC., PRUDENTIAL ASSET ALLOCATION FUND; PRUDENTIAL RETIREMENT INSURANCE & ANNUITY COMPANY; PRUDENTIAL TOTAL RETURN BOND FUND, INC.; PRUDENTIAL TRUST COMPANY; THE GIBRALTAR LIFE INSURANCE COMPANY, LTD.; THE PRUDENTIAL SERIES FUND; and THE PRUDENTIAL LIFE INSURANCE COMPANY, LTD. | Index No. |
| | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| -against- | |
| BANK OF AMERICA, NATIONAL ASSOCIATION; ASSET BACKED FUNDING CORPORATION; BANC OF AMERICA MORTGAGE SECURITIES, INC.; BANC OF AMERICA FUNDING CORPORATION; MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; MERRILL LYNCH MORTGAGE INVESTORS, INC., MERRILL LYNCH MORTGAGE CAPITAL, INC.; MERRILL LYNCH MORTGAGE LENDING, INC.; and FIRST FRANKLIN FINANCIAL CORPORATION | |
| Defendants. | |

LOWENSTEIN SANDLER LLP

David W. Field
Zachary D. Rosenbaum
Thomas E. Redburn, Jr.
Jennifer L. Fiorica
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Daniel L. Brockett
David D. Burnett
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100

Jeremy D. Andersen
Chris Barker
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  213-443-3000
Fax:  213-443-3100

NATURE OF ACTION ................................................................................................... 1

PARTIES ........................................................................................................................... 9

JURISDICTION AND VENUE .................................................................................... 18

BACKGROUND ............................................................................................................ 18

    A.    The Mechanics of Mortgage Securitization .................................................. 18

    B.    Securitization of Mortgage Loans: The Traditional Model ....................... 22

    C.    The Systemic Violation of Underwriting and Appraisal Standards in the Mortgage Securitization Industry ........................................................... 24

    D.    Defendants Sought to be RMBS Leaders by Creating a Vertically Integrated Mortgage Securitization Chain .................................................. 26

SUBSTANTIVE ALLEGATIONS ................................................................................ 36

I.    DEFENDANTS' FALSE STATEMENTS OF MATERIAL FACT AND MATERIAL OMISSIONS ..................................................................................... 36

    A.    Defendants' Misrepresentations Regarding Compliance with the Stated Underwriting Guidelines .................................................................. 37

        1.    Defendants' misrepresentations regarding underwriting standards .......... 37

        2.    Defendants' omissions regarding due diligence results ............................ 39

    B.    Defendants' Misrepresentations Regarding Owner-Occupancy Rates ................. 40

    C.    Defendants' Misrepresentations Regarding the Appraisal Process ...................... 41

    D.    Defendants' Misrepresentations Regarding LTV Ratios and CLTV Ratios ......... 42

    E.    Defendants' Misrepresentations Regarding Assignment to the Trusts ................. 43

    F.    Defendants Representations Regarding Credit Ratings were False and Misleading ..................................................................................... 46

II.    EVIDENCE THAT DEFENDANTS REPRESENTATIONS WERE FALSE AND MISLEADING ............................................................................................. 48

    A.    An Analysis of the Mortgage Loans and Certificates Directly at Issue ................. 48

        1.    A forensic analysis of the mortgaged properties' true occupancy status revealed a systemic misrepresentation problem ............................. 50

2. A forensic analysis of the Mortgage Loans' true LTV and CLTV ratios revealed a systemic misrepresentation problem.............................52

3. A forensic analysis of the Mortgage Loan's chain of title revealed a systemic misrepresentation problem.......................................59

4. The dismal performance of these Mortgage Loans and Certificates confirms they were infected by a systemic underwriting problem...........64

B. Evidence from Analyses Conducted by Defendants' Third-Party Due Diligence Firms.............................................................68

C. The Systemic Abandonment of the Originators Confirms the Mortgage Loans Were Misrepresented ...............................................71

1. Defendant Bank of America, N.A., which also acted as an originator, systemically abandoned its underwriting guidelines...............75

2. The Merrill-affiliated originator First Franklin Corp. systematically abandoned its underwriting guidelines .....................................78

3. Third-party Mortgage Lenders Network USA, Inc. systematically abandoned its underwriting guidelines .....................................79

4. Third-party originator WMC Mortgage Corp. systematically abandoned its underwriting guidelines .....................................81

5. Third-party originator Option One Mortgage Corp. systematically abandoned its underwriting guidelines .....................................87

6. Third-party originator CitiMortgage, Inc. systematically abandoned its underwriting guidelines .....................................92

7. Third-party Originator Accredited Home Lenders, Inc. systematically abandoned its underwriting guidelines .............................97

8. Third-party Originator Fremont Investment & Loan systematically abandoned its underwriting guidelines .....................................99

9. Third-party originator Wells Fargo Bank systematically abandoned its underwriting guidelines....................................................104

10. Third-party originator New Century systematically abandoned its underwriting guidelines ........................................................107

11. Third-party originator EquiFirst Corp. systematically abandoned its underwriting guidelines....................................................116

12. Third-party Residential Funding and its affiliated originators Homecomings Financial and GMAC Mortgage systematically abandoned their underwriting guidelines ..................................................118

13. Third-party originator First Horizon Home Loans Corp. systematically abandoned its underwriting guidelines ...........................129

14. Third-party originator Ownit Mortgage Solutions, Inc. systematically abandoned its underwriting guidelines ...........................132

15. Third-party originator Long Beach Mortgage Company systematically abandoned its underwriting guidelines ...........................134

16. Third-party originator People's Choice Home Loan, Inc. systematically abandoned its underwriting guidelines ...........................140

17. Third-party originator Ameriquest Mortgage Company systematically abandoned its underwriting guidelines ...........................142

18. Third-party originator First National Bank of Arizona systematically abandoned its underwriting guidelines ...........................144

19. Third-party originator Impac Funding systematically abandoned its underwriting guidelines .........................................................145

20. Third-party originator First NLC Financial Services, LLC systematically abandoned its underwriting guidelines ...........................146

21. Third-party originator Aegis Mortgage Corporation systematically abandoned its underwriting guidelines ..................................................148

22. Third-party originator M&I Bank systematically abandoned its underwriting guidelines .........................................................149

23. Third-party originator Delta Funding systematically abandoned its underwriting guidelines .........................................................151

24. Third-party originator Mortgage Investment Lending Associates, Inc. systematically abandoned its underwriting guidelines ....................152

25. Third-party originator Fieldstone Mortgage Company systematically abandoned its underwriting standards..............................153

26. Third-party originator Decision One Mortgage Company systematically abandoned its underwriting guidelines ...........................154

D. Loan-File Reviews By Those With Access To The Loan Files Confirm Defendants' Abandonment Was Systemic..........................................................155

E.    The Credit Ratings Were A Garbage-In, Garbage-Out Process ........................162

III.    DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE AND
        MISLEADING..................................................................................................167

    A.    Overview.................................................................................................167

    B.    Facts Showing Defendants' Knowledge of General Underwriting
          Abandonment by Originators..................................................................170

        1.    The consistency of the Loans' errors .......................................170

        2.    Defendants' extensive due diligence processes made them aware
              that the Mortgage Loans did not conform to the represented
              underwriting guidelines .............................................................172

        3.    Confidential witnesses confirm that Defendants knowingly
              originated defective loans .........................................................181

        4.    Confidential witnesses confirm the due diligence process was well-
              equipped to catch the errors at issue here—but they were directed
              to "look the other way"...............................................................187

        5.    Loan-file reviews conducted by others confirm that errors like this
              would have been caught by a review of the loan files .............204

        6.    The federal government and other parties have found that
              Defendants' due diligence process proved they had knowledge of
              the massive fraud .......................................................................206

        7.    Defendants' bullying of the rating agencies proves that they had
              knowledge of the massive fraud ...............................................209

    C.    Facts Showing Defendants' Knowledge of Appraisal Misrepresentations..........212

    D.    Defendants' Knowledge as to Owner-Occupancy Representations ...................219

    E.    Defendants' Knowledge as to the Title-Transfer Representations .....................221

    F.    Defendants' Knowledge as to the Credit Rating Representations.......................222

    G.    Additional Evidence of Merrill's Scienter.............................................223

    H.    Additional Evidence of Bank of America's Scienter.............................228

IV.    PRUDENTIAL'S DETRIMENTAL RELIANCE AND DAMAGES ...........................230

    A.    Prudential's Reliance .............................................................................230

      B.      Causation and Damages ..................................................................235

V.      DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT .................................239

VI.     OTHER MATTERS.........................................................................................243

      A.      Merrill Lynch & Co.'s Liability as Control Person ...............................243

      B.      Tolling of the Securities Act of 1933 Claims .......................................246

FIRST CAUSE OF ACTION ......................................................................................249

SECOND CAUSE OF ACTION ..................................................................................251

THIRD CAUSE OF ACTION ......................................................................................253

FOURTH CAUSE OF ACTION ..................................................................................254

FIFTH CAUSE OF ACTION ......................................................................................257

SIXTH CAUSE OF ACTION ......................................................................................269

SEVENTH CAUSE OF ACTION ................................................................................271

EIGHTH CAUSE OF ACTION ..................................................................................274

PRAYER FOR RELIEF .............................................................................................277

JURY TRIAL DEMANDED........................................................................................277

Plaintiffs The Prudential Insurance Company of America; Commerce Street Investments, LLC; Park Place Commerce Investments, LLC; Pru Alpha Fixed Income Opportunity Master Fund I, L.P.; Pruco Life Insurance Company; Pruco Life Insurance Company of New Jersey; Prudential Annuities Life Assurance Corporation; Prudential Investment Portfolios 2; The Prudential Investment Portfolios, Inc., Prudential Asset Allocation Fund; Prudential Retirement Insurance & Annuity Company; Prudential Total Return Bond Fund, Inc.; Prudential Trust Company; The Gibraltar Life Insurance Company, Ltd.; The Prudential Series Fund; and The Prudential Life Insurance Company, Ltd. (collectively, "Prudential"); by and through their attorneys, bring this action against Bank of America National Association; Asset-Backed Funding Corporation; Banc of America Mortgage Securities, Inc. (by way of its successor, Merrill Lynch, Pierce, Fenner & Smith Inc.); Banc of America Funding Corporation; Banc of America Securities LLC (collectively, "BofA"); and Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Merrill Lynch Mortgage Investors, Inc.; Merrill Lynch Mortgage Capital, Inc.; Merrill Lynch Mortgage Lending, Inc.; and First Franklin Financial Corporation (collectively "Merrill" and together with BofA, the "Defendants"); and allege as follows:

## NATURE OF ACTION

1.     Prudential seeks to recover damages it suffered as a result of Defendants' fraudulent sale of over $2 billion in mortgage-backed securities (the "Certificates").[1]  Prudential made its purchases in reliance on Defendants' misrepresentations regarding the quality of the Certificates and the residential mortgages underlying them (the "Mortgage Loans").  Prudential has undertaken its own analysis of the specific loans backing the Certificates, and found them not to comply with Defendants' representations.  Prudential's loan-level analysis has revealed

---

[1]     The securitizations at issue (collectively, the "Securitizations") are described in the Exhibits to this Complaint, which are all incorporated as if set forth fully herein.

systematic failures in Defendants' loan underwriting and assignment practices that caused Prudential's Certificates to be backed by countless Mortgage Loans that have since defaulted, been foreclosed upon, and for which Defendants lack proper title to seek recourse.

2.      In addition, civil lawsuits and government investigations regarding the third-party lenders that contributed mortgages to Defendants (the "Originators") have made public a flood of previously hidden information.  Multiple investigators have reached the same conclusion:  Defendants were engaged in a wide-ranging fraud.

3.      To induce investors like Prudential to purchase their Certificates, Defendants provided investors with information about the Certificates through Offering Materials, including registration statements, prospectuses, prospectus supplements, free writing prospectuses, term sheets, and other draft and final written materials (the "Offering Materials").  Prudential's loan-level analysis has revealed that many of the representations Defendants made to investors about the underlying collateral were false, and Defendants knew it.

4.      ***The Offering Materials falsely represented that a stated set of underwriting guidelines would be followed.***  Underwriting guidelines set the rules used to decide whether to grant, or securitize, a given loan.  Though "exceptions" can be made, *Defendants represented these would be limited to loans where "compensating factors" were present.*  If the underwriting guidelines are not actually followed—or if "exceptions" are granted where there are no compensating factors—the quality of the collateral underlying the Certificates is badly compromised.  Contrary to Defendants' representations, Defendants and the Originators systematically abandoned their stated guidelines and repeatedly granted exceptions on loans that had no compensating factors.  This is confirmed by Prudential's forensic analysis of 20,906 of the Mortgage Loans at issue here, and many other facts discussed below.

5. ***Defendants fraudulently omitted their "waiver" of loans flagged as being defective.*** Recently released reports confirm that Defendants' due diligence processes were consistently flagging numerous loans that were both outside the guidelines and that could not be justified through the presence of any purported "compensating factors." These same reports show that Defendants nonetheless provided "waivers" for nearly one-third of these defective loans. Defendants fraudulently omitted the high rate to which they were providing such "waivers," rendering the Offering Materials even more misleading.

6. ***The Offering Materials falsely represented that a specific number of properties would be owner-occupied.*** Whether or not a borrower is living at a mortgaged house is important, because borrowers are less likely to default on their primary residence. At the time Prudential made its investments, there was no way for investors to "test" Defendants' representations about owner-occupancy. However, recent advancements allowed Prudential to analyze the tax and property records for the Mortgage Loans. This analysis revealed that the Offering Materials for each Certificate inflated owner-occupancy statistics. For example, Prudential's forensic analysis revealed that, for the BOAA 2005-7 Securitization, the Offering Materials overstated the percentage of owner-occupied properties by over ***15%.***

7. ***The Offering Materials misrepresented the appraisal process, and presented false and misleading loan-to-value statistical data.*** The Offering Materials state that the mortgaged properties would be appraised using a particular process, such as the Uniform Standards of Professional Appraisal Practice. These appraisals were then used to calculate important statistics about the Mortgage Loans, such figures as their loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios. These representations were material because they tell

3

investors how much of an equity "cushion" the borrower has, and the likely recovery in the event of foreclosure.

8.      The falsity of these representations is confirmed by Prudential's forensic analysis. Using an unbiased, industry-standard, automated valuation model, Prudential was recently able to test the reasonableness of Defendants' appraisal values. Across every Certificate, Defendants consistently inflated the property values. The consistency and size of the "gap," and other facts set forth below, confirms that the appraisal process was being rigged, and that Defendants knew it. The misrepresented appraisals meant that homeowners had far less equity in the mortgaged properties, and were much more likely to default on the Mortgage Loans, than Defendants represented.

9.      ***The Offering Materials falsely represented that the credit ratings would reasonably relate to Certificates being offered.*** Defendants fed the rating agencies the same false data discussed herein. Because the quality of the credit ratings is only as good as the quality of the data given to the agencies, this rendered Defendants' representations regarding the credit ratings false and misleading. Had the rating agencies known the true characteristics of the Mortgage Loans, they would not have given the Certificates AAA ratings and the Certificates would have been unmarketable at anywhere near the values Prudential paid, if at all.

10.      ***Assignment of Mortgage Loans to the Trusts.*** The Offering Materials represented (a) that the underlying Mortgage Loans had been validly assigned to the RMBS trusts (the "Trusts") that issued the Certificates, and (b) that the Trusts, acting through loan servicers or the trustees, would have the ability to foreclose in the event of borrower defaults on the loans. But in fact, as reflected in Prudential's loan-level analysis of the chain of title of 20,906 Mortgage Loans underlying its securities, Defendants did not actually assign ***43%*** of

4

these Mortgage Loans to the Trusts.  Of the Mortgage Loans that were assigned to the Trusts, **over 58%** were not properly assigned, as represented in the Offering Materials.

11.     ***Defendants knew the representations were false.***  Defendants knew that large quantities of loans were defective, but securitized them anyway.

12.     Merrill had become determined to position itself at the top of the RMBS "league tables" among Wall Street banks so it could reap the profits from fees that came with that title.  To accomplish that task, Merrill entered into close relationships with a series of companies that originated mortgage loans—including through acquisition, investment, and "warehouse" lending or other similar ties.  Merrill represented in the Offering Materials that it had investigated and was aware of the practices of the loan origination companies with which it allied itself.  Rather than taking steps to address the flawed lending practices of its originators, however, Merrill encouraged these originators to engage in ever-more problematic practices in order to feed Merrill's appetite for loans that Merrill could package into securities and unload on investors.

13.     Merrill partially outsourced its due diligence to The Bohan Group ("Bohan"). As revealed in July 2008, a former Bohan loan reviewer ***"singled out Merrill in particular" as perpetuating the routine approval of defective mortgage loans*** for securitization.  This former loan reviewer noted that when she identified loans as failing stated underwriting guidelines, even in the face of intense pressure to "approve as many loans as possible as quickly as possible," a Merrill supervisor would nevertheless "find a way" to get the loans approved.

14.     In 2008, after Merrill's reckless business practices relating to RMBS and otherwise brought it to the brink of bankruptcy, Merrill was purchased by BofA in a merger transaction completed on January 1, 2009, and Merrill Lynch & Co., the surviving company (and a Defendant here), became a wholly owned subsidiary of Bank of America Corporation.

15.     Like Merrill, BofA also sought to keep pace with the market and bring home the lion's share of the profits to be had in the RMBS boom.  To do so, BofA created its own vertically-integrated machine for originating, packing and selling the Mortgage Loans in the form of RMBS.  In a business where volume ruled, BofA, in order to churn out as many mortgage loans as possible for its own securitizations, departed from its own underwriting standards and misrepresented the quality of the mortgage loans underlying its securitizations.

16.     Confidential witnesses interviewed by Prudential's counsel confirmed BofA's improper origination and securitization practices.  For example, one former employee stated that BofA loan officers themselves inflated borrower income and "*doctored the numbers*" to get stated income loans approved.  Another former BofA loan processor revealed that management told loan processors to ignore any evidence that directly contradicted borrowers' claims about their income.  According to another former BofA employee, loan officers would often manipulate appraisers to give unsubstantiated high appraisals to get loans approved, telling the appraisers "*I need you to come in at this amount*."

17.     BofA's abandonment of underwriting standards—and manipulation of appraisals and borrower income numbers—caused BofA to, as one former employee stated, fund loans that "*should not have been funded under any circumstances*."  Indeed, as one former employee of BofA's due diligence firm Clayton Holdings, Inc. ("Clayton") stated, a BofA Vice President of Structured Products specifically told him that he "*didn't give a flying f\*\*\* about DTI [debt-to-income ratios]*" and other credit characteristics of the loans.  The reason is clear—as that same BofA VP told the former Clayton employee that "*[BofA] can sell [the loans] to whoever . . . down the line*."

18.     Defendants used the third-party due diligence firm Clayton to pre-screen the loans they were securitizing.  Defendants were told that many of these loans were defective but securitized them anyway and sold the securities to Prudential and other investors.  Specifically, Clayton gave loans that failed to meet the guidelines *and* lacked any "compensating factors" a failing grade of "3."  These grades—and the reasoning for them—were given to Defendants on a *daily* basis.  Defendants could see in real-time how many defective loans they were purchasing.  Defendants were told that 23% (for Merrill) and 30% (for BofA) of the loans failed to meet the guidelines and lacked any "compensating factors," yet Defendants "waived" in almost a third of the loans into their securitizations.

19.     Testimony from Clayton's representatives confirms that Defendants were using the defect information to negotiate a lower price with the Originators.  In other words, Defendants used their due diligence processes not as a way to ensure the accuracy of the Offering Materials, but merely as bargaining leverage to increase their own profits.

20.     As detailed below, numerous sources show a *systemic* underwriting breakdown.  Prudential's forensic analysis of 20,906 Mortgage Loans confirms those systemic problems infected the Certificates at issue.  It is not surprising, then, that the Mortgage Loans have performed terribly.  Across all of the Securitizations, *over 26%* of the Mortgage Loans have already been written off for a loss.  Of the Mortgage Loans that remain active, *over 41%* are currently delinquent.  The Certificates' credit ratings have plummeted.  Even though all started out as investment-grade, with most being AAA-rated, all but five are now rated as "junk" by at least one of the major rating agencies.  With the underlying loans performing so poorly, the value of Prudential's Certificates has plummeted, causing Prudential to incur significant losses.  These losses were not caused by the housing market downturn, but by Defendants' knowing failure to

originate and securitize these Mortgage Loans in accordance with the stated underwriting guidelines.

21.     Prudential's loan-level analysis has revealed that across all of the Offerings Prudential tested, a staggering *51.83%* of the Mortgage Loans contained at least one material defect.  This means that *over 62,000* of the Mortgage Loans underlying the Certificates that Prudential tested were materially defective:

| Trust | Loan Pool | Number of Mortgage Loans in the Loan Pool | Percentage of Loans With a Material Defect | Number of Mortgage Loans With a Material Defect |
|---|---|---|---|---|
| ABFC 2004-HE1 | Aggregate | 4,476 | 53.63% | 2,400 |
| ABFC 2005-HE1 | Aggregate | 9,463 | 53.50% | 5,063 |
| ABFC 2006-HE1 | Group 2 | 4,602 | 45.00% | 2,071 |
| ABFC 2006-OPT1 | Aggregate | 4,808 | 56.13% | 2,699 |
| BAFC 2004-2 | Group 1 | 751 | 13.33% | 100 |
| BAFC 2006-E | Group 2 | 588 | 92.91% | 546 |
| BOAA 2005-7 | Group 3 | 469 | 87.43% | 410 |
| BOAA 2005-12 | Group 3 | 665 | 79.27% | 527 |
| BOAA 2006-5 | Group 3 | 161 | 80.67% | 130 |
| BOAMS 2004-E | Group 2 | 1,737 | 96.13% | 1,670 |
| BOAMS 2005-A | Group 2 | 753 | 81.90% | 617 |
| BOAMS 2005-B | Group 2 | 487 | 78.82% | 384 |
| FFMER 2007-3 | Group 2 | 5,795 | 32.88% | 1,905 |
| FFMER 2007-4 | Group 2 | 4,698 | 36.13% | 1,697 |
| FFML 2004-FF1 | Aggregate | 6,096 | 82.63% | 5,037 |
| FFML 2005-FF6 | Aggregate | 4,930 | 69.38% | 3,420 |
| FFML 2005-FFH1 | Aggregate | 3,220 | 68.38% | 2,202 |
| FFML 2006-FF18 | Group 2 | 7,547 | 29.75% | 2,245 |
| FFML 2006-FFH1 | Aggregate | 3,182 | 66.88% | 2,128 |
| FFML 2007-FF1 | Group 2 | 5,842 | 32.00% | 1,869 |
| MLMI 2004-WMC3 | Aggregate | 8,449 | 79.88% | 6,749 |
| MLMI 2005-WMC1 | Aggregate | 10,434 | 35.25% | 3,678 |
| MLMI 2006-HE2 | Aggregate | 3,502 | 65.63% | 2,298 |
| MLMI 2006-MLN1 | Group 2 | 1,743 | 43.13% | 752 |
| MLMI 2006-WMC1 | Group 1 | 3,682 | 39.88% | 1,468 |
| MLMI 2007-HE3 | Aggregate | 3,551 | 40.88% | 1,452 |
| SURF 2005-BC4 | Aggregate | 8,682 | 39.13% | 3,397 |
| SURF 2006-BC1 | Group 2 | 4,244 | 61.13% | 2,594 |
| SURF 2006-BC2 | Group 2 | 3,290 | 57.50% | 1,892 |
| SURF 2007-BC1 | Group 2 | 2,403 | 38.38% | 922 |

22.     These defect rates are likely just the tip of the iceberg—Prudential does not yet have access to the Defendants' loan files.  Rather, it has been limited in its investigation to what is publically available.  Discovery is likely to uncover additional problems, as Prudential only then will be able to fully test other representations, such as those regarding the income, employment, and housing history verification processes used, the qualifications of the appraisers, compliance with state laws, FICO score requirements, and other features that all were part of the Defendants' underwriting guidelines.

## PARTIES

### *The Plaintiffs*

23.     Plaintiff Commerce Street Investments, LLC is a company formed under the laws of, and domiciled in, the State of Delaware, with its principal place of business at 751 Broad Street, Newark, New Jersey, 07102.  Commerce Street is a wholly owned subsidiary of Prudential Financial, Inc., a company formed under the laws of, and domiciled in, New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey 07102.  Commerce Street's sole member is Prudential Financial, Inc.

24.     Plaintiff Park Place Commerce Investments, LLC is a company formed under the laws of, and domiciled in, the State of Delaware, with its principal place of business in Wilmington, Delaware.  Park Place is a wholly owned subsidiary of The Prudential Insurance Company of America, and ultimately of Prudential Financial, Inc.

25.     Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey 07102.  Prudential Insurance is a wholly owned subsidiary of Prudential Holdings, LLC, which is a Delaware

limited liability company. Prudential Holdings, LLC is a wholly owned subsidiary of Prudential Financial, Inc.

26.     Plaintiff Pru Alpha Fixed Income Opportunity Master Fund I, L.P. ("Pru Alpha") is a company formed under the laws of Delaware, with its principal place of business in Newark, New Jersey. Pru Alpha is a wholly owned subsidiary of Prudential Investment Management, Inc. ("PIM"), a company formed under the laws of, and domiciled in, the State of New Jersey, with its principal place of business at 751 Broad Street, Newark, New Jersey 07102, and ultimately Prudential Financial, Inc. Pru Alpha's partners are Pru Alpha Partners I LLC (whose sole member is PIM), and ED Ltd., a Cayman Islands corporation.

27.     Plaintiff Pruco Life Insurance Company ("Pruco") is an insurance company formed under the laws of Arizona, with its principal place of business in Newark, New Jersey. Pruco is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.

28.     Plaintiff Pruco Life Insurance Company of New Jersey is a life insurance company formed under the laws of New Jersey, with its principal place of business at 213 Washington Street, Newark, New Jersey 07102. Pruco Life Insurance Company of New Jersey is a wholly owned subsidiary of Pruco Life Insurance Company, and ultimately of Prudential Financial, Inc.

29.     Plaintiff Prudential Annuities Life Assurance Corporation ("PALAC") is an insurance company formed under the laws of, and domiciled in, the State of Connecticut, with its principal place of business in Shelton, Connecticut. PALAC is a wholly owned subsidiary of Prudential Annuities Holdings Company, Inc., and ultimately of Prudential Financial, Inc.

30.     Plaintiff Prudential Investment Portfolios 2 is a Delaware statutory trust with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission and is comprised of the following funds:  Prudential Core Short-Term Bond Fund and Prudential Core Taxable Money Market Fund.

31.     Plaintiff The Prudential Investment Portfolios, Inc., Prudential Asset Allocation Fund, is a Maryland Corporation with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission.

32.     Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.  PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.

33.     Plaintiff Prudential Total Return Bond Fund, Inc. is a Maryland corporation with a principal place of business in Newark, New Jersey.  It is an open-ended management investment company registered with the Securities and Exchange Commission.  From July 2003 through February 2010 it was known as Dryden Total Return Bond Fund, Inc.

34.     Plaintiff Prudential Trust Company is a corporation formed under the laws of Pennsylvania, with its principal place of business in Scranton, Pennsylvania.  Prudential Trust Company is a wholly owned subsidiary of PIM, and ultimately Prudential Financial, Inc. Prudential Trust Company serves as Trustee for the Institutional Core Plus Bond Fund of the Prudential Company Master Commingled Investment Fund for Tax Exempt Trusts, the

Institutional Core Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts, the Prudential Core Bond Fund of the Prudential Trust Company Collective Trust, and the Prudential Merged Retirement Plan.

35.     Plaintiff The Gibraltar Life Insurance Co., Ltd. ("Gibraltar") is a life insurance company formed under the laws of Japan, with its principal place of business at Prudential Tower 2-13-10, Nagatacho, Chiyoda-ku, Tokyo, Japan 100-0014. Gibraltar is a wholly owned subsidiary of Prudential Holdings of Japan, Inc., and ultimately Prudential Financial, Inc.

36.     Plaintiff The Prudential Series Fund is a Delaware statutory trust with a principal place of business in Newark, New Jersey. It is an open-ended management investment company registered with the Securities and Exchange Commission.

37.     Plaintiff The Prudential Life Insurance Company, Ltd. is an insurance company formed under the laws of, and domiciled in Japan, with its principal place of business in Tokyo, Japan. It sells life insurance and annuity products. The Prudential Life Insurance Company, Ltd. is a wholly owned subsidiary of Prudential Holdings of Japan, Inc., which is a Japanese corporation. Prudential Holdings of Japan, Inc. is a wholly owned subsidiary of Prudential Financial, Inc., which is a New Jersey Corporation.

### *Relevant Prudential Non-Party*

38.     PIM is a privately-owned investment manager. It primarily provides its services to institutions, pension plans, charitable organizations, state or municipal government entities, churches, foreign agencies, public funds, insurance companies, foundations, and endowments. PIM manages client-focused portfolios  and launches and manages equity, fixed income, and mutual funds. PIM also launches and manages hedge funds and structured vehicles. PIM is a wholly owned subsidiary of Prudential Financial, Inc.

39.     Each of the Plaintiffs in this action is an investment advisory client of PIM, pursuant to investment management agreements in which the entities have delegated investment discretion to PIM, subject to certain mandates and restrictions.  In its role as an investment advisor to the Plaintiffs, PIM purchased the Certificates on behalf of those entities.  While PIM makes purchases for its clients pursuant to such investment discretion, it still must act according to the investment client's mandates and restrictions.  At all times, PIM acted as an agent for the Plaintiffs in purchasing the Certificates at issue in this lawsuit.

40.     The Plaintiffs hold (or held) title to the Certificates at issue in this Complaint, and each bears (or bore) the risk of loss for the Certificates.  PIM does not have legal title to the Certificates at issue in this action, nor does it have a proprietary interest in the claims asserted by the Plaintiffs.  PIM purchased the Certificates for the benefit of and in the name of (or the name of the nominee of) the Plaintiffs.

41.     Prudential made the purchases described in Exhibit B.  These purchases were all made in New Jersey, and the decisions to purchase, including reliance on the Offering Materials, also took place in New Jersey.  Defendants solicited each of the purchases in New Jersey and sent the Offering Materials to PIM and other New Jersey residents.  In addition, because most of the plaintiffs are based in New Jersey, the harm from Defendants' fraud was felt in New Jersey.  The Offerings were made to the public, and on information and belief many of the loans were issued to New Jersey residents.  Defendants' fraud has thus affected many New Jersey residents, further affecting trade and commerce in New Jersey.

### *The Defendants*

42.     All of the Defendants are part of the same corporate family and acted together to control the entire creation of the Certificates at issue here, from loan origination or acquisition, to

mortgage pooling, to securities underwriting, to sale to Prudential. All of Defendants are direct or indirect subsidiaries of Bank of America Corporation.

43.     At all relevant times, Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Any allegations about acts of Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

44.     Prudential is not seeking relief against any bankrupt entity. It is, however, seeking relief from Defendants, including their successors-in-interest (if any), by reason of a sale or transfer of all or a portion of its assets.

45.     *The underwriters.* Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation and registered broker-dealer, with its principal place of business in New York, New York. Merrill Lynch, Pierce, Fenner & Smith Inc. acted as underwriter for certain Certificates, as identified in Exhibit A.

46.     Banc of America Securities LLC ("BAS"), which was a wholly owned broker-dealer subsidiary of Bank of America Corporation, acted as the underwriter for certain Certificates, as identified in Exhibit A. BAS was a Delaware limited liability corporation with its principal place of business in New York, New York. On November 1, 2010, BAS merged into Merrill Lynch, Pierce, Fenner & Smith Inc. with Merrill Lynch, Pierce, Fenner & Smith Inc. as the surviving corporation. As a result of this merger, Merrill Lynch, Pierce, Fenner & Smith Inc. remained a direct wholly owned broker-dealer subsidiary of Merrill Lynch & Co. and an indirect wholly owned broker-dealer subsidiary of Bank of America Corporation. Thus, the allegations below regarding BAS are made against Merrill Lynch, Pierce, Fenner & Smith Inc.

47.     The underwriters participated in the structuring of the Securitizations, including by participating in the preparation of the Offering materials and in the active marketing of the securitizations to investors.  The underwriters are prominently identified on the first page of the Prospectus Supplements.  The solicitation of Prudential was the result of the underwriters, depositors, and seller/sponsors' joint effort to market the Certificates through the creation and distribution of the Offering Materials.  Thus, the underwriters made, authorized, or caused the relevant misrepresentations alleged herein.

48.     *The seller/sponsors.*  Defendant Merrill Lynch Mortgage Lending, Inc. ("MLML") is a Delaware corporation, with its principal place of business in New York, New York.  It is a wholly owned subsidiary of Merrill Lynch Mortgage Capital Inc., which is a wholly owned subsidiary of Merrill Lynch & Co.  MLML was the seller/sponsor of certain Certificates, as identified in Exhibit A.

49.     Defendant Merrill Lynch Mortgage Capital Inc. ("MLMC") is a Delaware corporation with its principal executive offices in New York, New York, and is a subsidiary of Bank of America Corporation.  MLMC was the seller/sponsor of certain Certificates, as identified in Exhibit A.

50.     Defendant Bank of America, National Association is a nationally chartered United States bank with substantial business operations and offices at the Bank of America Tower at One Bryant Park, New York, New York 10036.  Bank of America, N.A., was the seller/sponsor of certain Certificates, as identified in Exhibit A.

51.     Defendant First Franklin Financial Corporation ("First Franklin") is a Delaware corporation with its principal place of business located at 2150 North 1st Street, San Jose,

California 95131. It is a wholly owned subsidiary of defendant Merrill Lynch Mortgage Capital Inc. First Franklin was the seller/sponsor of certain Certificates, as identified in Exhibit A.

52. The sponsors structured the Securitizations in which they participated, as identified in Exhibit A. They first originated or obtained the underlying Mortgage Loans, including from their affiliates, and then pooled the Mortgage Loans in the securitizations and sold, transferred, or otherwise conveyed title to those loans to the depositors. The sponsors' work includes working on the Securitizations through their control of the depositor-defendants (who were special-purpose entities used to merely carry out the transactions). The sponsors, along with the depositors and the underwriter, participated in the preparation of the Offering Materials, and are identified prominently on the front page of the Prospectus Supplements for each of the Securitizations. Thus, the sponsors made, authorized, or caused the relevant misrepresentations alleged herein.

53. *The depositors.* Defendant Merrill Lynch Mortgage Investors ("MLMI"), Inc. is a Delaware corporation and an indirect subsidiary of Merrill Lynch & Co., Inc., with its principal place of business in New York, New York. MLMI was the depositor for certain Certificates, as identified in Exhibit A.

54. Defendant Banc of America Funding Corporation ("BAFC") is a Delaware corporation with substantial business operations and offices at the Bank of America Tower at One Bryant Park, New York, New York 10036, and is a subsidiary of Bank of America Corporation. MLMI was the depositor for certain Certificates, as identified in Exhibit A.

55. Defendant Banc of America Mortgage Securities, Inc. ("BAMS") is a Delaware corporation with substantial business operations and offices at the Bank of America Tower at

16

One Bryant Park, New York, New York 10036, and is a subsidiary of Bank of America Corporation. BAMS was the depositor for certain Certificates, as identified in Exhibit A.

56.     Defendant Asset Backed Funding Corporation ("ABFC") is a Delaware corporation with substantial business operations and offices at the Bank of America Tower at One Bryant Park, New York, New York 10036, and is a subsidiary of Bank of America Corporation. ABFC was the depositor for certain Certificates, as identified in Exhibit A.

57.     The depositors were responsible for preparing and filing reports required under the Securities Exchange Act of 1934. The depositors, in conjunction with the sponsors and the underwriter, directly made the relevant misrepresentations alleged herein. The depositors are prominently identified on the front page of the Prospectus Supplements for each of the Securitizations. Thus, the depositors made, authorized, or caused the relevant misrepresentations alleged herein.

58.     *The Merrill corporate defendant.* Merrill Lynch & Co., Inc. ("Merrill Lynch & Co.") is the parent corporation of all the other Merrill Defendants. It is a Delaware corporation with its principal executive office in New York, New York and is a holding company that, through its subsidiaries, purports to be a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions, and individuals worldwide. On January 1, 2009, Merrill Lynch & Co. became a wholly owned subsidiary of Bank of America Corporation.

59.     *Relevant non-parties.* Bank of America Corporation purports to be one of the world's largest financial institutions, serving individual consumers, small-and-middle-market businesses, large corporations and governments with a full range of banking, investing, asset management and other financial and risk management products and services. It is a Delaware

corporation with substantial business operations and offices at the Bank of America Tower at One Bryant Park, New York, New York 10036. Every defendant named in this action is a subsidiary of Bank of America Corporation.

60.     The Certificates for each securitization relevant to this action were issued by a trust (collectively, the "Trusts"). The Trusts are identified in Exhibit A along with other details regarding Prudential's purchases.

## JURISDICTION AND VENUE

61.     Pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction over this action based upon diversity of citizenship among all plaintiffs and defendants and because the amount in controversy exceeds $75,000.

62.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a). This is a civil action where jurisdiction is founded on diversity of citizenship and this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, inasmuch as (i) all of the plaintiffs' purchases of Certificates were made in this district, (ii) their decisions whether to purchase were made in this district, and (iii) Defendants are subject to personal jurisdiction in this district.

## BACKGROUND

### A.     The Mechanics of Mortgage Securitization

63.     Mortgage pass-through securities, or certificates, represent interests in a pool of mortgage loans. Although the structure and underlying collateral may vary by offering, the basic principle of pass-through securities is that the cash flow from the pool of mortgages is "passed through" to the certificateholders when payments are made by the underlying mortgage borrowers.

64.     The initial step in creating a mortgage pass-through security is the generation of the loans by the initial originators.  Loans are then pooled into groups by a "sponsor" or "seller." The sponsor is often an investment bank, like Defendants here.  In order to ensure that Defendants had access to sufficient numbers of loans to feed its securitization machine, in many cases Defendants and their affiliates would originate the loans themselves.  Here, BofA originated 100% of the Mortgage Loans underlying many of the BofA Offerings, and thus BofA controlled the originator and securitization from the initial step of origination.  The same is true of Merrill, which, as noted below, purchased originator First Franklin in 2006, which originated 100% of the Mortgage Loans underlying many of the Merrill Offerings.

65.     After pooling the loans, the sponsor transfers them to the "depositor."  As it is here, the depositor is typically a special-purpose affiliate of the sponsor, and exists solely to receive and pass on the rights to the pools of loans.  As is the case here, the depositors are often controlled directly by the same officers and directors who run the sponsor, and have no business operations other than securitizing mortgage assets and related activities.

66.     Upon acquisition of the loans, the depositor transfers, or "deposits," the acquired loan pool to an "issuing trust."  The depositor then securitizes the loan pool in the issuing trust so that the rights to the cash flows from the pool can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches."  Tranches consist of multiple series of related securities offered as part of the same offering, each with a different level of risk and reward.  Any losses on the underlying loans—whether due to default, delinquency, or otherwise—are generally applied in reverse order of seniority.  As such, the most senior tranches of pass-through securities receive the highest

credit ratings. Junior tranches, being less insulated from risk, typically obtain lower credit ratings.

67.     Upon acquisition of the loans, the depositor transfers (or "deposits") the acquired loan pool to an "issuing trust." The depositor then securitizes the loan pool in the issuing trust so that the rights to the cash flows from the pool can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches consist of multiple series of related securities offered as part of the same offering, each with a different level of risk and reward. Any losses on the underlying loans are generally applied in reverse order of seniority. As such, the most senior tranches of pass-through securities receive the highest credit ratings. Junior tranches, being less insulated from risk, typically obtain lower credit ratings.

68.     Once the tranches are established, the issuing trust passes the certificates back to the depositor, who becomes the issuer of the securities. The depositor then passes the securities to one or more underwriters, who offer and sell the securities to investors in exchange for cash that is passed back to the depositor, minus any fees owed to the underwriters. Alternatively, the underwriters sometimes make a "firm commitment" to purchase the securities, keeping any proceeds they obtain by re-selling them to investors.

69.     Because the cash flow from the underlying loans is the source of payments to holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool. The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originators develop while assessing loan applications, and which securitizers review as part of their "due diligence" in purchasing and securitizing the loans.

70.     For residential mortgage loans, a loan file generally contains the borrower's application for the loan; documents relating to verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property. The loan file also typically contains the record of the investigation by the loan originator of the documents and information provided by the borrower, as well as detailed notes of the underwriter setting forth the rationale for the making of each loan.

71.     Investors like Prudential were not given (and still do not have) access to these loan files. Rather, investors must rely on representations Defendants made in the Offering Materials about the quality and nature of the loans that form the security for their investments.

72.     The collateral pool for each securitization usually includes thousands of loans. The sponsor, depositor, and underwriter are responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited in the trust. In accordance with industry standards, this involves performing due diligence on the loan pool and the originators to ensure the representations being made to investors are accurate.

73.     The *Wall Street Journal* has summarized the securitization process as follows:



Follow the Mortgage — What happens to your mortgage after you sign on the dotted line

Source: WSJ Reporting

## B.    Securitization of Mortgage Loans:  The Traditional Model

74.     Traditionally, mortgage originators financed their mortgage business through customer deposits, retained ownership of the loans they originated, and directly received the mortgage payment streams.  When an originator held a mortgage through the term of the loan, it bore the risk of loss if the borrower defaulted and if the value of the collateral was insufficient to repay the loan.  As a result, the originator had a strong economic incentive to verify the borrower's creditworthiness through prudent underwriting, and to obtain an accurate appraisal of the value of the underlying property.

75.     Mortgage loan securitization, however, shifted the traditional "originate to hold" model to an "originate to distribute" model, in which originators sell residential mortgages and transfer credit risk to investors through the issuance and sale of securities.  Under the new model, originators no longer hold the mortgage loans to maturity.  Instead, by selling the mortgages to trusts, which provide their securities to investors, the originators obtain the funds to make more loans.  Securitization also enables originators to earn most of their income from transaction and loan-servicing fees, rather than from the "spread" between interest rates paid on deposits and

interest rates received on mortgage loans, as in the traditional model. Thus, the "originate to distribute" model gives originators an incentive to increase the number of mortgages they issue regardless of credit quality. However, contractual terms, adherence to solid underwriting standards, and sound business practices obligate originators to underwrite loans in accordance with their stated policies and to obtain accurate appraisals of the mortgaged properties.

76.     Most mortgage securitizations were traditionally conducted through the major Government Sponsored Enterprises (the "Agencies"), i.e., the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). The Agencies purchased loans from originators and securitized the loans. These Agency securitizations had high credit quality because the Agencies required the underlying loans to be originated in accordance with strict underwriting guidelines.

77.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. Originators during that period generally made loans in accordance with their stated underwriting and appraisal standards and provided accurate information about the loans, borrowers, and mortgaged properties to the Wall Street banks that securitized the loans. Most non-Agency mortgage securitizations also had relatively high credit quality because they typically complied with the Agencies' underwriting standards. In turn, the Wall Street banks generally provided accurate information about the loans, borrowers, and properties to investors.

C.    **The Systemic Violation of Underwriting and Appraisal Standards in the Mortgage Securitization Industry**

78.    Unbeknownst to investors, the game fundamentally changed in the early 2000s. While both originators and Wall Street banks, through the 1990s, generally played by the rules and complied with their obligations to underwrite loans responsibly and provide accurate information to investors, this ceased to be the case in the following decade.

79.    With historically low interest rates decreasing the profits of traditional lending and securitization through Fannie Mae or Freddie Mac, Wall Street banks looked for new ways to increase fees. Investment banks like Defendants began to focus on creating products outside the traditional lending guidelines and expanding the number of borrowers who could purportedly qualify for loans, while also charging those borrowers higher fees than they would have paid on conforming loans.

80.    The shift towards non-traditional loans sparked a growing focus on the "originate to distribute" model. Originators, underwriters, and others in the securitization chain were incentivized to pump out as many loans as possible, as long as they could transfer the risk of non-payment to investors. According to an April 2010 report by the Financial Crisis Inquiry Commission ("FCIC"), loans that did not conform to Fannie Mae and Freddy Mac underwriting guidelines grew from around $670 billion in 2004 to over $2 trillion in 2006. Originators and securitizers, like Defendants, were willing to abandon sound underwriting practices and to misrepresent the loan collateral to ensure the securities' marketability.

81.    The history of this disastrous change in the market was investigated by the FCIC, created by the Fraud Enforcement and Recovery Act of 2009, which "reviewed millions of pages of documents, interviewed more than 700 witnesses, and held 19 days of public hearings," and which issued a report in January 2011 (the "FCIC Report"). The FCIC Report concluded that, as

24

a result of the practices such as Defendants', "[t]rillions of dollars in risky mortgages had become embedded throughout the financial system." FCIC Report at xi, xvi. As the FCIC also concluded: "The originate-to-distribute model undermined responsibility and accountability for the long-term viability of the mortgages and mortgage-related securities and contributed to the poor quality of mortgage loans." *Id.* at 125.

82.     The underwriters of the offerings and originators of the underlying mortgage loans make large amounts of money from the fees and other transaction revenues associated with their efforts to create and sell mortgage-backed securities. These fees and revenues are generally calculated as a percentage of the securitization's principal balance, and can amount to millions of dollars in large transactions. From 2000 through 2008, Wall Street banks learned that they could earn much more from arranging and selling residential mortgage-backed securities ("RMBS") than by selling mortgage loans to borrowers. The securitization business was a gold mine for investment banks able to control significant market share.

83.     Underwriters of RMBS offerings like those at issue here typically would collect between .2% to 1.5% in discounts, concessions, or commissions. On the Offerings at issue here, these commissions would have yielded Defendants many millions in underwriting fees alone. By being vertically integrated into every step of the securitization process, the Defendants earned even more. It was, in part, the fees Defendants were receiving for their promised underwriting, diligence, and oversight that kept them in the business of originating and acquiring mortgage loans for securitization, even after Defendants became aware that the loans did not comport with sound underwriting practices.

84.     To accomplish this tremendous volume growth, Defendants misrepresented the nature of the loans they securitized. Since the payment streams from borrowers ultimately fund

the return to investors, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal. Any representation bearing on the riskiness of the underlying mortgage loans was thus highly material. By misrepresenting the true risk profile of the underlying loan pools, Defendants defrauded Prudential. The Certificates' market value has declined substantially as the true risk profile of the underlying mortgage pool has been revealed.

**D.      Defendants Sought to be RMBS Leaders by Creating a Vertically Integrated Mortgage Securitization Chain**

85.      Throughout the 2000s, as Wall Street banks relied on mortgage securitization (and in particular RMBS) to rescue and inflate their profits, those banks started touting their position in "league tables" that ranked top issuers of asset-backed securities (including RMBS) by volume. In 2004, Merrill was far down in the rankings, while other institutions dominated the RMBS business.

86.      As described further in Section III.G, by 2004, E. Stanley O'Neal, the then-Chairman and Chief Exectutive Officer of Merrill, was determined to take aggressive action to pursue the mortgage securitization business and to climb to the top of the league tables for asset-backed securities, and, in particular, RMBS. Mr. O'Neal revamped his trading desk by bringing in new executives to lead Merrill's global asset-based finance operations, and specifically to increase the volume of mortgage loans coming into Merrill's trading desks. It also began some purchasing originators outright, and extending warehouse lines of credit, creating a vertically integrated business model.

87.      For example, Merrill provided cheap warehouse financing for Option One with the condition that it continue selling Merrill its loans. Paul Muolo & Matthew Padilla, *Chain of Blame: How Wall Street Caused the Mortgage and Credit Crisis* 184 & 200 (2008). Merrill also

had a $100 million ownership position in Ownit Mortgage Solutions Inc., for which it provided a warehouse line of credit. FCIC Report at 204. Merrill also provided warehouse lines and other financing (including via repurchase agreements) to Mortgage Lenders Network, Accredited, Fieldstone, WMC Mortgage, and other lenders. Merrill took its originators' mortgage loans as collateral for these facilities.

88.     Merrill Confidential Witness 1 ("MCW1"), an Assistant Vice President in Merrill's Global Asset Backed Finance group, further confirmed that Merrill provided warehouse lines of credit to originators. In these warehouse relationships, Merrill loaned the originators money, which the originators—including Ownit, Fremont Investment & Loan, Countrywide, IndyMac, First Franklin, and Ameriquest—in turn used to fund loans. The loans funded by the originators served as the collateral for the warehouse line of credit. These warehouse relationships gave Merrill a secure pipeline to feed its securitization machine. Indeed, MCW1 stated that although the loans originated by the warehouse borrower were pledged as collateral, they did "not hit Merrill's balance sheet"—meaning they were quickly sold and securitized.

89.     Within a short time, Merrill had climbed the "league tables" and was rapidly buying and securitizing residential mortgages in enormous volumes. In addition to being affiliated with or otherwise having close ties to the originators of the loans, Merrill created a vertically integrated mortgage securitization machine by having its own entities act as sponsor, depositor, and underwriter for the Certificates. In fact, Merrill was the fourth largest issuer of subprime mortgagebacked securities from 2005 to 2007, and by 2007, Merrill was the second largest issuer of subprime mortgage-backed securities.

90.     Like Merrill, BofA operated—and made huge profits—on every level of the securitization process, acting as originiators, underwriters, sponsors, sellers, depositors, and

servicers in the offerings at issue. Indeed, as set forth in the Exhibits, in many of the deals, BofA, like Merrill, acted in multiple, if not all, of these roles, implementing "vertical integration," which allowed them to control the entire securitization process and provided them with actual knowledge of the abuses at each level of the transaction. Like Merrill, BofA had its own steady supply of mortgage loans from Bank of America, N.A., which, as set forth in the Exhibits, originated all of the Mortgage Loans underlying many of the Offerings. As originator, BofA knew first-hand that the Mortgage Loans had been approved with a total disregard for proper underwriting standards.

91. Moreover, BofA, like Merrill, also engaged in warehouse lending, to ensure that it had access to a steady stream of mortgage loans to securitize and sell to investors. In 2001, BofA sold EquiCredit, the division of Bank of America that, at the time, was primarily responsible for making subprime loans. In order to guarantee that it could obtain sufficient mortgages to pool into its RMBS securitizations, BofA began to directly fund originating banks, including Countrywide and New Century (two of the worst offending originating banks in the financial crisis). According to *Inside Mortgage Funding*, BofA was the leading participant in the warehouse lending channel, with nearly 26 percent market share by 2009. October 5, 2010 BofA Press Release, "Bank of America Exits First Mortgage Wholesale Channel".)

92. In acquiring thousands of Mortgage Loans from third-party originators, BofA conducted its own due diligence on the acquired loans. BofA investigated whether the Mortgage Loans complied with designated underwriting guidelines and qualified for BofA's own acquisition protocols. BofA thus had direct, first-hand knowledge that other originators had systemically abandoned proper underwriting practices.

93.     After originating or acquiring Mortgage Loans, BofA warehoused them until such time as it possessed enough collateral to proceed to securitization.  BofA was at risk for any losses arising during the warehouse period—i.e., if a Mortgage Loan became delinquent or defaulted before it could be securitized, BofA could potentially suffer a loss.  BofA thus had a powerful incentive to securitize the Mortgage Loans as quickly as possible.  Even though BofA knew, or recklessly disregarded, that many of the warehoused Mortgage Loans were underwritten improperly, tainted by fraud, or not performing, BofA nevertheless chose to include these defective Mortgage Loans in the Securitizations and not to disclose these facts to investors like Prudential.

94.     As summarized below and seen further in the exhibits, Defendants operated at every level in the securitization chain:

95.     *Many of the Mortgage Loans came from the Defendants and their affiliates.*  Seven of the Securitizations (BAFC 2006-E, BOAA 2005-7, BOAA 2005-12, BOAA 2006-5, BOAMS 2004-E, BOAMS 2005-A and BOAMS 2005-B) were backed entirely by loans from Bank of America, N.A., which also served as the sponsor for those Securitizations.  Similarly, eight of the Securitizations (FFMER 2007-3, FFMER 2007-4, FFML 2004-FF1, FFML 2005-FF6, FFML 2005-FFH1, FFML 2006-FF18, FFML 2006-FFH1, and FFML 2007-FF1) were backed entirely by loans from First Franklin Financial Corp., which is a wholly owned subsidiary of defendant Merrill Lynch Mortgage Capital Inc.  First Franklin Financial Corp. also served as the sponsor for the FFMER 2007-3 and FFMER 2007-4 Securitizations.

96.     *The Sponsor Defendants* pooled the Mortgage Loans, many of which they had originated, and conveyed them to the depositors pursuant to Pooling and Servicing Agreements ("PSAs").  The PSAs included key representations made by the sponsors, that they knew and

intended would be passed on to securitization investors such as Prudential through the Offering Materials, for the investors to rely on in making their purchase decisions. The sponsors, along with the other Defendants, determined and approved the structure of the securitizations (such as the form the securitization would take, how the principal and interest would be allocated), determined and approved the manner in which the depositors and the trusts sold the related Certificates, controlled the disclosures made in connection with the related securitizations, and provided key data to the credit rating agencies. The sponsors had joint responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified prominently throughout the Offering Materials—including on the first page of the Prospectuses and Prospectus Supplements. The sponsors worked collectively with the depositors, underwriters, and trusts, as well as the corporate parents, to market and sell the Certificates, and profited from the sales.

97.     *The Depositor Defendants* were established as limited-purpose finance subsidiaries of BofA and Merrill. They had day-to-day control over the related trusts. Each was a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all rights and interests in such mortgage loans to the trustee for the benefit of the certificate-holders, and depositing the underlying mortgage loans into the issuing trusts. Each purchased mortgage loans from the sponsors, then sold, transferred, or otherwise conveyed the mortgage loans to a trust it had created to use as agents to hold the pooled loans for the benefit of certificate holders. Each depositor was the issuer of those Certificates within the meaning of Section 2(a)(4) of the Securities Act, and in accordance with Section 11(a) of the Securities Act, and filed the relevant registration statements with the SEC. Further, the depositor, as the issuer, is liable under the

Securities Act as a "seller" to those who purchased in the initial distribution, regardless of the form of underwriting used, pursuant to SEC Rule 159A. 17 C.F.R. § 230.159A. The depositors had joint responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified prominently throughout the Offering Materials they worked on (as identified in Exhibit A)—including on the first page of the Prospectuses and Prospectus Supplements. The depositors worked collectively with the sponsors, underwriters, and trusts, as well as their corporate parents, to market and sell the Certificates, and profited from the sales.

98.     *The Underwriter Defendants* used two methods to securitize mortgages for sale to investors. The originators would either (i) sell the loans to investment banks like BofA and Merrill, which would act as the sponsor and/or depositor and transfer the loans into a trust that would issue securities backed by the loans ("principal securitization"), or (ii) directly deposit the loans into a trust of its own creation that would issue securities backed by the loans, with an investment bank like BofA or Merrill acting as underwriter ("originator securitization"). 33 of the Offerings at issue were securitized through principal securitization, and the remainder were securitized through originator securitization. Even in originator securitizations, the investment bank is the key drafter of the offering materials and typically has final authority over many sections of the offering materials. The investment bank underwriter serves an essential role as a "buffer" between the originators and public investors.

99.     In both types of securitization, the underwriters served an essential role as a "buffer" between the originators and public investors. The collateral pool for each securitization usually includes thousands of loans. Instead of having each potential investor go through what would be an impractical, inordinately expensive, and time consuming task of reviewing thousands of loan files, the underwriters were generally responsible for gathering loan data from

the depositor, sponsor, seller, and originators, and then verifying and presenting to potential investors accurate and complete information about the loans that are deposited into the issuing trust.

100.     The underwriters also: (i) worked with the depositors and sponsors to structure the transactions; (ii) hired third party due diligence firms like Clayton and Bohan to review the mortgage loans; (iii) took the lead in coordinating the flow of documents and information among the rating agencies and parties to the transactions, including information about the loan characteristics and deal structure; (iv) purchased the mortgage-backed securities issued in the transactions on a firm commitment basis pursuant to written agreements with the depositor(s); and (v) offered and sold certificates to investors, such as Prudential.  The underwriters also made decisions on the volume of the securitizations to effectuate, and their executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed by their other affiliates.

101.     For some of the securitizations at issue in this Complaint, the underwriters acted as the securitization's underwriter but not the sponsor or depositor.  For those securitizations, the underwriters worked with the sponsors and depositors to issue RMBS, were involved in every aspect of mortgage securitization, and had access to a wealth of information.  The underwriters either knew that the representations they were making to Prudential were patently untrue, or they conducted due diligence so recklessly in light of obvious red flags that they failed to detect the falsity of their representations.

102.     The United States Senate Permanent Subcommittee on Investigations ("SPSI"), in its April 2011 report, "Wall Street and the Financial Crisis:  Anatomy of a Financial Collapse"

32

(the "SPSI Report"), explained the active role played by underwriters, and their obligations to tell the truth:

> When securities are offered to the public for sale, they are typically underwritten by one or more investment banks, each of which is a broker-dealer registered with the Financial Industry Regulatory Authority (FINRA). An underwriter is typically hired by the issuer of the new securities to help the issuer register the securities with the SEC and conduct a public offering of the securities. The underwriter typically purchases the securities from the issuer, holds them on its books, conducts the public offering, and bears the financial risk until the securities are sold to the public.

103. The SPSI report concludes that underwriters "have greater disclosure obligations than [mere brokers], because in this role they are actively soliciting customers to buy new securities they have helped an issuer bring to market." The report explains the underwriters' important role in conveying information to investors such as Prudential:

> Whether acting as an underwriter or placement agent, a major part of the investment bank's responsibility is to solicit customers to buy the new securities being offered. Under the securities laws, an issuer selling new securities to potential investors has an affirmative duty to disclose material information that a reasonable investor would want to know. In addition, under securities law, a broker-dealer acting as an underwriter or placement agent is liable for any material misrepresentation or omission of material fact made in connection with a solicitation or sale of securities to an investor.

104. The FCIC report underscores the Underwriters' responsibility to make accurate disclosures to investors such as Prudential:

> Unlike when a broker-dealer is acting as a market maker, a broker-dealer acting as an underwriter or placement agent has an obligation to disclose material information to every investor it solicits . . . . This duty arises from two sources: the duties of an underwriter specifically, and the duties of a broker-dealer generally, when making an investment recommendation to a customer.

105. As noted in the report, the First Circuit has observed that "[T]he relationship between the underwriter and its customer implicitly involves a favorable recommendation of the issued security . . . . Although the underwriter cannot be a guarantor of the soundness of any

issue, he may not give it his implied stamp of approval without having a reasonable basis for concluding that the issue is sound." *SEC v. Tambone*, 550 F.3d 106, 135 (1st Cir. 2008).

106.    The FCIC report notes that with respect to a broker-dealer, the SEC has held: "[W]hen a securities dealer recommends a stock to a customer, it is not only obligated to avoid affirmative misstatements, but also must disclose material adverse facts to which it is aware. That includes disclosure of 'adverse interests' such as 'economic self interest' that could have influenced its recommendation." *In the Matter of Richmark Cap. Corp.*, Securities Exchange Act Rel. No. 48757 (Nov. 7, 2003) (citing *Chasins v. Smith Barney & Co., Inc.,* 438 F.3d 1167, 1172 (2d Cir. 1970)). The SEC has also stated that, if a broker intends to sell a security from its own inventory and recommends it to a customer, "the broker dealer must disclose all material facts." SEC Study on Investment Advisers and Broker-Dealers at 56 n.252.

107.    All of the foregoing obligations and duties rested on all members of the underwriting syndicate, whether or not they were the lead underwriter on a particular deal.

108.    As a additional measure of assurance that the underwriters purported to stand behind the representations in the Offering Materials, the underwriters' name and/or business logo and marks are featured prominently throughout the Offering Materials, including on the cover page of the Prospectus and Prospectus Supplements where the marks are set off from the rest of the text in capital letters. The underwriters endorsed the reliability of the loan level information in the Offering Materials knowing that investors would rely on this "stamp of approval" in making a decision to purchase the Certificates. Investors like Prudential have only come to learn recently that this "stamp of approval" was knowingly false when made.

109.    Investors like Prudential were urged to read and rely on this false information. In many of the terms sheets, computational materials and Free Writing

Prospectuses, the underwriters told investors that "before you invest, you should read the prospectus in [the] registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering."

110.    By urging investors to review and rely upon the Prospectus and Prospectus Supplement, the underwriters sought to reinforce among investors the belief that the Prospectus and Prospectus Supplements would be the product of the underwriter's own due diligence and contain reliable information upon which to base their investment decisions. Those same documents, like the term sheets, computational materials and free writing prospectuses, continued to assure investors that the underwriters had conducted due diligence on the loan level information. By prominently placing their names on Prospectus Supplements and providing them to investors, the Defendant underwriters endorsed statements about the conduct of the sponsor, sellers, depositors, and originators and verified the loan information contained therein. Similar representations in the Offering Materials for each of the Securitizations.

111.    *BofA and Merrill also serviced the Mortgage Loans.* The Pooling and Servicing Agreements also established Defendants or their affiliates as Servicer of the Mortgage Loans underlying many of the Securitizations. As Servicers, Defendants were responsible for collecting homeowners' payments on the Mortgage Loans and remitting these payments to the RMBS Trusts after deducting a monthly servicing fee.

112.    This vertical integration and the warehouse-lending arrangements between originators and issuers heightened the already perverse incentives created by the "originate to distribute" model. The originator, secure with a pipeline to the market, gained even more incentive to loosen its lending practices. Those responsible for the securitization, like Merrill and BofA, focused on volume, and pushed the originators to loosen guidelines even more. And

once the loans were issued, Defendants had significant incentives to ignore problem loans because rejecting a loan would saddle an affiliated company (or, in the case of a warehouse borrower, a creditor) with a toxic loan *and* diminish the size of the security to be sold to investors (and thus, Defendants' fees).

113.    Both Merrill and BofA thus controlled and/or facilitated all aspects of originating, servicing, acquiring, and pooling the mortgage loans, as well as subsequently creating the securities and marketing and selling the Certificates at issue.  Defendants and their affiliates thus had actual knowledge of, or, at a minimum, were reckless as to the truth or falsity about, every aspect of the securitization process, from loan origination through sale to Prudential.

### E.    Additional Information on the Role of the Underwriters

..

### SUBSTANTIVE ALLEGATIONS

### I.    DEFENDANTS' FALSE STATEMENTS OF MATERIAL FACT AND MATERIAL OMISSIONS

114.    Below is just a sample of the misrepresentations Defendants made.  The Offering Materials all contain substantially similar, or identical, statements of material fact.  Additional example misrepresentations for each Certificate are detailed in the Exhibits.  In addition to the affirmative misrepresentations discussed herein, Defendants' Offering Materials were replete with fraudulent omissions relating to the same topics.  For instance, it is misleading to provide statistical information about the loan pool without simultaneously disclosing that there had been a systemic abandonment of the underwriting standards, that loans were knowingly given based on falsified information, and that the statistical descriptors themselves were baseless.

## A.    Defendants' Misrepresentations Regarding Compliance with the Stated Underwriting Guidelines

115.    The underwriting process used to originate the pools of mortgage loans underlying the Certificates was a critical factor in Prudential's decision to purchase securities. The underwriting process is designed to ensure loan quality; loan quality in turn determines the risk of the certificates backed by those loans. If the stated guidelines are not actually followed, then the underlying loans will be of lesser quality than represented, increasing the probability of defaults by borrowers and shortfalls in principal and interest payments to investors.

116.    Defendants' representations regarding their own and the Originators' underwriting practices were false and misleading. The Mortgage Loans underlying Prudential's Certificates did not, in fact, comply with the underwriting standards described in the Offering Materials, because those standards were systematically abandoned. Loans were offered with virtually no regard for borrowers' actual repayment ability or for the value and adequacy of mortgaged property that was used as collateral. This is confirmed by Prudential's loan-level analysis of the specific Mortgage Loans at issue here, documents and testimony regarding the practices of the key lenders at issue (including Defendants and their affiliates), and other facts set forth below.

### 1.    Defendants' misrepresentations regarding underwriting standards

117.    The Offering Materials for the Securitizations all confirm that the Mortgage Loans would be generated in accordance with the described set of underwriting guidelines. The Offering Materials for MLMI 2006-WMC1, for example, represented that "[a]ll of the Mortgage Loans were underwritten in accordance with the Underwriting Guidelines of WMC Mortgage Corp." which "are primarily intended to (a) determine that the borrower has the ability to repay the in accordance with its terms and (b) determine that the related mortgaged property will

provide sufficient value to recover the investment if the borrower defaults." MLMI 2006-WMC1 Prospectus Supplement dated February 10, 2006, at S-32.

118.     Similarly, the Offering Materials for BOAA 2005-7 represented that "[e]ach mortgage loan underwritten by Bank of America under its general underwriting standards is underwritten in accordance with guidelines established in the Bank of America's *Product and Policy Guides*," and "[t]hese underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing and assets available for downpayment, closing costs and cash reserves." The Offering Materials for BOAA 2005-7 further provide that "[a]dditionally, guidelines are established regarding the adequacy of the property as collateral for the loan requested." BOAA 2005-7 Prospectus dated May 24, 2005, at 24-25.

119.     Then, after representing that Defendants had (i) investigated and were aware of the practices of the loan originators and (ii) verified that the specific loans in the loan pools were, *in fact*, originated in accordance with the designated underwriting guidelines, Defendants further represented that any "exceptions" to those underwriting standards were made *only* on a case-by-case basis only when the borrower was able to demonstrate the existence of "compensating factors" that increased the quality of the loan application.

120.     For example, the Offering Materials for MLMI 06-HE2 represented: "*On a case-by-case basis*, First Horizon may determine that an applicant warrants a debt-to-income ratio exception, a pricing exception, a LTV exception, a credit score exception or an exception from certain requirements of a particular credit category." MLMI 06-HE2 Prospectus Supplement dated April 5, 2006 at S-42 (emphasis added). And the Offering Materials for ABFC 04-HE1 represented: "*On a case by case basis*, Fremont may determine that, *based upon*

*compensating factors*, a prospective mortgagor not strictly qualifying under the underwriting

risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an

underwriting exception." ABFC 04-HE1 Prospectus Supplement dated August 24, 2004, at S-49

(emphasis added).

### 2.    Defendants' omissions regarding due diligence results

121.    Defendants represented that, consistent with industry practice, they performed

extensive due diligence with respect to the loans that they were acquiring and securitizing.  For

example, Merrill specifically represented that, before acquiring *any* residential mortgage loans, it

conducted a review of the lender's operations:

> Prior to acquiring *any residential mortgage loans*, [Merrill Lynch Mortgage
> Lending, Inc.] conducts a review of the related mortgage loan seller that is based
> upon the credit quality of the selling institution . . .; [This] review process may
> include reviewing select financial information for credit and risk assessment and
> conducting an underwriting guideline review, senior level management discussion
> and/or background checks.
>
> . . .
>
> The underwriting guideline review entails a review of the mortgage loan
> origination processes and systems.  In addition, such review may involve a
> consideration of corporate policy and procedures relating to state and federal
> predatory lending, origination practices by jurisdiction, historical loan level loss
> experience, quality control practices, significant litigation and/or material
> investors.

SURF 2006-BC2 Prospectus Supplement dated March 28, 2006, at S-42.

122.    Similarly, for the BofA Offerings where a third-party originated the Loans,

BofA, like Merrill, represented that it conducted due diligence on those originators and their

practices.  For example, BofA represented that:

> In addition, in order to be eligible to sell mortgage loans to such Seller pursuant to
> a delegated underwriting arrangement, the originator must meet certain
> requirements including, among other things, certain quality, operational and
> financial guidelines.

BOAA 05-12 Prospectus dated November 22, 2005, at 23.

123.    Defendants' representations were understood reasonably by investors, including Prudential, to mean that Defendants had taken appropriate measures to ensure that non-compliant loans would not be included in the mortgage pools. Just the opposite was true. Defendants concealed that: (1) they were manipulating their review processes not to ensure quality, but to gain market share through increased volume, whether or not the loans met underwriting standards; (2) Defendants were informed by their quality review process that a substantial percentage of loans were defective, but Defendants "waived" the defects on a substantial percentage of these loans; (3) rather than excluding defective loans, Defendants kept these loans in the Securitizations but used the knowledge force a lower sales price, leaving themselves a larger profit margin in the Securitizations; and (4) Defendants improperly failed to adjust their review practices when their due diligence identified a high number of non-conforming loans being issued by originators.

## B.      Defendants' Misrepresentations Regarding Owner-Occupancy Rates

124.    Homeowners who reside in mortgaged properties pose less risk of default than owners of investment properties or vacation homes. Therefore, owner-occupancy statistics were material to Prudential because high owner-occupancy rates would make the Certificates safer investments than certificates backed by second homes or investment properties.

125.    The Offering Materials made very specific representations about the owner-occupancy levels in the loan pools, with those representations intended to indicate that a relatively high number of loans were tied to owner-occupied properties. For example, the Offering Materials for BOAA 2005-7 represented that 100% of the Mortgage Loans were owner-occupied. BOAA 2005-7 Prospectus Supplement July 26, 2005, at S-37. These representations were false and misleading. In truth, a much lower percentage of the loans were owner-occupied.

40

For instance, the true rate of occupancy for the Mortgage Loans in BOAA 2005-7 was only 84.92%, an overstatement of *over 15%*. The falsity of the Offering Materials' representations as to the Certificates is confirmed by Prudential's loan-level analysis of the Mortgage Loans at issue, and other facts set forth below.

### C.    Defendants' Misrepresentations Regarding the Appraisal Process

126.    Defendants represented that the properties being mortgaged would be subject to particular appraisal practices. Such representations are material, because the reliability of the process used to value the property bears directly on the reliability of the valuation itself.

127.    For example, the Offering Materials for SURF 2006-BC represented:

> Properties securing the mortgage loans are appraised by qualified independent appraisers. The appraiser inspects and appraises the subject property and verifies that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that presents a concise picture of the neighborhood, the property site and the improvements to the property to support an appraised value that adequately supports the estimate of market value.

SURF 2006-BC2 Pro. Supp. at S-39. The Offering Materials further represented:

> The SURF Underwriting Guidelines require a review of the appraisal by a loan underwriter, who may request additional diligence. This increased diligence may include additional comparables, a field review or a second full appraisal of the property.

*Id.*

128.    By way of another example, the Offering Materials for BOAA 2005-7 represented that "generally an an independent appraisal is made of each mortgaged property considered for financing," an evaluation "based on the appraiser's estimate of value, giving appropriate weight to both the market value of comparable housing, as well as the cost of replacing the mortgaged property." BOAA 2005-7, Prospectus at 25.

129.    Defendants knew that the appraisals underlying the Mortgage Loans did not follow the processes disclosed in the Offering Materials. Instead, the appraisals were designed

merely to generate a value high enough to justify loan approval. This is confirmed by a loan-level analysis of the specific Mortgage Loans at issue here, and other facts set forth below.

**D.**     **Defendants' Misrepresentations Regarding LTV Ratios and CLTV Ratios**

130.     An LTV ratio is the ratio of the original principal balance of the mortgage loan to the appraised value of the mortgaged property. The related CLTV ratio takes into account other liens on the property (such as "second" mortgage and home equity loans). These ratios were material to Prudential and other investors because higher ratios are correlated with a higher risk of default. A borrower with a small equity position in a property has less to lose if he or she defaults on the loan. There is also a greater likelihood a foreclosure will result in a loss for the lender if the borrower fully leverages the property. Analysts and investors commonly use these metrics to evaluate the price and risk of RMBS.

131.     The Offering Materials contain detailed statistics regarding these ratios for the Mortgage Loans in the collateral pool. Loans with over 100% LTV afford the lender no equity cushion and leave the lender with inadequate collateral from the outset of the loan. Defendants represented that only four of the Securitizations—BOAA 2005-7, BOAA 2005-12, FFML 2005-FFH1 and FFML 2006-FFH1—contained *any* underwater Mortgage Loans, and that in those Securitizations, only 3.20%, 1.50%, 1.96% and 1.70% of the Mortgage Loans, respectively, were underwater. These representations were false and misleading. In truth, for *each* of the Securitizations, a large number of Mortgage Loans were underwater. For instance, in each of the FFML 2005-FFH1, FFML 2006-FFH1, MLMI 2006-MLN1, MLMI 2007-HE3 Securitizations, *over 60%* of the loans in the collateral pools were in fact underwater.

132.     Defendants, as well as the Originators and appraisers, knew that the appraisals being used were inflated. They thus also knew the LTV and CLTV ratio statistics—derived from and dependent on the (baseless) appraisal values—were false and misleading because they did

not reasonably relate to the true value of the underlying properties. The CLTV ratios also omitted the effect of additional liens on the underlying properties, rendering them even further from the truth. That the LTV and CLTV statistics were false and misleading is confirmed by a loan-level analysis of the specific Mortgage Loans at issue here, and other facts set forth below.

**E.** **Defendants' Misrepresentations Regarding Assignment to the Trusts**

133.    A fundamental step in the mortgage securitization process is the transfer of title to the mortgage loans that collateralize each securitization. Title is transferred from the loan originator, to the depositor, and then to the issuing trust for the securitization. This transfer is necessary for the trust to be entitled to enforce the mortgage loans if a borrower defaults. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

134.    Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process—a promissory note and a security instrument (either a mortgage or a deed of trust). Generally, state laws and the Pooling and Servicing Agreements ("PSAs"), which are contracts that govern the administration of RMBS trusts, require the promissory note and security instrument to be transferred by endorsement, in the same way that a check can be transferred by endorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

135.    Defendants represented that they would properly transfer title to the Mortgage Loans to each Trust. For example, in the PSA for BOAA 2005-7, Defendants represented that "concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee on behalf of the Trust for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the

43

Mortgage Loans, including all interest and principal received on or with respect to the Mortgage Loans." BOAA 2005-7 PSA, July 28, 2005, at § 2.01(a). The Offering Materials and/or PSAs for each of the Securitizations at issue here had the same or similar representations.

136. Defendants made detailed representations about the documents that would be transferred to the Trustees in connection with the transfer and assignment of the Mortgage Loans. For exmaple, in the FFMER 2007-4 Offering Materials, Defendants stated:

> As to each Mortgage Loan, the following documents are generally required to be delivered to the Trustee (or its custodian) in accordance with the Pooling and Servicing Agreement: (1) the related original Mortgage Note endorsed without recourse to the Trustee or in blank, (2) the original Mortgage with evidence of recording indicated (or, if the original recorded Mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such Mortgage sent for recording), (3) an original assignment of the Mortgage to the Trustee or in blank in recordable form (except as described below), (4) the policies of title insurance issued with respect to each Mortgage Loan, and (5) the originals of any assumption, modification, extension or guaranty agreements..

FFMER 2007-4 Prospectus Supplement, June 25, 2007, at S-79, 80. The Offering Materials and/or PSAs for most of the securitizations at issue here had the same or similar representations.

137. PSAs generally require the transfers of mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust is properly formed. For example, the PSA for ABFC 2005-HE1 represented that Defendants would transfer the Mortgage Loans and deliver the Mortgage Loan files to the trustee "[c]oncurrently with the execution and delivery hereof." ABFC 2005-HE1 Purchase and Servicing Agreement, August 1, 2004, at § 2.01. The PSAs and/or Offering Materials for each of the securitizations at issue here had the same or similar representations.

138. Applicable state trust law generally requires strict compliance with the trust documents, including the PSA, and failure to comply strictly with the timeliness, endorsement,

physical delivery and other requirements of the PSA with respect to the transfers of notes and mortgages results in void transfers and lack of good title.

139.     In the Offering Materials and PSAs, Defendants also represented that each Mortgage Loan represented a valid lien such that the Trust could foreclose upon the mortgage in the event of a borrower's default.  For example, the Offering Materials for ABFC 2004-HE1 represented that "[w]ith respect to each Mortgage Loan, the Mortgage is a valid, subsisting enforceable and perfected first or second lien and first priority security interest on the Mortgaged Property."  ABFC 2004-HE1 PSA, August 1, 2004, at § 3.01(p).  The PSAs and/or Offering Materials for each of the Securitizations at issue here had the same or similar representations.

140.     The Offering Materials noted that, in some cases, the depositor may record mortgages "in the name of Mortgage Electronic Registration Systems, Inc. ('MERS')" rather than assigning them directly to the trustee.  BOAA 2006-5 Prospectus, May 23, 2006, at 83. Nonetheless, Defendants assured investors that the transfer of mortgages through the MERS system was sufficient to ensure that the Mortgage Loans could be foreclosed upon in the event of a borrower's default.  For example, the BOAA 2006-5 Prospectus Supplement states that, "[i]f a Mortgage has been recorded in the name of MERS or its designee . . . the Servicer will be required to take all actions as are necessary to cause the Trust to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS."  *Id.*  The Offering Materials for many of the Securitizations had the same or similar representation.

141.     Defendants knew that the assignments of title of the underlying the Mortgage Loans would not and did not follow the process disclosed in the Offering Materials.  Many of the titles were never assigned to either the Trusts nor to MERS—and many of those that have been

nominally so assigned are defective, given the title chain is missing key intervening assignments. Given the ownership of title is a fundamental part of the securitization process, this was a material omission. But it also rendered affirmatively false many of Defendants' representations above. For instance, the assignments were often incomplete and did not result in the Trusts possessing "all the right, title and interest of the Depositor in and to" the Mortgage Loans." FFML 2005-FFH1 Pooling and Servicing Agreement, May 1, 2005, at § 2.01. This is confirmed by a loan-level analysis of the specific Mortgage Loans at issue here and other facts, as set forth below.

**F.**     **Defendants Representations Regarding Credit Ratings were False and Misleading**

142.     Credit ratings are assigned to RMBS tranches by the credit rating agencies. Each credit rating agency uses its own scale with letter designations to designate various levels of risk. In general, AAA ratings (or Aaa rating from Fitch) are at the top of the credit rating scale and are intended to designate the safest investments.

143.     Credit ratings have been one tool among many for investors, including Prudential, to gauge risk. Almost every residential mortgage-backed security transaction requires, as a condition to the issuance of the securities, that the offered securities be rated in one of the four highest rating categories. Credit ratings were a material factor to Prudential because (1) they were necessary for its regulatory reserve requirements and (2) they provided greater comfort that Prudential would receive the expected interest and principal payments.

144.     The Offering Materials represented that ratings agencies supplied these ratings based upon an assessment of the likelihood of delinquencies and defaults in the underlying mortgage pools. For example:

> S&P's ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of payments required under the operative agreements

[and] take into consideration the credit quality of the mortgage pool including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments required under the certificates.

MLMI 2005-WMC1 Pro Supp, at S-108.

145.    Similarly:

Ratings on mortgage pass-through securities address the likelihood of receipt by Securityholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with such securities, the nature of the underlying assets and the credit quality of the guarantor, if any.

ABFC 04-HE1 Prospectus dated August 10, 2004, at 119.

146.    Each Certificate did in fact receive a rating, which is set forth further below.

147.    These representations were false and misleading, and Defendants knew it. Defendants fed the rating agencies the same false data regarding underwriting guidelines, debt-to-income ratios, loan-to-value ratios, owner-occupancy status, and home values that they provided in the Offering Materials. The rating agencies then input this false data into their models to determine the ratings on the Securitizations. As a result, Defendants pre-determined the ratings by feeding bad data into the ratings system. This not only rendered false and misleading Defendants' representations that the ratings process would address the credit risk of these Certificates, but also assured that the ratings themselves in no way reflected the actual risk underlying the Certificates. Defendants knew the ratings did not reasonably relate to the Certificates delivered to Prudential, and fraudulently omitted that the ratings process was being rigged with false data.

## II. EVIDENCE THAT DEFENDANTS REPRESENTATIONS WERE FALSE AND MISLEADING

### A. An Analysis of the Mortgage Loans and Certificates Directly at Issue

148.     Although Prudential still does not have access to the loan files for the Mortgage Loans, Prudential was recently able to test Defendants' representations regarding the Certificates. Using methodologies that were previously unavailable, Prudential examined 20,906 of the underlying Mortgage Loans, across 29 of the Offerings.

149.     For each Offering tested, Prudential attempted to analyze 400 defaulted loans and 400 randomly sampled loans. This sample size is more than sufficient to provide statistically significant data to demonstrate the degree of Countrywide's misrepresentations.

150.     Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, scholars, and private businesses. As the size of a sample increases, the reliability of its estimations of the total population's characteristics increases as well. Experts in RMBS cases have found a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely so large a sample would yield results vastly different from results for the entire population.

151.     It was not industry practice for investors to do an independent loan-level assessment of the accuracy of the representations made in the Offering Materials—Prudential reasonably relied upon Defendants to represent the Mortgage Loans correctly in the Offering Materials. Indeed, although the methodologies that enable investors like Prudential to perform these analyses on the large volume of data—without even having been told at the time of the Offering Materials the property addresses at issue—were not available until recently (*see* Section V.A), these tests draw from data largely contemporaneous with the transactions at issue. Thus,

though Prudential could not have run these tests at the time of its purchases (or any other time until within the last few years), the results are thus evidence that then-existing facts were misrepresented. Even though this recently available technique draws on contemporaneous information, and provides a robust test of Defendants' representations for pleading purposes, it still does not contain the level of information that was uniquely in Defendants' control, such as the loan files. Prudential still does not have access to those files.

152. Prudential's loan-level analysis shows that many of Defendants' statistical representations were false and misleading as to the specific Mortgage Loans at issue here. The consistency and size of these misrepresentations also confirms that the abandonment of sound underwriting practices was systemic, and that these specific Certificates were infected by the originators' systemic underwriting problems. Loans actually put through the underwriting processes stated in the Offering Materials would not so consistently emerge on the other end mis-described.

153. The facts alleged in this Complaint show Defendants' problems were systemic, and such is confirmed by the consistency of the results set forth below—the results of reviewing 20,906 Mortgage Loans across 30 Offerings. The Offerings on which Prudential did not run these tests involved many of the same affiliated parties, nearly identical disclosures, and both the underlying loans and the Certificates themselves were being generated around the same time and purportedly according to the same processes.

154. For example, the CBASS 2004-CB2, CBASS 2004-CB8, and CBASS-2005CB6 Offerings all included MLMI as the depositor and Merrill Lynch, Pierce, Fenner & Smith Inc. as underwriter, as did 17 of the Offerings that Prudential tested. Also, a substantial portion of the loans underlying CBASS 2004-CB8 and CBASS 2005-CB6 were originated by WMC Mortgage

Corp. and First NLC Financial Services, Inc., respectively, which were also key originators in many of the Offerings that Prudential tested. Similarly, the loans underlying the OOMLT 2004-1, OOMLT 2005-3, OOMLT 2005-4, OOMLT 2005-5, OOMLT 2006-2, and OOMLT 2007-5 Offerings were all originated by Option One Mortgage Corp., which also originated all or a substantial portion of the loans underlying the ABFC 2006-OPT1 and ABFC 2005-HE1 Offerings that Prudential tested. As such, on information and belief, the Offering Materials for the untested Offerings also misrepresented the owner-occupancy, LTV, CLTV, and title-transfer information at approximately the same, material rate as seen in the large sample of Certificates and Mortgage Loans discussed below.

## 1.  A forensic analysis of the mortgaged properties' true occupancy status revealed a systemic misrepresentation problem

155.    Prudential's loan-level analysis of the Mortgage Loans at issue here shows the owner-occupancy statistics Defendants provided to investors were false. Across every Offering, Defendants significantly overstated the number of owner-occupied properties, thus *understating* the true riskiness of the loans.

156.    To determine whether a borrower actually occupied the property as claimed, Prudential investigated tax information for the sampled loans. One would expect a borrower residing at a property to have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property. A borrower sending tax records to another address is evidence that the borrower is not actually residing at the mortgaged property. A borrower declining to make certain tax exemption elections that depend on living at the property is also strong evidence the borrower is living elsewhere.

157.    A review of credit records was also conducted. People generally have bills sent to their primary address. If a borrower had creditors send bills to another address, even six

months after buying the property, such conduct is good evidence the borrower was living elsewhere.

158.    Prudential also conducted a review of property records.  It is less likely a borrower lives in any one property if that borrower owns multiple properties.  It is even less likely the borrower resides at the mortgaged property if a concurrently owned, separate property did not have its own tax bills sent to the property included in the mortgage pool.

159.    A review of other lien records was also conducted.  A property being subject to additional liens, but those materials being sent elsewhere, is good evidence a borrower is not living at the mortgaged property.  If the other lien involved a conflicting declaration of residency, that, too, would be good evidence a borrower is not living in the subject property.

160.    Failing more than one of the above tests is strong evidence the borrower did not in fact reside at the mortgaged properties.  The results of Prudential's loan-level analysis are set forth below, which compares the percentage of Mortgage Loans for owner-occupied properties as represented in the Defendants' Offering Materials, with the actual percentage of loans for owner-occupied properties for each Trust.  Defendants overstated these percentages in the Offering Materials for all of the Offerings that Prudential tested:

| Trust | Tranche | Loan Pool | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Overstatement of Owner-Occupied Properties |
|-------|---------|-----------|------------------|------------------|------------------|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 84.87% | 73.62% | 11.26% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 90.00% | 77.52% | 12.49% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 92.11% | 84.18% | 7.93% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 95.41% | 84.92% | 10.49% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 92.39% | 83.24% | 9.15% |
| BAFC 2006-E | 2A3 | Group 2 | 87.07% | 72.79% | 14.29% |
| BOAA 2005-7 | 3CB1 | Group 3 | 100.00% | 84.92% | 15.08% |
| BOAA 2005-12 | 3CB1 | Group 3 | 89.17% | 76.54% | 12.63% |
| BOAA 2006-5 | 3A1 | Group 3 | 36.65% | 29.17% | 7.48% |
| BOAMS 2004-E | 2A6 | Group 2 | 93.55% | 79.02% | 14.54% |
| BOAMS 2005-A | 2A1 | Group 2 | 90.84% | 78.97% | 11.87% |

| Trust | Tranche | Loan Pool | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Overstatement of Owner-Occupied Properties |
|---|---|---|---|---|---|
| BOAMS 2005-B | 2A1 | Group 2 | 89.12% | 77.14% | 11.98% |
| FFMER 2007-3 | A2C | Group 2 | 96.13% | 85.85% | 10.28% |
| FFMER 2007-4 | 2A2 | Group 2 | 94.68% | 83.25% | 11.43% |
| FFML 2004-FF1 | M1 | Aggregate | 95.67% | 85.09% | 10.57% |
| FFML 2005-FF6 | M2 | Aggregate | 96.35% | 86.60% | 9.75% |
| FFML 2005-FFH1 | M2 | Aggregate | 98.91% | 87.84% | 11.07% |
| FFML 2006-FF18 | A2C | Group 2 | 95.04% | 84.90% | 10.15% |
| FFML 2006-FFH1 | A4, M2, M3, M4 | Aggregate | 99.34% | 87.23% | 12.11% |
| FFML 2007-FF1 | A2C | Group 2 | 96.13% | 87.14% | 8.99% |
| MLMI 2004-WMC3 | M2 | Aggregate | 94.22% | 82.65% | 11.58% |
| MLMI 2005-WMC1 | M1, M2 | Aggregate | 94.33% | 81.15% | 13.17% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 90.92% | 79.75% | 11.17% |
| MLMI 2006-MLN1 | A2C | Group 2 | 90.48% | 78.47% | 12.01% |
| MLMI 2006-WMC1 | A1B | Group 1 | 95.74% | 84.24% | 11.50% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 92.11% | 84.66% | 7.46% |
| SURF 2005-BC4 | M1 | Aggregate | 98.10% | 87.45% | 10.65% |
| SURF 2006-BC1 | A2C | Group 2 | 98.70% | 88.73% | 9.97% |
| SURF 2006-BC2 | A2B, A2D | Group 2 | 97.36% | 84.33% | 13.02% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 95.76% | 84.45% | 11.31% |

161.    The consistency of these results shows that the divergence between Defendants'

representations and reality was not due to phenomena such as borrowers changing their mind

about where to live.  Instead, these results reflect the fact that Defendants and their Originators

knew borrowers were misrepresenting their intent to live at the property.  Defendants and their

Originators allowed the falsification of these statistics in order to maneuver the loans through the

approval and securitization process.  They knew, but fraudulently omitted to disclose, that the

statistics were baseless.

**2.    A forensic analysis of the Mortgage Loans' true LTV and CLTV
ratios revealed a systemic misrepresentation problem**

162.    Prudential also had a sample of the Mortgage Loans valued by an industry-

standard automated valuation model ("AVM").  AVMs are routinely used in the industry as a

way of valuing properties during prequalification, origination, portfolio review, and servicing. AVM use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.

163. AVMs employ data similar to what appraisers use—primarily, county assessor records, tax rolls, and data on comparable properties. AVMs produce independent, statistically derived valuation estimates by applying modeling techniques to this data. The AVM Prudential used incorporates a database of 500 million mortgage transactions covering zip codes representing more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

164. The results of this analysis are set forth in the Exhibits. Applying the AVM to the available data for the loans underlying these Certificates shows the appraisal values used by Defendants were materially and consistently inflated. This caused the disclosed ratios to be lower than they really were, i.e., Defendants represented that borrowers had more of an equity "cushion" than really existed, and that prospects for recovery of funds upon a foreclosure were much greater than accurate data supported.

165. In certain of the Offerings, Defendants provided information regarding the Mortgage Loans' LTV ratios (that is, the ratios not taking into account any second liens). Specifically, Defendants made representations about the percent of loans that had LTV ratios above 80%. LTV ratios in excess of 80% provide the lender little value cushion to protect against borrower default and loss upon foreclosure. Consequently, an accurate disclosure is important to investors in assessing the security's riskiness. But a much greater percentage than what Defendants represented actually had LTVs higher than 80%. For example:

53

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 80% | Actual Percentage of Loans With LTVs of Greater Than 80% | Understatement of Percentage of Loans With LTVs of Greater Than 80%[2] |
|-------|---------|-----------|------|------|------|
| BAFC 2004-2 | 1B1 | Group 1 | 12.25% | 22.68% | 10.43% |
| BAFC 2006-E | 2A3 | Group 2 | 1.53% | 56.01% | 54.48% |
| BOAA 2005-7 | 3CB1 | Group 3 | 13.01% | 59.12% | 46.11% |
| BOAA 2005-12 | 3CB1 | Group 3 | 6.62% | 50.42% | 43.80% |
| BOAA 2006-5 | 3A1 | Group 3 | 4.35% | 19.30% | 14.95% |
| BOAMS 2004-E | 2A6 | Group 2 | 1.61% | 32.46% | 30.85% |
| BOAMS 2005-A | 2A1 | Group 2 | 1.86% | 53.85% | 51.99% |
| BOAMS 2005-B | 2A1 | Group 2 | 2.67% | 48.60% | 45.93% |
| FFMER 2007-3 | A2C | Group 2 | 44.90% | 82.17% | 37.27% |
| FFMER 2007-4 | 2A2 | Group 2 | 53.28% | 80.49% | 27.21% |
| FFML 2004-FF1 | M1 | Aggregate | 47.52% | 68.99% | 21.47% |
| FFML 2005-FF6 | M2 | Aggregate | 46.69% | 72.36% | 25.67% |
| FFML 2006-FF18 | A2C | Group 2 | 35.84% | 74.81% | 38.97% |
| FFML 2007-FF1 | A2C | Group 2 | 31.05% | 73.09% | 42.04% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 48.06% | 60.91% | 12.85% |
| MLMI 2006-MLN1 | A2C | Group 2 | 22.49% | 74.35% | 51.86% |
| MLMI 2006-WMC1 | A1B | Group 1 | 40.39% | 64.01% | 23.62% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 51.25% | 73.01% | 21.76% |
| SURF 2005-BC4 | M1 | Aggregate | 51.01% | 65.32% | 14.31% |
| SURF 2006-BC1 | A2C | Group 2 | 45.12% | 56.88% | 11.76% |
| SURF 2006-BC2 | A2B, A2D | Group 2 | 50.52% | 60.67% | 10.15% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 53.77% | 61.31% | 7.54% |

166.    The Offering Materials also misrepresented the number of the Mortgage Loans in the subject loan pools had LTV ratios greater than 90%. LTV ratios in excess of 90% provide the lender even less cushion to protect against borrower default and loss upon foreclosure. For example:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 90% | Actual Percentage of Loans With LTVs of Greater Than 90% | Understatement of Percentage of Loans With LTVs of Greater Than 90% |
|-------|---------|-----------|------|------|------|
| BAFC 2004-2 | 1B1 | Group 1 | 0.00% | 12.37% | 12.37% |
| BAFC 2006-E | 2A3 | Group 2 | 0.17% | 26.27% | 26.10% |
| BOAA 2005-7 | 3CB1 | Group 3 | 6.18% | 28.18% | 22.00% |

---

[2] While the AVM does not indicate a misrepresentation of this particular measure for certain Certificates, it does indicate a misrepresentation with respect to other measures—such as the amount of underwater loans and weighted average LTV, as indicated below.

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs Greater Than 90% | Actual Percentage of Loans With LTVs of Greater Than 90% | Understatement of Percentage of Loans With LTVs of Greater Than 90% |
|---|---|---|---|---|---|
| BOAA 2005-12 | 3CB1 | Group 3 | 3.46% | 25.21% | 21.75% |
| BOAA 2006-5 | 3A1 | Group 3 | 0.62% | 5.26% | 4.64% |
| BOAMS 2004-E | 2A6 | Group 2 | 0.63% | 13.37% | 12.74% |
| BOAMS 2005-A | 2A1 | Group 2 | 0.27% | 26.74% | 26.47% |
| BOAMS 2005-B | 2A1 | Group 2 | 0.41% | 23.46% | 23.05% |
| FFMER 2007-3 | A2C | Group 2 | 26.73% | 52.53% | 25.80% |
| FFMER 2007-4 | 2A2 | Group 2 | 26.67% | 57.04% | 30.37% |
| FFML 2004-FF1 | M1 | Aggregate | 23.36% | 40.58% | 17.22% |
| FFML 2005-FF6 | M2 | Aggregate | 20.37% | 41.12% | 20.75% |
| FFML 2006-FF18 | A2C | Group 2 | 24.58% | 41.31% | 16.73% |
| FFML 2007-FF1 | A2C | Group 2 | 20.51% | 37.22% | 16.71% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 26.56% | 32.30% | 5.74% |
| MLMI 2006-MLN1 | A2C | Group 2 | 18.59% | 38.37% | 19.78% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 29.37% | 54.87% | 25.50% |
| SURF 2006-BC2 | A2B, A2D | Group 2 | 30.55% | 35.56% | 5.01% |

167.    The Offering Materials also made representations about how many of the

Mortgage Loans were "underwater," i.e., with LTV ratios greater than 100%. Loans that are

underwater are inherently very risky given that they afford the lender no equity cushion and

leave the lender with inadequate collateral from the outset of the loan. Defendants represented

that only four of the Securitizations that Prudential tested—BOAA 2005-7, BOAA 2005-12,

FFML 2005-FFH1 and FFML 2006-FFH1—contained *any* Mortgage Loans with LTV ratios

greater than 100%, and that in those Securitizations, only 3.20%, 1.50%, 1.96% and 1.70% of the

Mortgage Loans, respectively, had LTV ratios greater than 100%. In truth, however, each of the

Securitizations contained a substantial number of Mortgage Loans with LTV ratios greater than

100%. For example:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 100% | Actual Percentage of Loans With LTVs of Greater Than 100% | Understatement of Percentage of Loans With LTVs of Greater Than 100% |
|---|---|---|---|---|---|

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 100% | Actual Percentage of Loans With LTVs of Greater Than 100% | Understatement of Percentage of Loans With LTVs of Greater Than 100% |
|---|---|---|---|---|---|
| BAFC 2006-E | 2A3 | Group 2 | 0.00% | 12.66% | 12.66% |
| BOAA 2005-7 | 3CB1 | Group 3 | 3.20% | 14.36% | 11.16% |
| BOAA 2005-12 | 3CB1 | Group 3 | 1.50% | 9.66% | 8.16% |
| BOAA 2006-5 | 3A1 | Group 3 | 0.00% | 5.26% | 5.26% |
| BOAMS 2004-E | 2A6 | Group 2 | 0.00% | 7.40% | 7.40% |
| BOAMS 2005-A | 2A1 | Group 2 | 0.00% | 11.36% | 11.36% |
| BOAMS 2005-B | 2A1 | Group 2 | 0.00% | 8.94% | 8.94% |
| FFMER 2007-3 | A2C | Group 2 | 0.00% | 30.60% | 30.60% |
| FFMER 2007-4 | 2A2 | Group 2 | 0.00% | 38.52% | 38.52% |
| FFML 2004-FF1 | M1 | Aggregate | 0.00% | 20.00% | 20.00% |
| FFML 2005-FF6 | M2 | Aggregate | 0.00% | 20.90% | 20.90% |
| FFML 2005-FFH1 | M2 | Aggregate | 1.96% | 68.54% | 66.58% |
| FFML 2006-FF18 | A2C | Group 2 | 0.00% | 22.42% | 22.42% |
| FFML 2006-FFH1 | A4, M2, M3, M4 | Aggregate | 1.70% | 63.22% | 61.52% |
| FFML 2007-FF1 | A2C | Group 2 | 0.00% | 19.28% | 19.28% |
| MLMI 2004-WMC3 | M2 | Aggregate | 0.00% | 10.66% | 10.66% |
| MLMI 2005-WMC1 | M1, M2 | Aggregate | 0.00% | 11.52% | 11.52% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 0.00% | 13.58% | 13.58% |
| MLMI 2006-MLN1 | A2C | Group 2 | 0.00% | 20.68% | 20.68% |
| MLMI 2006-WMC1 | A1B | Group 1 | 0.00% | 16.56% | 16.56% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 0.00% | 32.96% | 32.96% |
| SURF 2005-BC4 | M1 | Aggregate | 0.00% | 15.09% | 15.09% |
| SURF 2006-BC1 | A2C | Group 2 | 0.00% | 14.69% | 14.69% |
| SURF 2006-BC2 | A2B, A2D | Group 2 | 0.00% | 18.44% | 18.44% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 0.00% | 20.30% | 20.30% |

168. Certain Offering Materials, particularly for deals with large numbers of second-lien loans, presented CLTV ratios in addition to, or instead of, LTV ratios. An accurate CLTV ratio takes into account the total value of liens on the property, including any pre-existing "senior" lien on the property, as such a lien diminishes the owner's equity and has to be paid first upon foreclosure. As with the LTV statistics, Defendants misrepresented the CLTV statistics, and in doing so significantly overstated the CLTV ratios and thus (once again) understated the riskiness of the Mortgage Loans underlying the Certificates.

169.     Just as with LTVs, loans with CLTV ratios in excess of 80% provide the lender little value cushion to protect against borrower default and loss upon foreclosure.  Defendants again misrepresented this risk feature.  For example:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs of Greater Than 80% | Actual Percentage of Loans With CLTVs of Greater Than 80% | Understatement of Percentage of Loans With CLTVs of Greater Than 80% |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 57.28% | 78.54% | 21.26% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 34.99% | 66.38% | 31.39% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 47.31% | 75.97% | 28.66% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 42.68% | 75.90% | 33.22% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 50.37% | 75.57% | 25.20% |
| FFMER 2007-3 | A2C | Group 2 | 83.47% | 90.60% | 7.13% |
| FFMER 2007-4 | 2A2 | Group 2 | 70.92% | 83.95% | 13.03% |
| FFML 2006-FF18 | A2C | Group 2 | 85.32% | 89.92% | 4.60% |
| MLMI 2006-MLN1 | A2C | Group 2 | 84.39% | 91.25% | 6.86% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 77.02% | 89.16% | 12.14% |

170.     Defendants also misrepresented how many Mortgage Loans had CLTV ratios in excess of 90%:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs Greater Than 90% | Actual Percentage of Loans With CLTVs Greater Than 90% | Understatement of Percentage of Loans With CLTVs of Greater Than 90% |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 25.85% | 62.37% | 36.52% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 9.74% | 49.86% | 40.12% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 31.81% | 63.84% | 32.03% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 30.18% | 62.56% | 32.38% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 34.42% | 61.83% | 27.41% |
| FFMER 2007-3 | A2C | Group 2 | 64.99% | 79.76% | 14.77% |
| FFMER 2007-4 | 2A2 | Group 2 | 54.58% | 71.11% | 16.53% |
| FFML 2006-FF18 | A2C | Group 2 | 73.05% | 78.34% | 5.29% |
| FFML 2007-FF1 | A2C | Group 2 | 73.38% | 77.13% | 3.75% |
| MLMI 2006-MLN1 | A2C | Group 2 | 73.49% | 84.10% | 10.61% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 56.63% | 80.31% | 23.68% |

171.     As was the case with LTVs, Defendants dramatically understated the number of Mortgage Loans with a CLTV ratio in excess of 100%:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs Greater Than 100% | Actual Percentage of Loans With CLTVs Greater Than 100% | Understatement of Percentage of Loans With CLTVs of Greater Than 100% |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 0.00% | 40.40% | 40.40% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 0.00% | 26.67% | 26.67% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 0.00% | 48.74% | 48.74% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 0.00% | 42.56% | 42.56% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 0.00% | 42.24% | 42.24% |
| FFMER 2007-3 | A2C | Group 2 | 0.00% | 59.52% | 59.52% |
| FFMER 2007-4 | 2A2 | Group 2 | 0.00% | 56.54% | 56.54% |
| FFML 2006-FF18 | A2C | Group 2 | 0.00% | 55.42% | 55.42% |
| FFML 2007-FF1 | A2C | Group 2 | 0.00% | 57.62% | 57.62% |
| MLMI 2006-MLN1 | A2C | Group 2 | 0.00% | 71.97% | 71.97% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 0.00% | 60.62% | 60.62% |

172. Prudential also analyzed the weighted average CLTV ratio of the Mortgage

Loans in these pools and found that these too were understated:

| Trust | Tranche | Loan Pool | Represented Weighted Average CLTV | Actual Weighted Average CLTV | Understatement of Weighted Average CLTV |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 83.43% | 97.70% | 14.27% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 79.10% | 91.28% | 12.18% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 81.03% | 98.56% | 17.53% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 82.62% | 97.44% | 14.82% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 82.37% | 95.65% | 13.28% |
| FFMER 2007-3 | A2C | Group 2 | 93.07% | 108.50% | 15.43% |
| FFMER 2007-4 | 2A2 | Group 2 | 91.72% | 108.08% | 16.36% |
| FFML 2006-FF18 | A2C | Group 2 | 94.35% | 104.80% | 10.45% |
| FFML 2007-FF1 | A2C | Group 2 | 94.26% | 104.22% | 9.96% |
| MLMI 2006-MLN1 | A2C | Group 2 | 93.52% | 109.39% | 15.87% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 89.50% | 105.42% | 15.92% |

173. The consistency and size of these misrepresentations confirms that the

appraisers, Originators, and Defendants knew the appraisals being used were not reasonable

indicators of the properties' value, but were inflated figures generated to shepherd the loans

through the approval and securitization process. These results (and other facts discussed herein)

thus also demonstrate that the factual representations relating to appraisal practices were false.

Independent appraisers following the stated practices would not consistently generate appraisals that deviate so significantly (and so consistently upward) from the values found using an industry-standard AVM. Instead of following the disclosed appraisal processes, the appraisers worked with Defendants and other mortgage loan Originators to generate appraisal values that were not meant to approximate the actual value of the property, but to justify issuance of the mortgage loan.

174. The consistency of Defendants' misrepresentations also supports the conclusion that Defendants *knew* the appraisals were being intentionally inflated. Such is confirmed by the statements provided by former employees and other recent revelations, as discussed further below.

### 3. A forensic analysis of the Mortgage Loan's chain of title revealed a systemic misrepresentation problem

175. Defendants' representations about the valid transfer of title to the Mortgage Loans to the Trusts were false. In many instances, the collateral did not properly secure the underlying Mortgage Loans and the Trusts could not foreclose on delinquent borrowers because Defendants either lost, failed to timely create, or failed to timely deliver the paperwork necessary to prove title to the mortgages.

176. Contrary to their representations, Defendants did not properly assign large numbers of the Mortgage Loans to the Trusts. In their rush to securitize loans and thereby offload risky collateral onto investors such as Prudential, Defendants did not comply with the strict rules governing assignment of mortgages and the transfer of promissory notes and loan files. Defendants lost much of the paperwork relating to the Loans underlying the securitizations, or made no attempt to assign the Mortgage Loans and deliver the original mortgage notes to the issuing trusts, as represented.

177.     As part of its loan-level forensic analysis of the Mortgage Loans underlying its Certificates, Prudential also examined whether the chain of mortgage assignments was complete with respect to the Mortgage Loans. The review demonstrates that Defendants' representations regarding the title for the Mortgage Loans were false and misleading, and that Defendants fraudulently failed to disclose problems in the chain of title for the Mortgage Loans.

178.     The review demonstrates, for the Offerings for which data was available: (a) how many Mortgage Loans are currently held by the RMBS trust; (b) how many are held in the MERS electronic-recording system; (c) how many are still held in the originator's name; and (d) how many were assigned to a third party. Loans that are still held by the originator, or were assigned to a third party other than the Trust or MERS, violate Defendants' representations that the loans would be assigned to the Trust (or, in some cases, would be held by MERS).

| Securitization | Tranche(s) | Loan Pool(s) | Number of Loans Assigned To a Third Party (Other Than MERS) | Number of Loans Still Held in the Originator's Name | Percentage of Sampled Loans Assigned to a Third Party or Still Held in the Originator's Name |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 21 | 222 | 36.54% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 33 | 204 | 66.76% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 32 | 97 | 20.84% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 27 | 139 | 63.12% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 41 | 252 | 63.97% |
| BAFC 2004-2 | 1B1 | Group 1 | 1 | 10 | 57.89% |
| BAFC 2006-E | 2A3 | Group 2 | 25 | 391 | 85.95% |
| BOAA 2005-7 | 3CB1 | Group 3 | 1 | 275 | 92.00% |
| BOAA 2005-12 | 3CB1 | Group 3 | 6 | 379 | 92.33% |
| BOAA 2006-5 | 3A1 | Group 3 | 0 | 93 | 95.88% |
| BOAMS 2004-E | 2A6 | Group 2 | 11 | 735 | 97.77% |
| BOAMS 2005-A | 2A1 | Group 2 | 2 | 271 | 97.15% |
| BOAMS 2005-B | 2A1 | Group 2 | 5 | 171 | 95.14% |
| FFMER 2007-3 | A2C | Group 2 | 26 | 8 | 5.26% |
| FFMER 2007-4 | 2A2 | Group 2 | 18 | 12 | 4.56% |
| FFML 2004-FF1 | M1 | Aggregate | 60 | 553 | 95.33% |
| FFML 2005-FF6 | M2 | Aggregate | 148 | 326 | 67.33% |
| FFML 2005-FFH1 | M2 | Aggregate | 167 | 304 | 75.48% |
| FFML 2006-FF18 | A2C | Group 2 | 26 | 17 | 6.69% |
| FFML 2006-FFH1 | A4, M2, M3, M4 | Aggregate | 41 | 401 | 73.42% |

| Securitization | Tranche(s) | Loan Pool(s) | Number of Loans Assigned To a Third Party (Other Than MERS) | Number of Loans Still Held in the Originator's Name | Percentage of Sampled Loans Assigned to a Third Party or Still Held in the Originator's Name |
|---|---|---|---|---|---|
| FFML 2007-FF1 | A2C | Group 2 | 23 | 23 | 6.97% |
| MLMI 2004-WMC3 | M2 | Aggregate | 17 | 556 | 87.21% |
| MLMI 2005-WMC1 | M1, M2 | Aggregate | 34 | 45 | 12.01% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 63 | 158 | 32.89% |
| MLMI 2006-MLN1 | A2C | Group 2 | 16 | 39 | 9.15% |
| MLMI 2006-WMC1 | A1B | Group 1 | 39 | 37 | 11.31% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 335 | 26 | 54.53% |
| SURF 2005-BC4 | M1 | Aggregate | 49 | 61 | 19.37% |
| SURF 2006-BC1 | A2C | Group 2 | 38 | 22 | 8.19% |
| SURF 2006-BC2 | A2B, A2D | Group 2 | 37 | 16 | 7.32% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 44 | 25 | 9.61% |

179. Even among Loans that were assigned to the Trusts, a large number were still missing intervening assignments. For example:

| Securitization | Tranche(s) | Loan Pool(s) | Number of Loans Assigned To a Trust (not including MERS) | Number of Loans Assigned To a Trust But Missing Intervening Assignments | Percentage Loans Assigned To a Trust But Missing Intervening Assignments |
|---|---|---|---|---|---|
| ABFC 2004-HE1 | M1, M2 | Aggregate | 35 | 17 | 48.57% |
| ABFC 2005-HE1 | M2, M3 | Aggregate | 93 | 66 | 70.97% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 197 | 122 | 61.93% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 94 | 62 | 65.96% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 161 | 110 | 68.32% |
| BOAA 2005-7 | 3CB1 | Group 3 | 21 | 1 | 4.76% |
| BOAA 2005-12 | 3CB1 | Group 3 | 28 | 3 | 10.71% |
| FFMER 2007-3 | A2C | Group 2 | 354 | 242 | 68.36% |
| FFMER 2007-4 | 2A2 | Group 2 | 322 | 221 | 68.63% |
| FFML 2004-FF1 | M1 | Aggregate | 29 | 6 | 20.69% |
| FFML 2005-FF6 | M2 | Aggregate | 229 | 12 | 5.24% |
| FFML 2006-FF18 | A2C | Group 2 | 201 | 100 | 49.75% |
| FFML 2006-FFH1 | A4, M2, M3, M4 | Aggregate | 77 | 7 | 9.09% |
| FFML 2007-FF1 | A2C | Group 2 | 200 | 124 | 62.00% |
| MLMI 2004-WMC3 | M2 | Aggregate | 29 | 8 | 27.59% |
| MLMI 2005-WMC1 | M1, M2 | Aggregate | 199 | 129 | 64.82% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 230 | 114 | 49.57% |
| MLMI 2006-MLN1 | A2C | Group 2 | 196 | 161 | 82.14% |
| MLMI 2006-WMC1 | A1B | Group 1 | 283 | 198 | 69.96% |
| SURF 2005-BC4 | M1 | Aggregate | 206 | 166 | 80.58% |
| SURF 2006-BC1 | A2C | Group 2 | 308 | 227 | 73.70% |

| Securitization | Tranche(s) | Loan Pool(s) | Number of Loans Assigned To a Trust (not including MERS) | Number of Loans Assigned To a Trust But Missing Intervening Assignments | Percentage Loans Assigned To a Trust But Missing Intervening Assignments |
|---|---|---|---|---|---|
| SURF 2006-BC1 | A2B, A3D | Group 2 | 289 | 217 | 75.09% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 311 | 215 | 69.13% |

180.    Evidence of Defendants' failed attempts to foreclose on many homes while using invalid paperwork represents an attempt to cover up the problems like those seen in these Certificates.  The Federal Reserve System, the U.S. Office of the Comptroller of the Currency (the "OCC"), and the Office of Thrift Supervision issued a report in April 2011 regarding foreclosure processing by fourteen mortgage servicers, including BofA.  Their Interagency Review of Foreclosure Policies and Practices found "critical weaknesses in servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."  Their report found that Bank of America and other banks lacked sufficient oversight of the foreclosure process, evidenced by problems with affidavits and notarization.

181.    The OCC issued a Consent Order dated April 13, 2011 which identified problems with Bank of America's loan servicing and its "initiation and handling of foreclosure proceedings."  The OCC found, in part, that BofA "litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time."  BofA agreed to enter into a compliance program, which would include

> processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate

62

transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security, and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership . . . .

182.    BofA also agreed to a plan to ensure proper controls and oversight of the bank's activities with respect to MERS, including "ensur[ing] that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank."

183.    As a direct result of its misconduct, in September 2010, BofA and its affiliates had to suspend foreclosures in 23 states while it determined if the paperwork was processed correctly and affidavits by staff members were indeed legitimate. On October 9, 2010, Bank of America halted home foreclosures in all 50 states as it reviewed foreclosure paperwork, reflecting the grave impact of BofA's wrongdoing regarding the transfer of title and foreclosure practices.

184.    In states providing for non-judicial foreclosures, BofA utilizes its subsidiary ReconTrust Company, N.A. ("ReconTrust") to foreclose on homeowners. On August 4, 2011, the Attorney General for the State of Washington filed an action against ReconTrust alleging that the company "systematically conceals, misrepresents or inaccurately divulges the true parties to the mortgage transaction," including misrepresenting BofA's ownership of the mortgage notes. *Washington v. ReconTrust Co., N.A.* (King County, Wa. Aug. 4, 2011), pp. 6-7.

185.    A July 19, 2011 Reuters report confirmed that BofA and other banks "continue to file questionable foreclosure documents with courts and county clerks." The article explains that in recent months, "servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts."

186. State Attorneys General are also currently investigating the wrongdoing of BofA and other entities that have attempted to cover up the widespread failure to properly assign mortgage loans in seeking to foreclose on properties.

187. Defendants' representations in the Offering Materials that the MERS system was sufficient to ensure that the Mortgage Loans could be foreclosed upon in the event of a borrower's default was false. As multiple courts have held, because the actual mortgage note is typically not transferred to MERS, MERS is a nullity. In February 2011, MERS instructed its lender members to stop foreclosing in the name of MERS in light of the overwhelming authority that beneficial ownership of an underlying mortgage cannot be transferred to MERS.

### 4. The dismal performance of these Mortgage Loans and Certificates confirms they were infected by a systemic underwriting problem

188. The extremely high default rates of the Mortgage Loans and the precipitous drop in the credit ratings of the Certificates confirm that the Certificates were infected by Defendants' and the Originators' systemic underwriting problems.

189. Prudential's Certificates were supposed to be long-term, stable investments; yet they have already experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten and which contained loans that actually had the characteristics Defendants' Offering Materials claim. Overall, *over 26%* of the Mortgage Loans have had to be written off at a loss already. For instance, in each of the CBASS 2005-CB9, FMIC 2006-3, FMIC 2007-1, OOMLT 2007-5, MLMI 2006-MLN1, MLMI 2007-HE3, RAMP 2007-RS2, SURF 2006-BC2 and SURF 2007-BC1 Securitizations, at least *40%* of the Mortgage Loans have been written off for a loss. By way of further examples:

| Trust | Tranche | Loan Pool | Percentage of Original Loans that Were Written Off | Percentage of Active Loans that are Currently Delinquent |
|---|---|---|---|---|
| ABFC 2005-HE1 | M2, M3 | Aggregate | 11.47% | 42.55% |
| ABFC 2006-HE1 | A2B, A2C, A2D | Group 2 | 41.35% | 41.59% |
| ABFC 2006-OPT1 | A3C1, A3D | Group 3 | 42.17% | 52.36% |
| ABFC 2006-OPT1 | M2, M3 | Aggregate | 41.09% | 53.93% |
| AMSI 2004-R6 | A1 | Group 1 | 11.62% | 32.31% |
| AMSI 2004-R6 | M1 | Aggregate | 11.28% | 32.13% |
| BAFC 2006-E | 2A3 | Group 2 | 22.79% | 25.00% |
| CBASS 2004-CB2 | M1, M2 | Aggregate | 5.32% | 34.69% |
| CBASS 2004-CB8 | M2 | Aggregate | 11.94% | 33.77% |
| CBASS 2005-CB6 | A3 | Aggregate | 26.76% | 33.95% |
| CBASS 2005-CB9 | A2, A3 | Aggregate | 41.00% | 41.01% |
| CBASS 2007-CB5 | A2 | Aggregate | 38.41% | 37.29% |
| FFMER 2007-3 | A2C | Group 2 | 36.01% | 53.78% |
| FFMER 2007-4 | 2A2 | Group 2 | 36.93% | 53.91% |
| FFML 2005-FF6 | M2 | Aggregate | 21.36% | 46.12% |
| FFML 2005-FFH1 | M2 | Aggregate | 27.67% | 53.63% |
| FFML 2006-FF18 | A2C | Group 2 | 37.42% | 52.16% |
| FFML 2006-FFH1 | A4, M2, M3, M4 | Aggregate | 33.09% | 52.75% |
| FFML 2007-FF1 | A2C | Group 2 | 38.62% | 50.89% |
| FMIC 2006-3 | 2A2, 2A3 | Group 2 | 48.65% | 35.65% |
| FMIC 2007-1 | 2A1 | Group 2 | 41.67% | 27.43% |
| MLMI 2006-HE2 | A4, M2 | Aggregate | 39.91% | 57.28% |
| MLMI 2006-MLN1 | A2C | Group 2 | 49.34% | 64.15% |
| MLMI 2006-WMC1 | A1B | Group 1 | 38.88% | 49.41% |
| MLMI 2007-HE3 | A1, A2, A3, A4 | Aggregate | 47.54% | 55.50% |
| OOMLT 2004-1 | M1 | Aggregate | 9.15% | 31.44% |
| OOMLT 2005-3 | M3 | Aggregate | 20.58% | 43.33% |
| OOMLT 2005-4 | M2 | Aggregate | 26.06% | 44.65% |
| OOMLT 2005-5 | A4 | Group 2 | 28.17% | 45.13% |
| OOMLT 2005-5 | M2 | Aggregate | 27.84% | 45.53% |
| OOMLT 2006-2 | IIA3 | Group 2 | 38.04% | 55.42% |
| OOMLT 2007-5 | IIA2 | Group 2 | 46.19% | 47.49% |
| RAMC 2006-1 | AF4 | Group 2 | 13.83% | 38.73% |
| RAMP 2004-RS2 | MII1 | Groups 2A and 2B | 18.14% | 37.70% |
| RAMP 2006-RZ3 | A2 | Aggregate | 39.05% | 31.86% |
| RAMP 2007-RS2 | A2 | Aggregate | 43.37% | 34.09% |
| RASC 2007-KS1 | A3, A4 | Aggregate | 37.98% | 37.56% |
| RASC 2007-KS3 | AI2 | Group 1 | 39.71% | 40.59% |
| RFMS2 2005-HS2 | AI5 | Group 1 | 14.96% | 4.02% |
| RFMS2 2005-HS2 | AII | Group 2 | 19.70% | 3.45% |
| RFMS2 2006-HI2 | A4 | Aggregate | 27.59% | 7.35% |
| SURF 2005-BC4 | M1 | Aggregate | 33.48% | 53.53% |
| SURF 2006-BC1 | A2C | Group 2 | 42.20% | 53.25% |

| Trust | Tranche | Loan Pool | Percentage of Original Loans that Were Written Off | Percentage of Active Loans that are Currently Delinquent |
|---|---|---|---|---|
| SURF 2006-BC2 | A2B, A2D | Group 2 | 43.71% | 57.79% |
| SURF 2007-BC1 | A2B, A2C | Group 2 | 50.19% | 53.50% |

190. Not only have the Certificates experienced extraordinary default rates, their ratings have significantly deteriorated. Most initially received the highest possible rating, but all have been downgraded at least once, and all but three have now been downgraded to "junk-bond," i.e., non-investment-grade ratings. Any instrument rated lower than BBB (or Baa for ratings provided by Moody's) is considered below investment-grade:

| Certificate | Tranche | Ratings at Issuance (Fitch/Moody's/S&P) | Current Ratings (Fitch/Moody's/S&P) |
|---|---|---|---|
| ABFC 2004-HE1 | M1 | -/Aa2/AA+ | -/Caa2(sf)/BB-(sf) |
| ABFC 2004-HE1 | M2 | -/A2/AA | -/C(sf)/CCC(sf) |
| ABFC 2005-HE1 | M2 | AA/Aa2/AA(sf) | CCsf/Caa2(sf)/CCC(sf) |
| ABFC 2005-HE1 | M3 | AA-/Aa3/AA- | CCsf/C(sf)/CCCsf |
| ABFC 2006-HE1 | A2B | AAA/Aaa/AAA | CCsf/Caa3(sf)/CCC(sf) |
| ABFC 2006-HE1 | A2C | AAA/Aaa/AAA | Csf/Ca(sf)/CCC(sf) |
| ABFC 2006-HE1 | A2D | AAA/Aaa/AAA | Csf/Ca(sf)/CCC(sf) |
| ABFC 2006-OPT1 | A3C1 | AAA/Aaa/AAA | CCCsf/Caa2(sf)/B-(sf) |
| ABFC 2006-OPT1 | A3D | AAA/Aaa/AAA | CCCsf/Ca(sf)/B-(sf) |
| ABFC 2006-OPT1 | M2 | AA/Aa2/AA | Dsf/C(sf)/D(sf) |
| ABFC 2006-OPT1 | M3 | AA-/Aa3/AA- | Dsf/C(sf)/D(sf) |
| AMSI 2004-R6 | A1 | AAA/Aaa/AAA | BBBsf/A1/AAA(sf) |
| AMSI 2004-R6 | M4 | BBB-/Baa3/BBB- | Csf/C(sf)/CC(sf) |
| BAFC 2004-2 | 1B1 | -/-/AA | -/-/BBB(sf) |
| BAFC 2006-E | 2A3 | AAA/-/AAA | Dsf/-/D(sf) |
| BOAA 2005-7 | 3CB1 | AAA/Aaa/- | Dsf/Caa3(sf)/- |
| BOAA 2005-12 | 3CB1 | AAA/Aaa/- | Dsf/Caa2(sf)/- |
| BOAA 2006-5 | 3A1 | AAA/Aaa/- | CCCsf/B3(sf)/- |
| BOAMS 2004-E | 2A6 | AAA/-/AAA | BBsf/-/BBB-(sf) |
| BOAMS 2005-A | 2A1 | AAA/Aaa/- | Bsf/B2(sf)/- |
| BOAMS 2005-B | 2A1 | AAA/Aaa/- | B2(sf)/CCsf/- |
| CBASS 2004-CB2 | M1 | Aasf/Aa2/AA | CCCsf/B2(sf)/B-(sf) |
| CBASS 2004-CB2 | M2 | A/A2/A | Csf/Caa3(sf)/CCC(sf) |
| CBASS 2004-CB8 | M2 | A/A/A2 | CCC(sf)/C/Csf/Caa3(sf) |
| CBASS 2005-CB6 | A3 | AAA/Aaa/AAA | CCCsf/B3(sf)/B+(sf) |
| CBASS 2006-CB9 | A2 | -/AAA/Aaa | -/Csf/Ca(sf) |
| CBASS 2006-CB9 | A3 | -/AAA/Aaa | -/Csf/Ca(sf) |
| CBASS 2007-CB5 | A2 | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| FFMER 2007-3 | A2C | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |

| Certificate | Tranche | Ratings at Issuance (Fitch/Moody's/S&P) | Current Ratings (Fitch/Moody's/S&P) |
|---|---|---|---|
| FFMER 2007-4 | 2A2 | -/Aaa/AAA | -/Caa3/CCC(sf) |
| FFML 2004-FF1 | M1 | AA+/Aa2/AA(sf) | BBBsf/Ba1(sf)/AA(sf)/- |
| FFML 2005-FF6 | M2 | -/Aa2/AA | -/Caa3(sf)/BBB-(sf) |
| FFML 2005-FFH1 | M2 | AA/Aa2/- | CCsf/C(sf)/- |
| FFML 2006-FF18 | A2C | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| FFML 2006-FFH1 | A4 | AAA/Aaa/AAA | CCCsf/B1(sf)/BB+(sf) |
| FFML 2006-FFH1 | M2 | AA/Aa2/AA | Csf/C(sf)/CCC(sf) |
| FFML 2006-FFH1 | M3 | AA-/Aa3/AA- | Csf/C(sf)/CC(sf) |
| FFML 2006-FFH1 | M4 | A+/Aa3/A+ | Dsf/C(sf)/D(sf) |
| FFML 2007-FF1 | A2C | -/Aaa/AAA | -/Ca/CCC(sf) |
| FMIC 2006-3 | 2A2 | -/Aaa/AAA | /Ca(sf)/CCC(sf) |
| FMIC 2006-3 | 2A3 | -/AAA/AAA | /Ca(sf)/CCC(sf) |
| FMIC 2007-1 | 2A1 | -/Aaa/AAA | /Caa1(sf)/CCC(sf) |
| GE-WMC 2005-2 | A2C | AAA/Aaa/AAA | CCsf/Caa1(sf)/CCC(sf) |
| MLMI 2004-WMC3 | M2 | -/A2/AA(sf) | -/B1/AA(sf) |
| MLMI 2005-WMC1 | M1 | -/Aa2/AA | -/Baa1(sf)/AA(sf) |
| MLMI 2005-WMC1 | M2 | -/Aa3/AA | -/Ba1(sf)/AA(sf) |
| MLMI 2006-HE2 | A4 | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| MLMI 2006-HE2 | M2 | -/Aa2/AA | -/C(sf)/D(sf) |
| MLMI 2006-MLN1 | A2C | -/Aaa/AAA | -/Ca/CCC(sf) |
| MLMI 2006-WMC1 | A1B | -/Aaa/AAA | -/Caa3(sf)/CCC(sf) |
| MLMI 2007-HE3 | A1 | -/(P)Aaa/AAA | -/Ca(sf)/CCC(sf) |
| MLMI 2007-HE3 | A2 | -/(P)Aaa/AAA | -/Ca/CCC(sf) |
| MLMI 2007-HE3 | A3 | -/(P)Aaa/AAA | -/Ca/CCC(sf) |
| MLMI 2007-HE3 | A4 | -/(P)Aaa/AAA | -/Ca/CCC(sf) |
| OOMLT 2004-1 | M1 | AA+/Aa2/AA+(sf) | CCCsf/B1(sf)/BB+(sf) |
| OOMLT 2005-3 | M3 | AA-/Aa3/AA- | CCsf/Ca(sf)/B-(sf) |
| OOMLT 2005-4 | M2 | AA+/AA2/AA | CCsf/Ca(sf)/CCC(sf) |
| OOMLT 2005-5 | A4 | AAA/Aaa/AAA(sf) | Bsf/Baa3(sf)/A+(sf) |
| OOMLT 2005-5 | M2 | AA+/Aa2/AA | CCsf/Ca(sf)/CCC(sf) |
| OOMLT 2006-2 | 2A3 | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| OOMLT 2007-5 | 2A2 | -/Aaa/AAA | -/Caa3(sf)/CCC(sf) |
| RAMC 2006-1 | AF4 | AAA/Aaa/AAA | CCsf/Caa3(sf)/CCC(sf) |
| RASC 2007-KS1 | A3 | AAA/Aaa/AAA | CCsf/Ca(sf)/CCC(sf) |
| RASC 2007-KS1 | A4 | AAA/Aaa/AAA | Csf/C(sf)/CCC(sf) |
| RASC 2007-KS3 | AI2 | -/Aaa/AAA | -/Caa1(sf)/CCC(sf) |
| RAMP 2004-RS2 | MII1 | -/A2/AA | -/Ba3(sf)/BB(sf) |
| RAMP 2006-RZ3 | A2 | AAA/Aaa/AAA(sf) | CCCsf/Ba1(sf)/BB+(sf) |
| RAMP 2007-RS2 | A2 | -/Aaa/AAA | -/Ca(sf)/NR |
| RFMS2 2005-HS1 | AI5 | -/Aaa/AAA | -/Caa1(sf)/CC(sf) |
| RFMS2 2005-HS2 | AI5 | -/Aaa/AAA | -/Caa2(sf)/CC(sf) |
| RFMS2 2005-HS2 | AII | -/Aaa/AAA | -/Ca(sf)/CC(sf) |
| RFMS2 2006-HI2 | A4 | -/Aaa/AAA | -/Ca(sf)/CC(sf) |
| SURF 2005-BC4 | M1 | -/-/AA+ | -/-/CCC(sf) |
| SURF 2006-BC1 | A2C | -/Aaa/AAA | -/Ba1(sf)/BBB+(sf) |
| SURF 2006-BC2 | A2B | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| SURF 2006-BC2 | A2D | -/Aaa/AAA | -/Ca/CCC(sf) |

| Certificate | Tranche | Ratings at Issuance (Fitch/Moody's/S&P) | Current Ratings (Fitch/Moody's/S&P) |
|---|---|---|---|
| SURF 2007-BC1 | A2B | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| SURF 2007-BC1 | A2C | -/Aaa/AAA | -/Ca/CCC(sf) |

191.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools. Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

**B.    Evidence from Analyses Conducted by Defendants' Third-Party Due Diligence Firms**

192.    In connection with their purchase of the Mortgage Loans from the Originators, and consistent with industry practice, Defendants performed due diligence to assess loan quality. Defendants reaped tremendous fees from this purported diligence.

193.    In conducting its diligence, Defendants relied on its own teams of underwriters and well as on third-party due diligence firms (such as Clayton or Bohan) which were tasked with reviewing whether the loans met the disclosed guidelines. Defendants employed and engaged underwriters who reviewed a sample of the purchased loans purportedly to confirm that they both conformed to the representations made by the originators and complied with the company's own credit policies.

194.    One of the primary reviewers Defendants used was Clayton. As the FCIC found: "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying—and that securitizers were willing to accept." FCIC Report at 166.

195.    For each loan pool it was hired to review, Clayton checked for: (1) adherence to seller credit underwriting guidelines and client risk tolerances; (2) compliance with federal, state

68

and local regulatory laws; and (3) the integrity of electronic loan data provided by the seller to the prospective buyer. This review was commonly referred to as a "credit and compliance review." Contract underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to verify loan information, identified discrepancies in key data points, and graded loans based on seller guidelines and client tolerances. Critically, this also analyzed whether, to the extent a loan was deficient, there were any "compensating factors."

196.     Each day, Clayton generated reports for Defendants that summarized its findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards. This included giving loans three grades—a Grade 3 loan "failed to meet guidelines and were not approved," while a Grade 1 loan "met guidelines." Importantly, these Grade 3 loans did not contain any "compensating factors." Once Clayton identified such problems, the seller had the option of attempting to cure them by providing missing documentation or otherwise explaining to Clayton why a loan complied with the underwriting standards. If additional information was provided, Clayton re-graded the loan. Once this process was complete, Clayton provided the underwriters and sponsors with final reports. Tellingly, only 54% of the nearly one-million loans reviewed by Clayton Holdings "met guidelines," a number that its former president admitted reflected "a quality control issue in the factory" for RMBS. *Id.* at 165-66.

197.     Recently released internal Clayton documents show that, contrary to Merrill's representations in the Offering Materials, a startlingly high percentage of loans reviewed by Clayton for Merrill were defective, but were nonetheless included by Merrill in loan pools sold to Prudential and other investors. These findings are reflected in a Trending Report that Clayton prepared and provided to the FCIC. The Trending Report summarizes the daily reports that

Clayton provided to various banks, including Defendants, over time. According to the "Trending Report," Merrill was informed that *23%* of the loans Clayton reviewed for Merrill "failed to meet guidelines" and lacked any compensating features. Yet, *Merrill "waived in" to its pools 30% of those toxic loans.*

198.    Like Merrill, BofA ignored the red glags that Clayton found. According to the recently released internal Clayton documents mentioned above, Clayton informed BofA that *30% of the loans it reviewed "failed to meet guidelines,"* which included a finding that these loans had been granted despite the lack of any purported compensating factors justifying an exception. Nowithstanding Clayton's findings, BofA simply "waived in" *27% of these toxic loans* and included them in securitizations like the ones in which Prudential invested. BofA, like Merrill, never disclosed to Prudential that Clayton's due diligence showed that a substantial number of the loans in the pools backing BofA's RMBS securitizations were defective, and that BofA had nonetheless waived these defects.

199.    This high rejection and "waiver" rate—which was occurring at the same time the RMBS at issue here were being assembled and sold—further confirms that the Mortgage Loans backing the Certificates at issue here did not comport with represented underwriting guidelines, and that defective loans were included in the pools without any purported "compensating factors."

200.    The hidden "waiver" of rejected loans that were not subject to any compensating factors was a fraudulent omission and rendered Merrill's disclosures regarding its underwriting and due diligence processes even more misleading.

201.    As the FCIC report concluded:

[M]any prospecuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that

70

only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 Event loans were waived in.

. . . .

[O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans. ***Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.***

202.    These high percentages of non-compliant loans were identified despite Defendants pressuring Clayton and other third-party due-diligence firms to provide reports in a very short time frame, with only limited re-verification of data, and to approve as many loans as possible. *See* Section III.B below. Thus, the percentage of loans securitized by Defendants that were truly problematic was in fact much higher than the astounding rates Clayton's reports indicate these firms managed to discover despite the limitations placed on its activities.

### C.    The Systemic Abandonment of the Originators Confirms the Mortgage Loans Were Misrepresented

203.    As summarized below, many of the Mortgage Loans underlying Defendants' offerings at issue here were originated by Defendants themselves, or their affiliates. Other loans were originated by third-party lenders with whom Defendants had close financial arrangements.

| Trust | Tranche(s) | Loan Group | Key Originator(s) | % of Origination |
|---|---|---|---|---|
| ABFC 2004-HE1 | M-1, M-2 | Aggregate | Fremont Investment & Loan | 65.33% |
| | | | Wells Fargo Bank | 34.67% |
| ABFC 2005-HE1 | M-2, M-3 | Aggregate | Option One Mortgage Corp. | 81.16% |
| | | | Accredited Home Lenders, Inc. | 18.84% |
| ABFC 2006-HE1 | A-2B, A-2C, A-2D | Group 2 | Accredited Home Lenders, Inc. | 72.54% |
| | | | WMC Mortgage Corp. | 11.02% |
| ABFC 2006-OPT1 | A-3C1, A-3D | Group 3 | Option One Mortgage Corp. | 100% |
| | M-2, M-3 | Aggregate | | |
| BAFC 2004-2 | 1-B-1 | Group 1 | CitiMortgage, Inc. | 100% |
| BAFC 2006-E | 2-A-3 | Group 2 | Bank of America, N.A. | 100% |
| BOAA 2005-7 | 3-CB-1 | Group 3 | Bank of America, N.A. | 100% |

| | | | | |
|---|---|---|---|---|
| BOAA 2005-12 | 3-CB-1 | Group 3 | Bank of America, N.A. | 100% |
| BOAA 2006-5 | 3-A-1 | Group 3 | Bank of America, N.A. | 100% |
| BOAMS 2004-E | 2-A-6 | Group 2 | Bank of America, N.A. | 100% |
| BOAMS 2005-A | 2-A-1 | Group 2 | Bank of America, N.A. | 100% |
| BOAMS 2005-B | 2-A-1 | Group 2 | Bank of America, N.A. | 100% |
| FFMER 2007-3 | A-2C | Group 2 | First Franklin Financial Corp. | 100% |
| FFMER 2007-4 | 2-A2 | Group 2 | First Franklin Financial Corp. | 100% |
| FFML 2004-FF1 | M-1 | Aggregate | First Franklin Financial Corp. | 100% |
| FFML 2005-FF6 | M-2 | Aggregate | First Franklin Financial Corp. | 100% |
| FFML 2005-FFH1 | M-2 | Aggregate | First Franklin Financial Corp. | 100% |
| FFML 2006-FF18 | A-2C | Group 2 | First Franklin Financial Corp. | 100% |
| FFML 2006-FFH1 | A4, M-2, M-3, M-4 | Aggregate | First Franklin Financial Corp. | 100% |
| FFML 2007-FF1 | A-2C | Group 2 | First Franklin Financial Corp. | 100% |
| MLMI 2004-WMC3 | M-2 | Aggregate | WMC Mortgage Corp. | 100% |
| MLMI 2005-WMC1 | M-1, M-2 | Aggregate | WMC Mortgage Corp. | 100% |
| MLMI 2006-HE2 | A-4, M-2 | Aggregate | Acoustic Home Loans LLC | 39.63% |
| | | | First Horizon Home Loans Corp. | 25.53% |
| | | | Impac Funding Corp. | 14.70% |
| MLMI 2006-MLN1 | A-2C | Group 2 | Mortgage Lenders Network USA, Inc. | 100% |
| MLMI 2006-WMC1 | A-1B | Group 1 | WMC Mortgage Corp. | 100% |
| MLMI 2007-HE3 | A-1, A-2, A-3, A-4 | Aggregate | First NLC Financial Services, Inc. | 31.79% |
| | | | Aegis Mortgage Corp. | 26.09% |
| | | | Mortgage Lenders USA, Inc. | 13.67% |
| | | | EquiFirst Corp. | 11.31% |
| SURF 2005-BC4 | M-1 | Aggregate | MILA, Inc. | 29.83% |
| | | | Wilmington National Finance, Inc. | 28.20% |
| | | | United Pacific Mortgage | 20.00% |
| SURF 2006-BC1 | A-2C | Group 2 | Unspecified | 100% |
| SURF 2006-BC2 | A-2B, A-2D | Group 2 | Unspecified | 100% |
| SURF 2007-BC1 | A-2B, A-2C | Group 2 | Unspecified | 100% |
| AMSI 2004-R6 | A-1, M-4 | Group I, Aggregate | Ameriquest Mortgage Co. | 93.32% |
| | | | Town & Country Credit Corp. | 6.68% |
| CBASS 2004-CB2 | M-1, M-2 | Group I | Impac Funding Corp. | 24.28% |
| | | | Finance America LLC | 17.24% |
| | | | First National Bank of Arizona | 14.39% |
| | | | United Capital Markets Inc. | 10.38% |
| | | Group II | Finance America LLC | 38.64% |
| | | | New Century Mortgage Corp. | 15.79% |

| | | | Oakmont Mortgage Co., Inc. | 13.08% |
|---|---|---|---|---|
| CBASS 2004-CB8 | M-2 | Group I | Ownit Mortgage Solutions, Inc. | 45.99% |
| | | | American Business Financial Services, Inc. | 17.43% |
| | | | WMC Mortgage Corp. | 14.09% |
| | | | Long Beach Mortgage Co. | 4.74% |
| | | | Homefield Financial, Inc. | 3.08% |
| | | Group II | American Business Financial Services, Inc. | 36.06% |
| | | | Ownit Mortgage Solutions, Inc. | 11.94% |
| | | | Staten Island Bank | 9.89% |
| | | | WMC Mortgage Corp. | 7.37% |
| | | | Long Beach Mortgage Co. | 7.36% |
| CBASS 2005-CB6 | A-3 | Aggregate | Wilmington Finance, Inc. | 22.15% |
| | | | First NLC Financial Services, Inc. | 19.45% |
| | | | Lime Financial Services, Inc. | 19.13% |
| CBASS 2006-CB9 | A-2, A-3 | Aggregate | NC Capital Corp. | 29.45% |
| | | | Ameriquest Mortgage Co. | 28.43% |
| | | | Ownit Mortgage Solutions, Inc. | 24.16% |
| | | | AIG Federal Savings Bank | 11.98% |
| CBASS 2007-CB5 | A-2 | Aggregate | Fieldstone Mortgage Co. | 22.50% |
| | | | Wilmington Finance Inc. | 19.99% |
| | | | New Century Mortgage Corp. | 19.93% |
| | | | People's Choice Home Loan, Inc. | 19.70% |
| FMIC 2006-3 | 2-A2, 2-A3 | Group 2 | Fieldstone Mortgage Co. | 100% |
| FMIC 2007-1 | 2-A1 | Group 2 | Fieldstone Mortgage Co. | 100% |
| GEWMC 2005-2 | A-2c | Group 2 | WMC Mortgage Corp. | 100% |
| OOMLT 2004-1 | M-1 | Aggregate | Option One Mortgage Corp. | 100% |
| OOMLT 2005-3 | M-3 | Aggregate | Option One Mortgage Corp. | 100% |
| OOMLT 2005-4 | M-2 | Aggregate | Option One Mortgage Corp. | 100% |
| OOMLT 2005-5 | A-4 | Group II | Option One Mortgage Corp. | 100% |
| | M-2 | Aggregate | | |
| OOMLT 2006-2 | II-A-3 | Group II | Option One Mortgage Corp. | 100% |
| OOMLT 2007-5 | II-A-2 | Group II | Option One Mortgage Corp. | 100% |
| RAMC 2006-1 | AF-4 | Group II | Delta Funding Corp. | 100% |
| RAMP 2004-RS2 | M-II-I | Group II-A | EFC Holdings Corp. | 22.7% |
| | | | HomeComings Financial Network, Inc. | 20.4% |

| | | | Decision One Mortgage Co. | 15.7% |
|---|---|---|---|---|
| | | | EFC Holdings Corp. | 21.3% |
| | | Group II-B | HomeComings Financial Network, Inc. | 17.9% |
| | | | Decision One Mortgage Co. LLC | 16.3% |
| RAMP 2006-RZ3 | A-2 | Aggregate | Decision One Mortgage Co. LLC | 17.7% |
| | | | HomeComings Financial Network, Inc. | 16.2% |
| | | | Southstar Funding, LLC | 10.3% |
| RAMP 2007-RS2 | A-2 | Aggregate | Homecomings Financial, LLC | 10.5% |
| | | | SunTrust Mortgage, Inc. | 10.4% |
| | | | GMAC Mortgage, LLC | 8.4% |
| RASC 2007-KS1 | A-3, A-4 | Aggregate | Homecomings Financial, LLC | 20.4% |
| | | | Ownit Mortgage Solutions Inc. | 18.3% |
| RASC 2007-KS3 | A-I-2 | Group I | Homecomings Financial, LLC | 35.5% |
| | | | People's Choice Home Loan, Inc. | 10.9% |
| RFMS2 2005-HS1 | A-I-5 | Group I | Encore Bank | 14.5% |
| | | | Capital One Home Loans LLC | 10.1% |
| | | | HomeComings Financial Network, Inc. | 7.9% |
| RFMS2 2005-HS2 | A-I-5 | Group I | Encore Bank | 12.6% |
| | | | Capital One Home Loans LLC | 11.5% |
| | | | HomeComings Financial Network, Inc. | 9.5% |
| | A-II | Group II | HomeComings Financial Network, Inc. | 42.3% |
| | | | CTX Mortgage Co., LLC | 9.0% |
| RFMS2 2006-HI2 | A-4 | Aggregate | M&I Bank Federal Savings Bank | 19.5% |
| | | | Irwin Union Bank & Trust Co. | 17.2% |
| | | | Capital One Home Loans LLC | 13.1% |
| | | | HomeComings Financial Network, Inc. | 5.9% |

204.    The systemic breakdown of Defendants' own processes outlined above shows an abandonment of the quality-control processes that should have prevented the securitization of defective loans; and supports the conclusion that, in fact, Defendants routinely securitized defective loans, regardless of originator.  That the Mortgage Loans initiated by the third-party Originators were not generated in accordance with the stated underwriting guidelines (including because they lacked any purported "compensating factors") is also supported by the Prudential's

loan-level analysis of the Mortgage Loans' misrepresented features and their recent dismal performance. But the defective nature of the third-party originated loans is further confirmed by recent revelations about the Originators themselves.

205.     For instance, the OCC, a federal regulator of national banks, has issued a "Worst Ten in the Worst Ten" list to show the ten metropolitan areas that had the highest foreclosure rates in the first half of 2008 for subprime and Alt-A mortgages originated from 2005 through 2007; and the "Worst Ten" originators for each of those metropolitan areas (also measured by foreclosure rates). The "Worst Ten" list contains a remarkable number of the Originators of the Mortgage Loans at issue here: Aegis, Ameriquest, Decision One, Delta Funding, Fieldstone, First Franklin, Fremont Investment & Loan, New Century, Option One, Ownit, People's Choice, Wells Fargo, and WMC Mortgage. A sample of the additional governmental, documentary, and testimonial evidence of the Originators' abandonment of the represented underwriting standards is summarized below.

206.     Defendants had the opportunity to—and did—review the loan files of the Originators as part of their due diligence and their obligations in the securitization process. This review revealed or should have revealed that the actual underwriting practices were vastly inconsistent with the representations in the Offering Materials regarding the purported underwriting standards observed by Defendants and the third-party Originators.

### 1.     Defendant Bank of America, N.A., which also acted as an originator, systemically abandoned its underwriting guidelines

207.     Bank of America, N.A. originated 100% of the Mortgage Loans underlying the BAFC 2006-E, BOAA 2005-7, BOAA 2005-12, BOAA 2006-5, BOMAS 2004-E, BOAMS 2005-A and BOAMS 2005-B Securitizations.

208.    In pursuit of even greater profits, between 2004 and 2007, BofA abandoned its underwriting guidelines in an attempt to increase the volume of loans it originated.  In order to keep pace with the market and to fuel the pipeline of mortgage loans for its own highly profitable securitizations, BofA departed from its own underwriting standards.

209.    BofA was one of the most aggressive competitors in the mortgage market.  Indeed, in a June 13, 2005 e-mail from Angelo Mozilo (founder and Chief Executive Officer of Countrywide) to David Sambol (Chief Operating Officer of Countrywide), Mr. Mozilo complained that even Countrywide could not match some of BofA's riskier products:  "This is the third deal in the last 10 days that BofA has offered that is impossible to beat.  In fact the other two were substantially worse than this one.  It appears to me that BofA is making an aggressive move into mortgages once again."

210.    BofA's entire origination system was designed to allow for flexibility in approving loans that did not adhere to underwriting guidelines.  For example, BofA employed a multi-step process for loan approval, whereby a loan would be entered into an automated system first, but, if it was rejected, the loan would then be referred to a junior underwriter for manual underwriting.  If the junior underwriter did not approve the loan, the application would be escaled to a more senior underwriter with greater "exception" authority.

211.    In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  The FCIC Report stated that, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including BofA.  According to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, the study "showed a

very rapid increase in the volume of these irresponsible loans, very risky loans.  A large

percentage of the[] loans issued were subprime and Alt-A mortgages, and the underwriting

standards for these products had deteriorated." FCIC Report, at 172.

212.    As discussed above, BofA also participated in "warehouse lending," which gave

it close financial ties with otherwise unaffiliated originators, and access to an abundance of

information about the third-party originators' abandonment of their disclosed underwriting

guidelines.  In addition, BofA sought to expand its share of the mortgage securities market by

aggressively pursuing mortgage originators, including Option One, Accredited, and GMAC

Mortgage; offering to pay more for their mortgages than competing Wall Street banks; and

offering to perform less due diligence than its competitors.  At the same time, BofA knew that

the originating banks were churning out risky loans with a high likelihood of default.  As Ken

Lewis, then-CEO of Bank of America Corp. proclaimed on its 2007 second quarter earnings call,

"*Broker [loans] tends to be toxic waste.*"

213.    According to confidential witnesses interviewed prior to the filing of this

Complaint (as expanded upon in Section III), BofA regularly approved loans to unqualified

borrowers, approved loan applications that it *knew* contained false information.  BofA regularly

used exceptions to approve loans even when it was clear that the borrower lacked the ability to

pay.  Indeed, BofA had an entire division—the so-called "Plan C" group—dedicated to

approving problem loans that, according to a former BofA Mortgage Underwriter, "*should not

have been funded under any circumstances.*"  When BofA's underwriters *knew* that loan

applications contained false information, they were told by their superiors to *approve the loans

anyway.*  For example, a former BofA Loan Processor/Junior Underwriter was told that she

"*didn't have to consider evidence*" that directly contradicted borrowers' claims about their

income.  BofA employees also used their "close relationships" with appraisers to manipulate appraisal figures, and according to a former BofA Loan Officer, went so far as to "*doctor the numbers*" in loan applications in order to get loans approved.

### 2. The Merrill-affiliated originator First Franklin Corp. systematically abandoned its underwriting guidelines

214.    First Franklin Corp. ("First Franklin") originated 100% of Mortgage Loans underlying the FFMER 2007-3, FFMER 2007-4, FFML 2004-FF1, FFML 2005-FF6, FFML 2005-FFH1, FFML 2006-FF18, FFML 2006-FFH1, and FFML 2007-FF1 Securitizations.

215.    First Franklin was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

216.    According to confidential witnesses interviewed prior to the filing of this Complaint (as expanded upon in Section III), First Franklin's lending practices were wholly inconsistent with those represented in the Offering Materials:  one witness described First Franklin's underwriting practices as "*basically criminal*."  *Infra* ¶ 516.

217.    First Franklin's loan underwriters were *required* by their managers to give loans to borrowers who clearly did not meet the stated underwriting guidelines, in a way "that [they] did not agree with, but had to" in order to keep their jobs.  *Id*.  When an underwriter rejected a loan because it did not meet the underwriting criteria, a manager would re-direct the loan application to different loan processor who would "*sign behind your back*."  *Infra* ¶ 518.  For example, an underwriter recalled an instance where she was "*one thousand percent convinced*" that the income verifications submitted along with a loan were fraudulent.  *Infra* ¶ 520.  She presented this evidence to her manager, who rejected her concerns, and had the loan approved anyway.  *Id*.

218.     First Franklin's compensation structure also incentivized underwriters to approve defective loans.  *Infra* ¶¶ 519-25.  The bonus system was based solely on the numbers of loans an underwriter closed—not the total number of loans reviewed—which encouraged underwriters to approve as many loans as possible, regardless of actual quality.  *Id.*

219.     First Franklin also regularly abused the appraisal process.  Branch managers routinely "***signed off***" on appraisals with inflated values and "***crazy***" comparables.  (*Infra* ¶ 600.  Managers also hand-picked appraisers that they knew would "***do what [they] wanted,***"and regularly contacted appraisers directly to ask them to change their appraisals and omit key details.  *Id.*

220.     There were no safeguards in place to prevent any of this behavior.  For example, an underwriter emphasized that "no one was telling us to be more scrupulous, and "the audit team did nothing."  *Infra* ¶ 521.  Instead, employees who "***raised a stink***" about First Franklin's underwriting abandonment were regularly threatened with termination, and some underwriters were in fact fired for attempting to "***blow the whistle.***"  *Infra* ¶¶ 517-19.

### 3.     Third-party Mortgage Lenders Network USA, Inc. systematically abandoned its underwriting guidelines

221.     Mortgage Lenders Network USA, Inc. ("MLN") originated the Mortgage Loans underlying the MLMI 2006-MLN1 Offering and Mortgage Loans underlying the MLMI 2007-HE3 Offering.

222.     MLN was the fifteenth-largest subprime lender in the United States.  MLN then experienced a sudden increase in the number of early payment defaults on its subprime loans, and was forced to buy back many loans that were subject to repurchase requests.  MLN shut down its wholesale loan origination business in December 2006, and terminated the majority of its employees.  MLN ultimately filed for bankruptcy.

223.     During the same period, MLN was heavily investigated by state regulators regarding its lending practices.  The Connecticut Banking Commissioner issued a Temporary Order to Cease and Desist, and then an Order of Summary Suspension, prohibiting MLN from issuing mortgage loans until the outcome of a hearing conduct by the Department of Banking. Massachusetts, Rhode Island, Michigan, Maine, New Hampshire, Pennsylvania and Vermont also launched investigations.

224.     MLN's bankruptcy also revealed that the company was being investigated by federal law enforcement officials.  When the originator's liquidating trustee sought leave to destroy MLN's documents and ignore subpoenas, a U.S. Attorney opposed the plan on the grounds that it "threatens to impair federal law enforcement efforts."  Phil Milford & Dawn McCarty, *Mortgage Lenders Network Plan to Destroy Documents Opposed by U.S. Lawyers* (Jan. 21, 2011), http://www.bloomberg.com/news/2011-01-21/mortgage-lenders-network-document-destruction-plan-draws-u-s-challenge.html.

225.     Media reports have confirmed the breakdown of MLN's underwriting standards. For example, a report by ProPublica investigated a loan by MLN to borrower Sheila Ramos, which was included in the MLMI 2007-MLN1 offering and originated and securitized by the same entities at issue here.  Paul Kiel, *The Great American Foreclosure Story*, ProPublica (April 10, 2012), http://www.propublica.org/article/the-great-american-foreclosure-story-the-struggle-for-justice-and-a-place-t/single.  Ms. Ramos reports that "she clearly explained" to her mortgage broker "that she wasn't working because of her injuries and that her family was making do with her mother's Social Security payments and what little other income they could muster."  MLN originated the loan anyway.  ProPublica's later review of her loan file revealed that her income had been misreported at a shocking $6,500 per month.  The file also reported that Ms. Ramos

80

was not delinquent on any mortgage even though the file included documentation that she *was*
delinquent. By ProPublica's calculations, 40% of the mortgage loans backing the MLMI 2007-
MLN1 offering were in foreclosure as of October 2011, and another 21% of the borrowers were
behind on payments. *Id.*

### 4. Third-party originator WMC Mortgage Corp. systematically abandoned its underwriting guidelines

226.     WMC Mortgage Corp. ("WMC") originated all of the Mortgage Loans
underlying the MLMI 2004-WMC3, MLMI 2005-WMC1, MLMI 2006-WMC1, and GEWMC
2005-2 Securitizations, and Mortgage Loans underlying the ABFC 2006-HE1 and CBASS 2004-
CB8 Securitizations.

227.     WMC employed reckless underwriting standards and practices that resulted in a
huge amount of foreclosures, ranking WMC fourth in the report presented to the FCIC in April
2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.
General Electric, which had purchased WMC in 2004, closed down operations at WMC and took
a $1.4 billion charge.

228.     In June 2008, the Washington State Department of Financial Institutions,
Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an
Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect
Investigation Fees against WMC Mortgage and its principal owners individually. Statement of
Charges, No. C-07-557-08-SC01, Jun. 4, 2008.

229.     The Statement of Charges referenced a review of 86 loan files, which revealed
that at least 76 of 86 loans originated by WMC as late as October 6, 2006 were defective or
otherwise in violation of state law. *Id.* Among other things, the investigation uncovered that
WMC had originated loans with unlicensed or unregistered mortgage brokers, understated

amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers, and committed many other violations of state deceptive and unfair practices laws. *Id.*

230.　　In November 2012, U.S. Bank, N.A., as trustee for MABS 2006-HE3 and MABS 2007-WMC1, filed amended complaints and counterclaims against WMC alleging widespread defects in its lending practices. First Amended Complaint ¶¶ 68-82, *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortg. LLC*, No. 12-cv-2149 (D. Minn. filed Nov. 30, 2012; Second Amended Complaint ¶¶ 56-75, *MASTR Asset Backed Securities Trust 2007-WMC1 v. WMC Mortg. LLC*, No. 12-cv-1831, (D. Minn. filed Nov. 30, 2012); U.S. Bank's Fourth Amended Answer, Defenses and Counterclaims ¶¶ 61-75, *WMC Mortg., LLC v. MASTR Asset Backed Securities Trust 2007-WMC1*, No. 12-cv-1372, (D. Minn. filed Nov. 30, 2012). The filings detail how, in numerous cases, WMC's underwriting practices failed to comply with stated guidelines concerning borrower income, debt-to-income ratios, occupancy status, and payment defaults. *Id.*

231.　　WMC extended mortgages to borrowers without regard for their other debt obligations, including one borrower with obligations "understated by at least $1,198,758." *Id.* ¶ 74. WMC mortgages saddled borrowers with unsustainable debt burdens: the loan-file review identified borrowers with DTI ratios of 125%, 151%, and 232%, or with no income and hence no calculable DTI ratio. *Id.* ¶ 76. The review also uncovered widespread lending against non-owner-occupied properties *Id.* ¶¶ 77-78.

232.　　Previously, a review of the relevant loan files found that many of the underlying loans were defective; such basic representations as that no fraud had taken place and that the loans complied with WMC's underwriting guidelines, "were false when made." *See* Complaint ¶

3, *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortg. Corp.*, No. 11-cv-2542 (D. Minn. Sept. 2, 2011). The review of 200 loan files (some of which were from a co-originator, EquiFirst, also at issue in this case) found a 75% error rate.

233. For example, the re-underwriting found that a loan originated by WMC was plagued with misrepresentations of the borrower's income, debt liabilities and occupancy status. In particular, whereas the borrower stated on his loan application that he earned $14,782 per month performing "account analysis," the borrower's income tax returns for the 2005 and 2006 years made it unambiguously clear that he was a taxi driver with a monthly income of only $1,548. Further, the borrower's credit report disclosed two additional mortgages for $435,000, which the borrower failed to disclose on his loan application. Finally, contrary to the borrower's representations, the property he sought to purchase with the loan in question was not the borrower's primary residence, and as a result, the rental obligations of the borrower's actual primary residence added another $2,200 of monthly debt liabilities. In sum, if the borrower's characteristics were viewed in a true and accurate light, the borrower's debt-to-income ratio rose from an acceptable 34.9% to an incredible 761.7%. *Id.* ¶ 24.

234. According to the review of the related loan file and other information, another loan originated by WMC likewise contained numerous misrepresentations of the borrower's income, the co-borrower's income, and the borrower's undisclosed debt liabilities. Specifically, instead of her stated $9,200 monthly income as a billing manager, the borrower actually worked as an optometric technician, making $2,405 per month. Similarly, the co-borrower misrepresented his income and occupation to be $8,800, earned as a grade check, rather than the actual $2,843, earned as a laborer. Moreover, in the same month the borrower closed this loan, the borrower had also refinanced another, unrelated property, which increased her debt liabilities

by over $100,000. The borrower's loan application did not reflect the refinancing and the associated DTI increase. Even without the additional debt obligation resulting from the refinancing, the borrower's actual DTI increased from a reasonable 31.7% percent to an impermissible 108.8%. *Id.* ¶ 25.

235.  According to the trustee's complaint, the re-underwriting of a large sample of loans—the same type of loans, generated by the same originator, at the same time as at issue in this case—provided "compelling reason to believe that the vast majority" of the WMC loans were infected with similar frauds. The consistency of the trustee's findings with Prudential's own loan-level analysis of the WMC loans at issue in this case, as well as its consistency with the findings of the Washington State Department of Financial Institutions, confirms that WMC's underwriting problems were systemic. *Id.* ¶ 3.

236.  On January 20, 2012, the *L.A. Times* reported that the FBI and United States Department of Justice have been investigating possible mortgage origination fraud at WMC. According to the *L.A. Times*, "the government is asking whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans"; "the FBI's San Francisco office . . . has been looking into WMC's business practices for nearly two years"; and "the bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sales of mortgages to investors." Michael Hudson and E. Scott Reckard, "GE Lending Unit Said to be Target of U.S. Probe," *L.A. Times* (January 20, 2012), http://articles.latimes.com/2012/jan/20/business/la-fi-mortgage-probe-20120120.

237.  Former WMC employees have also provided first-hand evidence that WMC not only abandoned its underwriting standards and practices, but that WMC and its employees engaged in out-and-out fraud to increase profits and commissions. These employees provided

this evidence in interviews with *iWatch News,* which acts as an online publication dedicated to investigative and accountability reporting for the Center for Public Integrity, one of the oldest and largest non-partisan, non-profit investigative news organizations. Dave Riedel, a former compliance manager at WMC who supervised a quality-control team of a dozen or more people in Southern California, told *iWatch News* that WMC "sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors." Michael Hudson, "Fraud and folly: The untold story of General Electric's subprime debacle," *iWatch News* (January 6, 2012, last updated January 23, 2012), http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

238. Riedel and his team uncovered numerous examples of fraud committed by WMC employees. "These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents. Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms." In 2005, Riedel and his team became particularly concerned about a sales manager who oversaw the funding of hundreds of loans each month. Riedel told *iWatch News* that "[a]n audit of those loans . . . found that many of the deals showed evidence of fraud or other defects such as missing documents." Riedel brought these concerns to WMC's management, which took no disciplinary action against the sales manager. Later, Riedel informed a visiting GE compliance official of the audit and of WMC's failure to respond. As apparent payback for alerting management to the fraud he uncovered, Riedel lost his office and staff and was demoted.

239.     Also according to the 2012 report, in May of 2006, Riedel presented GE officials with results of an internal audit of loans that investors had asked WMC to repurchase, which indicated that "78 percent of them had been fraudulent" and "nearly four out of the five loan applications backing these mortgages had contained misrepresentations about borrower's incomes or employment."  Upon information and belief, WMC made no changes to its origination practices, procedures, or internal control in response to Riedel's presentation.

240.     Gail Roman, a former loan auditor at WMC's regional offices in New York, informed *iWatch News* that she "dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications," but "[m]anagement ignored [her] reports and approved the loans anyway."  Roman reported that WMC "didn't want to hear what you found . . . .[e]ven if you had enough documentation to show that there was fraud or questionable activity."

241.     Victor Argueta, a former risk analyst at WMC, told *iWatch News* that "one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved."  These documents included bank statements, W-2s and "'[a]nything to make the loan look better than what was the real story.'"  In another instance, Argueta reported to management that certain salespeople "were putting down fake jobs on borrowers' loan applications" and "listing their own cell phone numbers so they could pose as the borrowers' supervisors and 'confirm' that the borrowers were working at the made-up employers."  Despite's Argueta's report, WMC's management took no action against the offending salespeople.

242.     WMC Confidential Witness 1 ("WMCCW1"), a "Loan Analyst" (underwriter) in WMC's Dallas Office from early 2004 to 2006, provided further evidence of WMC's troubling underwriting practices in an interview with Prudential's counsel.  WMCCW1 described a

lending operation poisoned by conflicts of interest in many forms, including: (1) situations where underwriters rejected loan applications only to be overridden by managers; (2) pervasive efforts by salespeople to curry favor from underwriters by offering gift cards, bottles of liquor, dinners out, and sports tickets; (3) a bonus structure so skewed in favor of loan approvals that WMCCW1 could *double* her salary based on volume of loans closed; (4) rampant nepotism in the company's hiring and promotion decisions, which led to unqualified and inexperienced employees in positions of authority; (5) cozy relationships among loan officers and managers, which WMCCW1 explained created a conflict of interest because managers had authority to approve exceptions and waive applicable underwriting standards.

243.    WMCCW1 explained that WMC's culture and business practices hollowed out the lender's purported underwriting standards.  "***Nothing was fraudulent in the world of mortgages***."  It was "called '***creative thinking***.'"  For example, even brazenly fraudulent conduct such as doctored paystubs or reported incomes were not reported to any internal department.  She stated that "a lot of exception loans" were approved, and that she saw the numbers increase at the end of the month as loan officers scrambled to "***make quota***."

### 5.    Third-party originator Option One Mortgage Corp. systematically abandoned its underwriting guidelines

244.    Option One Mortgage Corp. ("Option One") originated or acquired all of the Mortgage Loans underlying the ABFC 2006-OPT1, OOMLT 2004-1, OOMLT 2005-3, OOMLT 2005-4, OOMLT 2005-5, OOMLT 2006-2, and OOMLT 2007-5 Securitizations, and Mortgage Loans underlying the ABFC 2005-HE1 Securitization.

245.    Option One was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc., in April 2008. According to the Comptroller of the Currency's "Worst Ten in the Worst Ten" list, Option One

was ranked as the sixth-worst mortgage originator by number of foreclosures in the worst-affected metropolitan areas.

246.     Confidential witnesses confirm Option One's systemic abandonment of underwriting guidelines.  Option One Confidential Witness 1 ("OOCW1") was the Post-Closing Team Lead at Option One from December 2002 until 2007.  OOCW1 stated that, during the appraisal process, mortgage loan underwriters at Option One would call their "appraiser friends" and communicate to the appraiser the requisite appraisal value for approval of the mortgage loan being underwritten.  OOCW1 said that many borrowers—an "abundance" of elderly borrowers in particular—were put into ARM loans and did not fully understand the terms of the loans.  According to OOCW1, this got Option One into "trouble," and the result of the "push" for loans resulted in borrowers quickly getting "upside down" on their mortgages.

247.     OOCW1 explained an institutional breakdown in underwriting standards:  even if she saw a stated income where a "bell boy was making $100,000 a year . . . *it was not our responsibility to stop that loan*."  She explained that she routinely saw loans with obvious signs of borrower misrepresentations, and that these were still funded even after being referred to a manager.

248.     Option One Confidential Witness 2 ("OOCW2") was a National Credit Underwriting Manager at Option One from 2001 to 2004.  According to OOCW2, the institutions that purchased loans from Option One "*didn't care*" about underwriting guidelines and only cared about the FICO scores of the borrowers.  OOCW2 often saw that loans he refused to underwrite were subsequently underwritten by his co-workers:  "*magically, the loan would appear*" in the portfolio.  In addition, if an applicant had a FICO score within guidelines,

OOCW2 was not empowered to reject the application, even if he did not think the borrower would be able to repay the loan.

249.   Option One Confidential Witness 3 ("OOCW3") was a Mortgage Underwriter at Option One from 2004 to 2006. OOCW3 stated that Option One's sales force was primarily paid on commission, so the volume of mortgage loans originated was critical to them. According to OOCW3, there was no consequence, either to Account Executives or Underwriters, if a borrower defaulted on his or her first mortgage payment. In addition, Account Executives often went behind the backs of Underwriters who rejected a loan and would simply seek approval from management.

250.   According to OOCW3, stated income loans were difficult, and at times, impossible to verify. Loans that met the guidelines but looked dubious, such as a cosmetologist or landscaper making an annual income of over $100,000, were made every day. In spite of the fact that OOCW3 felt that the cosmetologist likely was not earning the income stated on the application, OOCW3 did not have discretion to reject the loan. According to OOCW3, numerous loans with such misrepresentations were approved on a daily basis. As to owner-occupancy fraud, OOCW3 estimated that approximately one loan file a day had a misrepresentation regarding owner occupancy status, and several such loans were funded every week. Loans were "absolutely" funded despite the borrowers' misrepresentations.

251.   Clayton Confidential Witness 1 ("CCW1") was an Underwriting Project Lead at Clayton, who oversaw third party due diligence of sample pools of loans, including those originated by Option One. CCW1 discovered that Option One loans were exceptionally "bad loans . . . about as bad as could be." According to CCW1, Option One employed a practice known as "rugging." This meant attributing purported "compensating factors" to loan applicants

that bore no logical relationship to a lower credit risk. Consequently, borrowers would be upgraded into products they could not afford based on what CCW1 stated could, at best, be considered "wishful thinking." CCW1 also noted that Option One made loans with DTIs as high as 60% and relied on appraisals that were "real goofy." In addition, according to CCW1, Option One frequently refinanced loans that were six to eight months old, a practice that produces loans that are inherently presumed to be high risk.

252. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June. 3, 2008) (the "Option One Complaint"). According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." Option One Complaint ¶ 4. The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home." *Id.* ¶ 8. It also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* Option One's "origination policies . . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* ¶ 1.

253. On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL

5970550 (Mass. Super. Ct. Nov. 24, 2008). On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

254.    On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*, Massachusetts Attorney General (Aug. 9, 2011). Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices. The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See, e.g.*, Bloomberg.com, *H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit*, (Aug. 9, 2011).

255.    Further, former Option One employees have reported that:

- If an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, "the biggest screamer and shaker of trees gets the most fruit." For a "top-producing" account executive, whatever red flags there were would be "overlooked," and invariably the loan would be pushed through. It is estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner, and also stated that a loan applicant could tell "a straight up lie" about his income, but the untrue information would be overlooked and the loan would be approved, despite initial rejection of the application.

- Option One approved stated income loans "knowing good and well that those people did not make that much money in the position they were in."

- "The overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed. However, employees felt pressured to push loans through because every loan generated income and "[i]f you applied any level of rational thought, you were frowned upon."

- With respect to artificially inflated appraisals, an employee admitted that "[o]f course they inflated values." If an underwriter questioned the appraisal value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file.

- Option One's appraisals "were all bad," and borderline fraudulent, not merely incompetent. However, underwriters were unable to prevent loans based on the flawed appraisals.

- When employees objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department said to go forward with the loan.

- Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street banks to be securitized. An Assistant Vice President of Option One from 2005 to 2007, who worked in the Correspondent Lending department, which purchased loans from small mortgage companies, stated that Option One purchased loans that raised concerns under the stated guidelines and that when he raised such concerns he was essentially told, "Shut up, Wall Street will buy it; don't worry about it."

- "If [a borrower] had a FICO and a pulse, they could get a loan" from Option One.

- There were instances where employees "caught blatant fraud, and the [account executive] would still fight for it. [The account executives and managers] would fight me because they didn't care. They knew they were going to sell it on the secondary market, and they didn't care because it wasn't their money. They were going to get paid regardless. . . . At Option One they didn't have a portfolio; they sold everything, so they didn't care. . . . [Option One] didn't have to worry about it, because once they're done with these crappy loans, they'd sell them off. They were the investors' problem."

**6. Third-party originator CitiMortgage, Inc. systematically abandoned its underwriting guidelines**

256.    CitiMortgage, Inc. ("CitiMortgage") originated or acquired all of the Group 1 Mortgage Loans underlying the BAFC 2004-2 Securitization.

257.    In 2005, CitiMortgage began aggressively expanding its subprime and Alt-A loan production. Loans originated by CitiMortgage were woefully deficient in terms of their

underwriting and eventual performance, and suffered from severe infirmities that eventually led to significant defaults and losses that infiltrated Citigroup's RMBS and CDO securitizations.

258. Confidential witnesses have detailed the numerous flaws in CitiMortgage's loan origination processes. CitiMortgage Confidential Witness 1 ("CMCW1") was a CitiMortgage Senior Underwriter, Regional Site Manager, and Senior Fraud Investigator in the Fraud Prevention and Investigation Department from September 2006 through March 2009. CMCW1 states that in 2006, as other lenders were tightening underwriting guidelines and getting away from stated income loans, CitiMortgage was "totally counter-cyclical" and "really geared it up" in 2006 with loosened guidelines, loan approvals based on exceptions to guidelines, and stated income loans. According to CMCW1, by late 2006, CitiMortgage "was the only game in town" for mortgages that made it easy for borrowers to be approved. As a result, CMCW1 explained, CitiMortgage's loan volume continued to increase from late 2006 through 2008.

259. CMCW1 stated that traditional standards of mortgage loan underwriting were rarely taken into account at CitiMortgage. According to CMCW1, the only focus was "Can we sell this loan to someone?" and if the answer was yes, then the mortgage loan was approved. CMCW1 stated that employees with deep experience in the mortgage loan industry knew that at some point the mortgage loans might fail, and they advised senior management of these risks, but senior management "didn't want to hear it." Instead, CMCW1 stated, loan production staff was always too busy at month-end, "shoving" funded loan files to the next level.

260. According to CMCW1, most of CitiMortgage's loans were stated income. Even if an underwriter believed a stated income on a mortgage loan application was inflated, the underwriter was required to discuss the issue with the underwriting manager in the location where the loan was originated. The underwriting manager would usually approve the mortgage

loan in spite of the underwriter's concerns. He explained management's philosophy as: "*If you squinted one eye and looked closely at the loan file, then it would seem OK*." Underwriting standards were routinely waived based on "*creampuff reasons*" that CitiMortgage employees could could come up with: "*[i]f you built a case for it, you could probably get it done*."

261. CMCW1 stated that management ignored warnings about stated income loan programs. For example, when a fraud investigator at CitiMortgage told executive management that stated income loan programs made it too easy to defraud the lender, the executive management essentially responded, "Yeah, we know, but it meets the guidelines." In spite of these warnings, there was no effort to comprehensively search for and eliminate fraud in the stated income loan applications.

262. CMCW1 explained that the CitiMortgage Production team was essentially in charge of the underwriters and "turned on their blinders in order to meet the numbers" for volume production so that the Production team would receive their bonuses. The Production team regularly told underwriters "don't bother looking" at the mortgage application or file documentation and just approve the files for funding. CMCW1 explained that the production team conveyed in no uncertain terms that they didn't care how the underwriters accomplished it, but they expected the underwriters to find a way to approve each and every mortgage loan application.

263. According to CMCW1, exceptions to the already loosened underwriting guidelines based on "compensating factors" were for reasons that were frequently vague and flimsy. For example, loan applicants would sometimes write letters describing a recent medical problem to try to explain away why the applicants' income or assets fell short of underwriting guidelines. The letter would say that the applicant was "back on my feet now" and so would be

able to earn income again. CMCW1 explained that underwriters would regularly see such letters with identical wording coming from the same brokers, a clear indication of fraud, but some underwriters would nevertheless approve mortgage loan applications by using such letters as compensating factors to circumvent the underwriting guidelines.

264. CMCW1 stated that debt-to-income ratios were routinely "worked and re-worked and were backed into" to get within the underwriting guidelines. As a result, CMCW1 explained that any unexpected event in the borrower's life could have made the borrower immediately be unable to afford their monthly mortgage payment. CMCW1 also stated that he underwrote loans with LTV ratios that were "easily 100%."

265. CitiMortgage Confidential Witness 2 ("CMCW2") was an underwriter at CitiMortgage from March 2003 to June 2006 and an Operations Control Analyst from June 2006 to January 2007. CMCW2 stated that CitiMortgage underwriters did not have to make many exceptions to the minimum FICO scores when underwriting mortgage loans because the Desktop Underwriter program already allowed for a *20-30% variance* below the "minimum" FICO score requirements. CMCW2 further explained that if the FICO score was more than 20-30% below the "minimum" and the Desktop Underwriter program would not approve the mortgage loan application, the application had to go to a Risk Management Executive, who approved about 30% of applications that Desktop Underwriter rejected.

266. Citigroup consolidated its mortgage operations beginning in 2005 in order to expand into the subprime market. Beginning in 2005 and throughout 2006, Citigroup furiously expanded its subprime mortgage originations. By 2006, Citigroup was the fourth largest overall mortgage originator, with $132.92 billion of originations in the first nine months of 2006.

267.     Citigroup increasingly relied on acquisitions of loans from Citigroup's correspondent lender channel to build and sustain its market share growth and position as the fourth largest mortgage originator.  A correspondent lender is a lender that has a secured line of funds from a wholesale lender, such as Citigroup, that it uses to write and fund loans which are then transferred to the wholesale lender after closing.  Citigroup also increasingly relied upon its correspondent channel to generate loan production for itself and the securitization pools it was supplying.  The value of Citigroup's portfolio of correspondent channel loans ballooned from approximately $69 billion in 2005, to $88 billion in 2006, and to $94 billion in 2007.  These loans were permeated with fraud.

268.     As spelled out in a March 3, 2008 confidential presentation entitled "The Subprime Crisis: An Overview," Citigroup admitted that "the late-2006, early-2007 subprime originations are generally regarded as the poorest credits."  Citigroup further stated that "70+% of 2005-2006 subprime origination loans were '2-28' or '3-27' ARMs with low 'teaser' rates."

269.     In a recent $158.3 million settlement with the United State Department of Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA"), CitiMortgage admitted violations of government underwriting standards, more specifically that it had "failed to comply fully with all HUD-FHA requirements with respect to certain loans." Stipulation and Order of Settlement and Dismissal, *United States v. Citigroup*, 11-cv-5473 (S.D.N.Y. Feb. 13, 2012).  Among other things, CitiMortgage admitted that it endorsed loans that did not meet HUD's underwriting requirements and submitted "certifications stating that certain loans were eligible for FHA mortgage insurance when in fact they were not." *Id.* ¶ 2.

270.     The Complaint alleged that Citigroup's fraud unit, which was supposed to investigate potentially fraudulent loans it had originated, had a backlog of over 1,000 fraudulent

loan referrals that it never investigated for both FHA and non- FHA loans. *Id.* ¶¶ 49-51. Instead of investigating these loans, the fraud unit simply deleted the referrals. *Id.* ¶ 51. The government complaint also revealed that in 2008, HUD conducted an audit of loans that had been originated in 2006 and 2007, and found "material underwriting deficiencies in one-third of the defaulted loans they reviewed," including failures to properly assess the credit history and liabilities of borrowers, the assets used to qualify for loans, and the borrower income. *Id.* ¶ 61.

### 7. Third-party Originator Accredited Home Lenders, Inc. systematically abandoned its underwriting guidelines

271. Accredited Home Lenders, Inc. ("Accredited") originated Mortgage Loans underlying the ABFC 2005-HE1 and ABFC 2006-HE1 Securitizations.

272. Accredited has also been the target of lawsuits arising from its subprime origination practices and violations of reasonable underwriting and appraisal standards. Allegations include that senior managers in Accredited sales divisions frequently overruled decisions by their underwriters to reject loans. The number of overrides became so large that the originators were forced to institute a system to track such overrides, and to note when loans were made "as a business decision over the recommendation of the underwriter."

273. Accredited similarly allowed corporate underwriters and sales managers to override the decision of licensed property appraisers in order to ensure that loans were closed. Frequently, when an appraisal reviewer would conclude that an appraisal had been inflated and reject a loan application, the account executive who submitted the loan application would appeal the rejection to a sales manager who would then issue an override. Overrides were so frequent that (although unbeknownst to Prudential) by June 2006, over 10% of Accredited's total loans resulted from management overrides.

274.     Accredited Home Lenders was later forced to delay its 2006 annual filing, which was described by one journalist as "a Reader's Digest version of how subprime loans went from lucrative sources of returns to tripping up financial markets and threatening the survival of many of the companies that helped fuel the housing boom."  Matt Krantz, *Accredited Home Lenders' Filing a Subprime "Obituary,"* USA Today, http://abcnews.go.com/Business/story?id= 3442805&page=1.

275.     Claims asserted against Accredited for making false or misleading statements of material fact regarding Accredited's purported prudent underwriting guidelines have already been sustained under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.  *See Atlas v.  Accredited Home Lenders Holding Co., et al.*, No.  07-cv-488 H, slip op. at 13 (S.D. Cal.  Jan.  4, 2008) (sustaining allegations that "Defendants' statements regarding Accredited's underwriting practices were allegedly false and misleading because Defendants had caused Accredited to deviate from its publicly professed standards").

276.     On May 1, 2009, Accredited filed for bankruptcy.  In bankruptcy filings, Accredited has disclosed that it faces more than $200 million in repurchase claims.

277.     Further, on information and belief, former employees will testify that:

- Underwriting decisions were frequently overridden by managers on the sales side of the business.  The number of overrides grew so large that Accredited had to create a system just to track them—including a box to check that the override was given just "as a business decision" by higher-level management.  When underwriters complained, they were told "you have to go forward with it," or directly just ask "do you want a job?"

- If a loan was rejected as a subprime loan, it was re-submitted as a stated-income loan.

- Accredited employees routinely falsified and/or manipulated appraisals.

### 8. Third-party Originator Fremont Investment & Loan systematically abandoned its underwriting guidelines

278.    Fremont Investment & Loan ("Fremont") originated Mortgage Loans underlying the ABFC 2004-HE1 Securitization.

279.    Fremont was one of the country's largest and most reckless subprime mortgage lenders until it was shuttered by the FDIC. According to the Senate Permanent Subcommittee:

> Fremont Investment & Loan was once the fifth largest subprime mortgage lender in the United States. At its peak in 2006, it had $13 billion in assets, 3,500 employees, and nearly two dozen offices. Fremont Investment & Loan was neither a bank nor a thrift, but an "industrial loan company" that issued loans and held insured deposits. . . . . In June 2008, Fremont General Corporation declared bankruptcy under Chapter 11 . . .

SPSI Report at 237-38. Fremont was among the OCC's "Worst Ten in the Worst Ten" list of originators.

280.    In 2009, it was reported that the FDIC's move against Fremont, at the direction of Chairperson Sheila Bair, was the first government action against a subprime lender. As reported in the *New Yorker*: "Fremont was among the worst of the subprime offenders, using all the now familiar practices: targeting people with bad credit, ignoring traditional standards for underwriting home loans, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans. 'We ordered them out of the business,' she said. 'And they weren't happy about it.'" Ryan Lizza, *The Contrarian: Sheila Bair and the White House financial debate*, New Yorker, July 6, 2009.

281.    The FDIC, in its Order to Cease and Desist in the action styled *In the Matter of Fremont Investment & Loan, Brea, California*, Docket No. FDIC-07-035b, concluded that Fremont had been, among other things: "engaging in unsatisfactory lending practices, . . . marketing and extending [ARM] products to subprime borrowers in an unsafe and unsound manner, . . . approving borrowers without considering appropriate documentation and/or

verification of their income, . . . approving loans or 'piggyback' loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the collateral . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms."

282.     On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of loans issued to Massachusetts residents.  As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the conclusion that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow." *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).  The terms of the preliminary injunction were made permanent by the June 9, 2009 settlement.

283.     Similarly, on June 9, 2009, Massachusetts Attorney General Martha Coakley announced a $10 million settlement with Fremont that resolved charges "that the company was selling risky loan products that it knew was designed to fail, such as 100% financing loans and 'no documentation loans.'"  As alleged in the Attorney General's complaint:

> Fremont issued thousands of subprime loans, with multiple layers of risk, through mortgage brokers who regularly provided Fremont with false information that Fremont intentionally, recklessly or negligently failed to verify or audit . . . . Fremont knew or should have known substantial numbers of its subprime loans, especially absent prompt refinancing, would foreseeably fail and result in foreclosure, but nonetheless made the loans to promptly package and sell to the secondary market.

Complaint ¶ 2, *Commw. of Mass. v. Fremont Investment & Loan,* Case No. SUCV 2007-4373 (Mass. Super. Ct. October 4, 2007).

284.    Roger Ehrnman, Fremont's former regulatory compliance and risk manager, substantiated the findings of the Massachusetts Attorney General and the FDIC when he told the FCIC that Fremont repeatedly attempted to place rejected loans into the pools of mortgages that were to be sold to investors and "had a policy of putting loans into subsequent pools until they were kicked out three times." FCIC Report at 168.

285.    Fremont was singled out by Senator Carl Levin in his opening remarks to the Permanent Subcommittee and Investigations' hearing on Wall Street and the financial crisis; he noted that Fremont is "known for loans with high rates of delinquency." In her testimony to the FCIC, Vicki Beal, Senior Vice President of the due-diligence firm Clayton, was asked whether there were "some loan originators who just weren't as good as [the] others." She identified, among others, Fremont.

286.    Fremont Confidential Witness 1 ("FCW1") was a Senior Loan Processor at Fremont from 2001 through May 2007. FCW1's job was to gather the documents necessary to satisfy the "stipulations" required by Fremont's underwriters (such as paystubs, tax returns, and appraisals). FCW1 felt a sense of urgency and a pressure to close loans, and to possibly compromise lending standards, because of the "catch-22" created by the fact that underwriters and loan processors were only given bonuses on how many loans were closed—not how many were reviewed. In gathering documents, FCW1 had suspicions about incomes being claimed, such as "a waitress [that] was making an obscene amount of money." Nonetheless, "we had to accept it." The high claims of income, according to FCW1, became a joke amongst personnel in the lending center. According to FCW1, another "joke" amongst Fremont's lending center personnel was inflated appraisals. It was "obvious" that many appraisers were "not impartial" and engaged in "a lot of shady stuff."

287.     Fremont Confidential Witness 2 ("FCW2") was a loan processor at Fremont from 2002 to 2004, and a Senior Account Manager for Fremont in 2006. FCW2's duties included ensuring that the needed documents were included in the loan file. There was not only a quota of loans that the underwriters had to hit, but they were paid for every extra loan, and the entire team got paid even more if they collectively closed a given number of loans. According to FCW2, there were "some dubious loans" at the time, and underwriters would be "persuaded" to approve loans they were unsure about. Appraisals could "get a little sticky," and FCW2 had heard of instances where comparable sales were left off because they did not assist the needed appraisal.

288.     Fremont Confidential Witness 3 ("FCW3") was a Compliance Analyst at Fremont in 2005 and 2006 that was responsible for investigating suspicious activity. FCW3 noted that Fremont had very high loan production goals for its lending centers, but its compliance staffing was "very low." FCW3 formed the conclusion that management's understanding and interest in risk and compliance matters was "fairly low." Overall, the percentage of files FCW3 examined that had compliance-related shortcomings was "pretty high," suggesting a "structural process problem." He could not help but notice that many large loans were being granted to borrowers claiming assets in the form of automobiles and jewelry—yet, suspiciously, little cash in the bank.

289.     Fremont Confidential Witness 4 ("FCW4") was a VP Credit Officer at Fremont from 2006 to 2007. FCW4 described how Fremont would fund loans that made him "*cringe*." "*It's a given the products weren't good*." Singling out Merill, FCW4 stated that Fremont's clients "*bought anything*." If a loan was defective, oftentimes it was not kicked out of a pool but

simply purchased at a discount. As FCW4 explained, Fremont lacked any "reasonableness test" for stated-income loans until months before its bankruptcy.

290. Fremont Confidential Witness 5 ("FCW5") was a Senior Account Manager at Fremont from 2002 to September 2004, and again from October 2006 through April 2007. She explained that Fremont originated "**dubious loans**" based on "thin" justifications because the underwriting guidelines were "**open to interpretation**." If a Fremont underwriter was reluctant to approve a loan, he or she would frequently be "persuaded" by a higher-up to approve.

291. On information and belief, former Fremont employees will testify that:

- Fremont's Regulatory Risk Management group submitted numerous, repeated adverse written findings to senior Fremont executives in 2005 and 2006, which highlighted, among other things, unfair and deceptive acts, poor underwriting, and problematic incentive compensation.

- Fremont filed repeated Suspicious Activity Reports ("SARs") regarding broker fraud as to certain brokers, but Fremont executives would not end its relationships with the identified brokers.

- Fremont underwriters were instructed that Fremont's underwriting policies were merely a "guide," and broad use of exceptions to the policies was promoted in order to drive loan quantity. Indeed, between 2005 and 2007, an estimated 30% of Fremont's loans had some sort of exception, partly because anyone from an assistant manager on up had the authority to approve exceptions.

- Fremont would convert borrowers who were rejected under full documentation loan applications to "stated income" loans—with a higher reported income than previously documented—so that the loans were ultimately approved.

- Fremont underwriters would ignore obviously fraudulent documents when approving loans, and when information could not be falsified. Fremont underwriters would simply remove it from the application files.

- Fremont underwriters would call appraisers and directly request that they inflate their appraisal values in order to close a deal.

- Fremont experienced rampant fraud with regard to appraisals, such as appraisals that were incomplete, did not match the address of the property, or described the home as owner-occupied, when it was rented.

### 9. Third-party originator Wells Fargo Bank systematically abandoned its underwriting guidelines

292.     Wells Fargo Bank ("Wells Fargo") originated or acquired Mortgage Loans underlying the ABFC 2004-HE1 Securitization.

293.     Wells Fargo's poor underwriting practices have been the subject of numerous suits and investigations by investors and government actors.  For example, in March 2009, RMBS investors filed suit against Wells Fargo, alleging that it had misrepresented its underwriting guidelines and loan quality.  In denying in part a motion to dismiss, the court found that plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process." *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010).  Wells Fargo subsequently agreed to settle the investors' claims.

294.     In July 2009, the Attorney General of Illinois filed a lawsuit, *People v. Wells Fargo & Co.*, No. 09-CH-26434 (Ill. Cir. Ct. 2009), alleging that Wells Fargo "engaged in deceptive practices by misleading Illinois borrowers about their mortgage terms."  The complaint describes that borrowers were placed into loans that were "unaffordable and unsuitable," and that Wells Fargo "failed to maintain proper controls to ensure that borrowers were not placed into mortgages that were riskier or more expensive than the mortgage loans for which they were qualified."

295.     In April 2010, the City of Memphis filed a complaint in *Memphis v. Wells Fargo Bank*, No. 09-cv-02857 (W.D. Tenn. 2009), alleging that Wells Fargo "failed to underwrite African-American borrowers properly."  A similar lawsuit was filed by the City of Baltimore, *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, No. 08-cv-00062 (D. Md. 2008).  The *City of Memphis* and *City of Baltimore* complaints include sworn declarations from

many former Wells Fargo employees providing evidence of predatory lending and abandonment of underwriting guidelines. For instance, Camille Thomas, a loan processor at Wells Fargo from January 2004 to January 2008, stated under oath that loans were granted based on inflated appraisals, which allowed borrowers to get larger loans than they could afford due to the impact on the LTV calculation and some loans were even granted based on falsified income documents. Similarly, another affidavit by Doris Dancy, a credit manager at Wells Fargo from July 2007 to January 2008, stated that managers put pressure on employees to convince people to apply for loans, even if the person could not afford the loan or did not qualify for it. She was also aware that loan applications contained false data used to qualify customers for loans.

296.     The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007. Ms. Parmer confirmed that, during her tenure, Wells Fargo's underwriting standards were loosening, adding that they were being applied "on the fly" and that "[p]eople were making it up as they went." She also told the FCIC that 99 percent of the loans she would review in a day would get approved, and that, even though she later became a "fraud analyst," she never received any training in detecting fraud. The FCIC's January 2011 Report described how "hundreds and hundreds and hundreds of fraud cases" that Ms. Palmer knew were identified within Wells Fargo's home equity loan division were not reported to FinCEN.[3] In addition, according to Ms. Palmer, at least half the loans she flagged for fraud were nevertheless funded over her objections.

297.     In July 2011, the Federal Reserve Board issued a consent cease and desist order and assessed an $85 million civil money penalty against Wells Fargo & Co. and Wells Fargo Financial, Inc. According to the Federal Reserve's press release, the order addressed in part

---

[3] FinCEN is the Financial Crimes Enforcement Network, a bureau within the Treasury Department that collects and analyzes information regarding financial fraud.

allegations that "Wells Fargo Financial sales personnel falsified information about borrowers' incomes to make it appear that the borrowers qualified for loans when they would not have qualified based on their actual incomes." The Federal Reserve Board also found that the poor practices of Wells Fargo were fostered by Wells Fargo Financial's incentive compensation and sales quota programs, and the lack of adequate controls to manage the risks arising from those programs. Wells Fargo was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

298.    In October 2012, the federal government sued Wells Fargo for churning out thousands of fraudulent loans, alleging that Wells Fargo "engaged in a regular practice of reckless origination and underwriting," which "was a function of management's nearly singular focus" on origination volume. Complaint ¶¶ 2-3, *United States v. Wells Fargo Bank, N.A.*, No. 12-cv-7527 (S.D.N.Y. Oct. 9, 2012). "Well's Fargo's management was aware that a substantial percentage of its retail FHA portfolio—nearly 50% in certain months—did not comply with HUD requirements, contained an unacceptable level of risk, and therefore was ineligible for HUD insurance." *Id.* ¶ 41. The complaint alleges that Wells Fargo's deficient underwriting dealt hundreds of millions of dollars in losses to the federal government. *Id.* ¶ 131.

299.    The government's complaint identified widespread problems with Wells Fargo's underwriting processes that contributed to an explosion of improvident lending. It details how Wells Fargo rapidly filled its ranks with temporary hires who were inadequately trained and who were compensated based on the number of loans approved. *Id.* ¶¶ 42-43. "Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans. And management required underwriters to make decisions on loans on extremey short turnaround tise and employed lax and inconsistent underwriting

standards and controls." *Id.* ¶ 44. The government also found that the "huge decline in loan quality was detected contemporaneously by Well's Fargo's Quality Assurance division and was directly reported to senior management." *Id.* ¶ 46 "Despire these troubling findings, Wells Fargo's management failed to take action," *id.* ¶ 47, so that problem "escalated tremendously" even after concerns were raised, *id.* ¶ 48.

300.     Wells Fargo Confidential Witness 1 ("WFCW1") was an underwriter at Wells Fargo from 2005 through 2011. He explained that Wells Fargo demanded that he approve four to five loans every day, which he said compromised underwriting quality. WFCW1 noted that the culture at Wells Fargo placed heavy stress on volume—it was "***like a sweatshop***"—and affected not only his underwriting decisions but also led to management overrides. He stated that many loans that did not conform to guidelines were approved "over [his] head" when a salesperson appealed his decision to a manager. WFCCW1 also described a working environment riddled with conflicts of interest: salespeople were dedicated to a single underwriter, and often gave gifts to underwriters responsible for approving their loans.

### 10.     Third-party originator New Century systematically abandoned its underwriting guidelines

301.     New Century Mortgage Corp. ("New Century") and its affiliate NC Capital Corp. originated Mortgage Loans underlying the CBASS 2004-CB2, CBASS 2006-CB9, and CBASS 2007-CB5 Securitizations.

302.     Once one of the nation's largest mortgage origination companies, New Century collapsed and filed for bankruptcy. Formed in 1996, New Century grew rapidly to become one of the country's largest subprime lenders, reporting $56.1 billion in mortgage loans in 2005.

303.     In order to maintain high origination volumes, New Century ignored problems with borrower credit risk and collateral value and looked the other way while mortgage brokers

overstated borrower income and appraised values. Almost 50% of the loans it originated used a stated-income or no-income verification approach, which allowed borrowers to inflate their income and qualify for loans which they had little ability to pay. New Century also pressured appraisers to inflate the value of many properties regardless of the actual value of the underlying property so the loans would be approved and funded. New Century's bankruptcy examiner report, which was issued in February 2008, found "serious loan quality issues at [New Century] beginning as early as 2004" and numerous "red flags" relating to loan quality. As with many originators, New Century's loan production department was far more concerned with originating large quantities of loans than with ensuring their quality. When New Century's audit committee began identifying potential problems with its risk management systems, New Century's senior management failed to respond. *See* "New Century Financial: Lessons Learned," *Mortgage Banking*, October 2008.

304.    On February 29, 2008, after reviewing extensive documentary evidence and conducting over 100 interviews, court-appointed Bankruptcy Examiner Michael J. Missal issued a detailed report on the various deficiencies at New Century. These deficiencies included lax mortgage standards and a failure to follow its own underwriting guidelines. Among his findings, the Examiner reported:

- New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. . . . The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century Loans in the aptly named "CloseMore University." Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels. Examiner's Report 3.

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A senior officer of New Century warned in 2004 that the "number one issue is exceptions to the

guidelines." Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. *Id.*

- New Century . . . layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. *Id.*

- Certain senior managers at New Century in 2004 were told by a New Century employee that when underwriting stated income loans, "we are unable to actually determine the borrowers' ability to afford a loan."

- In 2004, the number and severity of the exceptions to underwriting standards employed by New Century to originate greater volume was described by one Senior Officer as the "number one issue" facing New Century.

- By 2004, New Century Senior Management became aware of spiking increases in Early Payment Default ("EPD") rates—where a borrower fails to make even the first several payments on a loan—suggesting that the loan should never have been originated in the first place. In every month following March 2006, the EPD rate exceeded 10%, reaching to as high as 14.95% by year end.

- Up until 2005 New Century used a DOS-based underwriting system which, according to a New Century manager interviewed by the Bankruptcy Examiner, enabled employees to "finagle anything."

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. Del. Feb. 29, 2008).

305. The Bankruptcy Examiner's investigation revealed that New Century's primary standard for loan quality was, contrary to its representations in the offering documents detailed in the attached Exhibits, whether the loan could be sold in the secondary market to investors like Prudential, not whether a borrower could meet the obligations under the terms of the loan.

306. As described in the Bankruptcy Examiner's Report, in New Century's wholesale division—which accounted for the vast majority (approximately 85%) of New Century's loan originations—the regional managers who had lending authority could override the internal appraiser's decisions. Moreover, the regional managers' compensation was not tied to loan quality, but was rather based on the volume of loans originated, providing incentive to inflate appraisal values in order to increase origination of New Century loans.

307.     A 2005 internal audit disclosed in the Bankruptcy Examiner's Report revealed that 18 of 77 (or 23%) of the loans reviewed at one New Century Sacramento fulfillment center had "exceptions with either the appraisal conducted or the review of the appraisal submitted with broker-provided loans or the review appraisal conducted by New Century's Appraisal Department."  The results of the audit were not an anomaly.  According to the Bankruptcy Examiner, the results of New Century's own loan quality audits of underwriting procedures, account manager review/approval, appraisals and funding "were dismal."  As reported by the Bankruptcy Examiner, of nine branches audited by New Century in 2005, none were rated satisfactory, seven were rated unsatisfactory and two were rated as needs improvement.

308.     The Bankruptcy Examiner's Report determined that New Century's representations that it "designed its underwriting standards and quality assurance standards to make sure that loan quality was consistent and met its guidelines" were "not supportable." Indeed, New Century's statements regarding its "improved underwriting controls and appraisal review process" have been held by federal courts to be false or misleading statements of material fact.

309.     New Century's Loan Production Department was the dominant force within the company and mortgage brokers were trained to originate loans in a department known as "CloseMore University."  Loan originations rose dramatically at New Century, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  According to the Bankruptcy Examiner's Report, New Century's Chief Credit Officer said that in 2004 New Century had "no standard for loan quality."

310.     The Bankruptcy Examiner highlighted the severity of New Century's improper conduct:  "The Examiner recognizes that the subprime mortgage market collapsed with great

speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions. Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."

311.     As the Bankruptcy Examiner found, New Century had engaged in a number of harmful mortgage practices, including "increasing loan originations, without due regard to the risks associated with that business strategy"; risk layering in which it issued high risk loans to high risk borrowers, including originating in excess of 40% of its loans on a stated income basis; allowing multiple exceptions to underwriting standards; and utilizing poor risk management practices that relied on the company's selling or securitizing its high risk mortgages rather than retaining them." SPSI Report at 236.

312.     On December 7, 2009, the SEC charged three of New Century's top officers with violations of the federal securities laws, and claimed that "New Century's business was anything but 'good' and it soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." The SEC Complaint further details the falsity of New Century's assurances to the market about its "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market," and its policy to "only approve subprime loan applications that evidence a borrower's ability to repay the loan." Claims asserted against New Century for making false or misleading statements of material fact regarding New Century's purported prudent underwriting guidelines have already been sustained under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, and Section 11 of the Securities Act of 1933.

313.     Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income. According to Lindsay, appraisers *"fear[ed]" for their "livelihoods"* if they failed to provide New Century with a lofty valuation of their collateralized property. As a result, New Century's appraisers *"would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value."*

314.     In 2008, the OCC identified New Century as *the worst subprime lender* in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas between 2005 and 2007 with the highest rates of delinquency. Further, the FCIC singled out New Century:

> New Century—once the nation's second-largest subprime lender—ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence. In a June 2004 presentation, the Quality Assurance staff reported they had found severe underwriting errors, including evidence of predatory lending, federal and state violations, and credit issues, in 25% of the loans they audited in November and December 2003. In 2004, Chief Operating Officer and later CEO Brad Morrice recommended these results be removed from the statistical tools used to track loan performance, and in 2005, the department was dissolved and its personnel terminated. The same year, the Internal Audit department identified numerous deficiencies in loan files; out of nine reviews it conducted in 2005, it gave the company's loan production department "unsatisfactory" ratings seven times. Patrick Flanagan, president of New Century's mortgage-originating subsidiary, cut the department's budget, saying in a memo that the "group was out of control and tries to dictate business practices instead of audit."

FCIC Report at 157.

315.     On June 16, 2012, the Federal Housing Finance Agency ("FHFA") made public a forensic review of more than one hundred loans originated by New Century.

316.     The FHFA forensic review revealed that *77%* of the New Century loans were not underwritten in accordance with New Century's underwriting guidelines or otherwise breached the representations contained in the transaction documents.  In particular, and by way of example, the review showed instances where there was no evidence that New Century tested the reasonableness of the borrower's stated income for the employment listed on the application as required by the applicable underwriting guidelines.  In addition, the review demonstrated that the borrower, in fact, falsely inflated his or her income on the application, resulting in lower than actual debt to income ratios.  Such misrepresentations were material to the originator's decision to lend because the DTI ratio is an important measure of the borrower's ability to repay the loan.  Had the loan underwriter performed a reasonableness test as required by the applicable underwriting guidelines, the unreasonableness of the borrower's stated income would have been evident.

317.     For example:

- A loan that closed in May 2006 with a principal balance of $310,250 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The loan application stated that the borrower was employed as a construction worker earning $6,800 per month. The borrower's stated income exceeded the Bureau of Labor Statistic's 90th percentile salary for a construction worker in the same geographic region, which should have been a red flag to the underwriter that the income was overstated. Moreover, in the Statement of Financial Affairs filed by the borrower as part of a 2007 Chapter 13 Bankruptcy, the borrower reported total income of $17,170 for 2006, resulting in a monthly income $1,431. There was no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on the borrower's verified income yielded a DTI of 212.61 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $273,719, which is over 88 percent of the original loan amount.

- A loan that closed in May 2006 with a principal balance of $216,000 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The loan application stated that the borrower was self-employed as a realtor earning $14,000 per month. The borrower's stated

income exceeded CBSalary.com's 90th percentile salary for a small business owner, the most analogous occupation, in the same geographic region, which should have been a red flag to the underwriter that the borrower's income was overstated. Moreover, the loan file contained post-closing loan modification documents, including the Borrower's 2006 tax return for the same employer at the time of loan origination, which reflected earnings for the borrower of $1,864 per month. There was no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on all evidence uncovered by the forensic review, yielded a DTI of 364.08 percent, which exceeds the guideline maximum allowable DTI of 50 percent.

318.     Similarly, the FHFA review revealed that New Century failed to incorporate all of a borrower's monthly obligations into its evaluations, precluding it from properly assessing the borrower's ability to repay the loan.  The following are examples where New Century's underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated.  Properly calculated, the borrower's actual DTI ratio exceeded the limits established by New Century's guidelines.  For example:

- A loan that closed in March 2006 with a principal balance of $442,000 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The forensic review revealed that the underwriter improperly excluded the monthly mortgage insurance payment of $118 along with two mortgage loans with total monthly payments of $2,206, and the underwriter improperly calculated the borrower's hazard insurance and taxes. A recalculation of the DTI based on all evidence uncovered by the forensic review resulted in an increase from 49.84 percent to 215.79 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $248,501, which is over 56 percent of the original loan amount.

- A loan that closed in March 2006 with a principal balance of $130,500 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. The forensic review revealed that the borrower obtained a mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $2,747.00. Although this loan was not listed on the application for the subject loan, there were eight credit inquiries listed on the origination credit report for the previous 90 days. There is no evidence in the file that the underwriter investigated the credit inquiries or took the additional debt obligations into account in originating the loan. Moreover, the borrower failed to include the monthly mortgage insurance of $57 per month. A recalculation of the DTI that includes the borrower's undisclosed debt and

monthly mortgage insurance resulted in an increase from 46.68 percent to 181.06 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $134,223, which is over 102 percent of the original loan amount.

319.     Relatedly, the FHFA's review showed the following examples where the borrower's credit report contained numerous credit inquiries which should have put New Century on notice for potential misrepresentations of debt obligations, and the resulting impact on the DTI ratio.  Had New Century properly addressed these irregularities, the undisclosed liabilities would have been discovered.  Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to repay the loan.  For example:

- A loan that closed in May 2006 with a principal balance of $156,478 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows eight credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,509. A recalculation of the DTI based on all evidence uncovered in the forensic review resulted in an increase in DTI from 48.25 percent to 76.77 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $1,815.

- A loan that closed in May 2006 with a principal balance of $100,251 was originated by New Century as a stated income loan and was included in the NCHET 2006-2 Securitization. A credit report included in the origination file dated prior to closing shows nine credit inquiries within the previous 90 days, including numerous inquiries from mortgage lenders and servicers. There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. Moreover, the borrower obtained another mortgage prior to the closing of the subject loan, which resulted in an additional monthly payment of $1,688. The additional mortgage was not listed on the application for the subject loan. A recalculation of the DTI based on all evidence

uncovered in the forensic review resulted in an increase from 38.93 percent to 80.17 percent, which exceeds the guideline maximum of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $74,295, which is over 74 percent of the original loan amount.

### 11. Third-party originator EquiFirst Corp. systematically abandoned its underwriting guidelines

320.   EquiFirst Corp. and its parent EFC Holdings Corp. ("EquiFirst") originated Mortgage Loans underlying the MLMI 2007-HE3 and RAMP 2004-RS2 Securitizations, respectively.

321.   EquiFirst was at one time the twelfth largest subprime mortgage wholesale originator in the United States. It used over 9,000 independent brokers, but had only 600 employees to oversee those brokers and ensure they were abiding by the stated underwriting standards. Months after being acquired by Barclays, the acquiring bank began slashing jobs, and eventually shut down the company's operations entirely less than a year later.

322.   U.S. Bank serves as the trustee for MABS 2006-HE3 and, unlike Prudential, had access to EquiFirst's actual loan files. A review of the underlying Mortgage Loans was conducted, which found that many of them were defective. Such basic representations as that no fraud had taken place, and that the loans complied with EquiFirst's underwriting guidelines "were false when made." *See* Complaint ¶ 3, *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortg. Corp.*, No. 11-cv-2542, (D. Minn. Sept. 2, 2011). A review of 200 loan files (some of which were from a co-originator, WMC, also at issue in this case) found a 75% error rate. *Id.* ¶ 20.

323.   As a concrete example, the re-underwriting found that a loan originated by EquiFirst was afflicted with borrower misrepresentations as to income, undisclosed debt liabilities and occupancy status. In particular, the borrower's employment and income as stated on the original loan application indicated that the borrower worked as a defense contract program

director, earning monthly income of $13,250. However, a subsequent verification with the borrower's place of employment revealed that the borrower actually worked as an associate, earning a monthly income of $9,019. Further, the borrower was qualified for the loan based on his total housing expense of $4,771 and total monthly obligations of $1,710, resulting in total monthly liabilities of $6,481.37. However, according to his credit report and other public documents, the borrower had additional monthly debt obligations in the amounts of $1,764, $1,408, $2,976, $2,301, $4,227, $647, $1,025, and $1,190, which in aggregate added $15,538 to the borrower's debt obligations per month. As a result of his lower income and higher debt obligations, the borrower's DTI rose from an acceptable 48.9% to an unacceptable 244.1%. Finally, although the borrower had represented that the underlying property for the loan would be his primary residence, public records demonstrate that the borrower did not occupy the subject property as a primary residence and that two unrelated individuals had turned on the utilities at the property—an indicator that the borrower utilized the subject property as a rental. *Id.* ¶ 26.

324. Based on the re-underwriting of a large sample of loans—the same type of loans, generated by the same originator, at the same time as at issue in this case—the trustee had "compelling reason to believe that the vast majority" of the EquiFirst loans it held were infected with similar frauds. *Id.* ¶ 3. The consistency of these findings with Prudential's own loan-level analysis of the specific EquiFirst Mortgage Loans at issue in this case confirms that EquiFirst's underwriting problems were systemic.

325. In November 2012, U.S. Bank, N.A., as trustee for MABS 2006-HE3 and MABS 2007-WMC1, filed an amended complaint against Equifirst alleging widespread defects in its lending practices. *See* First Amended Complaint ¶¶ 68-82, No. 12-cv-2149, (D. Minn. Nov. 30,

2012).  The filing detail how, in numerous cases, Equifirst's underwriting practices failed to comply with stated guidelines concerning borrower income, debt-to-income ratios, occupancy status, and payment defaults.  *Id.*  For example, "An EquiFirst Loan was originated as an owner-occupied property.  But utility records and other data indicates that the mortgaged property was in fact being rented out, while the borrower continued to live elsewhere." *Id.* ¶ 78.  In another case,

> An EquiFirst borrower was qualified based on total monthly obligations of $2,581.77.  However, multiple outstanding credit balances were omitted, including a Chase account with a monthly payment of $349, a Citi account with a monthly payment of $338, a Sears account with a monthly payment of $52, a Federal Credit Union account with a monthly payment of $582, and another Chase account with a monthly payment of $406.

*Id.* ¶ 74.  In addition, EquiFirst originated loans to borrowers with implausible stated incomes, such as a "self-employed truck driver making $10,750 per month," who was found to be making just $2,033 during the relevant period.  *Id.* ¶ 72.

### 12. Third-party Residential Funding and its affiliated originators Homecomings Financial and GMAC Mortgage systematically abandoned their underwriting guidelines

326.    Residential Funding Company, Inc. ("Residential Funding") acquired all of the Mortgage Loans underlying the RAMP 2004-RS2. RAMP 2006-RZ3, RAMP 2007-RS2, RASC 2007-KS1, RASC 2007-KS3, RFMS2 2005-HS1, RFMS2 2005-HS2, and RFMS2 2006-HI2 Securitizations.  Its affiliate Homecomings Financial, LLC (formerly known as HomeComings Financial Network, Inc.) ("Homecomings") was the main Originator of the Mortgage Loans underlying the RAMP 2004-RS2, RAMP 2006-RZ3, RAMP 2007-RS2, RASC 2007-KS1, RASC 2007-KS3, RFMS2 2005-HS1, RFMS2 2005-HS2, and RFMS2 2006-HI2 Securitizations.  Another affiliate, GMAC Mortgage, LLC, originated Mortgage Loans underlying the RAMP

2007-RS2 Securitization. Government investigations and statements provided by insiders in fact further confirm that Homecomings was churning out problematic loans.

327. Homecomings' systems were particularly apt to generate non-compliant loans because Homecoming employees and brokers could manipulate an automated system to obtain loan approvals.

328. Homecomings Confidential Witness 1 ("HCW1") worked as a Regional Account Executive at Homecomings from 2003 to 2005, then worked in the Wholesale Lending Department within GMAC until early 2006. HCW1 knew Correspondent Lending sales managers personally, and attended meetings with Residential Capital's Correspondent Lending personnel. Part of HCW1's duties included training loan brokers on how to use Homecomings' automated loan system. Based on HCW1's personal experience, daily conversations with other Account Executives, automated Help Desk personnel, and others, HCW1 stated that *Account Executives were trained by senior management to teach outside mortgage brokers how to manipulate borrower data to generate an approval.*

329. According to HCW1, training people on how to use the automated system involved "loading data in AssetWise with the intent of getting an approval. They could run it through a number of times with different data until it got an approval." Indeed, the automated system allowed multiple applications to be submitted on the same borrower. According to HCW1, *"there were brokers running [the automated system] twenty-five times for the same borrower."* Even though brokers were trained on how to do this data manipulation, according to HCW1 brokers sometimes would just fax their changes to Account Executives. However, as this would leave the Account Executive's user ID on the loan file, senior management tried to crack down on this practice. Rather than stressing how data manipulation should not take place at all,

according to HCW1, they simply wanted more training so the brokers could enter the data themselves, leaving less of a 'paper trail' leading back to the Account Executives.

330.   Because certain Account Executives did not want the social awkwardness of asking brokers to do the data entry themselves, according to HCW1 many continued to perform the data changes on behalf of larger clients.  Others simply would email the brokers instructions regarding the data changes, or talk them through the process on the phone.  In these ways, according to HCW1, "there was complicity on the part of employees, a lot of employees, in manipulating AssetWise until loan applications were approved."  According to HCW1, "*this was sanctioned behavior*."  Homecomings even had a Help Desk.  Rather than being just for technical support, according to HCW1, this desk was designed to inform brokers why a particular loan was being denied by the automated program.  An explanation was provided as to what minimum change would be required to generate an approval, and *brokers would use Homecoming's feedback to manipulate an approval*.  According to HCW1, the most commonly manipulated data included income, assets, and debt-to-income ratios.

331.   HCW1 believes that Homecomings' underwriters could see all the prior versions of the loan applications put through the system.  Thus, if the first application claimed a borrower was a carpenter making $6,000, they could see that prior version even if the fifth application claimed income of $16,000.  According to HCW1, underwriters could get "trapped by the guidelines."  That is, even if they noticed that income levels were changing in such a way, because the automated system was generating an approval on the last version of the application, the underwriters would be told they could not decline the application.

332.   According to HCW1, in the 2004-2005 timeframe, the parent company Residential Funding capped the percentage of loans that could be generated using "full

documentation" procedures. Residential Funding made a push to increase loan volumes elsewhere because "that's where the profits were" and it wanted the loans for its mortgage-backed securities operations. Around 2004 and 2005, HCW1 noticed an unannounced change to the automated systems. Whereas before, users had to submit a loan application under a specified program (full documentation, Alt-A, etc.), the automated program instead began approving the loan under any program for which it qualified.

333. Despite the manipulation—which, HCW1 represented, could be done even more easily using low-doc procedures—the automated system was initially ill-suited to the parent company's demand for more subprime products, as it was at first rejecting a large number of loans. Though according to HCW1 seven of ten loans rejected by Residential Funding's own automated program were eventually given a pass through manual underwriting, that process took time. Because that delay caused the company to lose business, the enterprise turned to "bulk" purchases.

334. Homecomings Confidential Witness 2 ("HCW2") worked as a Pre-Funding Quality Control Supervisor at Homecomings from 1997 to 2005. This review was supposed to identify missing information and documents. However, according to HCW2, pre-funding reviews covered only 5%-10% of the approved mortgages.

335. According to HCW2, 30%-35% of the loans HCW2's QC team reviewed resulted in an "inconclusive" recommendation, meaning that the underwriter needed to obtain further proof that the loan file was reliable. According to HCW2, 5% received a "misrepresentation with certainty" recommendation.

336. HCW2 stated that there was no formal channel for the QC group to challenge and overturn an underwriter's decision to approve a mortgage—area managers even had the

power to disregard QC's rejection of a mortgage, which, according to HCW2, did occur even when the recommendation was "*misrepresentation with certainty*." According to HCW2, Homecomings "*gave a lot of loans they shouldn't have*." HCW2 considered the stated-income loans "*all lies*."

337.     Homecomings Confidential Witness 3 ("HCW3") worked at Homecomings from 2002 to 2007. Until 2006, HCW3 worked as a Post-Funding QC Auditor. Thus, unlike HCW2's team, HCW3 would review loan files of mortgages that had already been funded. Around 2006, HCW3's role changed to fixing deficiencies in mortgages that had been identified as "*unsellable*," and HCW3's title changed to "Resolutions Coordinator." According to HCW3, this change occurred around the same time changes were occurring within the GMAC organization, and around that time Homecomings "started to spiral downward."

338.     By 2005, according to HCW3, the borrower qualifying process had gotten "*more lax, they took more risks, and got greedy*." This caused HCW3 to wonder how certain borrowers got loans at all.

339.     In mid-2008, the FTC began an investigation into Homecomings Financial, after a staff review had found evidence of discriminatory lending practices. The FTC found that Homecomings Financial "originated the vast majority of its loans through independent brokers" that were allowed to assess discretionary charges on borrowers. The FTC found that disparities in the fees were "substantial, statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics in violation of the ECOA and the FTC Act."

340.     On September 3, 2009, Residential Capital announced it was shutting down its wholesale mortgage origination operations, thereby closing down the lending operations of both Homecomings Financial and the other affiliated originator at issue here, GMAC Mortgage LLC.

In a January 22, 2009 letter, the FTC explained it was closing its investigation into Homecomings Financial because it had ceased originating loans, and that according to Residential Capital "the ability of [Homecomings Financial] to continue as a going concern is in substantial doubt," in part because Homecomings Financial "is heavily dependent on its own indirect parent, GMAC, for funding and capital support and that there can be no assurance that such support will continue."

341.    A March 5, 2009 article in the *Portland Tribune* discussed the massive failures in the lending industry. It quoted Tim Boyd, who worked at Homecomings Financial for seven years, as saying that: "In order to keep your market share, you had to be more aggressive." According to the article, he knew of loan officers who would tell title agents to "keep quiet about Option ARM loan provisions during document-signing time. 'They'd tell the title officer, 'Don't go over this, just glean through it quickly and get the thing signed.'"

342.    Pay-option loans give the borrower the choice of what to pay each month—but if they choose a low amount, the principal loan balance actually *increases,* eventually causing the "minimum" payment to jump. Option ARMs combine this with another confusing, risky feature: an initially low teaser interest rate that will reset after a certain period. The counterintuitive nature of an increasing principal amount is a risk that many borrowers may not fully understand, particularly when combined with the complex calculation of interest-rate risk. Obviously, a borrower that does not understand the loan terms is more likely to default, as it is more likely the borrower cannot properly determine whether he can afford the loan, or plan for and adjust for any unexpected change of circumstances. The FCIC's report recounted a study that found that *38% of borrowers with adjustable-rate mortgages did not understand* how much their interest

rates could reset at one time, and *more than half underestimated* how high their rates could reach over the years. FCIC Report at 90.

343. According to news reports from early January 2009, Residential Funding tripled the number of lawsuits it had filed against unaffiliated originators, alleging that they had wrongfully refused to buy back non-compliant loans that they had sold Residential Funding for use in its securitizations. These suits are based on alleged breaches by the originators of contracts in which they agreed to abide by the terms of their seller agreements and represented that the loans they had originated were prudently underwritten and that all loan documents were complete and accurate.

344. These are admissions that Residential Funding was acquiring loans that were based on insufficient documentation and not in compliance with Residential Funding's underwriting guidelines, including around the same time that loans Residential Funding was acquiring were being shuffled into securitizations such as those at issue here.

345. Residential Funding's willingness to include knowingly defective loans in securitization pools is confirmed by the testimony of a confidential witness who testified that *half* of all applications that were flagged as falling meaningfully short of underwriting guidelines were funding through underwriting "exceptions." It is also confirmed by the testimony of a second witness who, as above, described systemic, senior-level-approved manipulation of the data entered into the automated underwriting system.

346. MBIA Insurance Corporation is a monoline insurer that wrote insurance on certain Residential Funding securitizations. MBIA conducted an investigation into certain loan files after it was asked to make payments on its insurance policies. The deals that MBIA analyzed are probative of problems underlying Prudential's Certificates because the Defendants'

problems were systemic, and because the collateral pools for the securitizations that MBIA investigated were composed of the same type of collateral backing some of Prudential's Certificates. MBIA's analyses—the first part of which was only made public in December 2008—provides additional, strong evidence that essential characteristics of the Mortgage Loans underlying the Certificates were misrepresented, and that the problems with the Defendants' underwriting practices were systemic.

347.    In carrying out its review of the approximately 12,000 Residential Funding loan files, MBIA found that *88%* of the defaulted or delinquent loans in those securitizations contained material deviations from the stated underwriting guidelines. MBIA's report showed that a material number of mortgage loans included in the loan pools underlying the securitizations were made to borrowers who could not reasonably have expected to be able to repay the mortgage loans, and the risks inherent in the pools were significantly higher than represented. Indeed, MBIA claims that Residential Funding admitted to it that it knew the loan pools failed to comply with Residential Funding's underwriting guidelines.

348.    MBIA also found that "there were fundamental, material, and consistent violations of [Residential Funding's] underwriting guidelines and policies in connection with the underwriting of the mortgage loans . . . The undisclosed and misrepresented risks were pervasive throughout the mortgage loan portfolios for the securitization transactions."

349.    MBIA gave examples of individual loans that diverged from the stated underwriting guidelines. The following are three of many examples:

- On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, but the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the

borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned only $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan.

- On January 23, 2007, a loan with a principal balance of $100,000 was made to a borrower in Yuma, Arizona on a property with an original appraisal value of $298,000 and a senior loan balance of $129,035. The borrowers claimed on their loan application that their combined income was $113,520 per year. However, on May 12, 2009, the borrowers jointly filed for bankruptcy under Chapter 7, and their court filings indicated that they earned only $13,085 in 2007 and $17,650 in 2008. Moreover, no record of the borrower's claimed employer can be located on websites commonly used to verify the existence of a business: manta.com or yellowpages.com. The loan has been charged-off.

- On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary database based on job title and zip code, reports that the income at the 90th percentile for such a position is only $2,801 per month. The second borrower claimed to earn $59,592 annually as a sales associate at a home improvement store, but an income verification database showed that the borrower earned only $28,092 in 2006 and $32,977 in 2007. The loan has been charged-off.

350. In its review of Residential Funding loan files, Residential Funding's own insurer found, among other things, that:

- A significant number of mortgage loans have DTI ratios far in excess of RFC's Underwriting Guidelines, have CLTV ratios far in excess of RFC's Underwriting Guidelines and were made on the basis of 'stated incomes' that were grossly unreasonable.

- Contrary to RFC's Underwriting Guidelines, RFC failed, with respect to a significant number of mortgage loans, to verify employment for mortgage loan borrowers where required to do so, failed to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with credit scores that are ineligible under the Underwriting Guidelines and closed mortgage loans without verifying that the

borrower had sufficient funds or reserves as required by the Underwriting Guidelines.

- Numerous mortgage loan files are missing necessary mortgage loan documents and are missing certain disclosures, such as disclosures relating to loan transfers, which are necessary under applicable law.

351. MBIA found that the non-compliant nature of many of the loans it reviewed was due to RFC's systemic abuse of underwriting "exceptions." According to MBIA, a "significant number" of the "exception" loan files MBIA reviewed did not even identify which supposed exception was being relied upon, let alone contain sufficient documentation to justify the use of such an exception. In addition, MBIA found that a "significant number" of the loans it reviewed were approved based on the secret abuse of three practices that resulted in large numbers of non-compliant loans being contributed into securitization programs.

352. According to MBIA, Residential Funding improperly abused "negotiated commitments," where it agreed to buy future loans from the originator that failed to comply with Residential Funding's underwriting guidelines. Second, it improperly abused a "bulk purchase program" where it agreed to purchase a large amount of pre-existing loans that Residential Funding would not then confirm had been originated in compliance with Residential Funding's underwriting guidelines. Finally, Residential Funding underwrote or purchased loans using an automated system, Assetwise, which did not in fact analyze the proposed mortgage loans in accordance with Residential Fundings's underwriting guidelines. According to MBIA, these practices all helped contribute to the "substantial and material" number of non-compliant loans that were found in the reviewed securitization pools.

353. The results of MBIA's study are corroborated by the testimony of Residential Funding Confidential Witness 1 ("RFCW1"), a former Senior Underwriter at GMAC. In 2004 and 2005, according to RFCW1, Residential Funding dictated that its affiliated originator

Homecomings produce no more than 50% of its loans through fully-documented processes. According to RFCW1, it did this because it felt other products were more profitable, and wanted the alternative products for use in its securitizations. RFCW1 said that even though the automated underwriting system was being manipulated, and even though low-doc loans could be manipulated even more, the system was still rejecting too many loans. The resulting delay in approval by having to manually approve the rejected loans caused the company to lose business. Thus, according to RFCW1, it turned to "bulk buy" procedures.

354.     According to RFCW1, Residential Funding would buy hundreds of millions of fully-funded loans at a time. The loans were not put through the automated system until Residential Funding won the "bid." Only then did Residential Funding conduct due diligence. However, it would not perform due diligence on all the files, but only a small sample. The sample would decrease with each successive purchase from that seller—eventually such that no testing was done. According to RFCW1, this allowed Residential Funding to pursue fewer and fewer repurchase demands from the bulk-sellers. "It makes for a better relationship if you're not kicking back a lot of loans."

355.     According to RFCW1, the share of "stated income" loans went up in the 2004-2007 time frame. RFCW1 "hated" these, which "drove [RFCW1] insane," because RFCW1 "had to accept" whatever income was given. RFCW1 gave an example of a city bus driver that provided a stated income of $9,000 per month. According to RFCW1, only a human could really judge the facial reasonableness of a "stated income" amount as against the claimed occupation. Nonetheless, according to RFCW1, GMAC relied on its automated systems to underwrite stated-income loans, and there was no system in place for otherwise evaluating the reasonableness of the income claims. When RFCW1 raised such concerns, RFCW1's supervisor responded that

"*this is what we pay you to do.*" RFCW1 felt that "*short of walking out, we didn't have a choice.*"

356.   A loan-level forensic analysis conducted by another RMBS investor, Allstate Insurance Company, found systemic misrepresentation of LTV, CLTV, and owner-occupancy data for over 30,000 loans underlying its Residential Funding offerings.  For example, 37% of the loans sampled had recalculated LTV ratios understated by more than 10%, and 12% of the loans sampled had LTV ratios understated by more than 25%.  Allstate also found that the percentage of owner-occupied properties was overstated in the complaint by up to 14%.

357.   In addition, Allstate reported that the default rate on the mortgage loans underlying certain Residential Funding offerings was drastically high.  For RALI 2007-QH6, 55% of the loans from the original pool had already been written off at a loss or were currently delinquent, as of the time Allstate reported its findings.  Similarly, for RAMP 2006-RS3, RAMP 2006-RZ3, RFMSII 2007-HSA2, and RFMSII 2007-HSA3, over 40% of the loans from each deal's original pool were either already written off at a loss or currently delinquent.  Overall, approximately 24% of the original mortgage loans were already written off at a loss, and of the remaining loans, approximately 25% were currently delinquent.

### 13.   Third-party originator First Horizon Home Loans Corp. systematically abandoned its underwriting guidelines

358.   First Horizon Home Loans Corp. ("First Horizon") originated Mortgage Loans underlying the MLMI 2006-HE2 Securitization.

359.   First Horizon was well-established in the mortgage origination and securitization market.  In an effort to increase revenue and profits in an rapidly expanding market, First Horizon greatly increased the volume of mortgages it originated and securitized from 2005 to 2006.  First Horizon itself was forced to admit its poor underwriting, because many entities to

which it sold loans forced the company to buy them back. As stated in its 2008 Annual Report, available at http://ir.fhnc.com/annuals.cfm: "In addition to the negative aspects of asset quality on FHN's loan portfolio, increased repurchase and make-whole claims from agency and private purchasers of loans originated and subsequently sold by FHN hampered earnings as FHN recorded $148.5 million in charges for its obligations related to these assets." In its 2010 Annual Report (available at http://ir.fhnc.com/annuals.cfm), First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests."

360. Administrative and regulatory proceedings have revealed fraudulent underwriting practices at First Horizon. In July 2008, *Dow Jones* reported that Stephanie Jones, a former First Horizon corporate security investigator, alleged that the company "habitually ignored cases of mortgage and banking fraud committed by high-producing loan officers, and even concealed incidents by altering official filings sent to bank regulators." Marshall Eckblad, "Complaint Alleges First Horizon Concealed Mortgage Fraud," *Dow Jones Newswires*, July 2, 2008. According to Ms. Jones, First Horizon "allowed loan officers—as long as they were raking in the money—to do whatever they wanted." *Id.* Ms. Jones alleges that "she uncovered approximately 50 cases of mortgage fraud at First Horizon" and that First Horizon managers engaged in a "systematic effort . . . to conceal [the] mortgage fraud she uncovered." *Id.*

361. At one First Horizon branch in Idaho, Ms. Jones uncovered fraud by a loan officer who "conceded he had illegally altered loan documents, but told Jones that 'everyone in the branch [wa]s doing it.'" *Id.* When Ms. Jones proceeded to investigate the other employees at the branch, she found that they "routinely . . . inflated borrowers' income on applications." *Id.*

Ms. Jones then reported her findings to her supervisor, who she stated "didn't want me to pursue it." *Id.* Additionally, Ms. Jones alleges that Suspicious Activity Reports "would come back changed" from one of First Horizon's directors of corporate security, who "typically removed from the reports any references to fraud committed by loan officers and typically directed the allegations toward loan applicants instead." *Id.*

362.     In January 2010, U.S. Department of Housing and Urban Development ("HUD") Inspector General Kenneth M. Donohue subpoenaed First Horizon's successor company, First Tennessee, regarding failed loans issued by First Horizon that resulted in claims paid out by the Federal Housing Administration's ("FHA") mortgage insurance fund. According to FHA Commissioner David Stevens, First Horizon's data presented "key indicators of problems at the origination or underwriting stages." *See* Eric Snyder, *First Tennessee Bank Mortgage Loan Records Subpoenaed*, The Nashville Business Journal (Jan. 13, 2010) (http://www.bizjournals. com/nashville/stories/2010/01/11/daily17.html).

363.     The report released by HUD on September 27, 2010, based on a review of 18 loans originated by First Horizon, concluded that 28% of the loans were not written in accordance with HUD/FHA underwriting regulations and were not made to qualified borrowers. Specific examples of underwriting deficiencies evident from HUD's review of the loan files included: (1) excessive debt-to-income ratios without adequate compensating factors; (2) inadequate gift fund documentation or verification of receipt of gift funds; and (3) failure to verify or document whether borrowers met the minimum cash investment requirement. The report recommended that HUD should "pursue remedies under the Program Fraud Civil Remedies Act" and/or civil money penalties as a result of these underwriting violations. U.S. Dept't of Housing and Urban Development, Office of Inspector General, Memorandum No.

2010-ny-1807, *First Tennessee Bank, N.A., Memphis, TN, Did Not Properly Underwrite a Selection of FHA Loans* (dated Sept. 27, 2010).

364.     In January 2012, both the Federal Deposit Insurance Corporation and the Federal Home Loan Bank of San Francisco requested information on the loans underlying a total of 20 First Horizon securitizations from the years 2005 and 2006 due to significant concerns regarding underwriting irregularities at the company. First Horizon National Form 10-Q, dated May 8, 2012, at 35- 36, http://www.sec.gov/Archives/edgar/data/36966/000119312512218524/ d340174d10q.htm.

365.     First Horizon's poor origination practices eventually caught up to the company and many entities that purchased loans from First Horizon forced the company to buy them back. As stated in its 2008 Annual Report (available at http://ir.fhnc.com/annuals.cfm): "In addition to the negative aspects of asset quality on FHN's loan portfolio, increased repurchase and makewhole claims from agency and private purchasers of loans originated and subsequently sold by FHN hampered earnings as FHN recorded $148.5 million in charges for its obligations related to these assets." In First Horizon's 2010 Annual Report, First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests."

### 14.     Third-party originator Ownit Mortgage Solutions, Inc. systematically abandoned its underwriting guidelines

366.     Ownit Mortgage Solutions, Inc. ("Ownit") originated Mortgage Loans underlying the CBASS 2004-CB8, CBASS 2006-CB9, and RASC 2007-KS1 Securitizations.

367.     Ownit was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

368.     In September 2005, Defendant Merrill Lynch & Co. acquired a 20 percent stake in Ownit, and provided the company with a warehouse line of credit. FCIC Report at 204. According to Ownit's founder and chief executive, William D. Dallas, shortly after Merrill Lynch acquired that stake, it instructed Ownit to loosen underwriting standards. Edmund L. Andrews, Busted: Life Inside the Great Mortgage Meltdown 158 (2009).

369.     Ownit went bankrupt in December 2006, an event that the U.S. Department of Housing and Urban Development described as among "[a]rguably the first tremors of the national mortgage crisis." SPSI Report at 263. Merrill seized the collateral securing its warehouse loans to Ownit when the company failed. FCIC Report at 257.

370.     Ownit Confidential Witness 1 ("OMSCW1"), a Senior Underwriter at Ownit from 2004 through 2006, described a host of deficiencies infecting Ownit's underwritng practices and helpfully compared them to another originator she has worked for. Specifically, she said that Ownit *had no quality control program in place* to review loans that had already been underwritten and approved. Crucially, this meant that no one reviewed Ownit's mortgages with an eye to their suitability for investors.

371.     OMSCW1 also explained that the internal underwriting guideliens were highly ambiguous: *"there were so many unwritten things in the guidelines"* that expanded the discretion of Ownit employees to approve non-conforming loans. For example, she explained that underwriters could reclassify mortgaged properties based on arbitrary characteristics and thereby render them acceptable for origination. She described how Ownit routinely approved loans based on state incomes that were simply not believable, and suggested that loan officers were "fudging the numbers." OMSCW1 also described how the company's salespeople could override underwriters' rejections by appealing to a supervisor to get a loan approved, and that

supervisors often complied. In other cases, salespeople would directly ask for a loan to be approved as a "favor."

372.     Ownit Confidential Witness 2 ("OMSCW2"), a Regional Vice President at Ownit from 2004 through 2006, described how demand from Merrill Lynch specifically put pressure on her to generate loan volumes. She said that Merrill Lynch in particular was "screaming at us to deliver volume." OMSCW2 described confrontational conference calls with Merrill Lynch in which Ownit managers had to push back on demands for ever-greater loan volumes. She also confirmed that there were bonus incentives for underwriters to close loans.

### 15. Third-party originator Long Beach Mortgage Company systematically abandoned its underwriting guidelines

373.     Long Beach Mortgage Company ("Long Beach") originated Mortgage Loans underlying the CBASS 2004-CB8 Securitization.

374.     The massive failure of Long Beach's parent, Washington Mutual ("WaMu"), has brought scrutiny of Long Beach's origination practices and confirmed a wholesale abandonment of its purported underwriting guidelines. Government investigations, media reports, and confidential witnesses all confirm that "[s]enior managers at Long Beach Mortgage aggressively pushed through loans," which "enabled fraud to run rampant." Even those with obvious signs of mortgage fraud "were approved anyway." David Heath, *Policies at WaMu's Long Beach Mortgage Invited Fraud*, Seattle Tiems (Dec. 29, 2009.)

375.     On April 13, 2010, the SPSI held a hearing that focused on the role high-risk loans played in the financial crisis, using WaMu as a case history in how the drive for large fees ended up polluting the financial system with toxic mortgages. Among other things, the SPSI found that Long Beach used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often

contained excessive risk, fraudulent information, or errors. Specifically with respect to Long Beach, Subcommittee Chairman Levin observed that "[s]ubprime lending can be a responsible business. Most subprime borrowers pay their loans on time and in full. ***Long Beach, however, was not a responsible lender***. Its loans and mortgage backed securities were among the worst performing in the subprime industry."

376.    A relentless focus on loan volume owed much to Long Beach's compensation policies, which financially rewarded its employees for closing higher-risk loans and instituted loan sales quotas. The Long Beach 2004 Incentive Plan, for example, outlined four compensation tiers that were based on loan volume. Not only did the largest producers make more money by issuing more loans, but as they reached higher volume tiers, they earned a higher rate of commission. They also earned bonuses that were tied to the volume of loan origination. These bonuses could add up to tens of thousands, if not hundreds of thousands of dollars. Accordingly, Long Beach's employees targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to meet the obligations associated with the loans they were sold.

377.    James G. Vanasek, former Chief Credit Officer/Chief Risk Officer of Long Beach's parent WaMu, testified to the SPSI that "[b]ecause of the compensation systems rewarding volume versus quality and the independent structure of the originators, ***I am confident at times borrowers were coached to fill out applications with overstated incomes or net worth to meet the minimum underwriting requirements*** . . . . Not surprisingly, loan originators constantly threatened to quit and go to Countrywide or elsewhere if the loan applications were not approved."

378.     Numerous recently released documents show pervasive, fundamental, and systemic problems in Long Beach's loan origination and underwriting practices.  In January 2004, the FDIC and the State of Washington sent a report to WaMu's Board concerning, *inter alia*, "unsatisfactory underwriting practices at affiliate Long Beach Mortgage Company."  The recently released report noted an internal WaMu report dated July 31, 2003, which found that "40% (109 of 271) of loans reviewed were considered unacceptable due to one or more critical errors.  This raised concerns over Long Beach Mortgage's ability to meet the representations and warranty's [sic] made to facilitate sales of loan securitizations."  The report further noted that a second WaMu report in August 2003 had "reached similar conclusions and disclosed that Long Beach Mortgage's credit management and portfolio oversight practices were unsatisfactory."  The FDIC-Washington examiners themselves found that, out of 4,000 loans reviewed, "approximately, 950 were deemed saleable, 800 were deemed unsalable, and the remainder contained deficiencies requiring remediation prior to sale."  The FDIC-Washington examiners concluded that "[t]he culture, practices, and systems at Long Beach Mortgage Company are inconsistent with the lending activity of the bank."

379.     In a recently discovered internal November 2005 report entitled, "LBMC Post Mortem," the authors concluded that Long Beach's "*[u]nderwriting guidelines are not consistently followed* and conditions are not consistently or effectively met."  What is more, "[u]nderwriters are not consistently recognizing non-arm's length transactions and/or underwriting associated risk effectively."

380.     Another recently surfaced April 17, 2006 report from WaMu's former General Auditor, Randy Melby, to the Audit Committee of WaMu's Board of Directors, discussed Long Beach's "relaxed credit guidelines, breakdowns in manual underwriting processes, and

inexperienced subprime personnel." Mr. Melby concluded that "[t]hese factors, coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality."

381.    In a December 11, 2006 email from Cynthia Abercrombie, former WaMu Senior Vice President/Senior Risk Officer, to Ron Cathcart, WaMu's former Chief Enterprise Risk Officer, Ms. Abercrombie noted that post-funding reviews of Long Beach loans identified many issues:

- Appraisal deficiencies that could impact value and were not addressed;

- Material misrepresentations relating to credit evaluation were confirmed;

- Legal documents were missing or contained errors or discrepancies;

- Credit evaluation or loan decision errors; and

- Required credit documentation was insufficient or missing from the file.

The conclusion of the reviews was "*a lack of proper execution of the credit guidelines*" and "weakness in controls around clearing conditions." In response, Mr. Cathcart admitted that "*Long Beach represents a real problem for WaMu.*"

382.    On August 20, 2007, WaMu Audit Services issued a report (recently made public) entitled, "Long Beach Mortgage Loan Origination & Underwriting." The report was sent to WaMu's most senior executives, including Mr. Killinger, Mr. Rotella, Mr. Melby, Mr. Schneider and Mr. Cathcart. Among its conclusions were:

- *Underwriting guidelines established to mitigate the risk of unsound underwriting are not always followed* and decision-making methodology is not always fully documented.

- Focused areas of improvement for LMB are appraisal deficiencies, credit evaluation or loan decision errors, unaddressed fraud alerts, missing legal documents, material misrepresentations relating to credit evaluations, debt capacity or debt ratio error, missing title report, insufficient credit documentation, invalid or insufficient signing authority, misrepresentation in appraisal

information, missing Final HUD 1 statements that when obtained had unaddressed issues.

- Policies and procedures defined [sic] to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed.

383. Testimony by former Long Beach and WaMu Bank employees tell the same story. Karen Weaver, a former underwriter in Long Beach's Atlanta office, stated that a lot of brokers "were making up pay stubs and presenting that." A former Long Beach account executive for Colorado sales, Pam Tellinger, admitted she "knew brokers who were doing fraudulent documents all day long." Antoinette Hendryx, a former underwriter and team manager at Long Beach in California, described how account executives would "offer kickbacks of money" to underwriters to get questionable loans approved.

384. Long Beach Confidential Witness 1 ("LBCW1"), a former Account Executive at Long Beach in New Jersey from 1998 until October 2007, noted a shift in underwriting philosophy in 2005 toward increasing loan volume at all costs. Borrowers needed to produce less and less documentation, and FICO scores became more important than verifying income. In response, "volume really went through the roof."

385. Long Beach pushed through every loan it could close, through whatever means necessary. Long Beach Confidential Witness 2 ("LBCW2"), a former Senior Underwriter for Long Beach in Dallas, Texas, from 2004 through April 2007, reported that on one occasion LBCW2 expressed concerns to LBCW2's manager over funding some of the loans underwritten. But the manager's "direction from corporate" was simply to fund loans. LBCW2 also reported that at month-end team meetings, it was often discussed that the company was trying to increase volume by getting more "borrowers to fit."

386. LBCW2 recalled that some of the "crazier" programs at Long Beach included stated-income loans for W-2 wage earners, a program that started in 2005. Stated-income

programs, to the extent that lenders offered them, were traditionally reserved for self-employed borrowers with significant assets. At Long Beach, however, these "liar's loans" were common, even for those borrowers who were not self-employed. Long Beach would also approve 100% financing for stated-income borrowers with FICO scores as low as 500.

387.　　LBCW2 also relayed that borrowers with no established FICO score could get a loan merely by providing "three alternative trade lines." An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent payment, or a note from a person claiming that the borrower had repaid a personal debt. LBCW2 said that Long Beach originated "a significant amount" of these types of problematic loans, which "was just a disaster." LBCW2 said that these loans made up the majority of first-payment defaults at the end of 2006.

388.　　Long Beach Confidential Witness 3 ("LBCW3") was a Wholesale Mortgage Underwriter at the Long Beach loan processing center in Lake Oswego, Oregon, from August 2005 until December 2006. LBCW3 first joined WaMu in 2003 as a Senior Credit Analyst, and subsequently joined Long Beach in 2004 as a Senior Loan Coordinator, ultimately becoming a Wholesale Mortgage Underwriter. LBCW3 said that at Long Beach there was always a sense of working the underwriting guidelines to close loans, rather than mitigating Long Beach's credit risk. LCBW3 said that there was simply an environment in the loan processing center to "approve, approve, approve," and that any exception that was needed to approve a loan was not only done, but was "sought after." LBCW3 felt that Long Beach consistently pressured its underwriters to "find a way to make it work."

389.　　Long Beach Confidential Witness 4 ("LBCW4"), a Senior Underwriter with WaMu in Livermore, California, from 2003 through September 2007, said that if Long Beach's

competitors could not approve a loan, it was known to send the loan to Long Beach and they would make an exception to get the loan through. LBCW4 said that guidelines were "loose to the point of disbelief." LBCW4 described Long Beach's lending approach as follows: "If [potential borrowers] were breathing and had a heart beat, you could probably get the loan done."

390.     Long Beach Confidential Witness 5 ("LBCW5") served as a Quality Assurance Manager in the Long Beach Loan Fulfillment Center ("LFC") in Dallas, Texas, from November 2005 until August 2007. LBCW5 explained that the Quality Assurance group in Dallas performed a monthly audit on a random selection of subprime loans from the various loan origination centers around the country. This analysis was not focused on loan-specific issues, but instead concerned WaMu/Long Beach-wide trends that might suggest necessary changes in underwriting guidelines, compliance standards, or other systems.

391.     LBCW5 observed that, despite the extensive analysis that the group performed to determine the causes for WaMu/Long Beach-wide loan problems, WaMu/Long Beach ignored the results. LBCW5's group continued to identify the same problematic trends again and again. According to LBCW5, although WaMu/Long Beach was "going through the motions," in reality there was nothing but a "free for all to approve loans by the thousands."

### 16.     Third-party originator People's Choice Home Loan, Inc. systematically abandoned its underwriting guidelines

392.     People's Choice Home Loan, Inc. ("People's Choice") originated Mortgage Loans underlying the CBASS 2007-CB5 and RASC 2007-KS3 Securitizations.

393.     People's Choice was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

394. People's Choice's failure to adhere to its underwriting practices has been confirmed in widespread reports indicating: (i) a lack of quality control, which led mortgage brokers to manipulate documents and allowed borrowers to get away with lying on their loan applications; (ii) borrowers missing one or more of their first three payments, indicating poor underwriting by People's Choice; and (iii) approving borrowers with insufficient income to afford the required mortgage loan payments, which circumvented People's Choice's underwriting guidelinesbecause mortgage brokers forged borrower's bank statements, signatures, and income.

395. For instance, an investigation by NBC revealed that People's Choice borrowers included a massage therapist who claimed income of $180,000 a year and a manicurist who claimed income of over $200,000. Richard Greenberg & Chris Hanson, *If You Had A Pulse, We Gave You A Loan*, Dateline NBC (Mar. 22, 2009), http://www.msnbc.msn.com/id/29827248/ ns/dateline_nbcthe_hansen_files_with_chris_hansen/t/if-you-had-pulse-we-gave-you-loan/.

396. Former People's Choice COO James LaLiberte has stated that he tried to implement more controls over the loan origination process, but ran into resistance.

397. According to the NBC investigation, other former People's Choice employees have stated that underwriters felt pressured by sales staff to approve questionable applications. Moreover, underwriters would challenge some loans—in one case, as many as one-third of all loans—but would be overruled by company executives the vast majority of the time. Ultimately, *"there was a lot of 'keep your mouth shut' going on, meaning you just didn't ask questions about things you knew were wrong."* *Id.*

398. As part of a plan to take People's Choice public, in 2005 the company hired auditors to conduct an "Ethical Climate Survey." Nearly three-quarters of respondents said that

they were expected to do what they were told "no matter what." Nearly half stated that while they cared about ethics, "they act differently." One-third said they had witnessed "breaches of applicable laws and regulations." Former CEO Neil Kornswiet admitted to NBC through a spokesperson that "management and the Board were dismayed by what they read." *Id.*

### 17. Third-party originator Ameriquest Mortgage Company systematically abandoned its underwriting guidelines

399. Ameriquest Mortgage Company ("Ameriquest") originated 93.32% of the Mortgage Loans underlying the AMSI 2004-R6 Securitization and Mortgage Loans underlying the CBASS 2006-CB9 Securitization.

400. Government and civil investigations have brought a pervasive breakdown of underwriting standards to public light. Ameriquest has been frequently referred to as "one of the nation's worst subprime sharks." Michael Hudson, Data shows Deutsche Bank was key patron of questionable mortgage lenders, iWatch News, (Apr. 18, 2011), http://www.iwatchnews.org/ 2011/04/18/4173/data-shows-deutsche-bank-was-key-patron-questionable-mortgage-lenders. Ameriquest was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

401. Ameriquest was the focus of damning testimony to the FCIC. Illinois Attorney General Lisa Madigan testified before the FCIC that Ameriquest had

> engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale: inflating home appraisals; increasing the interest rates on borrowers' loans or switching their loans from fixed to adjustable interest rates at closing; and promising borrowers that they could refinance their costly loans into loans with better terms in just a few months or a year, even when borrowers had no equity to absorb another refinance.

FCIC Report at 12, n.51.

402. Ed Parker, the former head of Ameriquest's Mortgage Fraud Investigations Department, also testified before the FCIC. Mr. Parker informed the Commission that he had

detected fraud at the company within a month of starting his job there in January 2003, but that senior management did nothing with his reports. Mr. Parker testified that he had heard that other departments were complaining that he "looked too much" into the loans. *Id.* at 12. In November 2005, Mr. Parker was downgraded from "manager" to "supervisor," and he was laid off in May 2006.

403. Ameriquest has been sued by mortgage borrowers who blame the lender's lax underwriting standards for their loan delinquency.

404. In one lawsuit against Ameriquest, the plaintiff alleges that loan officers at a Brooklyn, New York, branch of Ameriquest coerced her into signing a loan. Unbeknownst to the plaintiff, Ameriquest created fake tax returns, employment records, and a 401(k) to make it appear that the loan was affordable. Other court filings allege that Ameriquest doctored loan documents or overstated borrowers' income in connection with the loans of 40 borrowers.

405. Institutional investors have also entered the fray, accusing Ameriquest of violating its own underwriting standards in originating loans that it later sold. For instance, Wachovia Bank, N.A., filed a lawsuit against Ameriquest, alleging that Ameriquest had not complied with repurchase requests on loans with fraudulent files. According to Wachovia's complaint, the 135 nonperforming loans sold to Wachovia on December 29, 2005, contained incorrect credit scores, incorrect employment status, and misstatements regarding the type of home that was being financed. In addition, the complaint alleges that the loans were not underwritten pursuant to the underwriting procedures that Ameriquest agreed to apply.

406. The widespread nature of such practices was confirmed by former Ameriquest employees in a National Public Radio broadcast. A former Ameriquest loan officer in Tampa, Florida, recalled that in order to sell a loan "at any cost," managers (1) encouraged loan officers

to conceal the actual cost and interest rates on loans and (2) would white out numbers on W2s and bank statements and fill in bigger amounts basically to qualify people for loans that they couldn't afford, a practice called "taking the loan to the art department." According to the National Public Radio broadcast, these practices were not isolated, were confirmed by former employees from Ameriquest offices around the country, and were widespread as early as 2003.

**18.     Third-party originator First National Bank of Arizona systematically abandoned its underwriting guidelines**

407.     First National Bank of Arizona ("FNB Arizona") originated Mortgage Loans underlying the CBASS 2004-CB2 Securitization.

408.     FNB Arizona merged with First National Bank of Nevada on June 30, 2008 and the combined institution collapsed only a month later, triggering a damning audit report by the Treasury Department's Inspector General. Office of Inspector General, *Safety and Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank, National Association*, Dep't of the Treasury, OIG-09-033 (Feb. 27, 2009).

409.     The Inspector General's report concluded that FNB Arizona's credit underwriting was fundamentally "unsound." *Id.* at 4. "FNB Arizona failed to improve its underwriting standards and drop riskier mortgage products" even as it was taking the unusual step of limiting its own recourse to mortgage brokers who had sold it non-conforming mortgage loans. *Id.* at 5. FNB Arizona set off early warnings among its regulators. "From 2002 through 2007, OCC examiners repeatedly expressed the need for stronger controls over FNB Arizona's residential mortgage division's origination of the high-risk non-traditional and Alt-A loans." *Id.* "Bank management, however, did not adequately address these concerns." *Id.*

410.     Ultimately, the breakdown of residential mortgage underwriting standards at FNB Arizona was so egregious that it not only helped to bring down the bank, but it caused the OCC to admit that "it did not effectively supervise FNB Arizona." *Id.* at 3.

### 19.     Third-party originator Impac Funding systematically abandoned its underwriting guidelines

411.     Impac Funding Corp. ("Impac") originated Mortgage Loans underlying the CBASS 2004-CB2 and MLMI 2006-HE2 Securitizations.

412.     Impac took advantage of the exploding market for residential mortgage-backed securities by significantly increasing the volume of mortgage loans they originated and securitized.  In 2003, Impac Funding originated approximately $9.5 billion of mortgage loans and securitized over $800 million of residential mortgage loans.  In 2004, the volume of mortgage loans that Impac Funding originated more than doubled—to $22.2 billion.  At the same time, the volume of mortgage loans that it securitized more than quadrupled—to over $3.7 billion.  Impac Funding was then considered the fourth-largest Alt-A mortgage originator and the second-largest company securitizing Alt-A loans in the United States.  In 2005, the volume of Impac Funding's loan origination and securitization remained high—at $22.3 billion and $2.5 billion, respectively.

413.     According to a shareholder class action, internal documents showed that by 2006 Impac's parent, Impac Mortgage Holdings, Inc. ("IMH"), "had the 2nd highest Alt-A 'severe delinquency rate,' at 8.31%, when compared to the top twenty issuers.  This was . . . nearly twice the 'Alt-A' issuer average."  Consolidated Amended Class Action Complaint ¶ 4, *Pittleman v. Impac Mortg. Hldgs., Inc.*, No. 07-cv-970 (C.D. Cal. Jan. 8, 2008).  Former IMH employees stated that "whatever loan came in, the goal was to pass it on to the next step for approval." *Id.* ¶ 45.  For example, "a low credit score . . . would not 'kill' [a] loan.  Rather, the loan would then

go to the 'deal desk,' where deals were regularly made to get loans approved." *Id.* One employee stated that "all loans denied by underwriters went to senior management," and that "management's theory was to approve loans," overriding the IMH underwriters. *Id.* ¶ 53.

414. Employees described how, thanks to "[t]he absence of income verification," "IMH repeatedly inflated the reported incomes of applicants in order to approve loans for which the applicant would not otherwise qualify. . . . For example, if an applicant was making $700 per week, it would be increased to $1,000 per week." *Id.* ¶ 47. Another employee concurred that IMH's "management encouraged the selling of loans to customers who should have not been eligible for Alt-A loans," and "this was accomplished because 90% of the loans done at IMH did not have documentation of income." *Id.* ¶ 50.

### 20. Third-party originator First NLC Financial Services, LLC systematically abandoned its underwriting guidelines

415. First NLC Financial Services, LLC ("First NLC") originated Mortgage Loans underlying the MLMI 2007-HE3 and CBASS 2005-CB6 Securitizations.

416. First NLC was one of the top subprime residential mortgage lenders in the United States. The company was sold in 2007 to an affiliate of the private equity firm Sun Capital Partners. The company later filed for bankruptcy.

417. In 2000, First NLC's first full year of operations, its loan origination volume sat at $308.9 million. First NLC was able to expand its loan originations over the next six years, originating over $7.4 billion in mortgage loans in 2006 alone.

418. First NLC accomplished this growth by abandoning its underwriting guidelines and sound business practices, as confirmed by numerous investigations, as well as its own bankruptcy filings.

419.     For instance, First NLC settled accusations with the Pennsylvania Department of Banking based on writing mortgages from an unlicensed location.

420.     An investigation by the Washington Department of Financial Institutions, Division of Consumer Services found that First NLC did not maintain proper books and records in violation of the state Consumer Loan Act.  This was based on First NLC's repeated failures to locate loan files that the government had requested for examination.  The failure to even be able to produce loan files requested by a government agency evidences the complete breakdown that occurred within First NLC's operations.

421.     Of the loan files First NLC was able to actually produce, the Washington Department of Financial Institutions found that *22%* demonstrated on their face that lending-law violations had occurred.  Engaging in lending-law violations represent an obvious failure to generate loans within the stated guidelines.

422.     A final order was entered against First NLC revoking its license to conduct business in the state of Washington and prohibiting it from participating in any other consumer loan companies for a period of five years.

423.     A similar investigation by the California Department of Corporations also found that First NLC was "conducting residential mortgage lending and/or servicing business . . . in such an unsafe and injurious manner as to render further operations hazardous to the public or to customers."  The Department of Corrections also later found that First NLC had not maintained and filed the lending reports required by state law, such as an Independent Auditor's Report on Internal Controls.  The company was ordered to cease lending and servicing activities in the state and later had its license revoked.

424.     Before closing, First NLC disclosed large loss provisions, and was increasing its reserves, in response to costs associated with the expected need for the company to buy back defective loans.  Nonetheless, First NLC was forced to close its doors after being asked by Wall Street banks that had securitized its loans to buy back millions of dollars worth of loans due to breaches of First NLC's representations and warranties.  Indeed, the bankruptcy filings revealed that the top seven unsecured creditors—six of them, banks that were heavily involved in the securitization of mortgage loans—all had claims arising out of breaches of First NLC's representations and warranties.

### 21.     Third-party originator Aegis Mortgage Corporation systematically abandoned its underwriting guidelines

425.     Aegis Mortgage Corporation ("Aegis") originated or acquired Mortgage Loans underlying the MLMI 2007-HE3 Securitization.

426.     Aegis was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas.

427.     Aegis was founded in 1993 with a $500,000 investment.  Initially, Aegis was a privately held mortgage banking company owned by three individuals.  By 1998, the company was generating $1 billion in annual loan volume.  In 1998 and 1999, Cerberus Capital Management, LP made a $45 million investment in Aegis, enabling the company to increase its subprime business.

428.     With this substantial cash injection, Aegis acquired two extremely distressed mortgage production operations—UC Lending and New America.  These and subsequent acquisitions enabled Aegis to grow from 150 employees in nine locations in 1999 to 3,800 employees in over 100 locations in 2005.  By 2006, Aegis was ranked as the 13th-largest subprime lender in the country, generating close to $20 billion in annual originations.  In eight

years, the company's subprime originations grew by 1,750%. The Center for Public Integrity

calculated that Aegis had originated at least $11.5 billion in subprime loans. Center for Public

Integrity, "The Subprime 25" (May 6, 2009), http://www.publicintegrity.org/2009/05/06/5554/

subprime-25.

429.     High-fee, high-risk mortgages fueled Aegis' astronomic growth. As the need for

these mortgages increased, loan underwriting standards were loosened to the point of

abandonment by 2006. A large portion of the loans Aegis originated during this time were

purchased from unlicensed mortgage brokers. Because investment banks purchased Aegis'

loans, underwriting standards were disregarded and quantity became more important than

quality. Aegis' Divisional head of underwriting, Helen Spavile, bullied the understaffed East

Coast underwriting department in Jacksonville, Florida, to approve whatever loans were sent

there for approval, resulting in the guidelines being ignored and the loans approved.

### 22.     Third-party originator M&I Bank systematically abandoned its underwriting guidelines

430.     M&I Bank, FSB ("M&I") originated Mortgage Loans underlying the RFMS2

2006-HI2 Securitization.

431.     M&I's catastrophic underwriting practices left the bank saddled with billions of

dollars in losses and ultimately forced it into a merger with Bank of Montreal. Cary Spivak,

*M&I's Dead End*, Milwaukee Journal Sentinel (July 9, 2011).

432.     Despite the lender's repeated assurances to investors, M&I's nonperforming

assets eventually exceeded 5% of M&I's loan portfolio, a level considered "*unsafe and*

*unsound*" by regulators. Ari Levy, *Toxic Loans Topping 5% May Push 150 Banks to Point of*

*No Return*, Bloomberg.com (Aug. 14, 2009). "These numbers [of bad loans] *are off the charts*."

*Id.*

Industry observers and insiders point to three actions that led to M&I's downfall:

As M&I moved into the 21st century, its top managers—and, more important, its management style—changed. ***Lusting for growth*** that couldn't be found in the Midwest, the company's new leaders moved away from the conservative approach that had been the bank's hallmark and became more aggressive lenders—a strategy that impressed Wall Street for several years. . . . .

Spivak, *M&I's Dead End* (emphasis added). After generations of family leadership, in 2002 M&I's CEO spot went to Dennis Kuester, a former IBM employee who "was praised for his sales skills" but who "never had written a loan," and "didn't have experience in credit." Once at the helm, Kuester "was pushing for more sales . . . and was ***not tight on the credit***." *Id.* (emphasis added).

433. A signal event in M&I's reckless growth spree was its acquisition of Kansas City-based Gold Banc Corp., "an institution with considerable baggage, including a chief executive officer who was ousted before the acquisition and went to prison afterward. But its presence on the west coast of Florida gave M&I a coveted beachhead there, although many of the loans in the Gold Banc portfolio ultimately went bad." Spivak, *M&I's Dead End*.

434. "M&I drove hard for business in Arizona in the first half of the past decade," beating their competitors by "quickly clos[ing] deals" and offering "very aggressive" terms to mortgage brokers. M&I also moved recklessly into speculative markets such as undeveloped areas around Phoenix, Arizona even though "***many other lenders . . . shunned those areas***." "Some of the areas targeted by M&I are desolate—a few homes scattered amid dirt roads and undeveloped lots." *Id.*

435. Industry observers later stated that M&I "needed the loan revenue" to justify its rapid expansion: "we have a bunch of branches now we need the loans. . . . They had to support that growth." Now, M&I is "stuck with loans on hundreds of properties" and foreclosing at a pace that "some fear . . . is contributing to the [Arizona] region's depressed housing prices." *Id.*

150

436.     Remarkably, M&I has admitted that it originated properties based on false appraisals; the lender filed (and later dropped) seven lawsuits against Arizona real estate appraisers, alleging that its appraisers showed a "*reckless disregard for the truth*' in estimating the value of [mortgaged] properties." *Appraiser Suits Dropped in Arizona*, Appraiser News Online (2010). Among other things, the appraisers that M&I later accused of negligent misrepresentation have asserted that M&I *did not even review the appraisals*, and *continued to use faulty appraisers* even after accusing them of negligence. *Id.*

437.     Upon acquiring M&I in 2011, Bank of Montreal repaid the $1.7 billion in federal bailout money that had been extended to M&I through the Troubled Asset Relief Program ("TARP"). Alan Zibel, *Bank of Montreal Repays M&I's TARP Debt*, Wall St. J. (July 5, 2011). But for the acquisition, M&I would have been forced to raise capital to return its TARP money given the size of the hole that imprudent lending left in M&I balance sheet.

### 23.     Third-party originator Delta Funding systematically abandoned its underwriting guidelines

438.     Delta Funding Corp. ("Delta") originated all of the Mortgage Loans underlying the RAMC 2006-1 Securitization.

439.     Delta was among the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected metropolitan areas, before its bankruptcy filing.

440.     Delta has faced federal and state enforcement actions in connection with its predatory lending practices, reaching a settlement the Justice Department and state authorities in 2000 after it was accused of violating the Fair Housing Act, the Equal Credit Opportunity Act, the Home Ownership and Equity Protection Act of 1994, and the Real Estate Settlement Procedures Act of 1974. Settlement Agreement & Order, *United States v. Delta Funding Corp.*, No. 00-cv-1872 (E.D.N.Y. March 3, 2000).

441.    Delta has been described as "[a]mong the worst offenders—by far."  According to one media report, "Delta's practices included . . . making loans far in excess of a property's true value by using inflated appraisals; and accepting obviously fake income documentation from loosely-supervised brokers."  Opinion, *A Subprime Mortgage Wolf Tries Wearing Sheep's Clothing*, N.Y. Daily News (June 20, 2009), http://www.nydailynews.com/opinion/subprime-mortgage-wolf-wearing-sheep-clothing-article-1.377736.  Josh Zinner, co-director of the Neighborhood Economic Development Advocacy Project, has stated that Delta "wrecked entire neighborhoods in Queens, Brooklyn, Philadelphia, you name it.  Literally thousands of people had their lives ruined."  *Id.*

### 24.    Third-party originator Mortgage Investment Lending Associates, Inc. systematically abandoned its underwriting guidelines

442.    Mortgage Investment Lending Associates, Inc. ("MILA") originated or acquired Mortgage Loans underlying the SURF 2005-BC4 Securitization.

443.    MILA was principally in the business of making subprime loans.  Using a proprietary software "that could process home-loan applications submitted over the Internet in seconds," MILA originated $4.5 billion in mortgages by 2006.  Manny Frishberg, "One-Minute Mortgage," *Seattle Met* (Dec. 28, 2008), http://www.seattlemet.com/real-estate/articles/0608-rainmaker.  Yet by the end of 2004, and because of increasingly ill-advised and risky lending practices, MILA was functionally insolvent.  Specifically, by the end of 2004, its revenue as a percentage of loan sales and repurchased loans as a percentage of loan sales were worsening at an accelerating rate.  Like other originators, MILA made representations and warranties regarding its loans' compliance with underwriting guidelines and other critical loan risk metrics.  If a loan breached these representations and warranties, MILA promised that it would repurchase the loan.  MILA repurchased loans of $2,718,671 in 2002, $8,260,655 in 2003, and *$37,660,332*

*in 2004.* MILA projected that its loan repurchases as a percentage of total loan sales would triple in 2005 through 2007. To survive financially, it needed a dramatic increase in available cash on hand, profitability and a means of reversing the alarming growth in bad loans it was required to repurchase. Ultimately, however, MILA collapsed on April 20, 2007 and ceased to be a going concern.

### 25. Third-party originator Fieldstone Mortgage Company systematically abandoned its underwriting standards

444. Fieldstone Mortgage Company ("Fieldstone") originated the Mortgage Loans underlying the FMIC 2006-3 and FMIC 2007-1 Securitizations, and Mortgage Loans underlying the CBASS 2007-CB5 Securitization.

445. Fieldstone's reckless lending practices earned it a spot on the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected markets. The deficiency of Fieldstone's underwriting practices is confirmed by the shocking write-off rates on the RMBS for which it was the sole Originator. As discussed above, more than 40% of the Mortgage Loans underlying the FMIC 2006-3 and FMIC 2007-1 transactions have been written off for a loss, and many more loans are currently delinquent.

446. FMIC 2006-3 was also among the reference portfolio for the infamous ABACUS 2007 AC-1 synthetic collateralized debt obligation, which Goldman Sachs assembled on behalf of an investor who hoped to bet against securities that he expected would be the among worst-performing in the RMBS market. *See* Darrell Duffie, *The ABACUS 2007 AC-1 Deal Structure and Investment Incentives* (April 27, 2010).

447. Other court filings also offer a window into now-defunct Fieldstone's disregard for sound lending practices. A TILA complaint filed in California describes how Fieldstone extended a thirty-year mortgage to a Spanish-speaking borrower on terms (provided only in

English) that were wholly at variance with the terms used to induce the borrower (in Spanish) to take out the loan. *Maldonado v. Fieldstone Mortg. Co., Inc., et al.*, No. 09-cv-2869 (C.D. Cal. June 23, 2009) (denying Defendants' motion to dismiss).

### 26. Third-party originator Decision One Mortgage Company systematically abandoned its underwriting guidelines

448.     Decision One Mortgage Company ("Decision One") originated Mortgage Loans underlying the RAMP 2004-RS2 and RAMP 2006-RZ3 Securitizations.

449.     Decision One's reckless lending practices earned it a spot on the OCC's "Worst Ten in the Worst Ten" list of originators, ranked by foreclosure rates in the worst-affected markets.  Before being shut down by its parent, Decision One was a major lender specializing in non-conforming loans, having written $11.2 billion in subprime loans by 2006.

450.     As an internal audit of the lender's mortgages confirmed, Decision One recklessly abandoned sound underwriting practices.  Conducted in or around 2006, the internal audit identified a host of deficiencies, including: "failure to properly confirm borrower income, fraudulent verification of rental payment history, and inadequate employer verification." Complaint ¶ 263, *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp.*, No. 10-cv-7560 (N.D. Ill. Nov. 23, 2010).  For example, to "verify" borower income, Decision One employees would simply assume that any borrower was a highly-paid manager in his or her respective profession. *Id.*

451.     According to a Decision One insider, "loans just closed without verification" at the end of each month as the lender rushed to record monthly origination volume. *Id.* ¶ 264. Managers routinely overrode underwriters' decisions in order to increase the number of loans closed and funded. *Id.* ¶ 266.  When underwriters expressed concerns to management, they "were left by the wayside." (*Id.* ¶ 264)

**D.** **Loan-File Reviews By Those With Access To The Loan Files Confirm Defendants' Abandonment Was Systemic**

452.    As discussed in Section II.A, Prudential's analysis of the Mortgage Loans directly at issue has found widespread and severe misrepresentations. Third parties with access to the complete loan files for BofA and Merrill securitizations have performed additional analysis of the mortgage loans underlying those offerings. This includes the Federal Housing Finance Agency ("FHFA") and American International Group ("AIG"). These analyses provide additional strong evidence that essential characteristics of the Mortgage Loans underlying the Certificates were misrepresented and omitted material information, and that the problems in BofA and Merrill's underwriting practices were systemic.

453.    Unlike Prudential, FHFA was able to access thousands of Merrill's loan files, including for the FFML 2006-FF18, FFMER 2007-3, FFMER 2007-4, FFML 2007-FF1, and SURF 2006-BC2 Offerings that Prudential purchased. FHFA performed a forensic review of the loan files for these five Offerings and many others with the same or similar parties, structure, timing and disclosures. The forensic review consisted of an analysis of the loan origination file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration, documentation with pertinent information indicating the borrower's assets or residence, and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information.

454.    FHFA's loan-file review found that an astounding *70%* of the loan files reviewed did not adhere to the applicable underwriting guidelines or otherwise represented breaches of the

155

relevant representations and warranties contained in the transactional documents. These breaches included:

- failure to test the reasonableness of the borrower's stated income which in turn contributed to material misrepresentations of income;

- failure to properly investigate multiple loan applications submitted by the same borrower within a relatively short time period showing increasingly higher stated incomes, which in turn also contributed to material misrepresentations of income;

- failure to properly investigate the borrower's intent to occupy the subject property as a primary residence or second home when red flags surfaced in the origination process that should have alerted the underwriter that the property was intended to be utilized for investment purposes;

- failure to properly investigate information contained in the borrower's credit report for potential misrepresentations of outstanding debt; and

- failure to properly calculate the borrower's outstanding debt which in turn resulted in the borrower's debt-to-income ratio ("DTI") exceeding the maximum allowed under the underwriting guidelines.

455.    For example:

- A loan that closed in December 2006 with a principal amount of $520,000 was originated under First Franklin's Stated Income Loan Program. The borrower stated earnings of $13,500 per month as a Criminal Defense Investigator. There is no evidence in the file that the loan underwriter tested the reasonableness of the stated income. Per the U.S. Bureau of Labor Statistics, for the relevant occupation, geographic region, and time period of the loan application, the 90th percentile of income was $7,573. The borrower's stated income was over one and one half times this amount. Based on the forensic review, the borrower's actual income during this time was $3,310 per month. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the borrower's misrepresentation of income would have been uncovered. The borrower's recalculated DTI based on all evidence uncovered in the forensic review is 182.85 percent, greatly exceeding the guideline maximum of 50.49 percent. The subject loan defaulted resulting in a loss of $283,162.

- A loan that closed in September 2006 with a principal balance of $82,800 was originated by Option One as a stated-income loan. The loan application stated that the borrower was employed as a property manager earning $13,765 per month. The borrower's stated income exceeded Payscale.com's 90th percentile salary for a property manager in the same geographic region. Moreover, in the Statement of Financial Affairs filed by the borrower as part of a bankruptcy

proceeding, the borrower reported monthly income of $2,325. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on the borrower's verified income yields a DTI of 157.19 percent, which exceeds the guideline maximum allowable DTI of 45 percent. The loan defaulted, resulting in a loss of $58,314.

- A loan that closed in April 2006 with a principal balance of $263,700 was originated as a stated-income loan. The loan application stated that the borrower was self-employed as a bookkeeper earning $10,200 per month. There is no evidence in the file that the loan underwriter tested the reasonableness of the stated income. The borrower's stated income exceeded Payscale.com's 90th percentile salary for self employed bookkeeper in the same geographic region. Loss mitigation documents, including the borrower's 2005 tax return, revealed that the borrower's actual business income was $760 per month. Moreover, a bankruptcy petition dated in January 2009 reflects no self-employed businesses for the borrower since 2003. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. A recalculation of DTI based on the borrower's verified income yields a DTI of 1,177.63 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted, resulting in a loss of $262,840.00.

456. FHFA, which also gained access to thousands of BofA's loan files, performed a forensic review of 2,441 loan files for two offerings underwritten by Defendant BAS. Those offerings—OOMLT 2007-6 and OOMLT 2007-FXD1—featured the same parties (Option One Mortgage Corp. as originator and sponsor, and Option One Mortgage Acceptance Corp. as depositor), structure, timing, and disclosures as the OOMLT Offerings Prudential purchased. The ABFC 2005-HE1 and ABFC 2006-OPT1 Offerings that Prudential purchased *also* featured Option One as a key originator, BAS as the underwriter, and the same or similar timing and disclosures. Thus, the findings of FHFA, made upon a review of the Defendants' own loan files, apply equally to the Certificates at issue here.

457. FHFA's loan-file review found that *over 80%* of the loan files reviewed did not adhere to the applicable underwriting guidelines or otherwise represented breaches of the relevant representations and warranties contained in the transactional documents. These breaches included:

- failure to test the reasonableness of borrowers' stated income, contributing to material misrepresentations of income;

- failure to investigate properly the borrower's intention to occupy the subject property when red flags surfaced in the origination process that should have alerted the underwriter that the property was not intended as a primary residence;

- failure to calculate properly the borrower's outstanding debt, causing the DTI ratio to exceed the maximum allowed under the underwriting guidelines; and

- failure to investigate properly red flags on the borrower's credit reports for potential misrepresentations of outstanding debt that should have alerted the underwriter that potential misrepresentations of outstanding debt existed.

458.    For example:

- A loan that closed in May 2007 with a principal balance of $108,000 was originated as a stated-income loan. The borrower stated earnings of $6,000 per month as a dietary technician. There is no evidence in the file that the loan underwriter tested the reasonableness of the stated income. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile for a dietary technician in the same geographic area during the time period of the loan application by more than 1.5 times. Moreover, in the Statement of Financial Affairs filed as part of the borrower's declaration of bankruptcy, the borrower reported a monthly income in 2007 of $932. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the misrepresentation of income would have been uncovered. A recalculation of DTI based on the borrower's true income yields a DTI of 206.71%, a figure more than four times the guideline maximum of 50%. The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $103,169

- A loan that closed in May 2007 with a principal balance of $385,000 was originated as a stated-income loan. The borrower stated earnings of $6,850 per month as a nurse. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile for a nurse in the same geographic area during the time period of the loan application by more than 1.5 times. Moreover, in the Statement of Financial Affairs filed as part the borrower's declaration of bankruptcy, the borrower reported a monthly income in 2007 of $2,833, and the borrower's 2007 W-2 form reflected earnings of $30,178 annually, or $2,515 per month. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the misrepresentation of income would have been uncovered. A recalculation of DTI based on the borrower's income, as reflected in the 2007 W-2 Form, yields a DTI of 134.69%, greatly exceeding the guideline maximum of 50%. The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $343,350.

158

- A loan that closed in May 2007 with a principal balance of $333,000 was originated as a stated income loan. The borrower stated earnings of $6,623 per month as a cosmetologist. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile for a cosmetologist in the same geographic region during the time period of the loan application by more than 1.2 times. Moreover, the borrower's 2006 and 2007 tax returns reveal that the borrower reported a monthly income in 2006 of $1,054, and monthly income in 2007 of $1,328. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the misrepresentation of income would have been uncovered. A recalculation of DTI based on the borrower's true income yields a DTI ratio of 226.72%, greatly exceeding the guideline maximum of 50%. The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $379,330.

- A loan that closed in October 2006 with a principal balance of $276,000 was originated as a stated income loan. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. The borrower stated an income of $10,000 per month as a language interpreter. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile for a language interpreter in the same geographic area during the time period of the loan application by more than 2.5 times. Moreover, in the Statement of Financial Affairs filed as part of the borrower's declaration of bankruptcy, the borrower reported a monthly income in 2006 of $1,144. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the misrepresentation of income would have been uncovered. A recalculation of the DTI based on the borrower's true income yields a DTI of 289.86%, a figure exceeding by nearly six times the guideline maximum of 50%. The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $250,993.

- A loan that closed in November 2006 with a principal balance of $350,000 was originated as a stated income loan. The borrower stated an income of $10,400 per month as a reflexologist. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. The borrower's stated income exceeded the Bureau of Labor Statistics' 90th percentile for a reflexologist in the same geographic area during the time period of the loan application. Moreover, in the Statement of Financial Affairs filed as part of the borrower's declaration of bankruptcy, the borrower reported a monthly income in 2006 of $30. Had the loan underwriting process tested the reasonableness of the borrower's stated income, the misrepresentation of income would have been uncovered. A recalculation of the DTI ratio based on the borrower's true income yields a DTI ratio of 1,343.36%, a figure exceeding by 26 times the guideline maximum of 50%. The loan defaulted, and the property was liquidated in a foreclosure sale, resulting in a loss of $224,089.

459.     AIG also reviewed 300 loan files from two Merrill securitizations:  MLMI 2006-AF1 and WFMBS 2005-AR14.  In MLMI 2006-AF1, the parties (including MLMI as depositor and MLML as sponsor), structure, timing, and disclosures were the same or substantially similar as those in many of the Offerings that Prudential purchased.  Thus, the findings of AIG, made upon a review of the Defendants' own loan files, apply equally to the Certificates at issue here.  AIG's review confirmed that Merril's underwriting abandonment, as well as those of the originators it was using, was systemic.  AIG found a stunning *90% breach rate*, including such examples as:

- *Failure to Verify Employment.*  On the loan application the borrower represented he was a self-employed mechanic for five years.  The loan guidelines required self-employment to be documented with a CPA letter confirming the borrower's self-employment history.  The loan file contained a CPA letter, but the letter was missing required information, including the name of the borrower's business, a certification that the CPA had prepared the borrower's income tax returns, and that the individual signing the letter is a licensed CPA.  An audit verification confirmed that the CPA's license expired in 1996, nearly a decade before the loan was made.  The loan defaulted.

- *Misrepresentation of Income.*  The borrowers' loan application was originally reviewed as a full documentation loan and documents in the loan file reveal that the borrowers' income was $6,369 per month.  Income of $6,369 per month would have given the loan a DTI of 86.31%, well above the maximum DTI of 50%.  Before the loan closed, the borrowers were put into a stated income program and the loan closed using an income of $11,528 per month, nearly double the borrowers' original income.  The falsified income produced a DTI of 46% which was acceptable under program guidelines.  The loan defaulted.

- Using a third-party vendor, AIG also reviewed loans underlying BofA securitizations.  In conducting this review, AIG used the same underwriting guidelines that the lenders purportedly used to originate the loans and that BofA misrepresented in the Offering Materials.  AIG reviewed over 4,500 loan files from eleven offerings, including the BAFC 2006-E Offering that Prudential purchased.  Many of the other offerings that AIG reviewed featured the same or parties, structure, timing and disclosures as the Offerings Prudential purchased.  For instance, AIG analyzed BOAMS 2006-B, while Prudential purchased certificates in BOAMS 2005-A and BOAMS 2005-B, all of which included Defendant Bank of America, N.A., as seller, sponsor, servicer, and originator, Defendant Banc of America Mortgage Securities, Inc. as depositor and Defendant BAS as underwriter.  Thus, the findings of AIG, made upon a review of the Defendants' own loan files, apply equally to the Certificates at issue here.

460.     AIG's review revealed violations of underwriting guidelines in excess of *90%* of the loans in each RMBS tested, including blatant misrepresentations of income, employment, and owner-occupancy.  Representative examples include:

- *Misrepresentation of Employment.*  The borrower stated on the loan application that she was self-employed as a builder for 25 years, earning $35,000 per month, and the co-borrower stated that he was also self-employed as a builder earning $30,000 per month.  The borrower also listed on the application that she had been the owner of her building/construction business for 25 years; however, she was born in 1971, which would have made the borrower 10 years old when she became the owner of the business.  Additionally, the loan file contained letters of incorporation for both the borrower and co-borrower's businesses with inception dates of 9/28/1993 and 2/26/2002, respectively.  A reasonably prudent underwriter should have noticed that the age discrepancy was a red flag and questioned the validity of the information contained on the loan application.  The loan defaulted.

- *Misrepresentation of Employment.*  In a loan originated by BofA, the borrower stated on the loan application that he was employed as a software engineer for 3 years earning $10,902 per month.  There was no evidence that the underwriter requested or obtained verification of his employment.  In fact the originating lender conducted a post-closing audit which concluded that the borrower was never employed with the company and the employer identification numbers were invalid.  In 2009 the borrower completed a financial statement which stated he worked for a pool service company for the prior three years—dating back to the time the subject loan closed.  The loan defaulted.

- *Misrepresentation of Income.*  On his loan application, the borrower stated he received $6,045 per month in retirement and social security income.  The loan file contained the borrower's retirement pay statement and social security statement.  Both documents were altered to cover the income amounts.  Additionally, the loan file contained a mortgage loan worksheet signed by the borrower which indicated a total gross monthly income of $3,438.  The lender's guidelines required a borrower's employment history to be verified for the 24 months preceding the loan closing under the Stated Income Program.  There was no evidence in the loan file that the underwriter requested or obtained a current verification of the borrower's pension income as required.  The loan defaulted.

- *Misrepresentation of Income.*  The borrower stated on the application that she was self-employed as a personal chef with a monthly income of $10,166.67, or $122,000.00 annually. The borrower's tax returns, contained in the loan file, showed a gross income for the entire year of 2007 of $3,126.00 for services as a personal chef, and $27,225 as a self-employed personal assistant.  The borrower earned monthly income that was $675 *less* than the amount of the subject loan

mortgage payment in the year following the mortgage closing. The borrower made only one payment on the mortgage, and defaulted.

- ***Misrepresentation of Debt Obligations***. The application failed to disclose that the borrower simultaneously closed on a second mortgage, originated by the same lender, in the same condominium complex. Public records show that the Borrower acquired a mortgage on the same day as the subject loan for $414,000 with a monthly payment of $4,995 for a property located in Dallas, TX. The origination underwriter failed to include that monthly payment in the borrower's DTI ratio for the subject loan, resulting in an imprudent underwriting decision. A recalculation of DTI based on the borrower's undisclosed debt, and recalculated income of $1,200 per month, yields a DTI of 1,129%, which exceeds the guideline maximum allowable DTI of 55%. The loan defaulted.

- In the same file, the borrower stated on her loan application that she was an owner of a liquor store for 13 years, and stated her monthly income as $23,000 a month. $23,000 a month for an owner of a liquor store is unreasonable and should have put the underwriter on notice for potential misrepresentation. The borrower filed a Chapter 13 bankruptcy with the Central District of California Bankruptcy Court in October 2008. Per the Statement of Financial Affairs, the borrower reported that she was retired and earned income of $1,200 per month in 2006.

- ***Excessive DTI***. The lender's guidelines permitted a maximum allowable DTI of 55% for a stated-income loan when the subject property was an investment property. The DTI was not accurate because the borrower's income for the year of the subject loan closing, 2006, was a ***loss*** of $200,684, or a monthly loss of $16,724 per month, and the borrower's total monthly debt was $7,878, meaning that the DTI could not be calculated because the income was ***negative***. The loan defaulted.

- ***Underwriting Guidelines Breach***. The lender's guidelines prohibited a loan amount greater than $400,000 for loans approved with a C or CC risk grade. The subject loan was approved as a C risk grade due to unsatisfactory mortgage payments in the last 12 months on the borrower's secondary mortgage. The subject loan closed in the amount of $740,000, which exceeds the guideline maximum of $400,000. The loan defaulted.

461.    Of the loan files reviewed, 264 were originated by BofA, and these loans independently reflected breach rates in excess of 90%.

### E.    The Credit Ratings Were A Garbage-In, Garbage-Out Process

462.    Even before loans were purchased for securitization, securitizers knew what types of loan features loan pools had to have in order to receive the desired credit ratings from

the rating agencies. For instance, prior to bidding in a loan auction, participants would often submit the purported loan features (contained on a loan tape) to the credit rating agencies. The agencies would then run the loan-level information (e.g., LTV ratio, CLTV ratio, occupancy status, etc.) through their quantitative models in order to estimate the number of loans that were likely to default. By combining predictions of the number of underlying loan defaults with the proposed "waterfall" structure of the various RMBS tranches, a rating could be assigned in accordance with the predicted likelihood that holders of that tranche would receive full payment on their securities.

463.    Securitizers knew what loan features would result in which credit ratings in other ways, too. For example, the agencies often made key features of their ratings model available to their customers, making it possible to see what a rating would likely be based on a given set of loan features, even without yet directly involving the agencies themselves. The loan information was also often given to the agencies in advance of the finalization of the transaction to procure "shadow" ratings—the ratings that the securities would receive if no insurance coverage were provided. Through these and other methods, by the time a final, for-publication rating was issued it had already been a *fait accompli* as the securitizers knew what data was going to be given in exchange for what resulting credit rating.

464.    Be it part of the initial purchase, the "shadow ratings," internal analysis, or the final for-publication ratings, the agency rating is always based on the output from the agencies' quantitative models. Those models use loan tape data—the same type of loan tapes used to create the Offering Materials, and sometimes even provided to investors by way of free-writing prospectuses with rows and rows of numbers—to mathematically predict how many loans in the pool would likely default under certain assumed scenarios. To simplify, the models may use the

163

historical default rates of mortgage loans with 80% LTV ratios in order to help predict the likelihood of future defaults in a pool made up entirely of loans having 80% LTV ratios. But the model's prediction of loan defaults, and thus the resulting rating, would be substantively meaningless in this example if the loans in the real world (rather than as-described-world on the loan tape) actually had an LTV ratio of 110%. It was therefore critical that the information about the loans given to the agencies reasonably relate to the real-world features of those loans.

465.    The fact that the ratings were only as good as the data given to the agencies via the same loan tapes used to create the Offering Materials for investors has been confirmed by testimony given in connection with the government's investigation into the mortgage meltdown. As the Senate Permanent Subcommittee on Special Investigations reported:

> For RMBS, the "arranger"—typically an investment bank—initiated the rating process by sending to the credit rating agency information about a prospective RMBS and data about the mortgage loans included in the prospective pool. The data typically identified the characteristics of each mortgage in the pool including: the principal amount, geographic location of the property, FICO score, loan to value ratio of the property, and type of loan . . . .

466.    Government reports also recognize that other data analyzed by the rating agencies included, without limitation, the amount of equity that borrowers had in their homes, occupancy status, and the amount of documentation provided by borrowers to verify their assets and income levels. (SEC, Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies 8 (2008).)

467.    Susan Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, confirmed that the rating agencies relied upon the investment bank to provide accurate information about the loan pools:

> The securitization process relies on the quality of the data generated about the loans going into the securitizations. **S&P relies on the data produced by others and reported to both S&P and investors about those loans . . . . S&P does not**

**receive the original loan files for the loans in the pool.** Those files are reviewed by the arranger or sponsor of the transaction, who is also responsible for reporting accurate information about the loans in the deal documents and offering documents to potential investors.

(SPSI hearing testimony, Apr. 23, 2010) (emphasis added).

468.     These governmental reports and testimony confirm that the credit ratings were a garbage-in, garbage-out process controlled by the securitizers. Ratings based on garbage data in no way "address the likelihood of receipt of all distributions on the Mortgage Loans by the related certificateholders," nor do such ratings "take into consideration the credit quality of the related mortgage pool." Those representations were reasonably understood to mean that the process used would *meaningfully* address the likelihood of receipt of payments in the real-world. That is false where, as here, the data given to the rating agencies did not reasonably describe the true nature of the loans. Rather, the process used only "t[ook] into consideration the credit quality of a [*hypothetical*] mortgage pool" that did not in fact exist.

469.     This rendered Defendants' process-related representations about the credit ratings for the Certificates at issue here false and misleading. As discussed above, because of the systemic abandonment of the underwriting guidelines by Defendants and the other Originators, key risk features such as the LTV ratios, CLTV ratios, and occupancy status were all being falsely reported. For instance, Prudential's forensic analysis found many of these measurements to be falsely represented to investors for the loans at issue. The falsity of this data alone was sufficient to render the credit ratings at issue here substantively meaningless. But this was likely just the tip of the iceberg in terms of the false data given to the agencies. On information and belief, the resulting false income claims were given to the agencies (including by Defendants) in the pre-purchase, shadow-rating, and final-rating stages (and any steps in between) along with the false claims about LTV ratios, CLTV ratios, occupancy status, and other data points. That

false data was then used to produce the ratings that formed the basis for the rating-related representations in the Offering Materials.

470.     That Defendants did not, inexplicably, provide *investors* false data while secretly providing the agencies with somehow-different *true* data is confirmed by the fact that all of the Certificates have been downgraded as revelations about the true nature of the loans has emerged. It is also supported by Susan Barnes' testimony, quoted above, that said the agencies rely "on the data produced by others and reported *to both S&P and investors*" in reaching its credit ratings. As discussed further above, much of the data given to investors with respect to the Certificates at issue was itself false and misleading. That that same false data is what was given to the agencies to use in giving a rating is confirmed by reviews conducted by those that have been given access to the Defendants' loan files. As discussed above, AIG, and FHFA reviewed Defendants' loan files and found incredible defect rates. All of these facts confirm that the allegations contained throughout this Complaint, establishing that the Offering Materials had false and misleading descriptors of the mortgage loans, also establish that the rating agencies were given false and misleading descriptors of the mortgage loans at every step where they were involved.

471.     The credit ratings themselves, and the other credit-rating representations, were also false and misleading because Defendants knew the data underlying them did not reasonably relate to the actual loans, rendering the ratings effectively meaningless. Defendants knew, including in their roles as underwriter (and the due-diligence obligations that came with such a position), that the LTV, CLTV, owner-occupancy, and other data on the loan tapes given to the agencies did not reasonably relate to the true nature of the loans being securitized. Through their deep roles in this industry, Defendants also knew that the credit ratings were only as good as the data given to the agencies. Accordingly, they knew the credit ratings did not reasonably

"address the likelihood of receipt of all distributions on the Mortgage Loans by the related certificateholders," knew the ratings did not truly "take into consideration the credit quality of the related mortgage pool," and did not genuinely believe in the credit ratings themselves.

472.　　Finally, Defendants did not merely manipulate the ratings process by feeding false information to the ratings agencies. Defendants also failed to disclose in the Offering Materials that they regularly used "financial engineering" of credit ratings to give high risk assets the veneer of safety and low risk. As discussed in greater detail below, this "engineering" came in numerous forms, including "ratings shopping," pressuring the agencies not to perform adequate scrutiny of its deals, and having analysts who did their job properly replaced on future deals.

## III.　DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE AND MISLEADING

### A.　Overview

473.　　This is not a typical securities fraud case where the misrepresentations were contained in single offering document or concerned a single event. This was a massive, multi-year scheme covering Defendants' entire securitization operations. Prudential's lawsuit concerns 54 Offerings. However, Prudential's suit is just the tip of the iceberg. Other investors (as well as monoline insurers) have brought fraud suits against Defendants covering many more offerings with a collective value in the tens of billions.

474.　　Pre-suit investigations by these plaintiffs, governmental investigations, and post-filing discovery in other lawsuits have unearthed facts that demonstrate beyond a shadow of a doubt that Defendants engaged in a deliberately illegal scheme over many years in which they sold billions in RMBS based on false representations that the underlying mortgage loans met underwriting guidelines. All the while, Defendants knew facts and had access to information

from both internal and paid due diligence proving their statements about adherence to underwriting guidelines to have been false and misleading. The motive was simple: greed. Defendants made hundreds of millions of dollars they could not have made but for their false and misleading statements.

475.    As an insurance company, Prudential typically invested in only the most risk-free securities. Indeed, all the Securitizations at issue in this lawsuit were originally given investment-grade ratings. In making its purchase decisions nothing was more important to Prudential than the low-risk nature of the Securitizations. And since the sole source of the payments on these Securitizations was the underlying Mortgage Loans, Defendants' representations concerning the risk factors on these mortgages was critical.

476.    Defendants' verification that the Mortgage Loans complied with published underwriting guidelines was *the* primary purpose of the extensive due diligence Defendants undertook during the securitization process. This due diligence, discussed below, gave Defendants all the information they needed to discover the systemic departure from underwriting guidelines. The evidence, discussed below, demonstrates that Defendants had actual knowledge of the falsity of their representations. At a minimum, Defendants were recklessly indifferent to the truth of the statements they made to Prudential.

477.    As discussed below, Defendants' knowledge is confirmed by, among other facts: (i) the consistency and breadth of the problems; (ii) Defendants' direct window into the fraudulent origination practices that applied to the loans that were generated in-house, as well as by the Originators with whom Defendants had "warehouse lending" relationships; (iii) evidence from "reunderwriting" Defendants' loan files, including the files underlying many of the Securitizations at issue here, which have shown fraud on the face of the documents themselves;

(iv) Clayton's "Trending Report," which shows that due diligence of the type Defendants performed here identified numerous defective loans, but Defendants "waived in" defective loans anyway; (v) confidential witness testimony from Defendants' employees, confirming that the bank acted knowingly; and (vi) confidential witness testimony showing, in many other ways, that Defendants' due diligence processes were catching errors of the type at issue here *on a daily basis*—even though the underwriters were understaffed, undertrained, and pressured to "look the other way" as often as possible.

478.    Similarly, the evidence shows that Defendants knew that the specific appraisal, LTV and CLTV representations contained in the underlying Offering Materials were likewise false.  Multiple confidential witnesses show that Defendants themselves abused the appraisal process.  Many other witnesses confirm that appraisal defects were often apparent on the face of Defendants' loan files, and that such defects were caught and flagged for Defendants on a daily basis by their due-diligence underwriters.

479.    The facts also show that Defendants' due-diligence process gave them actual, daily knowledge of problems with the owner-occupancy representations in the Offering Materials.  For instance, confidential witnesses confirm that many loan files revealed on their face that the occupancy claims were false—for instance, because the loan file showed that the borrower worked a long distance from where the mortgaged property was, or because the borrower had obtained insurance to protect its role as a landlord on the property.  Those witnesses also confirm that such problems were included in the due-diligence reports provided to Defendants.

480.    In short, this is not a case where Defendants should have asked more questions or should have been more skeptical of the data they were given.  Defendants were handed

evidence of problems with the Mortgage Loans on a silver platter. It is implausible to believe that Defendants ignored all the data to which they (but not Prudential) had access. The loan files *on their face* revealed to Defendants all they needed to know to determine the loans did not match the descriptions being given to them. Defendants' industry practices and numerous confidential witnesses confirm that those loan files were in fact reviewed by Defendants. Clayton's "Trending Report," and common sense, confirms that those reviews did in fact catch many loan defects—but Defendants deliberately chose to give the defect loans a free-pass to increase their own profits.

### B. Facts Showing Defendants' Knowledge of General Underwriting Abandonment by Originators

#### 1. The consistency of the Loans' errors

481. The same evidence discussed above demonstrating the consistent and pervasive falsity of Defendants' representations also supports the conclusion Defendants *knew* their Offering Materials were false. This did not happen with isolated offerings. Rather, the misrepresentations were consistent across a wide spectrum of securitizations. For instance, Prudential's forensic analysis found not just that the characteristics of the Mortgage Loans were *consistently* misrepresented from offering to offering. Occupancy rates were misrepresented across the Offerings, by as much as *over 15%*. The number of loans with LTV and CLTV ratios above 100% was misrepresented across the Offerings, by as much as *66.58%*. Improperly assigned loans account for *43%* of the Mortgage Loans at issue. In short, this was a massive scheme and the misrepresentations were pervasive.

482. The departures from represented underwriting guidelines resulted in Mortgage Loans being included in the pools which posed high credit risks. Such problems have manifested themselves in skyrocketing default rates—overall, *over 26%* of the Mortgage Loans have already

had to be written off for a loss. While all of the Certificates were initially rated "investment grade," most are now rated "junk." The problems are only going to get worse. *Over 41%* of the remaining Mortgage Loans are themselves currently delinquent.

483.      Evidence exists that these problems infected even greater percentages of the Mortgage Loans at issue. As described above, loan-file reviews performed by FHFA and AIG show that Defendants systematically, as a matter of practice, knowingly acquired and securitized loans that had been originated with virtually no regard for the borrowers' ability to repay their obligations. For example, AIG found that a staggering *90%* of the over 4,500 BofA loans that it re-underwrote did not meet the stated underwriting guidelines. FHFA similarly found a defect rate of *over 80%* among the 2,441 BofA loans that it re-underwrote. AIG and FHFA also re-underwrote Merrill loans, and found defect rates of *90%* and *70%*, respectively. These results confirm that Defendants' fraudulent practices pervaded their RMBS business during this period.

484.      The remarkable default and delinquency rates, understated LTV and CLTV ratios, overstated owner-occupancy rates, and consistently botched chains of title are not only evidence that the Mortgage Loans underlying the Offerings were defective. They are strong evidence that Defendants *knew* they were defective. Simply put, Defendants could not have originated, purchased, pooled, and securitized so many defective Mortgage Loans without knowing that, contrary to their representations, the Loans had vastly different features than what they were claiming. Courts have repeatedly recognized that a *consistent pattern* of *large* misstatements can itself be strong evidence of scienter. *See generally, e.g.*, *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 881 (3d Cir. 2000) ("[W]e believe that when multiple promised events fail to occur, there is a point where a strong inference of fraud can be made.").

### 2. Defendants' extensive due diligence processes made them aware that the Mortgage Loans did not conform to the represented underwriting guidelines

485.     That Defendants could not have (and did not) securitize so many Mortgage Loans without gaining knowledge of, or being reckless as to, the fact that the Loans did not have the stated features is confirmed by the multiple rounds of due diligence that Defendants conducted, the vertically integrated nature of Defendants' operations, and their prominence and experience in this marketplace. Defendants' unique position in the market gave them a direct window into the lax underwriting practices at issue here.

486.     As set forth above, Defendants controlled and/or facilitated all aspects of originating, servicing, acquiring, and pooling the mortgage loans, as well as subsequently creating the securities and marketing and selling the Certificates at issue. For instance, Merrill had direct ownership relationships with originators, and BofA originated its own loans. In their origination capacity, Defendants were directly involved in issuing loans to borrowers, including people who could not afford them or who submitted loan applications that were rife with misrepresentations. Defendants' employees interfaced directly with the borrowers, and were complicit in helping borrowers misrepresent the information in their mortgage applications (for example, as to income and appraised value of the mortgaged property). This false information was then passed to Defendants who underwrote and sponsored the securities. Thus, Defendants had direct knowledge of and involvement in issuing loans to unqualified borrowers. As Merrill acknowledged in an earnings call on April 19, 2007, its purchase of First Franklin "enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly."

487.     Merrill's relationship with First Franklin and BofA's in-house origination capability underscore the vertical integration model Defendants successfully implemented in their mortgage securitization businesses. The vertical integration between originators and issuers

172

exacerbated the already perverse incentives created by the "originate and distribute" business model. The originator, secure with a pipeline to the market, had even greater incentive to loosen its underwriting practices. Those responsible for the securitization—focused on volume—pushed them to do so even more. And once the loans were issued, Defendants had huge incentives to ignore defective loans because rejecting a loan would hamper an affiliated entity.

488. Both in connection with their own originations and in connection with their purchase of the Mortgage Loans from the non-affiliated originators, and consistent with industry practice, Defendants performed extensive due diligence to determine the quality of the loans they were originating, purchasing, and securitizing. Defendants operated quality assurance and risk management departments tasked with discovering whether the loans met the stated standards. They conducted due diligence on the originators they were purchasing loans from. Defendants also conducted due diligence on the loans included in each offering to ensure compliance with the approved underwriting guidelines. To make a determination about the quality of the loans and of the originators, Defendants employed a team of underwriters who reviewed a sample of the purchased loans to confirm that they both conformed to the representations made by the originators and complied.

489. Indeed, according to former CEO Stanley O'Neal, in his 2010 interview with the FCIC, Merrill conducted audits of the mortgages it purchased from third parties to examine compliance with disclosed underwriting guidelines. O'Neal Tr. 84:18, Sept. 16, 2010. Mr. O'Neal confirmed this involved checking individual loans. Former Merrill employee Jeff Kronthal, who at the relevant times helped run Merrill's structured finance business (including RMBS) also stated in his 2010 FCIC interview that teams within Merrill conducted due diligence

on the residential mortgage loans that Merrill was securitizing. Kronthal Tr. 94:1-5, Sept. 14,

2010.

490.     The Offering Materials confirm such reviews, consistent with industry practice,

were performed.  For example, Merrill specifically represented that, before acquiring *any*

residential mortgage loans, it conducted a review of the lender's operations:

> Prior to acquiring *any residential mortgage loans*, [Merrill Lynch Mortgage
> Lending, Inc.] conducts a review of the related mortgage loan seller that is based
> upon the credit quality of the selling institution . . .; [This] review process may
> include reviewing select financial information for credit and risk assessment and
> conducting an underwriting guideline review, senior level management discussion
> and/or background checks.
>
> . . .
>
> The underwriting guideline review entails a review of the mortgage loan
> origination processes and systems.  In addition, such review may involve a
> consideration of corporate policy and procedures relating to state and federal
> predatory lending, origination practices by jurisdiction, historical loan level loss
> experience, quality control practices, significant litigation and/or material
> investors.

SURF 2006-BC2 Prospectus Supplement dated March 28, 2006, at S-42.

491.     For the majority of the BofA Offerings, BofA itself was the originator through

BofA National.  Thus, BofA was not only familiar with the origination practices, *it created them*.

For the BofA Offerings where a third-party originated the Loans, BofA, like Merrill, represented

that it conducted due diligence on those originators and their practices.  For example, BofA

represented that:

> In addition, in order to be eligible to sell mortgage loans to such Seller pursuant to
> a delegated underwriting arrangement, the originator must meet certain
> requirements including, among other things, certain quality, operational and
> financial guidelines.

BOAA 05-12 Prospectus dated November 22, 2005, at 23.

492.     BofA CEO Brian Moynihan later told the FCIC that the bank employed a range of "due-diligence practices" with respect to the loans BofA originated, acquired, or sold, which "address[ed] various fraud-related issues, including underwriting, valuation, and documentation." Moynihan Supp. Response to FCIC Feb. 2, 2010 Request Letter, dated May 13, 2010, at 2.

493.     Where the loans were generated in-house, Defendants had a direct window into—and in fact controlled—the lax origination practices at issue.  For the loans that were not generated in-house, Defendants' due-diligence practices included, consistent with industry practice, participation in loan auctions.  Prior to the auction, originators provided bid sheets that would specify, among other things, the percentage of loans on which Defendants would be permitted to conduct due diligence.  The originators also provided a loan tape that described characteristics of the loan pool.  Based upon this information, Defendants prepared their bid.  If they won, they were allowed to conduct additional due diligence prior to the settlement date.  As successful purchasers of the loans, and consistent with industry practice and in line with Defendants' extensive business relationships, this due diligence benefitted from Defendants' access to the Originators' personnel and internal information.  This included access to information, personnel, and documents not just regarding the Originators' operations and procedures in general, but also access to information, personnel, and documents regarding the specific loans being offered for sale.  As would-be-securitizers, Defendants' motives at this point were also skewed.  Rejecting loans would leave a smaller pool to securitize—meaning smaller fees for Defendants' securitization efforts.  And rejecting too many loans could even convince originators to stop selling loans to them, cutting off Defendants' pipeline entirely.

494.     Defendants built exceptionally close ties with originators, giving them a bottom-up view of the defective loans they were purchasing and securitizing.  For example, in the fall of 2005, third-party Originator Ownit Mortgage Solutions was selling two-thirds of its volume to Merrill. which held a 20% ownership stake in the lender.  Merrill even placed its top RMBS executive, Michael Blum, on Ownit's board.  One Ownit executive has stated that "Blum was *intimately involved* with us."  Muolo & Padilla, *supra* at 193 (emphasis added).  In addition to its equity stakes in Ownit and First Franklin, Merrill also considered purchasing a number of other originators at issue here, including New Century, Ameriquest, Lime Financial Services, and even Countrywide.  *Id.* at 193-94.

495.     Merrill was keenly aware of the deficient operations of its originators from its experience assembling mortgage-related securities *and* from the diligence process that culminated in its acquisition of First Franklin.  Blum, who led Merrill's securitization business *and* its efforts to acquire third-party originators, "thought [Merrill] should start up its own originator rather than buy one."  Bethany McLean & Joe Nocera, *All the Devils are Here:  The Hidden History of the Financial Crisis* 238.  He told Merrill's CEO that "[b]uying something will be painful because they are *not well-managed companies* and they are at the *bottom of the food chain*."  *Id.*

496.     Defendants' access to information—and its skewed motives—was heightened not only where they generated the loans in-house, but also by the fact they also provided "warehouse" lines of credit to the third-party originators.  In a warehouse lending relationship, a

bank provides money to an originator, who uses the money to fund mortgages. The originator then sells the loan to the warehouse-provider, essentially paying the warehouse loan back by delivering the loans for securitization. Entering into such relationships helps the warehouse lender secure a pipeline of mortgages for its securitization machine. Warehouse loans give the warehouse lender the ability to control the practices of the originator, and give it an even more in-depth look at the true quality of that originator's operations.

497.    As noted above, Merrill provided cheap warehouse loans to originators such as Option One, MLN, Accredited (both Originators of Mortgage Loans at issue here) and ResMae with the condition that they continue selling Merrill their loans. BofA also extended warehouse lines to originators such as Countrywide, New Century, Option One, and Delta Funding.

498.    These warehouse lines allowed Defendants to control the origination practices of these lenders and gave Defendants an inside look into the true quality of the loans they originated. As one industry publication explained, warehouse lenders have "detailed knowledge of the lender's operations." Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, November 2007 at 11. Visiting their operations, interviewing their employees, and having access to their documents and data, Defendants here became intimately familiar with the lending practices through their extensive due diligence of their business operations, conducted not just for securitization process but for Defendants' decision to grant credit in the first instance.

499.    Warehouse lending relationships also perverted Defendants due-diligence incentives. If Defendants refused to buy the proffered loans, it could leave the originator unable to pay the warehouse loan and Defendants holding the bag. Accordingly, Defendants were ready and willing to accept bad loans from warehouse lenders, which they promptly securitized. Indeed, as Ken Lewis, then-CEO of BofA has admitted, *"Broker [loans] tends to be toxic*

*waste."* Testimony from former Clayton President Keith Johnson revealed that "the ones with the warehouse lines had the highest" defect rates among those his firm was asked to review on behalf of securitizers like Defendants. Johnson explained that securitizers like Defendants had a conflict of interest. Either the securitizer could reject the loan and force the loan originator to take it back—resulting in a loss because the rejection would be financed with the warehouse line of credit extended by the securitizer—or the securitizer could waive the loan into the pool and pass the loss on to the firm's investor-clients who purchased certificates that were backed by a faulty loan. As Johnson explained:

> [I]f Bob was originating for me as the client and I had a warehouse line to Bob, I think what happened is a conflict of interest. that if I put back [of 'kicked out'] loans to you, Bob[,] and you don't have the financial capacity to honor those, then I'm kind of caught, right? If I—the present value of the pain, I'm going to take a loss on the warehouse line.

> And what I do think happened is that maybe those warehouse lines were extended and actually increased and I perhaps bought your production and I shouldn't have. That the quality wasn't—and I don't think any of the prospectuses disclosed the relationship between the warehouse lenders and the securitizers.

500.    The warehouse lines discussed above represent only a fraction of the disclosed and undisclosed financing arrangements with third-party originators that gave Defendants detailed knowledge of their operations and the quality of their mortgage loans. For example, Merrill also extended repurchase-agreement ("repo") financing to Fieldstone, for which it accepted "non-performing, re-performing and sub-performing loans" as collateral, and many other originators. *See, e.g.*, Fieldstone Investment Corp. Form 8-K, April 24, 2006, at 2. *See also* Master Repurchase Agreement Between: Merrill Lynch Mortgage Capital Inc., as Buyer and WMC Mortgage Corp., as Seller, Sept. 22, 2003. Bank of America extended similar facilities to New Century and others. *See, e.g.*, New Century Financial Corp., Form 8-K, Sept. 2, 2005.

These publicly-reported financing relationships were only the tip of the iceberg given the volume of mortgage loans that Defendants securitized from various third-party originators.

501.     That Defendants, occupying the privileged positions described above, and conducting due diligence at so many different stages, were able to (and did) uncover the misrepresented nature of these Mortgage Loans is confirmed by government-released data. That data shows that Defendants were consistently able to uncover loan defects—but just as consistently were willing to securitize the defective loans anyway.

502.     As discussed above, Defendants often engaged third-party due diligence firms, such as Clayton or Bohan, to conduct some of the due diligence steps discussed above. These firms gave Defendants *daily* reports indicating exactly how many loans failed to meet the guidelines—*and* which lacked any purported "compensating factors." Documents that were made public by the government's investigation confirmed that Defendants were being informed that many of the loans they had reviewed were defective—but Defendants knowingly approved them for use in securitizations anyway. That Defendants were receiving *daily* reports regarding how many loans were defective confirms they acted knowingly in securitizing the defective Mortgage Loans at issue here.

503.     Clayton prepared a wide range of reports for banks such as Defendants. These reports generally took the form of: (i) daily reports, which contain a variety of information regarding the characteristics of a particular mortgage loan on a daily basis; (ii) final reports, which reflect all of the information contained in the daily reports for a mortgage loan, including any grade changes, waivers, and comments; and (iii) trending reports, which track the performance and treatment of a mortgage loan over time. The information contained in the daily, final, and trending reports includes, but is not limited to, information regarding: (i)

whether a loan complied with the applicable underwriting guidelines; (ii) whether a loan was eligible for an exception to the applicable underwriting guidelines, including whether any compensating factors applied, and any comments; (iii) the borrower's assets; (iv) documentation missing from the loan application; (v) the status and condition of the underlying property; (vi) the disposition of the loan, including any transfers or foreclosure; and (vii) whether the loan complied with applicable laws and regulations. Clayton made each of these types of reports, as well as any other loan-specific information, available at the request of its clients, such as Defendants.

504.    Clayton's clients were generally only given read access to Clayton's reports. An exception was made for waivers. Clients such as Defendants were given passwords to access Clayton's reports in order to waive loans that did not meet the applicable underwriting standards into securitizations. If a client made a waiver call, the date and time on which it was made would be reflected in Clayton's reports.

505.    In addition to receiving these daily reports, Defendants often had onsite representatives present for the due diligence review. These onsite representatives typically had full access to the data entered into the Clayton Loan Analysis System, which was the program loan reviewers used to keep track of their progress as they went through a file (checking off boxes to indicate, for instance, that proper supporting documentation had been found in the file). The loan reviewers also used the system to record narrative descriptions in a "notes" field (for example, explaining why loans did not deserve a fully passing grade). Such notes to the file were made for Defendants' benefit, explaining whether the loan's failing grade was because of non-compliance with underwriting guidelines, faulty appraisals, "red flags" as to the accuracy of the occupancy representations, or anything else problematic in the loan files. Thus, Defendants'

representatives on-site were usually able to see this entire process unfold in real-time, giving Defendants even more direct access to information regarding the credit quality and characteristics of the loans.

506.     As discussed above, the FCIC found that *23%* and *30%* of the loans reviewed by Clayton for Merrill and BofA, respectively, both failed to meet the stated guidelines, and were not subject to any "compensating factors" justifying the use of an "exception." Merrill and BofA nonetheless securitized *30%* and *27%* of these flagged loans. Based on the systemic nature of the problems that have been uncovered, the overlap in time with the Securitizations at issue, and Prudential's loan-level forensic analysis of the Mortgage Loans, Defendants' internal and third-party due diligence processes here similarly caught high numbers of defective loans—and yet Defendants fraudulently "waived" them into the Securitizations at issue here anyway.

### 3.     Confidential witnesses confirm that Defendants knowingly originated defective loans

507.     As set forth above, Merrill affiliates and BofA originated many of the loans for Defendants' Offerings. Through their involvement in the origination process, Defendants abandoned their stated underwriting guidelines and sound underwriting practices, and knew of, and assisted in, the falsification and misrepresentation of both borrower income and appraisals on mortgaged properties. Former employees of BofA and entities affiliated with Merrill have confirmed that Defendants regularly approved loans to unqualified borrowers, approved loan applications that they *knew* contained false information.

508.     BofA employed a multi-step process for loan approval, not to ensure that only compliant mortgage loans were originated, but to increase the chances that a loan would be approved, even if previously rejected. In the first instance, borrower information was entered into BOA's "Desktop Underwriting" system. If a loan was rejected by this automated system,

the loan would then be referred to a junior underwriter for manual underwriting. If a junior underwriter was unable to approve the loan, the application would be escalated to a more senior underwriter with greater "exception" authority.

509. Contrary to its representations, BofA granted "exceptions" to stated underwriting criteria without evaluating a borrower's repayment capabilities or considering countervailing compensating factors. Indeed, BofA Confidential Witness 1 ("BOACW1"), a former Loan Processor/Junior Underwriter, who worked for BofA from early 2006 to 2008, revealed that BofA used exceptions to stated underwriting guidelines to approve loans "quite a bit." BOACW1 also noted that use of an exception to approve a loan was not always noted in the loan file.

510. BofA Confidential Witness 2 ("BOACW2"), another former Loan Processor/Junior Underwriter, who worked for BofA from 2003 to 2008, disclosed that *loans were approved even when it was clear that the borrower lacked the ability to repay.* For example, BOACW2 recalled that many times loans were approved where the borrower was left with only $500 in monthly income after the borrower paid his or her monthly mortgage expenses.

511. BofA Confidential Witness 3 ("BOACW3"), a former Loan Officer at BofA from the 1990s up until 2008, revealed that loan officers would submit a loan application for one type of loan product and, if the application was rejected, the loan officer would submit the same application for a different product, which might also be rejected, only to be re-submitted yet a third time for another product until the loan was ultimately approved.

512. BofA Confidential Witness 4 ("BOACW4"), a former Mortgage Underwriter with BofA from 2005 to 2006, said that BofA and its employees would do "whatever they could

do to make loans"—loans that BAS would then securitize and seek to insure with companies like Prudential.

513.    Indeed, there was an entire division at BofA dedicated to approving problem loans—BOA's so-called "Plan C" group, which employed alternative underwriting criteria to approve and fund severely credit-blemished loans.  The "Plan C" group had even greater exception authority than senior underwriters, and the group's mandate was to find ways to fund loans that were rejected under BofA's stated underwriting guidelines—loans that BOACW4 believed "*should not have been funded under any circumstances.*"  BOA's rationale for approving such loans, according to BOACW4, was that "*if we didn't do it, someone else would.*" Thus, BofA was fully engaged in the race to the bottom in mortgage securitizations, abandoning its stated underwriting guidelines along the way.

514.    BofA did not just approve loans that never should have been funded in the first place, former employees recounted instances in which they *actually knew* that the income recorded by borrowers on their loan applications was false, but *they were told by their superiors to approve the loans anyway.*  BOACW1 recalled situations in which borrowers accidentally submitted information demonstrating that their actual income did not match the income stated on their applications.  When this fact was raised with management, BOACW1 was told that stated income loans did not require income verification, so she should not worry about approving the loan.  In effect, BofA told its employees "*we didn't have to consider evidence" that directly contradicted borrowers' claims about their income.*

515.    Likewise, BOACW3 stated that it was common for borrowers to "*give information that's not right,*" and that BofA loan officers should have, but often did not, question and verify the correctness of that information.  BOACW3 revealed that BofA loan officers often

went so far as to artificially inflate borrowers' incomes and "*doctor the numbers*" to get loans approved.

516.    BofA also enforced a 30-day rule, under which loan officers were required to collect all necessary documentation to close and fund a loan within 30 days.  If required documentation was not collected within the 30 days, loan officers were often directed to approve the loan anyway.  Indeed, BOACW1 noted several occasions where managers directed her to close and fund a loan after 30 days, despite the fact that the loan was missing key supporting documentation.

517.    Merrill's practices were no better.  FFCW1, an Underwriter for Merrill's origination arm, First Franklin, stated that First Franklin's lending practices were "*basically criminal*."  Underwriters were required to depart from stated underwriting guidelines in a way "that [they] did not agree with, but had to do" if they wanted to keep their jobs.  FFCW1 stated that First Franklin extended loans to borrowers who clearly did not meet First Franklin's underwriting guidelines; despite knowledge of this, the branch manager "looked the other way" in order to approve these loans.  For example, FFCW1 described how a Branch Manager at First Franklin would approve loans even to prospective borrowers who were clearly not legal residents of the United States.  If FFCW1 refused to sign off on the loan, the manager would simply find another underwriter to sign.

518.    When FFCW1 and another former underwriter "spoke out" about the problematic lending practices taking place at First Franklin, they were both fired for attempting to "blow the whistle" on the First Franklin's problematic lending practices.

519.    FFCW2, a Senior Underwriter at First Franklin from 2002 to May 2005, revealed that certain fellow underwriters "*would approve anything*" because First Franklin's

compensation structure "created an incentive" to close risky loans and depart from stated underwriting guidelines. According to FFCW2, when an underwriter rejected a loan because it failed the underwriting criteria, a manager would re-direct the loan application to a different loan processor who would "*sign behind your back.*" She also described a manager's explicit threat to terminate her if she "raised a stink" about lax underwriting practices.

520.     FFCW2 stated that the bonus structure was based solely on the number of loans the underwriter actually funded and closed—not the total number of loans reviewed (which would include loans that were approved as well as loans that were rejected). Accordingly, underwriters had a powerful incentive to disregard loan quality, and instead to approve as many loans as possible.

521.     For example, FFCW2 recalled an instance where she was "one thousand percent convinced" that the income verifications submitted along with a loan were fraudulent, as the borrower's payroll deductions for Social Security and Medicare fell below the acceptable ranges for such deductions, resulting in an inflated net "take-home" pay for the borrower. She presented this evidence to her manager, who rejected her concerns. The loan was approved even though this former employee believed the deductions were illegitimate and the paystub was fraudulent. FFCW2 stated that her manager would routinely delete underwriters' negative comments on a loan application and approve loans based on the sanitized documentation.

522.     FFCW2 also described First Franklin's *failure to adhere to official policies* regarding loans with missing documentation. Underwriters were supposed to document all of their calculations in worksheets for each loan to facilitate post-closing review. However, FFCW2 explained that this was apparently not mandatory and therefore underwriters did not consistently perform the documentation. She also explained that there were *no repercussions* for

185

underwriters that disregarded sound underwriting practices. Underwriters that generated high volumes at the expense of underwriting quality were praised for being "speedy," while those who were more cautious were called "too picky." She emphasized that "*no one was telling us to be more scrupulous*" to avoid chargebacks, and that "*the audit team did nothing*" to prevent problematic lending practices, even as numerous loans raised red flags upon post-closing review.

523.     FFCW3, a Senior Underwriter with First Franklin until 2005, stated that her branch manager would often override her decisions not to fund loans. This was because First Franklin audited only about 5% of its closed loans, and the branch manager thought it was unlikely that defective loans he approved would be identified. The branch manager routinely overruled FFCW3's decision to reject loan applications, even though borrowers' reported incomes were facially unbelievable.

524.     For example, FFCW3 recalled one instance where a borrower who worked as a cocktail waitress at a restaurant called Blueberry Hill claimed on the loan application to earn $5,000 a month. FFCW3 rejected the loan because she did not believe the claimed income was accurate, but her branch manager overrode her decision, reasoning that some cocktail waitresses might be able to validly claim a high income if they worked at a high-end establishment— despite that Blueberry Hill was similar to a diner, likened by FFCW3 to an International House of Pancakes.

525.     FFCW3 separately recalled a borrower who had an auto-detailing business and claimed to make $7,500 a month. FFCW3 rejected the application, but she was again overruled by her branch manager without any further verification. FFCW3 also remembered several instances where nude dancers claimed very high income on their loan applications. FFCW3 conceded that dancers who worked in very high-end establishments might be able to legitimately

claim high incomes, but that these individuals worked at "the diviest places" in Las Vegas. On that basis, this former employee rejected those applications, but her branch manager *routinely* ruled that these claims of high income were acceptable and overrode her decision.

526.     Finally, FFCW3 reported that First Franklin's bonus structure incentivized underwriters to close and fund as many loans as possible regardless of actual quality.

527.     PHH Confidential Witness 1 ("PHHCW1") underwrote mortgage loans on behalf of Merrill while employed as a Junior Underwriter at PHH Mortgage Corporation from 2005 until 2007. During PHHCW1's tenure, PHHCW1 underwrote many stated income and stated asset loans. PHHCW1 was skeptical about the truthfulness of the incomes and assets being claimed by many of the borrowers. Using the example of a hairdresser, PHHCW1 stated that when looking at a loan application PHHCW1 would think "there's no way a hairdresser can make so much." Despite PHHCW1's frequent doubts, the loans were approved anyway.

528.     According to PHHCW1, there were other underwriters who questioned the accuracy of the incomes and assets being claimed by borrowers. When confronted with a loan application that reported a facially absurd income, PHHCW1 and PHHCW1's colleagues would comment: "Look at what this person does. We're in the wrong business!"

529.     PHHCW1 became so concerned about the untruthfulness of the incomes and assets being claimed that PHHCW1 turned over a number of loan applications to the fraud department. However, virtually every loan PHHCW1 submitted for review was returned with approval for PHHCW1 to authorize and close the loan.

    **4.**    **Confidential witnesses confirm the due diligence process was well-equipped to catch the errors at issue here—but they were directed to "look the other way"**

530.     Defendants clearly knew that, contrary to their representations, loans were routinely made outside of the stated guidelines, without regard to whether there were any

purported "compensating factors" justifying a lending or underwriting exception. Similarly, Defendants failed to disclose that many "exceptions" were made without any "compensating factors" present at all. This is evidenced by, among other things, the high percentage of Defendants' loans identified by Clayton Holdings that both failed the given underwriting guidelines and that did not show any "countervailing features," and the numerous facts showing underwriting abandonment by many of the key originators at issue here.

531.     The "waiver" rate revealed by the FCIC's investigation understates the number of defective loans allowed into the Securitizations. Firms such as Clayton were put under extreme pressure to give as many loans as possible a pass, and conducted increasingly cursory reviews. Thus, Defendants knew the true rates of defects were actually much higher, and that they were allowing in even more defective loans than Clayton's data have since revealed. Indeed, after Clayton's startling disclosures came to light, the former head of Merrill's structured products division, Jeff Kronthal, admitted to the FCIC that the credit crisis was due, in part, to "the level of fraud that was being committed . . . in the mortgage origination process." Kronthal Tr. 91:10-13, Sept. 14, 2010. This—as well as the fact that the due diligence processes were well equipped to capture the type of errors at issue here—is further confirmed by the testimony of numerous confidential witnesses:

532.     *Clayton Confidential Witness 1* ("CCW1") was an Underwriting Project Lead at Clayton from 2003 until October 2006. According to CCW1, the task of a Project Lead included direct dealings with clients such as Defendants. CCW1 had been particularly involved with BOA, and had formed a close relationship with a particular BofA representative and VP of Structured Products (the "BofA Representative"). CCW1 recalled reviewing loans for BofA originated by Ameriquest, which he called a "loan mill." CCW1 also reviewed loans originated

by First Franklin, Fremont, MILA, First National Bank of Arizona, GMAC/Residential Funding, and Wells Fargo.

533.    At various times, CCW1 also worked as a QC Underwriter, reviewing the work conducted by other underwriters. CCW1 confirmed that Defendants' due diligence provider was put under pressure to cut corners, yet still managed to provide Defendants with a daily update as to why scores of loans did not meet the stated underwriting guidelines.

534.    In CCW1's view, the quality and experience of Clayton's underwriters decreased as Clayton hired more and more underwriters during the real estate boom. Many underwriters were in their 20s, and some even in their late teens, without much, if any, underwriting experience. According to CCW1, this did not mean that the underwriters were flagging too many things—quite the opposite. Not knowing what else to do, on certain projects, Team Leads would tell the inexperienced underwriters to simply copy and paste into Clayton's systems the same exact data that appeared on the loan tape. This confirms that when loans were graded "3" for BofA, they must have been *really* bad loans that fortuitously were likely reviewed by one of the more experienced underwriters, making the high number of "3s" flagged for Defendants— yet later waived in by them—all the more astonishing.

535.    According to CCW1, the review process typically began with receipt of a "loan tape," which contained data on what the loans features were supposed to be, i.e., whether they were owner-occupied or not, what their LTV ratios were, the documentation process used to grant the loan, etc. The purpose of Clayton's diligence, in CCW1's view, was to ensure that the actual loan files supported the descriptions of the loans contained in the "loan tapes," and to evaluate the loans to ensure that the loan fell within the underwriter's guidelines. Loans graded as "3s" were to be kicked from the loan pools.

536.    During CCW1's tenure at Clayton, "a lot of 3s were changed to 2s and 1s." Loans that were missing documentation that was later supplied by the lender or the client could be re-graded during a "stip clearing" process—but sometimes this new documentation appeared as if by "miracle." According to CCW1, others were simply waived in. Even when "compensating" factors were purportedly found to justify a "2" grade, rather than a "3" grade, CCW1 characterized many of these factors as "almost wishful thinking" and "pretty weak." CCW1 estimates that 80% of loans initially graded "3" were ultimately re-graded. This is on top of CCW1's estimation that "at least 20% - 25%" of the loans initially graded "2" and "1" out of the gates were likely really deserving of a failing grade.

537.    CCW1 understood that Clayton was not supposed to assign too many failing grades to loans so as not to "upset" the client (such as Defendants) and the lender that was selling the loans, which could lead to business being taken to Clayton's competitors. This was conveyed to Clayton by the clients (including by Defendants), the lenders which had originated the loans, and even by other Project Leads. This point was made explicitly by the BofA Representative, who told CCW1 to "*get this [expletive] guy out of here*," after a Clayton underwriter, who was an expert on appraisals, was kicking out too many loans based on problems with the appraisals.

538.    According to CCW1, BofA saw Clayton as irrelevant, given the larger objective of securitizing the loans. The BofA Representative made it clear that BofA was not actually interested in the fundamental quality of the loans being reviewed. For example, the BofA Representative colorfully admitted that he did not "*give a flying [expletive] about DTI [debt-to-income ratios]*" or about whether the loans satisfied credit, character and collateral requirements. According to the BofA Representative, BofA only cared about whether the loans met federal,

state, and local lending compliance standards. The BofA Representative told CCW1 that "we [BofA] can sell them [the loans] to whoever" regardless of the other underwriting criteria. "[BofA] can sell it [the loans] down the line" as long as the loans were not "predatory."

539.    Another client similarly told CCW1 to "get this [expletive] done and get out of here, and don't make a big deal" about any issues, even though CCW1 had found problems such as inflated appraisals and missing documents.

540.    CCW1 told of instances where many loans failed because the truth-in-lending disclosures did not actually match the loans' terms. These represented, according to CCW1, "pretty serious" legal violations. After CCW1 failed many such loans, he was told that he would not obtain a bonus for completing the project because the client had been unhappy with the number of failures. Project leads had been told to "make everyone happy."

541.    While at Clayton, CCW1 typically reviewed 8 to 10 loans a day. Later, CCW1 was pressured to increase that to 21 loans per day. CCW1 protested that this afforded an insufficient amount of time to review each loan. CCW1 was further instructed to simply "get the deal done." This made CCW1 feel that the due diligence reviews were "just going through the motions," performing only a cursory review of loans. CCW1 admitted that Clayton "did a bad job on stated incomes," as borrowers with "average jobs" were approved based on claims of making $300,000 to $400,000 per year. CCW1 also admitted that many of the appraisals suffered from "bad comps."

542.    CCW1 singled out a borrower's debt profile as something that was only given a cursory review. For instance, when it came to detailing a borrower's history of late payments, Clayton personnel were told to just "ballpark it." And aspects of a borrower's debt—such as car payments—were simply ignored based on assumptions about the borrower's behavior.

543. ***Clayton Confidential Witness 2*** ("CCW2"), who worked at Clayton reviewing loans from 2003 to 2006, has stated that reviewers were not given much time to review loan files—as little as half an hour for home equity loans and only 40 to 60 minutes for standard mortgages. Further limiting CCW2's review (and thus making the high rejection rates all the more astounding) was the fact that CCW2 was not authorized to conduct any independent outside confirmation, but only to mechanically check to see that the appraisals contained, for example, a list of three other properties. According to CCW2, Clayton's analysis was further handicapped by the fact that reviewers were expected to know how to apply differing guidelines depending on the client. In addition, a loan had to have four deviations from the applicable guidelines before it was even considered for rejection. Even then, the loan was not immediately rejected, but rather simply elevated for further review.

544. In other words, CCW2, like CCW1, confirms that the staggering "reject" rates seen in the third-party diligence reports provided to Defendants likely vastly understate the problems that would have been caught by Defendants' processes.

545. ***Clayton Confidential Witness 3*** ("CCW3") was a contract underwriter at Clayton from 2003 to 2004, and a transaction specialist there from 2005 to 2007. CCW3's team would underwrite loans, including by visiting a client's offices to conduct the review. CCW3 confirms that a grade 3 file did not meet the guidelines and did not have compensating factors. CCW3 also confirmed that reports were run daily that would provide notes on the reasons for the grade—and confirmed these reports were usually sent to the client. According to CCW3, clients sometimes would call to discuss low grades given to certain loans. If the client still wanted to buy the loan, the grade would sometimes be changed, sometimes based on the receipt of

additional documents that supposedly cured the deficiency, but also sometimes merely by agreement.

546.   ***Clayton Confidential Witness 4*** ("CCW4") worked for Clayton as a Contract Underwriter.  Like CCW2, CCW4 stated that reviewers were given only 45 minutes to an hour to approve or reject a loan file.  Also like CCW2, CCW4 recalled a lot of pressure to approve loans.  According to CCW4, Clayton's team leaders had the ability to "fix" CCW4's findings, and CCW4 was told to keep CCW4's mouth shut rather than raise questions.

547.   ***Clayton Confidential Witness 5*** ("CCW5") worked as a Senior Underwriter directly responsible for reviewing loans for Clayton, as well as a QC Auditor.  The QC Auditor's function included reviewing loans that had been "kicked" by the underwriter assigned to that loan.  CCW5 specifically recalled doing work for both BofA and Merrill.  Like the other witnesses, CCW5 confirmed that the primary objective of Clayton's review was to ensure the loans adhered to the lender's guidelines.  This included reviewing the loan files to determine that they were complete.  Also like the other witnesses, CCW5 explained that clients often "waived" in defects.

548.   CCW5 complained that the loans were even worse than the guideline failures suggested.  For instance, employees of the fast-food restaurant McDonald's would claim to earn $10,000 a month, far more than employees would actually be paid.  Such loans would be "kicked" by CCW5, but CCW5 believed they were nonetheless taken by the clients as part of the "stip clearing" process.  Other lending violations were also discovered, such as truth-in-lending violations and missing documents.

549.   ***Clayton Confidential Witness 6*** ("CCW6") was a Senior Project Lead at Clayton from 2004 to 2009, which meant that CCW6 oversaw teams of underwriters assigned to review

samples of loan pools being considered for purchase by Clayton's clients. CCW6 was the main central underwriting lead responsible for Merrill, which he understood was one of Clayton's biggest accounts. CCW6 again confirmed clients received daily reports, as well as a final report summarizing the total results at the end of a project. CCW6 confirmed that he was on the phone *with a Merrill representative on a daily basis* during the course of the due diligence reviews, and the Merrill representative would occasionally call CCW6 when the representative was negotiating with the lender regarding the purchase of a loan pool. CCW6 stated that the Merrill representative usually asked for additional information about a particular loan or loans.

550.    CCW6 recalled reviewing loans originated by First Franklin, Option One, and Fremont, among others. He also reviewed Ownit loans on behalf of Merrill on many ocassions, and noted that Ownit's loans "really stood out to him as problematic."

551.    CCW6 also stated certain clients could access the reports in real-time using Clayton's software application. The reports reflected the results of CCW6's teams' review of the loans as against the underwriting guidelines they were given to apply—an analysis CCW6 again confirms including giving a grade of "3" if the loan failed the guidelines (such as missing documentation) but did not contain any "compensating factors." The reports also indicated why a loan was given the grade. The reviews CCW6 performed sometimes would take place at the client's location, as some clients did not want the loan files to leave their premises. CCW6 also confirmed, as the FCIC found, that Clayton was only asked to perform a review of a sample of the loans—and often the client dictated what loans made up that "sample."

552.    According to CCW6, at the end of a review a "stipulation clearing" process was undertaken. Loans were re-reviewed to see if grade "3s" could be made into grade 2s or grade 1s, such as through the provision of supplemental documentation in the loan file. In other

situations, however, clients waived the requirements that necessitated the "3" grade, and the loan was accepted. According to CCW6, there was often "no rhyme or reason" offered by the client as to why the waivers were being provided. Rather, underwriters would make the grade change in the system. CCW6 harbored doubts about the ability of borrowers whose loans CCW6's team was reviewing to repay the loans, but "as long as the loans met the guidelines, it didn't matter." This included accepting clearly unreasonable income claims.

553. **_Clayton Confidential Witness 7_** ("CCW7") was the Director of Client Service Management at Clayton from October 2001 until December 2005, and a Vice President of Business Development from December 2005 until October 2007. In these roles, CCW7 oversaw due diligence on both conduit and bulk loan pools that Clayton reviewed, including at the time Clayton provided work for Defendants on the Loans at issue here. CCW7 specifically recalls doing work for BofA and Merrill.

554. A typical Clayton engagement may involve 20 underwriters working at the premises of the lender. The reviewers were "checking the boxes," in the sense that if a borrower was claiming a certain income, they would check the loan file to ensure that the appropriate paystubs and bank statements were included. If so, they would "check a box" to indicate the borrower did in fact meet the guideline requirements for income.

555. CCW7 confirmed that daily reports from Team Leads were created for Defendants, including an indication of what grades were given to what loans that day, and how many loans had already undergone a second quality-control review. These reports were either forwarded by CCW7 to Defendants, or given directly to their representatives by the Team Lead if the project involved a Defendant representative on-site.

556.     According to CCW7, in addition to the "waivers" discussed elsewhere, Clayton was also told what it was *not* to evaluate—i.e., Clayton was told to "disregard certain items." Even more loans were given a passing grade outside of formal instructions, according to CCW7, because underwriters would give loans a "2" grade even if it was technically a "3" loan, only because the underwriter thought that was what the client wanted.

557.     In addition, CCW7 recalled several instances in which loan originators would progressively apply pressure up the hierarchy until either Clayton or the banks yielded and accepted loans that had been graded as non-compliant. According to CCW7, if the originator could not persuade the Clayton Team Lead to re-grade a defective loan, the originator would contact CCW7. If CCW7 resisted, the originator would contact the bank's asset manager, who would apply pressure on CCW7 to re-grade the rejected loan. Frequently, the pressure to accept a rejected loan would come directly from a bank's trading desk, which needed a certain number of loans to complete a deal it had structured. If Clayton refused to re-grade the loan, the bank's traders would "flip their lid." On numerous occasions, CCW7 was directly contacted by asset managers and traders from banks who would "pound" on him until he re-graded a loan.

558.     ***Clayton Confidential Witness 8*** ("CCW8") worked as a Due Diligence Underwriter at Clayton from August 2004 to July 2005, evaluating loans for credit and compliance issues. CCW8 specifically recalls doing work for BofA, and reviewing loans originated by GMAC and Wells Fargo.

559.     CCW8 confirmed that Clayton's role in Defendants' due diligence processes was to audit loans for compliance with underwriting guidelines and legal requirements. This included, for example, reviewing the file to ensure the appropriate truth-in-lending and HUD forms were included. CCW8 also confirmed that, at the outset, the due diligence process would

include instructions to ignore problems if they fell within a given range, such as LTV ratios being within 5% of the underwriting guidelines.

560. The last screen on the underwriter's computer program asked for a grade to be given. Loans graded "2" or "3" required a "Credit Narrative" to be provided, explaining for the client's benefit why the loan received that grade. Once the underwriter hit "enter," the data was transferred to a version of the loan tape held by Clayton, known as the Clayton Loan Analysis System. That tape reflected the review results, and was delivered to the client.

561. Even though CCW8 gave "3" grades only to "really, really" bad loans, 99% of the time the grades were eventually changed to a "2." Rather than rejecting the loans, CCW8 understood that Clayton's clients would negotiate a lower purchase price from the originators.

562. ***Clayton Confidential Witness 9*** ("CCW9") was a Due Diligence Underwriter at Clayton from 2003 to 2007. CCW9 recalled reviewing loans originated by GMAC, CitiMortgage, First NLC, and Option One, among others. CCW9 noted that it was easy to get a job at Clayton; the company was even hiring truck drivers to do loan re-underwriting because clients put the company under so much pressure to churn through so many loans. About half the people on larger jobs had "no clue what they were doing," and thus would take short-cuts like copying and pasting information to make it appear as though the loan met the guidelines. This, despite the fact that the point of the review was to double-check that information to begin with, such as verifying the loan file had the correct supporting documentation for the income claims reported on the loan tape.

563. CCW9 also confirmed that Clayton's review for Defendants would under-report the number of loans that failed the guidelines because the real guidelines had a series of "if/then" relationships (such as that a loan with a high LTV ratio was permissible *if* it had a concomitantly

lower borrower DTI). But the Clayton matrix would only report the maximum values, regardless of their inter-relationships. According to CCW9, the changing of loans from "3s" to "2s" was going on "across the Board."

564. **_Clayton Confidential Witness 10_** ("CCW10") worked as a Supervisory Lead/Quality Control Underwriter for Clayton from August 2004 through February 2008, i.e., during the entire period Defendants were using Clayton as part of their due diligence process. CCW10 specifically recalled reviewing loans originated by Ameriquest, which contained "egregious underwriting violations," such as inflated stated incomes. CCW10 also reviewed loans originated by First Franklin and GMAC.

565. CCW10 confirmed that Clayton was using a lot of inexperienced people that "had no idea what they were doing." According to CCW10, part of Clayton's job was to review the files to make sure the data provided accurately described the backup documentation. It also involved reviewing the file overall to see if the borrower had the ability to repay the loan.

566. CCW10 agreed with the "textbook" explanation of the 3-grade system described above (with a "2" meaning the loan fell outside the guidelines, but was apparently subject to an exception). But "in practice," according to CCW10, a "2" was used merely to hold loans that Defendants thought were of acceptable risk, even if Clayton did not agree with the designation, and even if there was no evidence in the file of any "compensating factors." In other words, "[q]uite often, the [client] had you make it a 2 without any compensating factors in the file." This included Clayton receiving instructions from clients not to grade loans "3," even if they did not comply with the stated guidelines, merely because the clients grew tired of ordering re-grades at the back end, and to disregard facially unreasonable income claims. CCW10 asked for

his sarcasm to be excused after he jadedly asked "What? [Clients] asking us to change the loan scores?"

567. **Clayton Confidential Witness 11** ("CCW11") was a Team Lead at Clayton, who started work there in 1999 and continued with the firm until 2008. CCW11 specifically recalled working on projects for BofA and Merrill. He also recalled reviewing loans originated by Wells Fargo and New Century. CCW11 described New Century as a "loan mill," and said that appraisals were frequently an issue with its loans.

568. As with the other Clayton employees, CCW11 confirmed that Defendants received daily reports that not only informed them of how many loans had failed, but also provided narrative descriptions for why the loans failed. CCW11 also confirmed that clients often had representatives on-site. CCW11 recalled that when he met a particular BofA representative, the first words out of the representative's mouth were, *"I don't want any [expletive] 3s."* CCW11 also recalled that on-site managers would sometimes receive the actual loan files for the "3" loans, for their personal review. CCW11 described the relevant time period as a "feeding frenzy."

569. **Bohan Confidential Witness 1** ("BCW1") worked as a Contract Underwriter at another third-party due diligence firm, the Bohan Group ("Bohan"), from 2004 until 2006. The work involved reviewing mortgage pools offered for sale over the course of one to two weeks for each project, either at the lender's offices or at a rented space. BCW1 specifically recalls doing work for BofA and Merrill, and reviewing loans originated by Accredited, Wells Fargo, and Impac.

570. BCW1 described a similar fast-paced review process as discussed above with Clayton. Specifically, underwriters were expected to review 10 to 12 loans per day, which meant

that they "didn't get into the meat of the loan." Indeed, the time constraints often meant that the review was limited to "data entry" because the reviewers had to take everything at "face value." BCW1 said reviewers "were told to overlook things . . . that should not have been overlooked," such as appraisals, credit reports, asset or income documents, or at the reasonableness of stated income or assets. During the review, the income claims would "jump out at you" as being clearly unreasonable and unrealistic, but many clients did not care. If the client did not care, the loan would be given a passing grade.

571.    BCW1 confirmed, as with Clayton, that Bohan graded loans on a three-point scale, where grade "3" loans failed guidelines and did not show any compensating factors. According to BCW1, Team Leads and Quality Control Underwriters could change the score without the underwriter's knowledge. Team Leads were "nonchalant" about quality because their goal was to "hit numbers, make money, more than anything." The constant message was to "get the job done quickly." Further, the entire process was "completely client-driven," so if a client wanted a "2" grade, it got a "2" grade. When BCW1 took a discrepancy to a Team Lead's attention, BCW1 would sometimes be told "not to worry" because the "loans were pretty much purchased" already, and thus the reviewers "just need[ed] to get the audit done."

572.    The most common problems BCW1 could recall were FICO scores that were lower than guidelines required, DTI and LTV ratios higher than the guidelines allowed, suspect income calculations, and Truth-in-Lending Disclosure violations. In addition, discrepancies in the value of the collateral were common, such as square footage failing to comply with specifications for the type of property purportedly being purchased (such as guidelines limiting loans to only large properties). Though instructed not to look carefully at borrower income claims, much of the claims looked like "garbage" to BCW4.

573.  **Bohan Confidential Witness 2** ("BCW2") worked as a Deal Manager during the 1990s and into 2006. In that role, BCW2 communicated with clients to help determine how to configure the Bohan Risk Analysis Information Network ("BRAIN") to reflect the underwriting parameters the client wanted tested, and would communicate with the underwriters on how to run those tests.

574.  According to BCW2, the due diligence process did not give loans a "3" grade unless the error was outside a margin of error, which would have been set by Defendants.(For instance, the client might have given pre-instructions to accept variations in LTV ratios or DTI ratios up to 5 percent, such that a loan with a DTI of 57 percent would be given a passing grade even if the guidelines only allowed for 52 percent DTI.)

575.  BCW2 would email the day's results to the client nightly. The BRAIN system even allowed Defendants to request customized reports as to the grades that had been given, for instance highlighting only certain types of loans or grades. Most clients would respond to the nightly reports the next morning. This often involved challenging the failing grades. According to BCW2, clients would change grade "3" loans to grade "2" loans "constantly." An example that BCW2 had "no doubt" happened, or certainly something similar, was that a housekeeper might claim an income of $100,000 and Bohan would grade the loan "3" because of the income's unreasonableness. Nonetheless, the client would change it to a "2." A review with 40 percent grade "3" loans was not abnormal, according to BCW2. The reasons why a loan was given a "3" grade were to be noted in the reports, so that the client could see why a given loan failed. Indeed, Bohan stressed that everyone involved in the review should make it very clear in the file notes why a loan was given a particular rank.

576. **Bohan Confidential Witness 3** ("BCW3"), a former Contract Due Diligence Underwriter at Bohan Group and Hanover Capital Partners (another due diligence firm used by Merrill), explained to Prudential that investment banks like Merrill who retained these third-party firms were aware of these red flags. She knew this because in her work with Hanover, the witness interacted with Merrill representatives during the so-called "tie-out" meetings which were designed to raise with the loan purchaser the problems detected in the loan pool.

577. The witness also recalled one occasion when, in the course of reviewing loans for Merrill in December, she came across a borrower whose name sounded like "Merry Christmas" and who had "terrible credit" and "didn't pay her bills." The Merrill representative however, decided that he was going to accept the loan simply because it was "Christmas-time." Notwithstanding such knowledge, Merrill proceeded to include such loans in securitization pools anyway, so as to increase its production volume and market share.

578. BCW3 specifically recalled reviewing loans originated by Option One, which were "a joke." She also reviewed loans originated by Fremont and First Franklin.

579. **Bohan Confidential Witness 4** ("BCW4") worked as an underwriter at Bohan from 2003 to 2007. BCW4 specifically recalled doing work for Merrill, and reviewing loans originated by Fremont and Option One. BCW4 confirmed that the Defendants' reviews did include credit, compliance, and collateral analyses. However, the due diligence began with instructions from Defendants, including criteria they "did not care" about. After a review, a "clean-up meeting" was held with the Team Lead, which involved "re-underwriting" the loans. Team Leads could overturn failing grades, but it was not possible to delete the narrative entry from the file, meaning that data would always be visible to Defendants even after a grade had

been changed.  BCW4 stated that securitizers would use such information to negotiate a lower price with the originators.

580.    Another former Bohan loan reviewer has commented that "the pressure was so intense to approve as many loans as quickly as possible" that one of her supervisors would stand on a desk screaming at the employees.  Muolo & Padilla, *supra* at 197.  The same loan reviewer stated that when she identified loans as failing to comply with stated underwriting guidelines, "a Merrill supervisor would find a way to get the loan approved."  The reviewer stated that Merrill "perpetuated the whole thing," referring to the fraudulent approval and securitization of non-compliant mortgage loans.

581.    *In sum*, despite all of these limitations and pressures placed on the third-party due diligence firms, and the opportunities to cure or otherwise change the grades from fail to pass, the third party reports still showed high numbers of loans that were identified by the due diligence firms as failing the given underwriting guidelines.  These numbers show that Defendants regularly securitized large numbers of defective loans, including in all of Defendants' Offerings at issue here, contrary to Defendants' representations.

582.    The proper response to the due-diligence conclusions would have been to refuse to buy a loan pool, or to use the findings of the due diligence firm to probe the loans' quality more deeply.  Instead, particularly when purchasing loans from third-parties, Defendants used the deficiencies in the loan pool to increase their own profit margins on the Securitizations.  According to the September 2010 testimony before the Federal Crisis Inquiry Commission by Clayton's former president, D. Keith Johnson, the purchasing banks, like Defendants, would use the exception reports to force a lower price.  In other words, rather than reject defective loans from collateral pools, or cease doing business with consistently failing originators, Defendants

would instead use the Clayton Holdings data simply to insist on a lower price from the third-party loan originators, leaving more room for their own profits when the problem loans were hidden in securitization pools.

583.    Defendants' hidden "waiver" of rejected loans into the securitizations was a fraudulent omission and rendered Defendants' disclosures even more misleading.  As the FCIC report concluded:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 loans were waived in.
>
> . . .
>
> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans. *Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.*

FCIC Report at 167, 170 (emphasis added).

### 5.    Loan-file reviews conducted by others confirm that errors like this would have been caught by a review of the loan files

584.    Prudential still does not have access to the loan files.  As seen above, however, the loan files themselves often revealed fundamental problems with the loans.  That Defendants' knew the Offering Materials were false and misleading, through their possession of the loan files, is further confirmed by the fact that other parties who have since obtained such files have discovered widespread errors in the files.

585.    FHFA, for instance, examined thousands of Defendants' loan files, including for five of the Merrill Offerings that Prudential purchased.  FHFA's loan file review found that an astounding *70%* of the Merrill loan files, and *over 80%* of the BofA loan files reviewed did not

adhere to the applicable underwriting guidelines or otherwise represented breaches of the relevant representations and warranties contained in the transactional documents. Similarly, AIG reviewed the loan files underlying Defendants' securitizations, including for the BAFC 2006-E Offering that Prudential purchased, and found breach rates in excess of *90%*.

586.     Other loan-file reviews have caught errors as those below:

- Improperly using gross receipts rather than taxable income to calculate DTI.

- Improperly including in income calculations "rental" income from properties the loan files showed were sold years before.

- Inconsistent claimed income levels in multiple loan applications, which the files revealed was shifted to lower-documentation loan programs after getting rejected based on the prior (lower, documented) income.

- Credit reports that revealed debts that were not disclosed on the loan application, or included in the reported DTI.

- Incorrect treatment of student debt, such as excluding it from DTI without proper documentation that repayment obligations had been deferred.

- Loan files containing conflicting appraisal reports from the same appraiser, dated the same day.

- Loan files lacking the required verifications for purportedly self-employed borrowers.

- Loan files lacking the requisite supporting documents (such as bank statements, pay stubs, tax returns, etc.) that were often supposed to be included as support for the income, debt, asset, and other datapoints used in the underwriting process.

- Rental amounts used in DTI calculations conflicting with the figures provided in the Verification of Rent forms.

587.     The "UNDERWRITING RED FLAGS" document provided by CCW1 lists dozens more "red flags" that Clayton and others with access to loan files have caught. For example, borrower verifications of employment contained "red flags" where "property seller has same address as employer," "pay stubs from large employer are handwritten," "business entity not registered or in good standing with the applicable regulatory," and "date of hire is a weekend

or a holiday." This is just a small sample of the ways in which falsities in underwriting and other problems were revealed on the face of the loan files themselves. Of course, proper underwriting would have required even more data to be gathered in the face of these problems—not, simply, the provision of a reflexive "waiver," as happened all too often during Defendants' due diligence process.

588.     That such problems have been found on the face of the loan files confirms that Defendants here—who had access to the loan files, and who gave their in-house and third-party due diligence teams access to those loan files—had all the information they needed to know the loans here were being misrepresented. Based on what limited data Prudential has been able to uncover, the high instances of defects (and defect waivers) that Clayton identified for Defendants, and all the other facts set forth above, a review of Defendants' loan files in discovery should similarly show that the loans' misrepresentations would be apparent to anyone who opened the files. The ease with which Defendants learned of the consistent problems at issue here, especially when combined with what is known about Defendants' extensive due diligence processes, confirms they acted with scienter.

> **6.    The federal government and other parties have found that Defendants' due diligence process proved they had knowledge of the massive fraud**

589.     Defendants have been investigated by the federal government and sued by many plaintiffs for related wrongdoing arising from RMBS securitization. These lawsuits further confirm that Defendants' misrepresentations were not mere isolated or innocent mistakes that harmed Prudential, but rather the result of the company's reckless or intentional misconduct.

590.     In May 2011, the New York Attorney General announced that it was investigation BofA's mortgage-related securitization activities. The New York Attorney General's investigation found that BofA "face[s] Martin Act liability because there are repeated

false representations in the Governing Agreements [for RMBS] that the quality of the mortgages sold into the Trusts would be ensured." In addition, BoFA faces liability for "persistent illegality" in violation of Executive Law § 63(12) for "repeatedly breached representations and warranties regarding loan quality."

591. FHFA, as Conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, sued BofA in September 2011 for selling over $6 billion in RMBS to the Government Sponsored Entities ("GSEs") pursuant to prospectuses and other offering materials that contained misrepresentations. As described by the government, BofA "falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans." The FHFA complaint cites the results of a re-underwriting of over 2,000 loans similar to those backing the Certificates at issue here. FHFA found a "pervasive failure to adhere to underwriting guidelines" among the tested loans.

592. BofA has also been sued by AIG, MBIA, Syncora and others for wrongdoing related to RMBS. The allegations in those complaints are consistent with the information herein, and the multiplicity of similar allegations from many plaintiffs, including the federal and state government, corroborate the allegation herein that BofA routinely acquired and included in securitizations loans that did not meet underwriting standards and other representations to Prudential.

593. The securitizations at issue in these complaints, and the plaintiffs' analysis of those securitizations, overlap with the Prudential's Certificates. The AIG Amended Complaint, for example, includes ten Offerings that are also named in this Complaint: BAFC 2006-E, BOAA 2005-7, BOAA 2005-12, FFMER 2007-3, FFMER 2007-4, FFML 2006-FF18, FFML

2006-FFH1, FFML 2007-FF1, SURF 2006-BC1, and SURF 2006-BC2. AIG performed a loan-level analysis of the loans underlying these specific offerings, and found material discrepancies between the description of the loans in the Offering Materials and their actual characteristics—including LTV ratios and owner occupancy statistics.

594.    FHFA also sued Merrill in September 2011 after Fannie Mae and Freddie Mac purchased over $24 billion in Merrill sponsored and/or underwritten RMBS pursuant to "pervasive" misrepresentations. Many of the offerings that are the subject of the FHFA action are likewise named in this Complaint, including: FFMER 2007-3, FFMER 2007-4, FFML 2006-FF18, FFML 2007-FF1, FMIC 2006-3, MLMI 2006-MLN1, MLMI 2006-WMC1, SURF 2005-BC4, SURF 2006-BC1, SURF 2006-BC2, and SURF 2007-BC1. Based on a forensic review of 13,351 loan files from 18 of the offerings—some of which overlap with the Securitizations at issue here—the government found "numerous significant violations of the originator's underwriting guidelines." The review further revealed that statistics such as owner occupancy rates and LTV ratios were "false and omitted material facts due to widespread falsifications of borrower's incomes and debts, inflated property values and misstatements of other key characteristics of the mortgage loans."

595.    In December 2011, Merrill agreed to pay $315 million to settle a class action brought by lead plaintiff the Public Employees' Retirement System of Mississippi that alleged misconduct related to RMBS. The settlement is one of the largest resolving RMBS investor claims. Merrill is also a defendant in suits brought by Allstate Insurance Company and the Federal Home Loan Bank of Seattle that involve allegations of RMBS wrongdoing.

596.    The multiplicity of similar allegations from many plaintiffs, including the government, corroborate the allegation herein that Defendants routinely originated, acquired and

included in securitizations loans that did not meet underwriting standards and other representations to Prudential.

### 7. Defendants' bullying of the rating agencies proves that they had knowledge of the massive fraud

597. Defendants knew that they needed to obtain high credit ratings in order to maintain the appearance that the Certificates were safe and highly rated, and ultimately, to sell the Certificates. This motive was improper and extended beyond a general business motive for profits. Defendants acted on this motive by exerting improper pressure on the agencies to provide undeserved ratings.

598. As the SPSI found, Defendants and other banks used "financial engineering" of credit ratings to give high risk assets the veneer of safety and low risk. (SPSI Report at 30.) This "engineering" came in numerous forms, including pressuring the rating agencies for favorable ratings and playing the rating agencies off one another with the threat of withholding future business if the sponsoring bank was not given favorable treatment (*i.e.,* "ratings shopping"). As detailed in the SPSI report:

> At the same time Moody's and S&P were pressuring their RMBS and CDO analysts to increase market share and revenues, the investment banks responsible for bringing RMBS and CDO business to the firms were pressuring those same analysts to ease rating standards. Former Moody's and S&P analysts and managers interviewed by the Subcommittee described, for example, how investment bankers pressured them to get their deals done quickly, increase the size of the tranches that received AAA ratings, and reduce the credit enhancements protecting the AAA tranches from loss. They also pressed the CRA analysts and managers to ignore a host of factors that could be seen as increasing credit risk. Sometimes described as "ratings shopping," the analysts described how some investment bankers threatened to take their business to another credit rating agency if they did not get the favorable treatment they wanted. The evidence collected by the Subcommittee indicates that the pressure exerted by investment banks frequently impacted the ratings process, enabling the banks to obtain more favorable treatment than they otherwise would have received.

(*Id.* at 278.)

599.     As one S&P director put it in an August 8, 2006 e-mail (that has only recently been made publicly available):  "[Our RMBS friends have] become so beholden to their top issuers for revenue [that] they have all developed a kind of Stockholm syndrome which they mistakenly tag as Customer Value creation."  Ratings analysts who complained about the pressure, or did not do as they were told, were replaced on deals or terminated.

600.     Summarizing the intense pressure investment banks put on ratings analysts to provide favorable ratings, Richard Michalek, a former Moody's VP and Senior Credit Officer, testified before the SPSI that:

> The willingness to decline to rate, or to 'just say no,' to proposed transactions, steadily diminished over time.  That unwillingness to say no grew in parallel with the company share price and the proportion of total firm revenues represented by structured finance transactions . . . coincident with the steady drive toward commoditization of the instruments we were rating . . . .  The threat of losing business . . . even if not realized, absolutely tilted the balance away from independent arbiter of risk towards captive facilitator of risk transfer. . . .  The message from management was, 'must say yes.'

601.     Gary Witt, former Managing Director at Moody's, also confirmed the widespread practice of ratings shopping during his testimony before the FCIC.  When asked if investment banks frequently threatened to withdraw their business if they didn't get their desired rating, Witt responded:  "Oh God, are you kidding? All the time. I mean, that's routine. I mean, they would threaten you all the time . . . It's like, 'Well, next time we're just going to go with Fitch and S&P.'"  *See also* Written Statement of Eric Kolchinsky, Managing Director, Moody's Derivatives Group ("Managers of rating groups were expected by their supervisors and ultimately the Board of Directors . . . to build, or at least maintain, market shares.  It was an unspoken understanding that loss of market share would cause a manager to lose his or her job . . . [L]owering credit standards . . . was one easy way for a managing director to regain market share.").

602.     Former Moody's senior vice-president Mark Froeba explained to the FCIC that
Moody's senior management "put in place a new culture that would not tolerate for long any
answer that hurt Moody's bottom line," resulting in a "a palpable erosion of institutional support
for rating analysis that threatened market share." Froeba stated:

> When I joined Moody's in late 1997, an analyst's worst fear was that he would
> contribute to the assignment of a rating that was wrong, damage Moody's
> reputation for not getting the answer right and lose his job as a result.
> When I left Moody's [in 2007], an analyst's worst fear was that he would do
> something that would allow him to be singled out for jeopardizing Moody's
> market share, for impairing Moody's revenue or for damaging Moody's
> relationships with its clients and lose his job as a result.

603.     Defendants actively pressured the ratings agencies to make exceptions for certain
offerings, in the form of relaxed analytical standards, and would then use those exceptions as a
precedent for further relaxation of future standards.  In one e-mail, Mr. Michalek relayed his
concern of such conduct:  "I am worried that we are not able to give these complicated deals the
attention they really deserve, and that they are taking advantage of the 'light' review and the
growing sense of 'precedent.'"  (SPSI Report at 305.)

604.     The SPSI singled out Merrill, documenting numerous ways in which the bank
sought to procure favorable ratings by unseemly means.  For example, the SPSI produced an e-
mail exchange in which Merrill agreed to a Moody's fee schedule for a structured-finance
transaction *"under the assumption . . . that you will work with us . . . to try to get to some
middle ground with respect to the ratings."*  *Id.* at 283.  The "middle ground" that Merrill
sought, in exchange for a continued stream of fee payments to Moody's for structured-finance
ratings, was Moody's willingness to compromise its standards to satisfy Merrill's need for high
credit ratings.

605.     The SPSI Report also discusses how rating analysts who requested detailed information about transactions became unpopular with Wall Street banks, which then pressured the analysts' managers to bar them from rating their deals. Mr. Michalek testified that while he worked at Moody's, he was prohibited from working on RMBS transactions for certain banks, including Merrill, because he scrutinized deals too closely: "During my tenure at Moody's, I was explicitly told that I was 'not welcome' on deals structured by certain banks . . . I was told by my then-current managing director that I was 'asked to be replaced' on future deals by . . . *Merrill Lynch*." SPSI Report at 286. This testimony was confirmed by Mr. Michalek's superior at the time. Similarly, a Moody's managing director confirmed to *The Wall Street Journal*, that "Moody's agreed to switch analysts on deals after bankers complained." *Moody's Opened Up*, The Wall Street Journal (April 11, 2008).

606.     These practices are further confirmed by the SEC's Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies from July 2008. The SEC found that ratings agency analysts were aware of the ratings agencies' "business interests when securing the rating of the deal" and "discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies." These findings were based on the SEC's review of internal documents and emails, including an email from a ratings agency employee to colleagues stating "[w]e are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets this week because of the threat of losing deals."

**C.      Facts Showing Defendants' Knowledge of Appraisal Misrepresentations**

607.     Defendants' extensive due diligence processes, described above, also revealed the systemic appraisal problems found by Prudential's loan-level analysis here. Evidence of appraisal problems is supported by the consistency of the wide disparities between reported and

212

actual LTV ratios for the Certificates, discovered through the use of loan-level, contemporaneous information.  As summarized above, the number of loans with LTV and CLTV ratios above 100% was misrepresented across the Offerings, by as much as *66.58%*.  The average LTV and CLTV ratios were also misrepresented across the Offerings, by as much as *17.53%*.

608.    Defendants' knowledge of appraisal misrepresentations is also supported by evidence of the other systemic problems at issue here, testimony and investigations into the originators at issue here, confidential witness testimony detailed above, and other testimony that has been provided by industry insiders.

609.    Defendants' former employees have revealed that Defendants abused the appraisal process by pressuring appraisers to inflate appraisals, which skewed the LTV ratios reported to investors like Prudential.  According to BOACW2, a former Loan Processor/Junior Underwriter, it was common knowledge and widely understood that during the period of 2004 to 2007, BofA Loan Officers had close relationships with appraisers that allowed them to directly influence the appraisal decisions.  For example, Loan Officers "called the appraiser and said they [the Loan officer] needed this amount" for the valuation of the property at issue.  Not only did Loan Officers tell appraisers "I need you to come in at this amount," but the Loan Officers would often also tell BOACW2 before the appraisal was actually received that they knew the appraiser would be submitting the necessary valuation.  BOACW2 had concerns that the ability of the Loan Officers to influence the appraisers was inappropriate, but as with her other concerns, she felt she had little opportunity to express them.

610.    FFCW1 and FFCW3 disclosed similar instances of appraisal abuse at Merrill's origination arm, First Franklin.  FFCW1, for example, revealed that her managers at First

Franklin contacted appraisers directly if "*they didn't get exactly what they wanted*" and requested a re-appraisal until they received a satisfactory figure.

611.    FFCW3 revealed that, although comparable properties in an appraisal were supposed to be within one mile of the property at issue, her branch manager routinely "signed off" on appraisals with comparables that were further away, including some comparables that were "crazy." FFCW3 also stated that her branch instructed appraisers to change their appraisals and omit certain key details. For instance, she recalled a situation where the appraiser that the property had a roof that was approximately 40 years old. The former employee considered this an important detail since it implied that the roof would likely need to be replaced in the near future. However, her branch manager told the appraiser to remove this detail about the roof from the appraisal, saying "we don't need that added." FFCW3 also revealed that her branch manager would pick certain appraisers because he knew they would return with favorable (overstated) appraisals: "*He would pick the appraiser who would do what he wanted . . . he'd say, 'don't use that guy, use this guy.'*"

612.    Former employees also confirm that Defendants knew that the loans they purchased from third party originators contained appraisal misrepresentations. According, to BofA Confidential Witness 5 ("BOACW5"), a former Junior Underwriter and Senior Loan Specialist from 2001 to 2008, among the loans that BofA purchased from third party originators "we saw a lot of fraud," including "appraisal issues." Defendants went on to securitize and resell these loans and falsely claim that they had no knowledge that there were appraisal-related problems with them.

613.    In addition, as described above, Defendants' due-diligence process included the use of third-party firms, such as Clayton. Clayton gave Defendants real-time updates about what

loans had been flagged as defective, including narrative reports for each loan as to why that loan was given a failing grade. The Clayton reviewers inputted into the "notes" section of their systems details on why the loans were given failing grades, including descriptions of problems seen in the appraisal reports. This system, as above, was used to generate daily reports for Defendants. Defendants could also typically see the data in real time, both using remote software access given to clients or through Defendants' on-site representatives. In other words, Defendants were often receiving, on a daily basis, information about problems with appraisals.

614.    For instance, CCW1, who did extensive work for BofA, confirmed that the underwriters at Clayton who reviewed loans for Defendants looked at the hard-copy loan files to determine whether the data included in the file supported the LTV and similar data in the loan tape. This common-sense check involved tasks such as reviewing the appraisal report to see whether the "comparable" properties were actually close in value to the mortgaged property, and whether the comparable properties actually had the same or similar features (such as the number of bedrooms and bathrooms). CCW1 also confirmed that the reports that were generated for Defendants from the Clayton Loan Analysis System included the narrative descriptions of why loans with unreliable appraisals were being given a "3" grade. On top of such information, the report given to Defendants also included summary appraisal-related statistics, such as the range of appraised values, average appraised values, and other appraisal-related metrics.

615.    In fact, on one occasion, CCW1 recalled that Clayton had assigned a certain employee that was particularly knowledgeable about appraisals to review a pool of loans for BofA, and that this employee was kicking loans out due to innacurate or suspeect appraisals. CCW1 revealed that this made the BofA Representative angry, who told this former employee to "get rid of this [expletive] guy," leading to that employee's termination. Nor was BofA blind to

the inherent risks of this behavior. A conversation between the witness and the BofA President during a December 2005 review of First Franklin loans on behalf of BofA struck an ominous tone when the Bank of America executive informed the witness that he should *"look for another job"* as soon as possible because the mortgage field was going to *"blow up"* imminently.

616.     Similarly, according to BCW1, who also specifically recalls doing work for BofA, the review Bohan provided for Defendants involved such simple steps as reviewing the photographs in the appraisal file, which would show obvious problems like a house missing stairs. The appraisal review also involved asking for clarification on the "comps" used to calculate the value. Or a loan might be flagged as having an appraisal too high in relation to the same property's prior sales (such as an appraisal for $350,000 on a house that sold for $200,000 two years earlier).

617.     CCW8 also confirmed many of the loans graded "3" were due to bad appraisals. The problems with the appraisals were apparent in the files. For instance, often too many line-adjustments were used to increase the value above and beyond what the "comps" supported. An adjustment could be made, for example, if the comparable had one bedroom less than the mortgaged property. But the guidelines limited how large any one adjustment could be, and limited the total number of adjustments that could be made. Too many "adjustments," of course, suggests the property was not really "comparable" to begin with.

618.     According to CCW8, Defendants' due diligence reviewers also checked whether the comps were actually comparable—such as where the loan was for a two-story property but the "comp" was a single-story dwelling. CCW8 also confirmed that the photos included in the appraisal were reviewed by Clayton, as was the appraiser's explanation for why the "comps" were chosen.

619.     According to CCW10, Clayton reviewed the reasonability of the appraisals based on factors such as whether it just "made sense," including by looking at whether the "comparables" were close enough geographically, whether they had similar features to the mortgaged property, and whether they had not been subject to too many "adjustments." Notes about why the underwriter did not believe the appraisal supported the reported value (and thus, did not support the reported LTV guideline requirements) were inputted into the narrative section of the Clayton Loan Analysis System, which, as discussed above, typically generated reports for Defendants on a daily basis.

620.     According to CCW10, Clayton's review for Defendants would have also caught even more fundamental problems with the appraisal-related representations, such as the wrong formulas being used (i.e., LTVs being calculated based on the purchase price rather than the appraised value, in violation of the stated guidelines). This review was on top of the more substantive review of the documents in the loan file that Clayton performed for Defendants, such as looking not just at the difference in value between the mortgaged property and the "comps," but also whether there was any geographic divider (such as a freeway, or railroad tracks) that may also have rendered the two properties too different to be compared. In addition, according to CCW10, some Clayton clients did "drive-bys" of the mortgaged properties to further assure themselves of the accuracy of the appraisal reports.

621.     The failure rates identified by Defendants' due diligence processes likely vastly understated the number of appraisal problems in the Loans, because of all the pressure Defendants' due diligence providers were under to "pass" as many loans as possible. Confidential witness testimony confirms this pressure extended to appraisal issues. For instance, according to CCW1, BofA expressly told Clayton to "get this [expletive] done and get out of

here, and don't make a big deal" about any issues, even though CCW1 had found problems such as inflated appraisals and missing documents.

622.     CCW5, who had previously worked as an appraiser earlier in his career, also stated that he encountered many loans that he believed were based on inflated appraisals. Thus, when he reviewed a loan with a particularly high LTV ratio, he "always kicked it." Invariably, however, the Project Lead at Clayton informed him that the high LTV ratio was fine and instructed him not to reject the loan.

623.     CCW10 also discussed how the due diligence process included reviewing the reasonableness of the appraisals—even though certain clients began instructing Clayton to grade loans with unreasonable appraisals "2s," rather than "3s," because they tired of having to re-grade the loans at the back end anyway.

624.     Congressional testimony and other statements, which have recently come to light, confirm there was widespread corruption in the appraisal processes during the period relevant to this Complaint. For instance, Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking noted that the dynamic of financial dependence between appraisers and underwriters created a "terrible conflict of interest," where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

625.     Richard Bitner, a former executive of a subprime lender for 15 years, testified in April 2010 that "the appraisal process [was] highly susceptible to manipulation," and the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals." Similarly, Patricia Lindsay, a former wholesale lender, testified in April 2010 that in her experience appraisers were "often times pressured into coming in 'at value,'" i.e., at least the

amount needed for the loan to be approved. The appraisers, "fearing" for their "future business and their livelihoods," would choose properties "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."

626.    Jim Amorin, President of the Appraisal Institute, testified in April 2009 that "in many cases, appraisers are ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"

627.    The FCIC's January 2011 report recounts the similar testimony of Dennis J. Black, an appraiser with 24 years of experience who held continuing education services across the country. "He heard complaints from the appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems. Black told the FCIC, "The story I have heard most often is the client saying he could not use the appraisal because the value was [not] what they needed.' The client would hire somebody else." FCIC Report, at 91.

628.    Defendants knew appraisal fraud was occurring both in Defendants and the Originators. The Defendants, the Originators, and their appraisers did not genuinely believe in the appraised values underlying the Mortgage Loans.

### D.    Defendants' Knowledge as to Owner-Occupancy Representations

629.    Defendants' extensive due diligence processes, described above, also caught the systemic owner-occupancy problems found by Prudential's loan-level analysis here. As summarized above, occupancy rates were misrepresented across every Original RMBS by as much as *15%*.

630.    As described above, Defendants engaged in an extensive due diligence process. That process typically gave Defendants real-time updates as to what loans had been flagged as defective, including narrative reports for each loan as to why that loan was given a failing

grade. The Clayton reviewers inputted into the "notes" section of their systems details on why the loans were given failing grades, including by describing occupancy-related "red flags." This system was used to generate daily reports for Defendants, on top of the fact that Defendants could usually see the data in real-time both by way of the remote software access given to clients, or by way of Defendants' on-site representatives.

631.     In other words, Defendants frequently received information on a daily basis about problems seen in the loan files in terms of false occupancy claims. CCW10 confirmed that owner-occupancy representations were reviewed as part of Defendants' due-diligence process. Indeed, "the three things any due diligence underwriter worth his salt always verifies is owner occupancy, LTV, and debt ratio," according to CCW10. CCW10 also confirmed that Clayton's underwriters could and did spot problems in the loan file that indicated the occupancy representations were false.

632.     Defendants' due diligence reviewers were instructed to spot occupancy problems in a variety of ways. CCW10 gave a litany of examples, such as: (a) the place of employment being unreasonably far from the mortgaged property; (b) inconsistencies in the addresses listed in the supporting documents in the file (such as W-2s and bank statements); (c) the mortgaged property also being relied on as a source of rental income; (d) borrowers with long histories of rental income; (e) mortgaged properties worth more than the "second" properties (as most people live in the more-valuable property, as compared to their investment or vacation properties); (f) addresses and rental information contained in the credit reports indicating that mail was being sent elsewhere, while rental income was being claimed; (g) landlord hazard policies being included in the loan files; and (h) differing data between the loan tape and the loan file.

633.     According to CCW10, notes made on unreasonable occupancy claims were entered into the Clayton Loan Analysis System, which, as discussed above, generated reports for clients on a regular basis.  In addition, CCW10 knows that banks *on their own* would sometimes hire investigators to visit the properties, to do a visual check as to whether the property appeared owner-occupied.

634.     CCW1 personally flagged problems with regard to owner-occupancy claims, because he understood that vacation or investment properties have "significantly higher risk" than primary residences.  This meant loans that were flagged for having misrepresented occupancy characteristics were given a "3," with a note in the Clayton Loan Analysis System (which, as discussed above, typically generated daily reports for Defendants) explaining exactly what information in the file called into serious question the occupancy claim.

635.     As with CCW10, both CCW1 and CCW11 gave examples of how the due diligence processes gave Defendants actual knowledge of owner-occupancy defects, such as discrepancies in the claimed address and those that appear on the credit report.  This and other evidence confirms that Defendants had knowledge of the owner-occupancy defects in the Mortgage Loans but included them in the Original RMBS and the Certificates anyway.

**E.     Defendants' Knowledge as to the Title-Transfer Representations**

636.     As discussed above, Defendants' misrepresentations concerning title to the Mortgage Loans were consistent, and reflect huge discrepancies between the Offering Materials' representations and reality.  As noted above, Prudential's forensic loan-level analysis revealed that across the Offerings Prudential tested, *43%* of the Mortgage Loans were not properly assigned to the Trusts.

637.     The Offering Materials stated that the Depositors were establishing the Trusts for each Securitization and assigning the Mortgage Loans "concurrently" with the execution of the

Pooling and Servicing Agreement. *See, e.g.*, BOAA 2005-7 Pooling and Servicing Agreement, dated July 28, 2005, at § 2.01(a). This is a representation of present fact. But the above figures themselves also demonstrate that Defendants never had any intention of properly assigning the Mortgage Loans as represented in the Offering Materials. Because Defendants operated a highly integrated, high-volume securitization business, and based on the consistency of the errors at issue here, Defendants knew at the time they made their representations that none of the described process would actually be carried out in a reasonable fashion. In other words, they knew at the time of the representations they had no intention to carry through with the above-described procedures.

638.    In sum, for all the reasons above that securitizers could not have consistently misrepresented underwriting guidelines without knowing they were false, so too could Barclays and RBS not have underwritten and sold these securities without gaining knowledge that the vast majority of the "mortgage-backed securities" they were creating were not (and never would be) backed by mortgages at all.

### F.    Defendants' Knowledge as to the Credit Rating Representations

639.    As discussed in greater detail above, the credit ratings were a garbage-in, garbage-out process. Defendants had intimate knowledge of the process by which ratings were produced, and also knew what types of features loan pools had to have in order to receive the desired credit ratings from the rating agencies. Defendants knew not only that the LTV, CLTV, and owner-occupancy data was being misrepresented to investors, but that the same data, when fed to the rating agencies, would produce credit ratings that were utterly baseless.

640.    Also as discussed in greater detail above, Defendants improperly pressured the ratings agencies to provide undeserved ratings. Those tactics were done willfully, and with the knowledge that the ratings ultimately given to the Certificates did not reflect the actual credit

quality of the Certificates. Accordingly, Defendants knew the credit ratings did not reasonably address the "likelihood of the receipt by a certificateholder of distributions on the mortgage loans" and, indeed, did not genuinely believe in the credit ratings themselves.

## G. **Additional Evidence of Merrill's Scienter**

641.    When the mortgage securitization business began to take off in the early 2000s, Merrill was not initially a dominant market player. In "league tables" that ranked top issuers of asset-backed securities (including RMBS) by volume, Merrill sat low in the rankings, outperformed by other institutions such as Royal Bank of Scotland, Morgan Stanley, Credit Suisse, Citigroup, Lehman Brothers, and Bear Stearns. Muolo & Padilla, *supra* at 186. In his book *And Then The Roof Caved In: How Wall Street's Greed and Stupidity Brought Capitalism to its Knees*, David Faber describes Merrill's focus on RMBS and other mortgage-related securities in the heyday of this business, in 2006 and 2007:

> As Merrill headed into 2007, it had . . . a mission to get even bigger in the one area that had been so instrumental to all its success: mortgages. It wanted to originate more mortgages, buy more mortgages, package more mortgages into securities, and package more of those securities into CDOs [i.e., collateralized debt obligations]. And of course, it wanted to sell those securities and CDOs as fast as it possibly could, because that's where the money was. It was also happy to keep increasing the leverage on its balance sheet as its assets ballooned past $1 trillion, driven by the addition of all those mortgages.

642.    Merrill faced a key problem in its quest to the top—fierce competition from an increasing number of market players. The intense competition led Merrill to abandon underwriting guidelines and to make as many loans as possible appear to pass muster under those guidelines. Muolo & Padilla, *supra* at 196-97. Thus, starting in 2004, Merrill, led by then-CEO E. Stanley O'Neal, was determined to take aggressive action to climb to the top of the league tables for asset-backed securities and in particular, RMBS. *Id.* at 189. O'Neal revamped his trading desk by hiring new people, including Michael Blum, who would lead Merrill's global

asset-based finance operations, and George Davies, a trader whose task was to increase the volume of mortgage loans coming into Merrill's trading desks. *Id.*

643.    With its securitization operations revamped, Merrill began buying up immense volumes of subprime mortgage loans to securitize. *Id.* With the competitive field more crowded with underwriters, Merrill began paying more for loans than any other firm on Wall Street. *Id.* Merrill also decided to use its other operations to entice subprime lenders to sell their loans to Merrill. *Id.* at 190. For example, Merrill began offering the subprime lenders "warehouse" financing at very little or no cost so long as the lender continued to sell Merrill its subprime loans. *Id.* In other words, Merrill sacrificed its warehouse lending business for a bigger share of the securitization business.[4] As described by Greg Farrell in his 2011 book *Crash of the Titans: Greed, Hubris, the Fall of Merrill Lynch, and the Near-Collapse of Bank of America*, while Merrill's warehouse originators were relegated to pursuing the "dregs of the mortgage business," Merrill continued to fund and acquire the mortgages, thereby "scraping the bottom of the barrel, accepting the lowest quality mortgages being written."

644.    At the same time, Merrill adopted liberal standards as to what mortgage loans it was prepared to acquire and routinely purchased loans that did not comply with the underwriting standards it was disclosing to investors. Muolo & Padilla, *supra* at 196-97. In a *New York Times* article published on January 26, 2007, William Dallas, Ownit's CEO, stated that Merrill and other Wall Street firms were paying him a greater amount for no-income-verification loans than for full-documentation loans. Vikas Bajaj & Christine Haugheny, Tremors at the Door, *N.Y.*

---

[4]  "To entice Bill Dallas [the founder of First Franklin] and other subprime executives into selling their loans to Merrill, its salesmen offered them a deal: If you agree to sell your loans to us, we'll offer warehouse financing for next to nothing. Merrill's warehouse chief was Jim Cason, who had been with the firm for a couple of years. With O'Neal's edict to grow the subprime business, Cason's unit, by 2005, became one of the largest warehouse lenders to nonbank residential lenders in the nation. 'The idea was to create a one-stop shopping place for subprime lenders,' said one warehouse executive familiar with Merrill's efforts. 'Merrill would make no money on the warehouse business, but it would do it to get the securitization business.' As George Davies, the head trader later admitted: 'The idea was to secure product [mortgages].'" Muolo & Padilla, *supra* at 190.

*Times*, Jan. 26, 2007. Dallas is quoted as saying: "The market is paying me to do a no-income-verification loan more than it is paying me to do the full-documentation loans. What would you do?" *Id.* Merrill knew from its experience with loan securitization that "liar loans" were plagued by fraud. It also knew these loans would be securitized and sold to investors. Nonetheless, Merrill encouraged subprime lenders to generate these loans anyway in order to increase loan volume.

645.    Another way Merrill sought to increase its market share is by buying originators outright. As one Merrill insider stated, "Merrill Lynch 'went hog wild' . . . buying up right and left mortgage finance companies." Elizabeth MacDonald, *Dumbest Bubble Deals*, FoxBusiness, Jan. 27, 2009. In the fall of 2005, Merrill purchased a 20 percent stake in subprime lender Ownit to ensure a steady supply of loans. Muolo & Padilla, *supra* at 196. Around 2006, Merrill announced that it was planning to buy another subprime lender, First Franklin, in a transaction which Merrill finalized in February 2007 for $1.3 billion. *Id.* at 200. Over that period, Merrill aggressively pursued its strategy to capitalize on RMBS by controlling a constant stream of loans to securitize and sell. As O'Neal explained in a recently-disclosed September 2010 interview with the FCIC, Merrill purchased First Franklin in order "to control our [own] source of origination," echoing the interviewer's comment that Merrill made the purchase "to vertically integrate." O'Neal Tr. 87:5-21, Sept. 16, 2010. According to David Faber, "Merrill was happy to focus its energy on its new acquisition [First Franklin] rather than a firm that was still trying to play by the old [stricter] rules of underwriting." Faber, *supra* at 76.

646.    Within only a few short years, Merrill moved to the top of the list of underwriters of RMBS securities. Muolo & Padilla, *supra* at 190-91. Between 2003 and 2006, Merrill's operating profit averaged $5.2 billion, more than double the $2.1 billion it averaged in the

preceding five years. *Id.* at 194. These huge profits came at the expense of investors, which were purchasing RMBS backed by loans far riskier than was being disclosed.

647.     Former Merrill executives have acknowledged the rampant fraud that resulted from a system where originators were paid based solely on volume. As former Merrill CEO John Thain commented in a September 2010 interview with the FCIC: "[W]hen you have a system where you pay someone for originating mortgages simply on volume and nothing happens to them if the credit quality is bad, and nothing happens to them if the borrower is fraudulent on his loan application, and nothing happens to him if the appraisal's fraudulent, then that's probably not a very smart system." Thain Tr. 98:7-14, Sept. 17, 2010.

648.     By April of 2007 Merrill was experiencing buyer's remorse regarding some of their acquisitions over the previous two years. That month, Merrill demanded a $90 million price adjustment from National City Bank on the acquisition of First Franklin. According to a complaint filed by Merrill against National City Bank in 2008, almost half of the requested $90 million price adjustment stemmed from overvaluation of mortgage loans held by First Franklin. Complaint ¶ 33, *Merrill Lynch Bank & Trust Co., FSB v. Nat'l City Bank*, No. 601062-08 (N.Y. Sup. Ct, filed April 10, 2008).

649.     Merrill's headlong rush into the mortgage-related business led the company to take on an enormous amount of risk. In particular, CEO Stanley O'Neal had increased profitability by having Merrill take on an increasing amount of risk through its CDO and RMBS exposure. In 2007, Merrill's assets equaled more than 27 times its equity, such that a mere 4 percent decline in the value of its assets would erase all of its capital. During a September 2010 interview with the FCIC, Mr. O'Neal admitted that there were "no good answers" for why the company's exposure to mortgages had grown so large in late 2006 and early 2007. In fact, at a

time when the other investment banks were scaling back their involvement in securitizing mortgages, the head of Merrill'a fixed-income, commodities, and currencies business, Osman Semerci, ignored the warning signs due to his "eagerness to collect the upfront fees that came with securitizing mortgages—fees which made his performance look good in the short term." Greg Farrell, *Crash of the Titans*, at 33.

650. Merrill eventually came to the conclusion that the enormous pool of mortgages and CDOs it had collected on its books was becoming a liability. To rid itself of its toxic mortgage inventory—including, on information and belief, RMBS similar to the Securitizations—Merrill resorted to repackaging the most problematic RMBS and CDO positions in its inventory into new CDOs. FCIC Report, at 202. Dow Kim, the former co-president of global markets and investment banking at Merrill, told the FCIC that Merrill's retention of super-senior tranches in its CDO positions was "part of a strategy begun in late 2006 to reduce the firm's inventory of subprime and Alt-A mortgages."

651. This trend began in 2006 and continued into 2007, during the same period in which Defendants were marketing the Securitizations here to Prudential. Indeed, by the spring of 2007 the heads of Merrill's fixed-income, commodities, and currencies business boasted to the board of directors that they "had reduced a $17.7 billion subprime mortgage exposure the previous September to $3.5 billion as of the date of [the] presentation." Greg Farrell, *Crash of the Titans*, at 15. Merrill recognized and reported internally on the severe risks posed by its RMBS and CDO collateral it had helped create by originating, acquiring, and pooling so many defective mortgage loans, but failed to disclose those risks to investors.

652. By February 2007, Merrill was also making vigorous margin calls on its originators in an effort to shift toxic mortgage risks upstream. Paul Muolo, Margin Calls Seen at

Merrill Lynch, Nat'l Mortg. News (Feb. 19, 2007), http://www.nationalmortgagenews.com/ nmn_issues/ 31_21/-445735-1.html. Market participants stated that Merrill was being "super-aggressive" in seeking security from its originators, so much so that Merrill became "the main culprit" in the liquidity squeeze affecting subprime lending. This indicates clearly that Merrill knew that its pipeline was filled with vast numbers of loans that did not comply with stated guidelines, and was demanding margin from originators precisely to absorb any non-conforming loans that could be put back to the originator.

653. Yet at the same time, Merrill was also attempting to slough off risk by selling those same mortgage loans to investors like Prudential via the numerous offerings that Merrill continued to sponsor and underwrite through 2007 and 2008. Taken together, these facts confirm that Merrill was not selling financial products it believed were investment-grade and underwritten in conformity with stated underwriting guidelines. Rather, Merrill sold Prudential and others RMBS that Merrill knew were backed by toxic, defective Mortgage Loans—and which it desperately wanted to get off its balance sheet.

## H. **Additional Evidence of Bank of America's Scienter**

654. BofA plotted to increase the volume of subprime loans it originated between 2004 and 2007. In 2004, under the guise of "community development," BofA announced its commitment to invest $750 billion over 10 years in low- and moderate-income ("LMI") communities through consumer loans and other programs. FCIC Report, at 97; May 22, 2006 BofA Press Release, "Bank of America Community Development Lending Exceeds $85 Billion." Pursuant to this initiative, BofA crowed that, in 2005 alone, it provided more than $33.2 billion in mortgage loans to LMI borrowers and made "more than $40 million in loans and investments every business hour." *Id.* But BofA used "community development" and pro-home-ownership rhetoric as a smokescreen to do away with underwriting standards and to

conceal its true purpose: to originate volumes of subprime loans to sell on the secondary market and to use in its own RMBS securitizations.

655.    In order to keep pace with the market and to provide mortgage loans for its own securitizations, BofA departed from its own underwriting standards. The FCIC reports that, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including Bank of America. According to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, the study "showed a very rapid increase in the volume of these irresponsible loans." FCIC Report, at 172. At the same time, BofA was providing mortgage loans to a risky class of borrowers that demonstrated a credit profile with an increased likelihood of default. As disclosed to the FCIC in June 2010, almost 17% of the LMI loans originated by BofA between 2004 and 2007 were delinquent at some point for 90 days or more. June 16, 2010 BofA letter to FCIC, Schedule 2.5. BofA, however, retained only about 50% of those LMI loans on its balance sheet and either sold or securitized the rest. *Id.*

656.    In addition, BofA sought to expand its share of the mortgage securities market by aggressively pursuing subprime mortgage originators (including Option One, Accredited, and GMAC), and offering to pay more for their mortgages than competing Wall Street banks and offering to perform less due diligence than its competitors. At the same time, BofA knew that the originating banks were churning out risky loans with high likelihood of default. As Ken Lewis, then CEO of Bank of America Corp. proclaimed on its 2007 second quarter earnings call, *"Broker [loans] tend[] to be toxic waste."*

## IV.    PRUDENTIAL'S DETRIMENTAL RELIANCE AND DAMAGES

### A.    Prudential's Reliance

657.    Prudential typically purchased senior or highly rated mezzanine classes of mortgage-backed securities.  Prudential purchased the Certificates to generate income and total return through safe investments.  Prudential also purchased these securities with the expectation that the investments could be—and indeed some were—purchased and sold on the secondary market.

658.    Prudential invested in the Certificates as part of a broader plan to invest in a diverse array of carefully underwritten mortgage-backed securities.  Its purchase decisions were based on due diligence done on multiple levels.  For instance, Prudential's investment manager has credit research analysts specifically tasked with analyzing potential risks.  The research analysts' recommendations have never been overridden with respect to residential mortgage-backed securities.

659.    In making the investments, Prudential relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes related to the underlying Mortgage Loans. Prudential received, reviewed, and relied upon the Offering Materials, which described in detail the Mortgage Loans underlying each offering.  Offering Materials containing the representations outlined above and in the Exhibits (or materially similar counterparts thereto) were obtained, reviewed, and relied upon in making the purchase.

660.    As part of its business practice, Prudential reviewed draft Offering Materials and term sheets as well as the final Offering Materials.  Prudential also reviewed other materials such as the related Pooling and Servicing Agreements, and any documents related to insurance-based credit enhancements on the securities.  Such materials (or materially similar counterparts thereto)

were made available prior to purchase. That practice was carried out with respect to the Offering Materials outlined in this Complaint.

661.    Specifically, but without limitation, prior to purchasing mortgage-backed securities Prudential reviewed and considered the underwriting guidelines of the originators or conduits involved. Prudential gained an understanding of the purported processes in the Offering Materials at issue here, and also understood them from its review of similar offering materials issued by and about Defendants and the Originators over the course of the many years Prudential has been purchasing residential mortgage backed securities. For instance, representations such as that the guidelines would be followed, that the guidelines were intended to in some reasonable way assess the borrower's capacity for repayment, and that "exceptions" would only be made when "compensating factors" exist are common to many of Defendants' securitizations, including those at issue here. The consistency of these core representations reinforces the reasonability of Prudential's actual reliance on the Offering Materials at issue here, as well as the fraudulent nature of Defendants' key omission of facts regarding its systemic underwriting abandonment.

662.    Prudential would also review, prior to purchase, the specific representations made about the Mortgage Loans—such as whether the loans were backed by owner-occupied properties, and the loan's LTV and CLTV ratios. At no point did Defendants disclose to Prudential that these statistics were misrepresented, and indeed, baseless.

663.    Prudential fully explored all information made available to investors before purchasing residential mortgage-backed securities. Indeed, Prudential also often visited originators' offices on-site. Prudential also regularly attended industry conferences and met with originators and underwriters who attended.

664.     Prudential continued to monitor its investments after purchase, including with respect to the Certificates here.  However, Prudential did not and could not have uncovered the misrepresentations at issue here prior to purchase—and, indeed, did not know of the wrongdoing alleged herein until recently.  For similar reasons, Prudential did not and could not have discovered the losses caused by the misrepresentations—i.e., its injuries—at issue here until recently.  Indeed, as noted below, nearly all of Prudential's Certificates retained strong credit ratings through at least late 2008.

665.     As discussed above, the Offering Materials contained certain information purporting to describe the Mortgage Loans.  More detailed information was contained in "loan tapes," but these loan tapes were often not made available to investors.  Even if they were, such would still not provide investors with the information necessary to discover the fraud.  This is because the loan tapes are simply rows of numerical data—data that, as alleged above, was itself false.  Thus, without the loan *files* containing the backup materials standing behind those numerical descriptions—documents that were never made available to investors, and which could not have been given to Prudential without violating rules regarding the selective dissemination of material, non-public information—even having the loan *tapes* full of (false) data would not have revealed the fraud.

666.     Still without access to the loan files, investors such as Prudential have only recently been able to test representations about the risk attributes of the underlying loans.  For instance, investors might be provided a table claiming that one property was owner-occupied, had an LTV ratio of 75%, and the borrower had a debt-to-income ratio of 30%.  Simply seeing that loan-by-loan breakdown, however, in no way informed investors that that data was false, or that the originators had disregarded their guidelines.

667.    Investors like Prudential were not given loan files containing full documentation that would have shed light on whether Defendants' representations had a reasonable basis in fact. Indeed, the materials provided to investors often did not even include the specific property addresses, nor did it identify the consumers tied to the loans.  There was thus no practical way, until recently, for investors to "look behind" the tables of numbers in order to assess whether those numbers were actually reflective of the mortgage loans being securitized.  Thus, prior to May 2009, as explained below, the only information investors could obtain on the nature of the mortgage loans was what they were told in the Offering Materials.

668.    As noted above, using currently available technology, Prudential has used a "loan-level analysis" for the purposes of this Complaint that tests the representations at issue. However, it was not until well after the purchases at issue here that investors were offered the ability to access proprietary databases, developed by a data vendor over the course of many years and at a significant cost, that would allow them to determine the accuracy of the loan-level information provided in the Offering Materials.  It was only through such databases that enough data could be linked together, through the use of proprietary algorithms, that investors could even identify the specific loans underlying offerings.  Without knowing a property's address, investors obviously could not know anything about the property's actual value other than what they were told in the Offering Materials.  Thus, prior to the development of these informational services, there was no publicly available means of consistently identifying the specific loans underlying mortgage-backed securities offerings, and thus no way of verifying the representations made to investors about the features of those loans.

669.    In May 2009, an early form of informational service, called TrueLTV, was first made public.  It allowed investors, for the first time (but even then, at a significant cost) to

determine what specific properties were actually being included in a collateral pool. For instance, the database compares the property zip code, loan amount, and date of origination (high-level information provided in the Offering Materials) and compares those points across other databases to see if there is a "match" in the same zip code. This is a simplified explanation; the actual algorithm used is proprietary. But the point is that it typically takes an enormous database to even identify the property included in the collateral pool.

670.    Investors like Prudential would need the specific property address in order to verify representations made in the Offering Materials, such as the LTV ratios. Prudential is not aware of any other similar service or process that could have reasonably provided this information prior to May 2009. Though the identification of the property addresses was available in May 2009 through the TrueLTV service, that service did not have the data elements necessary to evaluate owner occupancy claims. The data sets necessary to test occupancy claims were added in 2010 and included in a new service called Reps and Warranties. Only through the Reps and Warranties service, released in 2010, was it possible to compare the property addresses against other borrower information to validate the occupancy claims made in the Offering Materials. Prudential is not aware of any other similar service or process that could have reasonably provided this information prior to 2010.

671.    In purchasing the Certificates, Prudential justifiably relied on Defendants' misrepresentations and omissions of material facts detailed above, including the misstatements and omissions in the Offering Materials. But for the misrepresentations and omissions in the Offering Materials, Prudential would not have purchased or acquired the Certificates as it ultimately did, because those representations and omissions were material to its decision to acquire the Certificates.

**B.**      **Causation and Damages**

672.      The false and misleading statements of, and omissions of, material facts in the Offering Materials directly caused Prudential damage, because the Certificates were in fact far riskier than Defendants had described them to be.  The Mortgage Loans underlying the Certificates experienced defaults and delinquencies at very high rates due to Defendants' abandonment of the disclosed underwriting guidelines.  Again, however, it was not until much later that Prudential could have known it was injured, and not until much later that it could have known they were caused by Defendants' misrepresentations.  The poor collateral performance resulted in downgrades to the Certificates' ratings, which made them unmarketable at anywhere near the prices Prudential paid, thus confirming that Prudential paid far more for the Certificates than the value it actually received.

673.      Even in the context of the housing downturn, the Certificates would have held much higher value had the securities been as represented in the Offering Materials, because their mortgage pools would not have defaulted at nearly the same high rate.  This decreased value is evidenced collectively by, but need not be measured solely by:  (a) the high rates of default and delinquency of the Mortgage Loans; (b) the Certificates' plummeting ratings; (c) lower-than-expected past and projected cash flow; and (d) lower market value.

674.      Prudential has incurred substantial losses due to the poor quality of the collateral underlying the Certificates and Defendants' failure to properly transfer title to the Loans. Because of the declining collateral base, it is likely that Prudential will not realize the full payments it expected.  This is reflected in the significantly diminished market value for these securities, which, again, is a strong indicator that the true value of the Certificates was far less than what Prudential paid.

675.     The disclosure of irregularities in the underwriting practices actually used with respect to the Mortgage Loans, the increased risk regarding future cash flow, and problems with transfer of title, have further fed the substantial decline in market value of the Certificates. Prudential purchased the Certificates not only for their income stream, but also with an expectation of possibly reselling the Certificates on the secondary market.  Prudential thus viewed market value as a critical aspect of the Certificates it purchased.  Prudential incurred substantial losses on the Certificates due to a drastic decline in market value attributable to the misrepresentations.  Prudential has already incurred losses on the Certificates it has sold on the secondary market.

676.     The loans underlying the Certificates have experienced default and delinquency at extraordinarily high rates due to the abandonment of the disclosed underwriting guidelines. These rates of default are much higher than what a pool of loans that had the features Defendants described would have experienced in the same economic conditions—and thus, Prudential's losses have been much greater than they would have been if the Certificates and the loans underlying them were as Defendants described them to be.  For example, the fact that the loans were not backed by owner-occupied properties at their claimed rate made them more prone to default, thus making the Certificates poorer investments, accelerating their decline in value.  The diminished prospect of continued cash flows dictates that the Certificates are less valuable than they would have been but for the misrepresentations.  Prudential is seeking recovery for past and current damages either through a damage award or rescission.

677.     Prudential's damages can be quantified using secondary-market pricing.  Though the secondary market may have temporarily "seized up" during the height of the financial crisis, today there is a functioning, liquid, secondary market for mortgage-backed securities such as the

Certificates. Numerous brokers are active in, and have trading desks specifically dedicated to, the secondary market for residential mortgage-backed securities, including without limitation Barclays, BofA, Citigroup, Deutsche Bank, Goldman Sachs, Royal Bank of Scotland, JPMorgan, Nomura, and Morgan Stanley.

678.    In April 2011, the *Wall Street Journal* reported that "AIG Bonds are in Demand," finding that the Federal Reserve Bank of New York's "much anticipated" auction of $1.5 billion in subprime bonds was "deemed successful by industry participants." Anusha Shrivastava, AIG Bonds Are in Demand, Investors Line Up for Fed's First Auction of Subprime Debt, WALL ST. J. (Apr. 7, 2011). "Industry participants said dealers saw solid interest from investors." According to a CEO quoted by the article, "[t]he overwhelming majority of the list [of bonds] traded at more than the estimated price, indicating healthy demand by dealers and investors."

679.    The liquidity of the market has continued since then, with the *Wall Street Journal* reporting in March 2012 that investors were "[b]ullish" on subprime mortgage bonds. According to the report, in the first two months of 2012, "investors bought $42.4 billion and sold more than $50 billion [of RMBS] through dealers." Al Yoon, Investors Bullish On Subprime, Nonagency Mortgage Bonds, Survey, WALL ST. J. SMART MONEY, (Mar. 30, 2012), http://www.smart money.com/news/on/?story=ON-20120330-000647&cid=1259. Those numbers continued in March 2012, when "[i]nvestors bought $21.3 billion in subprime and other risky residential mortgage bonds through Wall Street dealers . . . , exceeding the $20.4 billion they sold." *Id.* This data was released by the Financial Industry Regulatory Authority, or FINRA, which began reporting data on the volume of RMBS trades in mid-2011.

680.     Prudential viewed market value as a critical aspect of the Certificates it purchased. Prudential has lost much of the market value in these securities—much more than it would have lost if the Certificates had been backed by loans of the quality Defendants represented.

681.     In short, defaults were much higher than they would have been if the Mortgage Loans had been properly underwritten; this revealed that the true value of the Certificates was a significant discount to what Prudential paid. This is evidenced by the drop in market value of the securities. Loans which were properly underwritten would have withstood the same economic conditions much better than those Defendants offloaded onto Prudential. Securities backed by loans with the features Defendants described would currently have a much higher value than Prudential's Certificates, and thus Prudential was damaged by Defendants' wrongdoing. That this loss in the Certificates' value represents an actionable injury caused by Defendants' misrepresentations, however, could not have been discovered by Prudential until relatively recently.

682.     Prudential's damages here are separate and severable from any losses Prudential may have sustained by the economic downturn, and such could be measured through the discovery process. For instance, but without limitation, upon discovery of the full extent of Defendants' misrepresentations, expert testimony may compare the performance of the *actual* Certificates and/or loan pools here, with the performance of securities and/or loan pools that had the features described in the Offering Materials, as one potential measure of Prudential's damages. However, it is well beyond Prudential's pleading burden to perform such analysis here, and in any event the full extent of Defendants' misrepresentations is unknown.

## V.   DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT

683.     The key information cited and relied upon herein did not generally become available to Prudential until, at the earliest, mid-2009, and often later.  This key information includes, for example:  the FCIC report (January 2011); information associated with the FCIC Report, such as documents and testimony relating to Clayton (September 2010-January 2011); and re-underwriting analyses done by those who obtained the "loan files" (2010-2011).  Indeed, as noted above, Prudential could not have performed a loan-level analysis until 2010—which should have provided evidence of Defendants' misrepresentations regarding the specific Mortgage Loans at issue here.

684.     As discussed above, all but three of the Certificates that Prudential purchased from Defendants' Offerings now have been downgraded to non-investment grade by at least one rating agency.  The following chart summarizes the dates of downgrade to below investment grade:

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| ABFC 2004-HE1 | M1 | 3/24/2011 (Moody's)<br>7/15/2011 (S&P) |
| ABFC 2004-HE1 | M2 | 3/24/2011 (Moody's)<br>7/15/2011 (S&P) |
| ABFC 2005-HE1 | M2 | 4/16/2010 (Fitch)<br>6/3/2010 (Moody's)<br>9/4/2012 (S&P) |
| ABFC 2005-HE1 | M3 | 6/12/2009 (Fitch)<br>6/3/2010 (Moody's)<br>7/18/2011 (S&P) |
| ABFC 2006-HE1 | A2B | 6/12/2009 (Fitch)<br>3/20/2009 (Moody's)<br>9/9/2008 (S&P) |
| ABFC 2006-HE1 | A2C | 11/24/2008 (Fitch)<br>10/31/2008 (Moody's)<br>9/9/2008 (S&P) |
| ABFC 2006-HE1 | A2D | 11/24/2008 (Fitch)<br>10/31/2008 (Moody's)<br>9/9/2008 (S&P) |

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| ABFC 2006-OPT1 | A3C1 | 6/12/2009 (Fitch) 6/3/2010 (Moody's) 8/11/2011 (S&P) |
| ABFC 2006-OPT1 | A3D | 6/12/2009 (Fitch) 6/3/2010 (Moody's) 8/11/2011 (S&P) |
| ABFC 2006-OPT1 | M2 | 2/22/2008 (Fitch) 3/20/2009 (Moody's) 9/22/2008 (S&P) |
| ABFC 2006-OPT1 | M3 | 2/22/2008 (Fitch) 4/21/2008 (Moody's) 9/22/2008 (S&P) |
| AMSI 2004-R6 | A1 | - |
| AMSI 2004-R6 | M4 | 2/3/2009 (Fitch) 1/9/2009 (Moody's) 4/23/2008 (S&P) |
| BAFC 2004-2 | 1B1 | |
| BAFC 2006-E | 2A3 | 4/6/2009 (Fitch) 7/1/2009 (S&P) |
| BOAA 2005-7 | 3CB1 | 8/6/2009 (Fitch) 2/20/2009 (Moody's) |
| BOAA 2005-12 | 3CB1 | 8/6/2009 (Fitch) 2/20/2009 (Moody's) |
| BOAA 2006-5 | 3A1 | 12/17/2008 (Fitch) 2/20/2009 (Moody's) |
| BOAMS 2004-E | 2A6 | 12/5/2012 (Fitch) |
| BOAMS 2005-A | 2A1 | 10/5/2011 (Fitch) 6/2/2009 (Moody's) |
| BOAMS 2005-B | 2A1 | 10/5/2011 (Fitch) 6/2/2009 (Moody's) |
| CBASS 2004-CB2 | M1 | 3/12/2012 (Fitch) 3/10/2011 (Moody's) 1/18/2013 (S&P) |
| CBASS 2004-CB2 | M2 | 7/2/2008 (Fitch) 3/10/2011 (Moody's) 9/30/2009 (S&P) |
| CBASS 2004-CB8 | M2 | 6/12/2009 (Fitch) 3/10/2011 (Moody's) 2/25/2010 S&P) |
| CBASS 2005-CB6 | A3 | 6/12/2009 (Fitch) 4/12/2010 (Moody's) 8/11/2011 (S&P) |
| CBASS 2006-CB9 | A2 | 6/12/2009 (Fitch) 3/16/2009 (Moody's) |
| CBASS 2006-CB9 | A3 | 11/24/2008 (Fitch) 10/17/2008 (Moody's) |
| CBASS 2007-CB5 | A2 | 10/17/2008 (Moody's) 8/4/2009 (S&P) |

240

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| FFMER 2007-3 | A2C | 10/16/2008 (Moody's) 8/20/2008 (S&P) |
| FFMER 2007-4 | 2A2 | 3/19/2009 (Moody's) 4/21/2009 (S&P) |
| FFML 2004-FF1 | M1 | 4/9/2012 (Moody's) |
| FFML 2005-FF6 | M2 | 4/6/2010 (Moody's) |
| FFML 2005-FFH1 | M2 | 6/12/2009 (Fitch) 3/19/2009 (Moody's) |
| FFML 2006-FF18 | A2C | 10/16/2008 (Moody's) 9/22/2008 (S&P) |
| FFML 2006-FFH1 | A4 | 6/12/2009 (Fitch) 4/6/2010 (Moody's) 11/16/2012 (S&P) |
| FFML 2006-FFH1 | M2 | 2/28/2008 (Fitch) 3/19/2009 (Moody's) 8/4/2009 (S&P) |
| FFML 2006-FFH1 | M3 | 2/28/2008 (Fitch) 3/19/2009 (Moody's) 8/4/2009 (S&P) |
| FFML 2006-FFH1 | M4 | 2/28/2008 (Fitch) 3/19/2009 (Moody's) 8/19/2008 (S&P) |
| FFML 2007-FF1 | A2C | 10/16/2008 (Moody's) 8/20/2008 (S&P) |
| FMIC 2006-3 | 2A2 | 11/3/2008 (Moody's) 10/6/2009 (S&P) |
| FMIC 2006-3 | 2A3 | 11/3/2008 (Moody's) 10/6/2009 (S&P) |
| FMIC 2007-1 | 2A1 | 3/16/2009 (Moody's) 3/26/2010 (S&P) |
| GEWMC 2005-2 | A2C | 6/12/2009 (Fitch) 3/13/2009 (Moody's) 10/21/2011 (S&P) |
| MLMI 2004-WMC3 | M2 | 3/21/2011 (Moody's) |
| MLMI 2005-WMC1 | M1 | - |
| MLMI 2005-WMC1 | M2 | 7/19/2010 (Moody's) |
| MLMI 2006-HE2 | A4 | 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| MLMI 2006-HE2 | M2 | 10/22/2008 (Moody's) 9/16/2008 (S&P) |
| MLMI 2006-MLN1 | A2C | 10/22/2008 (Moody's) 9/2/2008 (S&P) |
| MLMI 2006-WMC1 | A1B | 3/17/2009 (Moody's) 9/25/2009 (S&P) |
| MLMI 2007-HE3 | A1 | 3/17/2009 (Moody's) 8/4/2008 (S&P) |
| MLMI 2007-HE3 | A2 | 10/22/2008 (Moody's) 8/4/2009 (S&P) |

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| MLMI 2007-HE3 | A3 | 10/22/2008 (Moody's) 8/20/2008 (S&P) |
| MLMI 2007-HE3 | A4 | 10/22/2008 (Moody's) 8/20/2008 (S&P) |
| OOMLT 2004-1 | M1 | 5/14/2010 (Fitch) 3/18/2011 (Moody's) 9/28/2012 (S&P) |
| OOMLT 2005-3 | M3 | 6/12/2009 (Fitch) 3/17/2009 (Moody's) 1/13/2009 (S&P) |
| OOMLT 2005-4 | M2 | 6/12/2009 (Fitch) 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| OOMLT 2005-5 | A4 | 3/22/2011 (Fitch) |
| OOMLT 2005-5 | M2 | 11/25/2008 (Fitch) 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| OOMLT 2006-2 | 2A3 | 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| OOMLT 2007-5 | 2A2 | 10/30/2008 (Moody's) 8/4/2009 (S&P) |
| RAMC 2006-1 | AF4 | 6/12/2009 (Fitch) 10/22/2009 (Moody's) 9/23/2011 (S&P) |
| RASC 2007-KS1 | A3 | 6/12/2009 (Fitch) 3/20/2009 (Moody's) 8/4/2009 (S&P) |
| RASC 2007-KS1 | A4 | 11/20/2008 (Fitch) 3/20/2009 (Moody's) 8/4/2009 (S&P) |
| RASC 2007-KS3 | AI2 | 3/20/2009 (Moody's) 8/4/2009 (S&P) |
| RAMP 2004-RS2 | MII1 | 3/30/2011 (Moody's) 9/4/2009 (S&P) |
| RAMP 2006-RZ3 | A2 | 6/12/2009 (Fitch) 7/15/2011 (Moody's) 1/19/2012 (S&P) |
| RAMP 2007-RS2 | A2 | 3/20/2009 (Moody's) 1/13/2009 (S&P) |
| RFMS2 2005-HS1 | AI5 | 6/15/2009 (Moody's) 4/2/2010 (S&P) |
| RFMS2 2005-HS2 | AI5 | 10/30/2008 (Moody's) 1/26/2010 (S&P) |
| RFMS2 2005-HS2 | AII | 8/6/2008 (Moody's) 6/10/2008 (S&P) |
| RFMS2 2006-HI2 | A4 | 12/17/2008 (Moody's) 4/2/2010 (S&P) |
| SURF 2005-BC4 | M1 | 8/4/2009 (S&P) |

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| SURF 2006-BC1 | A2C | 6/18/2010 (Moody's) |
| SURF 2006-BC2 | A2B | 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| SURF 2006-BC2 | A2D | 10/23/2008 (Moody's) 8/4/2009 (S&P) |
| SURF 2007-BC1 | A2B | 3/17/2009 (Moody's) 8/4/2009 (S&P) |
| SURF 2007-BC1 | A2C | 10/23/2008 (Moody's) 8/4/2009 (S&P) |

685.     As this chart reflects, nearly all of Prudential's Certificates retained strong credit ratings through late-2008.

686.     Thus, information that either put Prudential on actual notice of the legal violations at issue here, or was sufficient to lead to such actual knowledge in the exercise of reasonable diligence, was affirmatively concealed by Defendants and did not publicly emerge prior to, at the earliest, late-2008.

## VI.     OTHER MATTERS

### A.     Merrill Lynch & Co.'s Liability as Control Person

687.     The primary violators in this action for purposes of the Securities Act of 1933 are Merrill Lynch Mortgage Investors, Inc. as Depositor and Merrill, Lynch, Pierce, Fenner & Smith Inc. as Underwriter.  Merrill Lynch Mortgage Investors, Inc. is a limited purpose, indirect, wholly owned subsidiary of Merrill Lynch & Co. and was the issuer of the Certificates.  Merrill, Lynch, Pierce, Fenner & Smith Inc. is a wholly owned subsidiary of Merrill Lynch & Co. and was the underwriter for the Certificates.  Both committed primary violations of the Securities Act as alleged herein.

688.     Merrill Lynch & Co. had the power to direct or cause the direction of the management and policies of the primary violators.  Indicia of Merrill Lynch & Co.'s control includes, for example, the following:  (i) Merrill Lynch & Co.'s managing partner and its

243

director and senior counsel signed Merrill Lynch Mortgage Investors, Inc.'s registration statements; (ii) Merrill, Lynch, Pierce, Fenner & Smith Inc. conducts business under the name Merrill Lynch & Co.; (iii) Merrill Lynch & Co. created Merrill Lynch Mortgage Investors, Inc. and defined its purpose; (iv) Merrill Lynch & Co.'s SEC filings show Merrill Lynch & Co.'s control through comprehensive involvement with the securitization operations including the issuance and underwriting of mortgage-back securities; (v) revenue from the securitizations involving the primary violators inured to Merrill Lynch & Co.'s benefit; and (vi) Merrill Lynch & Co. directly participated in the issuance and sale of the Certificates, including prominently featuring "Merrill Lynch & Co." on the front page of each Prospectus and Prospectus Supplement.

689.    Merrill Lynch & Co. created special-purpose entities ("SPEs"), which were wholly owned subsidiaries that purchased residential mortgage loans for Merrill Lynch's securitization business.  Merrill Lynch & Co. established Merrill Lynch Mortgage Investors, Inc. in order to acquire the mortgage loans and to securitize and sell those loans to investors in the form of the Certificates.  Thus, Merrill Lynch & Co. established Merrill Lynch Mortgage Investors, Inc. for the purpose of advancing the interests of Merrill Lynch & Co.'s securitization business.  According to the Offering Materials, Merrill Lynch Mortgage Investors, Inc.'s certificate of incorporation limited its activities to "those necessary or convenient to carry out its securitization activities."

690.    Merrill Lynch & Co. also publicly represented that it controlled the securitization business.  For example, in Merrill Lynch & Co.'s Form 10-K for the years ended December 29, 2006 and December 28, 2007, Merrill Lynch & Co. represented that "[i]n the normal course of business, *Merrill Lynch* securitizes . . . residential mortgage loans." (Emphasis added.).  Merrill

Lynch & Co. further described its significant involvement in securitization in its 2007 Form 10-K, stating that its "involvement with SPEs used to securitize financial assets includes: structuring and/or establishing SPEs; selling assets to SPEs; managing or servicing assets held by SPEs; underwriting, distributing, and making loans to SPEs; making markets in securities issued by SPEs; engaging in derivative transactions with SPEs; owning notes or certificates issued by SPEs; and/or providing liquidity facilities and other guarantees to, or for the benefit of, SPEs."

691. Exhibit 21 to Merrill Lynch & Co.'s 2006 and 2007 Form 10-Ks provide that Merrill, Lynch, Pierce, Fenner & Smith Inc. "[a]lso conducts business under the name 'Merrill Lynch & Co.'" Merrill Lynch & Co. stated in both its 2006 and 2007 Form 10-Ks that it had "[r]etained interests in securitized assets," and the majority consisted of "mortgage-backed securities that Merrill Lynch expect[ed] to sell to investors in the normal course of its underwriting activity." (Emphasis added.). Thus, Merrill Lynch & Co. not only represented it was involved in the structuring and issuance of mortgage-backed securities through SPEs, but also represented it conducted underwriting of those securities in the normal course of its business.

692. Merrill Lynch & Co. executives and directors also played roles in Merrill Lynch & Co.'s control over Merrill Lynch Mortgage Investors, Inc. For example, Paul Park, who was, at the relevant times, a managing partner of Merrill Lynch, was simultaneously the President and Chairman of the Board of Directors of Merrill Lynch Mortgage Investors, Inc. Similarly Michael M. McGovern, who was, at the relevant times, a Director and Senior Counsel of Merrill Lynch & Co., was simultaneously a Director of Merrill Lynch Mortgage Investors, Inc. Merrill Lynch & Co. also established Merrill Lynch Mortgage Investors, Inc. in the same facilities that it occupied, with the same registered agent and registered office in Delaware.

693.    Merrill Lynch & Co.'s direct role in the issuance and underwriting of the Certificates at issue here is also evidenced by the use of its corporate name—"Merrill Lynch & Co."—in bold on the front page of each Prospectus and Prospectus Supplement of the Offerings in this case.  Thus, Merrill Lynch, & Co., through Merrill Lynch Mortgage Investors, Inc. and Merrill, Lynch, Pierce, Fenner & Smith Inc., used these Prospectuses and Prospectus Supplements to market and sell the Certificates to investors.

694.    The benefits of the securitization business, including the issuance and sale of the Certificates at issue here, inured directly to Merrill Lynch & Co., which consolidated the revenues from the issuance and sale of residential mortgage-backed securities in its financial statements.  According to the 2007 Form 10-K, in 2006 and 2007, Merrill Lynch & Co. reported "cash inflows" of $95.8 billion and $100.2 billion, respectively, from residential mortgage loan securitization transactions.

## B.    Tolling of the Securities Act of 1933 Claims

695.    On May 20, 2009, a consolidated class action complaint was filed against various Merrill entities, former officers and directors thereof, and certain other parties on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten, or sold by these entities.  *See Pub. Emp. Ret. Sys. of Miss., et al. v. Merrill Lynch & Co.*, Civil Action No. 08-cv-10841 (S.D.N.Y. 2008) (the "Class Action").  This action was comprised of a series of consolidated actions by different named plaintiffs, all of which alleged claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

696.    The first of those actions was filed on December 5, 2008, and expressly included Prudential in the class definition with respect to the FFMER 2007-3 and FFMER 2007-4 Offerings.  *See Conn. Carpenters Pension Fund v. Merrill Lynch & Co.*, No. 09-cv-01076 (Cal. Super. Ct. 2008) (the "Connecticut Carpenters Action").  Another action was filed on February

17, 2009, and included Prudential in the class definition with respect to the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Offerings. *See Pub. Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 09-cv-1392 (S.D.N.Y. 2009) (the "PERS Action"). A third action was filed on March 27, 2009, and also included Prudential in the class definition with respect to the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Offerings. *See Wyoming State Treasurer v. Merrill Lynch & Co.*, 09-cv-3030 (S.D.N.Y. 2009) (the "Wyoming Action").

697.     The May 20, 2009 consolidated class complaint in the Class Action also included Prudential in the class definition with respect to the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Offerings.

698.     On March 31, 2010, the Court in the Class Action held, in a summary order, that the named plaintiffs in the Class Action had standing to sue Merrill only with respect to the Offerings in which the named plaintiffs themselves had invested. The Court explained its order in a June 1, 2010 opinion. The Court held that the named plaintiffs could not represent class members who bought in other Merrill offerings, even if the offerings emanated from a common registration statement. This decision narrowed the Class Action class to exclude class members whose investments in Merrill RMBS do not overlap with those of the named plaintiffs. In the same opinion, the Court dismissed all claims against Merrill Lynch Mortgage Lending, Inc., among other defendants, and the section 15 claims against Merrill Lynch, Pierce, Fenner & Smith Inc., each with prejudice.

699.     On July 6, 2012, the plaintiffs in the Class Action filed an amended class action complaint. The amended class action complaint included the FFMER 2007-3, FFMER 2007-4,

MLMI 2006-MLN1, and MLMI 2006-WMC1 Offerings, all of which were Offerings in which the named plantiffs themselves had invested.

700.    On February 6, 2012, Prudential entered into a tolling agreement with Defendants whereby "any statute of limitations, statute of repose and other time-related defense, whether statutory, contractual or otherwise and whether at law, in equity or otherwise (including, but not limited to, the doctrines of waiver, laches, acquiescence or estoppel), which are or may be applicable" to Prudential's claims were temporarily tolled through the filing of this Complaint.  The February 6, 2012 tolling agreement covers nearly all of Prudential's purchases of the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1, and MLMI 2006-WMC1 Offerings.  Effective May 25, 2012, Prudential entered into an amended tolling agreement with Defendants that covers the remainder of Prudential's purchases of the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1, and MLMI 2006-WMC1 Offerings.

701.    On February 28, 2012, Prudential opted out of the class settlement in the MissPERS Class Action, which the court had preliminary approved, in order to preserve its rights to seek legal recourse independent of the MissPERS Class Action.  The court subsequently granted final approval of the MissPERS class settlement and entered judgment on May 7, 2012 (*see* docket entry no. 185).

702.    Prudential had been part of the putative class in all of the Merrill class actions, including the Connecticut Carpenters Action, the PERS Action, the Wyoming Action, and the Class Action.  Prudential reasonably and justifiably relied on the named plaintiffs in these class actions to protect its rights and it reasonably and justifiably relied on the class action tolling doctrines of *American Pipe* to toll the statute of limitations.

703.     Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them. *Id.* at 255. As the Second Circuit stated in *In re WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007): "[B]ecause Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class, notwithstanding that they also filed individual actions prior to the class certification decision." *American Pipe* does not require that the individual claims be identical to, or even from the same jurisdiction as, the class action claims, but rather only that the claims have the same factual basis. *See Cullen v. Margiotta*, 811 F.2d 698,718-21 (2d Cir. 1987), *Tosti v. Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985).

704.     Defendants Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Mortgage Investors, Inc., Merrill Lynch Mortgage Lending Inc., and Merrill Lynch & Co. in this Complaint were all also named as defendants in the Class Action, for the same statutory causes of action asserted herein and were named in each of the actions consolidated in the Class Action.

705.     This action is brought within one year of the time when Prudential discovered or reasonably could have discovered the facts upon which this action is based, and within three years of the time that the Certificates upon which this cause of action is brought were sold to the public, by virtue of the timely filing of the Connecticut Carpenters, PERS, and Wyoming Actions, and the Class Action, and by the tolling of Prudential's claims afforded by those filings, and by virtue of the parties' Tolling Agreement.

## FIRST CAUSE OF ACTION
### (Common-Law Fraud/Fraudulent Inducement Against All Defendants Except Merrill Lynch & Co., Inc.)

706.     Prudential realleges each allegation above as if fully set forth herein.

707.     This count is against all Defendants except Merrill Lynch & Co., Inc. (the "Misrepresentation Defendants").  It is against each Misrepresentation Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

708.     Each Misrepresentation Defendant made, authorized or caused the representations at issue, which are identified and summarized in Section I above and further identified in the Exhibits.

709.     The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

710.     Each of the Misrepresentation Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each made the misleading statements with an intent to defraud Prudential.

711.     The Misrepresentation Defendants had reason to expect that Prudential was among the class of persons who would receive and rely on such representations, and intended that their misleading statements would induce Prudential to purchase the Certificates.

712.     Prudential justifiably relied on the Misrepresentation Defendants' false representations and misleading omissions.

713.     Had Prudential known the true facts regarding the Misrepresentation Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates as it ultimately did.

714.     As a result of the foregoing, Prudential has suffered damages according to proof. In the alternative, Prudential hereby demands rescission and makes any necessary tender of the Certificates.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Common Law Fraud/Fraudulent Concealment Against All Defendants Except Merrill Lynch & Co., Inc.)

715.     Prudential realleges each allegation above as if fully set forth herein.

716.     This is a claim for aiding and abetting brought against the Misrepresentation Defendants, as defined above, arising from the intentional and substantial assistance each rendered to the others to advance the fraud on Prudential.  It is against each Misrepresentation Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

717.     Within those deals in which each Misrepresentation Defendant played a role, each of the Misrepresentation Defendants knew of the fraud perpetrated by the other Misrepresentation Defendants on that deal.  Each knew of the representations and omissions made by the others.  Each also knew that the representations and omissions made by each of the other Misrepresetnation Defendants were false and/or misleading at the time they were made.

718.     As discussed above, within each enterprise (Merrill and BofA), the Misrepresentation Defendants were all highly interdependent businesses with overlapping management and a constant flow of information among the Misrepresentation Defendants. Within those deals in which each Misrerpesentation Defendant played a role, all of the Misrepresentation Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme to securitize each of the trusts at issue and market and sell the Certificates to investors, including Prudential, without disclosing the truth about those investments.

719.     All of the Misrepresentation Defendants, through their employees and representatives, substantially assisted in, among other things:  (a) acquiring the Mortgage Loans; (b) packaging up those loans into pools which were transferred to the depositor then the Trusts; (c) waiving into the collateral pools of the Trusts loans previously rejected by Clayton, despite

the lack of compensating factors; (d) creating and structuring the Trusts whose Certificates would be sold to investors including Prudential; and (e) preparing the Offering Materials which would be used to market the Certificates to investors like Prudential. Within those deals in which each defendant played a role, through overlapping personnel, strategies and intertwined business operations, and the fluid transfer of information among the defendants, each of the defendants knew of the fraud perpetrated on Prudential. Within those deals in which each defendant played a role, each acted in concert to defraud Prudential.

720.     Each of the Misrepresentation Defendants provided each of the others that also worked on the same deals with substantial assistance in making the fraudulent representations and omissions. Specifically, but without limitation, the sponsor defendants originated or acquired the Mortgage Loans and sponsored their securitization, assisted in preparation of the Offering Materials, transferred the loans to the depositor, and made representations regarding the quality of the loans. Specifically, but without limitation, the depositor defendants issued the securities, entered into agreements with the relevant trusts, filed and signed the registration statements, and assisted in the preparation of the Offering Materials. Specifically, but without limitation, the underwriters assisted in the preparation of the Offering Materials, and acted as broker-dealer with regard to the issuance and underwriting of the Certificates.

721.     Each of the Misrepresentation Defendants made representations regarding the characteristics of the Mortgage Loans, including applicable underwriting guidelines, due diligence results, owner-occupancy rates, loan-to-value and/or combined loan-to-value statistics, credit ratings, title-transfer process, and/or underwriting exceptions.

722.     The Misrepresentation Defendants could not have perpetrated their fraud without the substantial assistance of each other Misrepresentation Defendant that worked on the same

deals, and they all provided financial, strategic, and marketing assistance for their scheme. The BofA Misrepresentation Defendants were highly intertwined and interdependent businesses and each benefited from the success of the scheme. The Merrill Misrepresentation Defendants were similarly highly intertwined and interdependent businesses and each benefited from the success of the scheme. Through the fraudulent sale of the Certificates to Prudential, the Misrepresentation Defendants were able to materially improve their financial condition by reducing their exposure to declining subprime-related assets and garnering thousands of dollars in fees from the structuring and sale of the Certificates.

723.    As a direct, proximate, and foreseeable result of the Misrepresentation Defendants' actions, Prudential has suffered damages according to proof.

### THIRD CAUSE OF ACTION
**(Equitable Fraud Against All Defendants Except Merrill Lynch & Co., Inc.)**

724.    Prudential realleges each allegation above as if fully set forth herein.

725.    This is a claim for equitable fraud brought against the Misrepresentation Defendants, as defined above. It is against each Misrepresentation Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

726.    The Defendants made, authorized or caused the representations and/or omissions set forth above and further detailed in the Exhibits.

727.    Those representations and omissions were material.

728.    Each Defendant's representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

729.    Prudential reasonably and justifiably relied on such misrepresentations and omissions. Prudential would not have purchased the Certificates had it known the true facts

regarding, *inter alia*, the Defendants' and originators' underwriting violations, the credit ratings assigned to the Certificates, transfer of title, and the defects in the loans making up the Securitizations.

730.    Prudential has suffered injury for which there is not, or may not be, an adequate remedy at law.

731.    Prudential therefore demands rescission or rescissory damages for its equitable fraud claim, providing recovery of the consideration paid for the Certificates, with interest thereon.  Prudential is prepared to tender the Certificates in the event the Court grants such relief.

### FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation Against All Defendants Except Merrill Lynch & Co., Inc.)

732.    Prudential realleges each allegation above as if fully set forth herein.

733.    This count is against the Misrepresentation Defendants, as defined above.  It is against each Misrepresentation Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

734.    Because the Mispresentation Defendants arranged the Securitizations, and originated or acquired, underwrote, and serviced most of the underlying Mortgage Loans, they had unique and special knowledge about the loans in the offerings.  In particular, they had unique and special knowledge and expertise regarding the quality of the underwriting of those loans, as well as the servicing practices employed as to such loans.

735.    Because Prudential could not evaluate the loan files for the Mortgage Loans underlying its Certificates, and because Prudential could not examine the underwriting quality or servicing practices for the Mortgage Loans in the offerings on a loan-by-loan basis, it was heavily reliant on the Misrepresentation Defendants' unique, special, and superior knowledge regarding the Mortgage Loans when determining whether to make each investment in the

Certificates.  Prudential was entirely reliant on the Misrepresentation Defendants to provide accurate information regarding the loans in engaging in that analysis.  Accordingly, the Misrepresentation Defendants were uniquely situated to evaluate the economics of each offering.

736.     Going back over many years covering these numerous purchases, Prudential relied on the Misrepresentation Defendants' unique, special, and superior knowledge regarding the quality of the underlying Mortgage Loans and their underwriting when determining whether to invest in the Certificates at issue in this action.  Prudential's longstanding relationship with Defendants, coupled with Defendants' unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between Defendants and Prudential.

737.     The Misrepresentation Defendants were in the business of providing information for use by others, including Prudential.  Specifically, but without limitation, the Misrepresentation Defendants were in the business of providing information by way of the Offering Materials so that investors could rely on them in deciding whether to invest in the securities being offered.  This information was for the use of a small class of large, institutional investors.

738.     The Misrepresentation Defendants were aware that Prudential relied on their unique, special, and superior knowledge, expertise, and experience and depended upon them for accurate and truthful information in making the decision to invest in each of the Certificates.  The Misrepresentation Defendants were also aware that the representations regarding the underwriting standards, as well as those regarding the characteristics of the Mortgage Loans, would be used for the particular purpose of deciding whether to invest in those Certificates.  The

Misrepresentation Defendants also knew that the facts regarding their compliance with their underwriting standards were exclusively within their knowledge.

739. Based on their expertise, superior knowledge, and relationship with Prudential, the Misrepresentation Defendants owed a duty to Prudential to provide complete, accurate, and timely information regarding the Mortgage Loans and the offerings. The Misrepresentation Defendants breached their duty to provide such information to Prudential.

740. The Misrepresentation Defendants breached their duty to provide such information to Prudential by making misrepresentations that induced Prudential's investment in the offerings. The misrepresentations are set forth in Section I above and in the Exhibits. At the time the Misrepresentation Defendants made these misrepresentations, they were, at a minimum, negligent in their due diligence and/or understanding of the extent to which the Mortgage Loans underlying the Certificates complied with the underwriting guidelines and had the characteristics represented in the Offering Materials. Thus, the Misrepresentation Defendants were at the very least negligent in making statements that were false, misleading, and incorrect. Such information was known or reasonably should have been known by the Misrepresentation Defendants, and was not known or readily knowable by Prudential. In addition, the Misrepresentation Defendants knew that Prudential was acting in reliance on that information.

741. Prudential reasonably relied on the information the Misrepresentation Defendants did provide and was damaged as a result of these misrepresentations. Had Prudential known the true facts regarding the Misrepresentation Defendants' underwriting practices and the quality of the loans making up the offerings, it would not have purchased the Certificates as it ultimately did.

## FIFTH CAUSE OF ACTION
**(New Jersey Civil RICO, N.J.S.A. 2C:41-1 *et seq.*, against the Defendants)**

742.    Prudential realleges each allegation above as if fully set forth herein.

743.    This count is against all Defendants, with respect to only the securities subject to the parties' tolling agreement (ABFC 2004-HE1, ABFC 2005-HE1, ABFC 2006-HE1, ABFC 2006-OPT1, BAFC 2004-2, BAFC 2006-E, BOAA 2005-7, BOAA 2005-12, BOAA 2006-5, BOAMS 2004-E, BOAMS 2005-A, BOAMS 2005-B, FFMER 2007-3, FFMER 2007-4, FFML 2004-FF1, FFML 2005-FF6, FFML 2005-FFH1, FFML 2006-FF18, FFML 2006-FFH1, FFML 2007-FF1, MLMI 2004-WMC3, MLMI 2005-WMC1, MLMI 2006-HE2, MLMI 2006-MLN1, MLMI 2006-WMC1, MLMI 2007-HE3, SURF 2005-BC4, SURF 2006-BC1, SURF 2006-BC2, and SURF 2007-BC1).

744.    This count is against the Misrepresentation Defendants, as defined above.  It is against each Misrepresentation Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

745.    For the purposes of this Count Five, Prudential alleges that Defendants acted with the knowledge and intent required to violate the statutes identified as racketeering activity below and/or were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to Prudential.

746.    Defendants violated the New Jersey Civil RICO statute by committing or conspiring amongst themselves and others to commit a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and -2(d).

### *The Enterprises*

747.    There are two separate RICO enterprises at issue:  (1) the Merrill Enterprise, and (2) the BofA Enterprise.

748.    *First*, the Merrill Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of residential mortgage loans and then processed the underlying loans into mortgaged-backed securities so that the Merrill Defendants could sell certificates at inflated values to investors such as Prudential on the basis of false and fraudulent Offering Materials (the "Merrill Enterprise").

749.    The Merrill Enterprise included at least the following persons, businesses, or other legal entities that played the following discrete and well-defined roles in Merrill's carefully planned, highly organized scheme:

(a)    First Franklin, which originated mortgage loans underlying certain Certificates purchased by Prudential, and acted as the sponsor for certain Certificates purchased by Prudential, as outlined above;

(b)    Merrill Lynch Mortgage Capital, Inc., which acted as the sponsor for certain Certificates purchased by Prudential, as outlined above;

(c)    Merrill Lynch Mortgage Lending Inc., which acted as the sponsor for certain Certificates purchased by Prudential, as outlined above;

(d)    Merrill Lynch Mortgage Investors, Inc., which acted as the depositor for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(e)    Merrill Lynch, Pierce, Fenner & Smith, which sold Prudential and other unsuspecting investors certain mortgage-backed securities, as set foth in Exhibit A; and

(f)    Merrill Lynch & Co., which formed the other Merrill entities to perform specific tasks required to originate or acquire mortgages, securitize those mortgages, and then sell securities to Prudential and other investors in order to maximize corporate

258

profits. Merrill Lynch & Co. also had the ability to direct and did in fact direct, purposefully engage in, assist, and/or further the Merrill Enterprise, as it funded the activities of the other members of the Enterprise, managed and supervised the operations of the Enterprise; set the methods for the Enterprise (including the intentional increase in the sale of residential mortgaged-backed securitizations and deliberate indifference to, or circumvention of, stated underwriting guidelines); directed the goals of the Enterprise, which included the maximization of short-term profits and fees from the sale of residential mortgaged-backed securities through the use of false and fraudulent Offering Materials; and received and consolidated the funds generated by the Enterprise's activities.

750.    The members of the Merrill Enterprise played specific and well-defined roles in the process of originating and then securitizing loans into residential mortgage-backed securities, as described above, and, without limitation in Section D of the "Background" section further above.

751.    The members of the Merrill Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the fraudulent sale of inflated mortgage-backed securities to investors, including Prudential.

752.    At all relevant times, the Merrill Enterprise was and remains engaged in trade or commerce in activities affecting trade or commerce in connection with the sale and purchase of securities in the State of New Jersey.

753.    The Merrill Enterprise is an enterprise within the meaning of N.J.S.A. 2C:41-1(c).

754.  **Second**, the BofA Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of residential mortgage loans and then processed the underlying loans into mortgage-backed securities so that Defendants could sell certificates at inflated values to investors such as Prudential on the basis of false and fraudulent Offering Materials (the "BofA Enterprise").

755.  The BofA Enterprise included at least the following persons, businesses, or other legal entities that played the following discrete and well-defined roles in BofA's carefully planned, highly organized scheme:

(a)  Bank of America, N.A., which acted as the sponsor and originator for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(b)  First Franklin Financial Corp.., which acted as the sponsor and originator for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(c)  Banc of America Mortgage Securities, Inc., which acted as the depositor for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(d)  Asset Backed Funding Corporation, which acted as the depositor for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(e)  Bank of America, Funding Corporation, which acted as the depositor for certain of the Certificates purchased by Prudential, as set forth in Exhibit A;

(f)  Merrill Lynch, Pierce, Fenner & Smith (formerly known as Banc of America Securities LLC, for whom Merrill Lynch, Pierce, Fenner & Smith is liable as successor in interest), which sold Prudential and other unsuspecting investors certain mortgage-backed securities, as set forth in Exhibit A; and

(g)     Bank of America Corporation, which formed the other BofA entities to perform specific tasks required to originate or acquire mortgages, securitize those mortgages, and then sell securities to Prudential and other investors in order to maximize corporate profits.  Bank of America Corporation also had the ability to direct and did in fact direct, purposefully engage in, assist, and/or further the BofA Enterprise, as it funded the activities of the other members of the Enterprise, managed and supervised the operations of the Enterprise; set the methods for the Enterprise (including the intentional increase in the sale of residential mortgaged-backed securitizations and deliberate indifference to, or circumvention of, stated underwriting guidelines); directed the goals of the Enterprise, which included the maximization of short-term profits and fees from the sale of residential mortgaged-backed securities through the use of false and fraudulent Offering Materials; and received and consolidated the funds generated by the Enterprise's activities.

756.     The members of the BofA Enterprise played specific and well-defined roles in the process of originating and then securitizing loans into residential mortgage-backed securities, as described above, and, without limitation, in Section D of the "Background" section further above.

757.     The members of the BofA Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the fraudulent sale of inflated mortgaged-backed securities to investors, including Prudential.

758.     At all relevant times, the BofA Enterprise was and remains engaged in trade or commerce in activities affecting trade or commerce in connection with the sale and purchase of securities in the State of New Jersey.

759.     The BofA Enterprise is an enterprise within the meaning of N.J.S.A. 2C:41-1(c).

### The Pattern of Racketeering Activity

760.     Defendants, along with the other members of the Enterprises, engaged in a pattern of racketeering activity consisting of two or more separate and distinct acts of racketeering activity. Defendants committed this pattern of racketeering activity during at least 2004 to 2008 and beyond, and in connection with but not limited to the Securitizations in which Prudential purchased Certificates. The acts of racketeering include, but are not limited to, those set forth below:

**a.     Violations of the New Jersey Uniform Securities Act (N.J.S.A. 49:3-47 *et seq.*)**

761.     Under N.J.S.A. 49:3-52(b), it is "unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

762.     Similarly, under N.J.S.A. 49:3-52(a) and -52(c), it is unlawful for any person to offer, sell or purchase a security by employing "any device, scheme, or artifice to defraud" or by engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

763.     Defendants are "persons" within the meaning of N.J.S.A. 49:3-49(i).

764.     The Certificates purchased by Prudential are "securities" within the meaning of N.J.S.A. 49:3-49(m).

765.     Defendants and the Trusts (although not named as defendants) qualify as offerors or sellers of the Certificates in the Securitizations because they issued, marketed, and/or sold the

Certificates to Prudential and other members of the public for their own financial benefit within the meaning of N.J.S.A. 49:3-49(j)(1)-(2).

766. Defendants and the Trusts offered and sold the Certificates in the Securitizations to Prudential in the State of New Jersey within the meaning of N.J.S.A. 2C:1-3.

767. As identified above in Sections I and II, and in the Exhibits, on two or more occasions, in violation of N.J.S.A. 49:52(a), (b), and (c), Defendants made numerous material misstatements in the Offering Materials used to sell Prudential the Certificates in Securitizations. In addition, Defendants made numerous omissions of fact that made the Offering Materials false and misleading.

768. As alleged in detail above in Sections I and II, and in the Exhibits, the Offering Materials in the Securitizations created and utilized by Defendants and the Trusts were materially false and misleading because, among other things, they misrepresented the underwriting standards applicable to the mortgage loans backing the Certificates, misrepresented the owner-occupancy information for the loans, misrepresented the LTV and CLTV ratios and appraisal information for the loans, misrepresented the title-assignment process and status, and misrepresented information relevant to the credit ratings process for the Certificates.

769. Defendants knew that the Offering Materials included untrue statements of material fact and misleading omissions.

770. In the alternative, Defendants recklessly and consciously disregarded a substantial and unjustifiable risk that the Offering Materials in the Securitizations included untrue statements of material fact and misleading omissions. Given the nature of this risk, the access of these Defendants to the loan files for the mortgages underlying the Certificates, and the central role each entity played in the mortgage securitization process, the disregard by these

Defendants of the risk that the Offering Materials were materially misleading or fraudulent constituted a gross deviation from the standard of conduct that a reasonable person would observe in the same situation.

771.    Defendants made these misrepresentations and omissions with the purpose and intent of convincing Prudential to purchase the Certificates in the Securitizations.

772.    Prudential did not know, and in the exercise of due diligence could not have known, of the untruths and omissions.

773.    The sponsor and depositor defendants are not only liable as primary violators, they are also jointly and severally liable because they controlled one or more of the primary violators, including with respect to the Securitizations.

774.    Defendants' violations of N.J.S.A. 49:3-52(a), -(b), and -(c), as well as 49:3-70(a) and -(b), constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(p).

    **b.    Deceptive Business Practices (N.J.S.A. 2C:21-7i)**

775.    On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in intentional acts involving deceptive business practices.

776.    As alleged in detail above Sections I and II, and in the Exhibits, Defendants in the course of their business made false or misleading statements in the Offering Materials connected with the offer and sale of Certificates in the Securitizations, or omitted material information required by law to be disclosed therein.

777.    Defendants knew that the Offering Materials included those untrue statements of fact or material omissions.

778.     The Certificates offered by Defendants and purchased by Prudential on the basis of Defendants' false and misleading Offering Materials are "securities" within the meaning of N.J.S.A. 2C:21-7i.

779.     Defendants made these misrepresentations and omissions for the purpose of promoting the sale of securities to Prudential and other investors at inflated values for their own pecuniary gain.

780.     Defendants' violations of N.J.S.A. 2C:21-7i constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(o).

**c.     Theft by Deception (N.J.S.A. 2C:20-4)**

781.     On two or more occasions, Defendants purposefully committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving theft by deception by obtaining the property of another by deceitful means and artful practices with the intention of depriving Prudential and other investors of their property.

782.     As alleged in detail above in Sections I and II, and in the Exhibits, Defendants repeatedly used false and misleading Offering Materials in the Securitizations to induce Prudential to purchase the identified Certificates. By this conduct, Defendants created or reinforced Prudential's false impression of existing facts, including facts relating and directly relevant to the value of the Certificates, which Defendants knew or believed to be false, in violation of N.J.S.A. 2C:20-4(a).

783.     Defendants also prevented Prudential from acquiring information pertinent to the disposition of its funds, including information that would have contradicted the false representations of fact in the Offering Materials in the Securitizations, in violation of N.J.S.A. 2C:20-4(b).

784.    By failing to amend the materially false and misleading Offering Materials and/or notify Prudential of the true underwriting standards, owner-occupancy statistics, LTV and CLTV ratios, title-transfer process, and credit ratings process relevant to the in the Securitizations, Defendants also failed to correct a false impression, which allowed Defendants to hide their enterprise from discovery by Prudential and other investors. Defendants' failure to correct the false impression they created or reinforced in the Offering Materials was in violation of N.J.S.A. 2C:20-4(c).

785.    Defendants' repeated and related violations of N.J.S.A. 2C:20-4(a), -4(b), and -4(c) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(n).

**d.    Falsifying Records (N.J.S.A. 2C:21-4(a))**

786.    On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving falsifying or tampering with records with the intention of deceiving or injuring Prudential and other investors.

787.    As alleged in detail above in Sections I and II, and in the Exhibits, Defendants repeatedly used false and misleading Offering Materials in the Securitizations to knowingly falsify, remove, or conceal material facts relevant to the value of the securities they sold to investors such as Prudential, including but not limited to the pertinent underwriting guidelines, owner-occupancy statistics, LTV and CLTV ratios, due diligence process, title-transfer process, and credit ratings connected with the Certificates purchased by Prudential.

788.    The Offering Materials created and utilized by Defendants constitute a "writing or record" within the meaning of N.J.S.A. 2C:21-4(a).

789.    Defendants' violations of N.J.S.A. 2C:21-4(a) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(o).

266

*Relatedness of the Acts of Racketeering Activity*

790.     The incidents of racketeering activity committed by the Defendant/members of the Enterprises had, among other things, the same or similar intents, results, victims, and methods of commission.

791.     The acts of racketeering activity committed by Defendants relating to the Securitizations involve transactions or purported transactions with or affecting Prudential.

792.     The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar intents in that they sought to obtain property, including but not limited to Prudential's money, through illegal means.

793.     The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar results, in that Defendants actually obtained personal property, including but not limited to Prudential's money, through illegal means.

794.     The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar victims:  investors (including Prudential) in Defendants' residential mortgage-backed securities, including the Certificates.

795.     The methods by which Defendants committed the incidents of racketeering activity relating to the Securitizations were the same or similar, including by way of example and not limitation, inducing Prudential to pay Defendants hundreds of millions of dollars to purchase residential mortgaged-backed securities on the basis of materially false and misleading Offering Materials.

796.     In the Enterprises, the acts of racketeering committed by the Defendants serving as members thereto are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar

types of misrepresentations or omissions, the same or similar benefits to Defendants, the same or similar injuries to Prudential, and the same or similar efforts by Defendants' to conceal their misconduct.

### *Defendants' Violations of the New Jersey RICO Statute*

797.     Defendants violated N.J.S.A. 2C:41-2(c) by associating with an enterprise and conducting or participating, indirectly or indirectly, in that enterprise through a pattern of racketeering activity.

798.     Defendants also violated N.J.S.A. 2C:41-2(d) by conspiring with others, including but not limited to the other members of the Enterprises, to violate N.J.S.A. 2C:41-2(c). In furtherance of that conspiracy, Defendants committed overt acts that include but are not limited to the racketeering activity alleged above.

### *Proximate Cause of Injury to Prudential by*
### *Defendants' New Jersey RICO Violations*

799.     Defendants' behavior directly targeted Prudential, which purchased the Certificates in the Securitizations based on the false and fraudulent representations in the Offering Materials.  As a result, Prudential purchased securities at falsely inflated values that have experienced significant downgrades, defaults, and delinquencies.  Defendants' misrepresentations and omissions have adversely affected both the value of the securities purchased by Prudential and the income flow therefrom.  As a result, Prudential's injuries flow directly from acts of racketeering activity committed by Defendants that constitute part of the pattern of racketeering activity.

800.     Prudential has been injured by reason of these violations of N.J.S.A. 2C:41-2 and is entitled to recover three times the actual damages it has sustained pursuant to N.J.S.A. 2C:41-4(c).

801. Pursuant to N.J.S.A. 2C:41-4(c), Prudential is also entitled to recover its attorneys' fees in the trial and appellate courts, and its costs of investigation and litigation reasonably incurred.

802. Pursuant to N.J.S.A. 2C:41-4(a), Prudential is also entitled to such other and further relief that this Court may deem just and proper, including but not limited to the dissolution or reorganization of Defendants' RICO enterprise; the denial, suspension, or revocation of Defendants' licenses to do business in the State of New Jersey; and any and all appropriate cease and desist orders necessary to discontinue Defendants' acts or conduct.

## SIXTH CAUSE OF ACTION
### (Violation of Section 11 of the 1933 Act Against Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch Mortgage Investors, Inc.)

803. Prudential realleges each allegation above as if fully set forth herein, except to the extent that Prudential expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

804. This claim is brought under Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §77k ("Section 11"), against Merrill Lynch, Pierce, Fenner & Smith Inc. as underwriter and Merrill Lynch Mortgage Investors, Inc. as depositor (collectively, the "Section 11 Defendants"), arising from Prudential's purchases of the Certificates.

805. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act. This count is predicated upon the Section 11 Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials for the following Offerings that Prudential invested in (identified by the name of the Offering): FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1, and MLMI 2006-WMC1.

806. Each of Prudential's purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the registration statements.

807.     The Offering Materials for the Offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  At the time it obtained the Certificates, Prudential did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

808.     The materially untrue statements and omissions of material fact in the Offering Materials are set forth in Sections I and II above, and in the Exhibits.

809.     The Section 11 Defendants are strictly liable to Prudential for the materially untrue statements and omissions in the Offering Materials under Section 11.  Defendant Merrill Lynch Mortgage Investors, Inc., as depositor, is liable for issuing the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15 U.S.C. §77b(a)(4), and in accordance with Section 11(a) of the 1933 Act, 15 U.S.C. §77k(a).  Defendant Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith Inc. is liable for its role as underwriter of the Offerings, in accordance with Section 11(a)(5) of the 1933 Act, 15 U.S.C. § 77k(a)(5).

810.     The Section 11 Defendants owed Prudential a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

811.     Prudential has sustained damages measured by the difference between the price Prudential paid for the Certificates and (1) the value of the Certificates at the time this suit was brought, or (2) the price at which Prudential sold the Certificates in the market prior to the time

this suit was brought. Prudential's Certificates lost substantial market value subsequent to and due to the materially untrue statements of facts and omissions of material facts in the Offering Materials alleged herein.

812. The Section 11 Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Prudential of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Materials.

813. By reason of the conduct herein alleged, the Section 11 Defendants violated Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing. By virtue of the foregoing, Prudential is entitled to damages from each of the Section 11 Defendants.

814. This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials, and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the MissPERS Class Action (including its member cases) and by the tolling of Prudential's claims afforded by that action, as well as the tolling afforded by the parties' Tolling Agreement.

### SEVENTH CAUSE OF ACTION
**(Violation of Section 12(a)(2) of the 1933 Act Against Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch Mortgage Investors, Inc.) )**

815. Prudential realleges each allegation above as if fully set forth herein, except to the extent that Prudential expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.

816. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

817. This count is predicated upon Section 12 Defendants' negligence for making untrue and materially misleading statements in the Offering Materials for the following Offerings

271

that Prudential invested in (identified by the name of the Offering): FFMER 2007-4 and MLMI 2006-MLN1.

818.     This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2) ("Section 12(a)(2)"), against Merrill Lynch, Pierce, Fenner & Smith Inc. as underwriter and Merrill Lynch Mortgage Investors, Inc. as depositor (collectively the "Section 12(a)(2) Defendants"), arising from Prudential's purchases of the Certificates.

819.     The Section 12(a)(2) Defendants offered and sold the Certificates to Prudential by means of the defective Offering Materials, including the Prospectuses and Prospectus Supplements, which contained materially untrue statements of facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading. Prudential purchased the Certificates directly from the Section 12(a)(2) Defendants, who both transferred title to Prudential and who solicited Prudential for financial gain. The depositors and underwriters solicited and sold the Certificates to Prudential, while the underwriters also directly transferred title of these Certificates to Prudential.

820.     The materially untrue statements of facts and omissions of material fact in the Offering Materials are set forth in Sections I and II above and in the Exhibits.

821.     The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

822.    The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

823.    The Section 12(a)(2) Defendants owed to Prudential the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Section 12(a)(2) Defendants failed to exercise such reasonable care.

824.    The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care should have known, that the Offering Materials contained materially untrue statements of facts and omissions of material facts, as set forth above, at the time of the Offerings.  Conversely, Prudential did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

825.    Prudential has sustained material damages in connection with its investments in the Offerings and accordingly has the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.

826.    This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials, and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the MissPERS Class Action (including its member cases) and by the tolling of Prudential's claims afforded by that action, as well as the tolling afforded by the parties' Tolling Agreement.

## EIGHTH CAUSE OF ACTION
**(Violation of Section 15 of the 1933 Act Against Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Lending Inc., and First Franklin Financial Corp.)**

827.    Prudential realleges each allegation above as if fully set forth herein.

828.    This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. §77o ("Section 15"), against Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Lending Inc., and First Franklin Financial Corp. (the "Section 15 Defendants"), for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

829.    Merrill Lynch Mortgage Lending, Inc. and First Franklin Financial Corp. were the sponsors for the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Securitizations, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Certificates by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting Merrill Lynch Mortgage Investors, Inc. as the special purpose vehicle, and selecting Merrill Lynch, Pierce, Fenner & Smith Inc. as underwriter.  In their roles as sponsor, Merrill Lynch Mortgage Lending, Inc. and First Franklin Financial Corp. knew and intended that the mortgage loans they purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

830.    Merrill Lynch Mortgage Lending, Inc. and First Franklin Financial Corp. also acted as the seller of the mortgage loans for the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Securitizations, in that they conveyed such mortgage loans to Merrill Lynch Mortgage Investors, Inc. pursuant to a mortgage loan purchase agreement,

mortgage loan sale and assignment agreement, pooling and servicing agreement, or other substantially similar agreement.

831.     Merrill Lynch Mortgage Lending, Inc. and First Franklin Financial Corp. also controlled all aspects of the business of the Section 11 and 12(a)(2) Defendants, as Merrill Lynch Mortgage Investors, Inc. was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of Merrill Lynch Mortgage Lending, Inc. overlapped with the officers and directors of Merrill Lynch Mortgage Investors, Inc.  For example, Michael M. McGovern served as a Director of Merrill Lynch Mortgage Investors as well as being Vice President, Secretary, and Director of Merrill Lynch Mortgage Lending and Senior Counsel of Merrill Lynch & Co.  In addition, because of their positions as sponsors, Merrill Lynch Mortgage Lending, Inc. and First Franklin Financial Corp. were able to, and did in fact, control the contents of the Registration Statements filed by Merrill Lynch Mortgage Investors, Inc., including the Prospectuses and Prospectus Supplements, which pertained to the FFMER 2007-3, FFMER 2007-4, MLMI 2006-MLN1 and MLMI 2006-WMC1 Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

832.     Merrill Lynch & Co., Inc. is a controlling person within the meaning of Section 15 by virtue of its actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including its control over the content of the Offering Materials.

833.     For the reasons set forth in Section V(A) above, Merrill Lynch & Co., Inc. had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to

cause those Defendants to engage in the acts described herein. By virtue of its control, ownership, offices, directorship and specific acts, Merrill Lynch & Co., Inc. had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Materials.

834.    The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 and Section 12(a)(2) Defendants at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements. The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Prudential. By virtue of this coordinated approach across the various Defendants, Merrill Lynch generated profits at multiple levels of the securitization process.

835.    The Section 11 and 12(a)(2) Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Materials. None of the Section 11 and Section 12(a)(2) Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material fact, or were not misleading.

836.    Prudential did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

837.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with—and to the same extent as—the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

## PRAYER FOR RELIEF

WHEREFORE Prudential prays for relief as follows:

An award in favor of Prudential against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.    Prudential's monetary losses, including loss of market value and loss of principal and interest payments;

b.    Treble damages;

c.    Rescission and recovery of the consideration paid for the Certificates, with interest thereon; Prudential is prepared to tender the Certificates in the event the Court grants such relief;

d.    Punitive damages;

e.    Attorneys' fees and costs;

f.    Prejudgment interest at the maximum legal rate; and

g.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Prudential hereby demands a trial by jury on all issues triable by jury.

DATED:    March 14, 2013        LOWENSTEIN SANDLER LLP

By: _____

David W. Field



Zachary D. Rosenbaum
Thomas E. Redburn, Jr.
Jennifer L. Fiorica
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500
*Attorneys for Plaintiffs*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Daniel L. Brockett (*pro hac vice* application forthcoming)
David D. Burnett (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
daveburnett@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* application forthcoming)
Christopher R. Barker (*pro hac vice* application forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Fax: 213-443-3100
jeremyandersen@quinnemanuel.com
chrisbarker@quinnemanuel.com