# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA et al., | : | |
| Plaintiffs, | : | Civil Action No. 13-1586 (SRC) |
| v. | : | **OPINION** |
| BANK OF AMERICA, NATIONAL ASSOCIATION et al., | : | |
| Defendants. | : | |

**CHESLER**, U.S.D.J.

This matter comes before the Court on the motion to dismiss the Complaint for failure to state a valid claim for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6), by Defendants Asset Backed Funding Corporation, Banc of America Funding Corporation, Bank of America Mortgage Securities Inc., Bank of America, National Association, First Franklin Financial Corporation, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital, Inc., Merrill Lynch Mortgage Investors, Inc., Merrill Lynch Mortgage Lending, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively, "Defendants."). For the reasons stated below, the motion will be granted in part and denied in part.

## BACKGROUND

In a nutshell, this case arises from a dispute over the sale of certain residential mortgage-backed securities ("RMBS") by Defendants to Plaintiffs the Prudential Life Insurance Company, Ltd., Pruco Life Insurance Company of New Jersey, Prudential Asset Allocation Fund, Pru Alpha Fixed Income Opportunity Master Fund I, L.P., the Prudential Investment Portfolios, Inc., the

Prudential Insurance Company of America, Prudential Retirement Insurance & Annuity Company, Prudential Annuities Life Assurance Corporation, the Gibraltar Life Insurance Company, Ltd., Prudential Total Return Bond Fund, Inc., Prudential Trust Company, Commerce Street Investments, LLC, Pruco Life Insurance Company, Prudential Investment Portfolios 2, the Prudential Series Fund, and Park Place Commerce Investments, LLC. (collectively, "Plaintiffs"). The Complaint alleges that Defendants obtained the underlying mortgages, created the securitizations based on them, issued "Offering Materials" for their sale, and sold them to Plaintiffs.  The Complaint asserts eight causes of action: 1) common law fraud; 2) aiding and abetting common law fraud; 3) equitable fraud; 4) negligent misrepresentation; 5) violation of New Jersey Civil RICO ("NJRICO"); 6) violation of § 11 of the Securities Act of 1933 (the "1933 Act"); 7) violation of § 12(a)(2) of the 1933 Act; and 8) violation of § 15 of the 1933 Act. Defendants have now moved to dismiss the Complaint.

The Complaint alleges a variety of statistics in support of its claims.  It is often not clear, however, what the basis for a particular statistic is.  The Complaint highlights one particular research study and appears to use the phrases "forensic analysis" and "loan-level analysis" to refer to it interchangeably.  The forensic analysis was performed on 20,906 mortgages across 29 or 30 securitizations, but it is not always clear which statistics came from it.  (Compl. ¶¶ 20, 148, 153.)  For each securitization examined, this analysis looked at 400 defaulted loans and 400 randomly selected loans.  (Compl. ¶ 149.)  The Complaint clearly states that this forensic analysis yielded the "Occupancy Analysis."  The Occupancy Analysis aimed to test Defendants' representations about owner-occupancy, based on tax and property records.  (Compl. ¶ 6.)  There are four other subjects for which statistics are given, and it is not clear whether the loans

2

examined were the same as those used in the forensic analysis: 1) chain of title; 2) material defects; 3) default and delinquency rates; and 4) the AVM Study.  The AVM Study aimed "to test the reasonableness of Defendants' appraisal values."  (Compl. ¶ 8.)  The Complaint also alleges a "loan-level analysis" which looked for loans with at least one "material defect" and found over 62,000 such loans.  (Compl. ¶ 21.)  This suggests that at least the material defect analysis was performed on a different loan sample from the 20,906 mortgage forensic analysis.

<b>STANDARD OF REVIEW</b>

**I.      Motion To Dismiss Under Rule 12(b)(6)**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  "The defendant bears the burden of showing that no claim has been presented."  Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Twombly, 127 S. Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

3

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S. Ct. at 1964-65 (internal citations omitted); see also FED. R. CIV. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 1965 (internal citations omitted).

> Factual allegations must be well-pleaded to give rise to an entitlement to relief:
>
> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1357 (3d ed. 2007).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

The Supreme Court has characterized dismissal with prejudice as a "harsh remedy."  New York v. Hill, 528 U.S. 110, 118 (2000).  Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile.  Alston v. Parker, 363 F.3d 229, 235

(3d Cir. 2004).  "When a plaintiff does not seek leave to amend a deficient complaint after a

defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend

within a set period of time, unless amendment would be inequitable or futile."  Grayson v.

Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

## DISCUSSION

### I.    First Count: common law fraud

There is no dispute that Plaintiff's claims for common law fraud are governed by the law

of the State of New Jersey.  Under New Jersey law:

> The five elements of common-law fraud are: (1) a material misrepresentation of a
> presently existing or past fact; (2) knowledge or belief by the defendant of its
> falsity; (3) an intention that the other person rely on it; (4) reasonable reliance
> thereon by the other person; and (5) resulting damages.

Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).  Federal Rule of Civil Procedure

9(b) requires that "fraud must be pled with particularity in all claims based on fraud."  Lum v.

Bank of Am., 361 F.3d 217, 220 (3d Cir. 2004).  Defendants move to dismiss the common law

fraud claims on multiple grounds.

### A.    Are the forensic analysis allegations sufficient?

Defendants first attack the claim for common law fraud on the ground that the forensic

analysis (the "Analysis") "is so flawed as to be utterly useless at the pleading stage."  (Defs.' Br.

10.)  At the outset, the Court notes that this kind of argument presents an uphill climb for

Defendants: methodological critiques of research evidence may be effective at trial, but, on a

motion to dismiss, well-pleaded[1] factual allegations are taken as true.  Defendants'

---

[1] In light of the lack of clarity in the Complaint about which research studies produced
which statistics, "well-pleaded" seems an unfortunate choice of words.  Nonetheless, this Court

methodological attacks on the Analysis confuse the process of weighing evidence as proof with the process of examining whether allegations suffice to make a claim plausible. The two are very different and, on a Rule 12(b)(6) motion, this Court does only the latter. Arguments that go to the proof value of evidence miss the mark at this stage.

Defendants first contend that, since the Analysis was not performed on 24 of the 54 offerings at issue, this leaves any claims about those 24 offerings unsupported by factual allegations of misrepresentation. This argument is unpersuasive, as it overlooks the relevant legal standard at this stage: factual allegations must be sufficient merely to make a claim plausible. Proof is not required. Twombly teaches that, to survive a Rule 12(b)(6) motion, a complaint does not need "detailed factual allegations." Twombly, 127 S. Ct. at 1964-65. Rather, the complaint "needs more than 'labels and conclusions.'" Id. Sampling is a well-known method for generating inferences about a population based on assessment of a subset of its members. Allegations based on sampling easily satisfy the requirement that the factual basis be more than labels and conclusions.[2] At this stage, sampling provides a sufficient factual basis for the Court

has taken the statistical assertions stated in the Complaint as well-enough-pleaded for these purposes.

[2] Moreover, as observed by Judge Cote in a similar RMBS case, such an argument can be tantamount to requiring proof at the pleading stage:

> If defendants were correct that in order to allege the falsehood of group-level representations in connection with the offering of asset-backed securities, a plaintiff must conduct a detailed pre-complaint, asset-level analysis, it would be the rare complaint that would survive a motion to dismiss. Indeed, such a rule might constitute an insurmountable barrier for any private plaintiff. After all, [Plaintiff] was apparently able to obtain the loan files it reviewed at least in part through recourse to administrative subpoenas. Such a requirement would also impose prohibitive costs on the would-be plaintiff, essentially requiring her to prove her case at the pleading stage. . .

to find it plausible that a sample of 29 out of 54 offerings adequately represents all 54. Defendants will have the opportunity at trial to persuade the finder of fact of the flaws of sampling as evidence.

Defendants next attack the sampling methodology used in the Analysis: "Because Plaintiffs used a non-random and intentionally biased sample, their 'analysis' is inherently incapable of saying anything statistically significant about the loan pools." (Defs.' Br. 11.) The Complaint alleges that, for each offering, the forensic analysis examined 400 defaulted loans and 400 randomly sampled loans. (Compl. ¶ 149.) Defendants argue that, in such a sample, bad loans are overrepresented. Again, this is an argument for trial, as it attacks the inference that the evidence is probative. At this stage, statistically significant evidence is not required; only allegations giving rise to plausibility are needed. Plaintiffs allege that the Analysis reviewed roughly 21,000 mortgage loans underlying 30[3] offerings and found evidence both of "systemic misrepresentation" and that certain statements in the Offering Materials were false. (Compl. ¶¶ 153, 155.) As explained more fully in the discussion that follows, considering these allegations under the plausibility standard, this Court finds that they can make plausible some claims that

───────────────────

Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 489-490 (S.D.N.Y. 2012). See also Fed. Hous. Fin. Agency v. UBS Ams., Inc., 858 F. Supp. 2d 306, 328 (S.D.N.Y. 2012) (finding loan sampling "sufficiently suggestive" to make claim plausible); Fed. Deposit Ins. Corporation v. Countrywide Fin. Corp., 2012 U.S. Dist. LEXIS 167696, *19 (C.D. Cal. Nov. 21, 2012) ("This Court has rejected the position that a complaint must include granular loan-level data before it can pass a motion to dismiss"); VNB Realty, Inc. v. Bank of Am. Corp., 2013 U.S. Dist. LEXIS 132250, *31 (S.D.N.Y. Sept. 16, 2013) (sufficient that statistical allegations be "sufficiently analogous" to subject matter of claim.)

[3] The Complaint sometimes states that the Analysis was performed on 29 securitizations; at others, that it was performed on 30 securitizations.

certain statements in the Offering Materials were false.  Assuming, *arguendo*, that, as Defendants contend, this sample was "biased" and that defaulted loans were overrepresented, a study of 21,000 mortgage loans nonetheless provides a sufficient factual basis to make certain of these claims plausible.  For example, the Analysis found evidence that, in samples drawn from 30 securitizations, the percentage of loans with a material defect ranged from a low of 13% to a high of 96%.  (Compl. ¶ 21.)  Eighteen of the 30 showed material defect rates higher than 50%.  (Id.) This is not proof of the claim that underwriting standards were abandoned and misrepresented, but it does offer substantial support to make the claim of systematic abandonment of underwriting standards and misrepresentation plausible.  Sampling bias is an argument for trial.

Furthermore, the cases Defendants cite in support do not make their case.  Utah v. Evans, 536 U.S. 452, 467 (2002), deals with the construction of "sampling" as a statutory term and has no relevance.  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994), is at least more in the ballpark, since the Second Circuit did indeed hold that the research methodology in the complaint was so flawed that it did not adequately plead RICO proximate cause.  The problem is that the proposition that the research methodology described in a complaint could be so manifestly flawed that a court might find that it fails to provide sufficient factual support for an element of a claim is unremarkable.  First Nationwide offers nothing close to a bright line rule; the analysis is highly fact-specific.  As the discussion above makes clear, this Court does not find that the Analysis, as described in the Complaint, is such obvious junk research that it fails to constitute relevant factual allegations which, considered along with the other factual allegations in the Complaint, make plausible certain of the assertions of misrepresentation.

Furthermore, courts in similar cases have rejected such arguments on a motion to dismiss.

See, e.g., CMFG Life Ins. Co. v. RBS Secs., 2013 U.S. Dist. LEXIS 116933, *20 (W.D. Wis. Aug. 19, 2013) (denying a motion to dismiss based on critique of similar forensic analysis allegations).

      B.     Do Plaintiffs fail to adequately plead a misrepresentation relating to occupancy?

The Complaint alleges that the forensic analysis shows: "Across every Offering, Defendants significantly overstated the number of owner-occupied properties, thus *understating* the true riskiness of the loans." (Compl. ¶ 155.) The Complaint alleges that Plaintiffs performed a number of tests on the sampled loans and that "[f]ailing more than one of the above tests is strong evidence that the borrower did not in fact reside at the mortgaged properties." (Id. at ¶ 160.) The Complaint then asserts:

> The consistency of these results shows that the divergence between Defendants' representations and reality was not due to phenomena such as borrowers changing their mind about where to live. Instead, these results reflect the fact that Defendants and their Originators knew borrowers were misrepresenting their intent to live at the property.

(Id. at ¶ 161.) This Court finds the reasoning here unpersuasive. The Complaint has failed to allege sufficient facts to make plausible the claim that the Defendants had knowledge at any relevant time during the processes of underwriting, securitization, or sale of the securities that borrowers misrepresented their intent to live on the property.

Crucially, the Complaint confuses two distinct issues: 1) the borrowers knew that the properties would not be owner-occupied and misrepresented this to Defendants; and 2) the Defendants knew that the borrowers would not be occupying the property and misrepresented this to the Plaintiffs. These are very different. The fraud claim here requires factual support for

the second of these propositions, but the facts alleged are insufficient.  In the absence of facts supporting the second proposition, allegations supporting the first are irrelevant.

The forensic analysis was performed after the purchase of the securities by Defendants. Even accepting the assertion as true that, on the whole, the prospectuses overstate the number of owner-occupied properties, and thus understate the true riskiness of the loans, this says nothing about how this happened or what Defendants knew at what time.  The Complaint fails to present even the barest theory explaining how Defendants were involved in any fraud.  What employees of Defendants knew that the borrowers would not be occupying the property during the underwriting process, and how would they have known it?  The Complaint relies on information that could not have been available during the underwriting process – as alleged, it was obtained after the borrowers already owned the property.

Instead of allegations supporting the second proposition, the Complaint alleges facts that support the inference that, on the whole, some borrowers may have misrepresented their intent to live at the property and third-party due diligence reviewers should have flagged such misrepresentations.  There is nothing here to suggest that Defendants knew that the borrowers would not be occupying the properties at any relevant time.  Nor, as Defendants observe, does the Complaint allege facts to support the inference that the Offering Materials even misreported what the borrowers said about their intent to occupy the properties.  Rather, the Complaint acknowledges that the owner occupancy representations were based on the self-reports of borrowers – and there is no allegation here that Defendants misrepresented what borrowers reported.

The Complaint fails to adequately plead scienter with regard to the owner occupancy

statements.  The parties dispute the proper standard for pleading scienter in the Third Circuit

under Rule 9(b).  Defendants cite In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418

(3d Cir. 1997), as authority for the proposition that "a plaintiff alleging securities fraud must still

allege specific facts that give rise to a 'strong inference' that the defendant possessed the

requisite intent."  To meet this standard, "Plaintiffs must either (1) identify circumstances

indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive

and a clear opportunity for committing the fraud."  Id. at 1422.  Plaintiffs, in opposition, contend

that the holding of Burlington is limited to claims under the Securities Exchange Act of 1934,

and that it does not apply to common law fraud claims.  Plaintiffs do not, however, persuade this

Court that Burlington should be read so narrowly.  In Burlington, in short, the Third Circuit

adopted the Second Circuit's position that Rule 9(b) requires a complaint alleging securities

fraud to meet the "strong inference of scienter" standard.  Id.  Plaintiffs have pointed to nothing

in Burlington to support limiting this to a particular subset of securities fraud cases.  Rather, the

language of Burlington supports the understanding that Rule 9(b) applies to all securities fraud

claims, and that it requires the plaintiff asserting such claims to allege specific facts that give rise

to a strong inference of scienter.

       In three pages, the Complaint states the basis for the inference that Defendants knew that

the owner occupancy representations were false.  The Complaint relies entirely on information

provided by three confidential witnesses.  In brief, the Complaint first alleges that CCW10 said

that a due diligence underwriter "worth his salt" would have verified owner occupancy, and that

the due diligence underwriters reviewed owner occupancy.  (Compl. ¶ 631.)  In the following

paragraph, however, the Complaint alleges that the due diligence underwriters "were instructed

to spot occupancy problems in a variety of ways," and lists eight signs of potential owner occupancy problems that could be found from a file review.  (Compl. ¶ 632).  Also, due diligence reviewer Clayton's "Loan Analysis System" allowed the entry of notes about "unreasonable occupancy claims" and generated reports for Defendants.  This provides very close to no factual support for an inference that Defendants actually knew that borrowers had misrepresented their intent to occupy the property.  Rather, it suggests at most that, as a matter of best practices, third-party due diligence reviewers should check for eight indicators that owner occupancy may have been misrepresented.[4]  The occurrence of an indicator, it would seem, would mean at most that there was a basis to consider the owner occupancy representation to be suspect.  It does not support inferences that, for the securitizations at issue, the due diligence reviewers actually did check for these indicators, did find signs of misrepresentation of owner occupancy status, and did report such findings to the Defendants, who willfully disregarded these reports.  Instead, at most, the cited confidential witness statements suggest that, as a best practice, third-party due diligence reviewers ought to have found information in the file that ought to have raised suspicions of misrepresentation, that ought to have been reported to Defendants, who ought to have then investigated the facts of owner occupancy and found out the truth.  That is very far from supporting the inference that Defendants knew at the time of issuance of the Offering Materials that a substantial number of owner occupancy representations were false.

---

[4] Similarly, CCW1 stated that he or she did flag and note in the Clayton Loan Analysis System when "information in the file called into serious question the occupancy claim."  (Compl. ¶ 634.)  The Complaint also alleges that CCW1 and CCW11 "gave examples of how the due diligence processes gave Defendants actual knowledge of owner-occupancy defects."  (Compl. ¶ 635.)  In the absence of any further information, this statement is purely conclusory.  The Complaint does not allege any specific facts supporting the inference that the due diligence process gave Defendants such actual knowledge.

Applying the Third Circuit's standard for pleading scienter in a fraud claim, the Complaint lacks factual allegations which give rise to a strong inference that Defendants knew that the owner occupancy statements in the Offering Materials were false. As to the claims of fraud by making false owner occupancy statements, the Complaint fails to plead sufficient facts to give rise to a plausible claim for relief, and such claims will be dismissed without prejudice.

C.      Do Plaintiffs fail to adequately plead a misrepresentation relating to title transfer?

The Complaint alleges that Defendants knowingly misrepresented that they would properly transfer title to the underlying mortgage loans to the particular trusts. The sole factual allegation made in support is: "Prudential's forensic loan-level analysis revealed that across the Offerings Prudential tested, *43%* of the Mortgage Loans were not properly assigned to the Trusts." (Compl. ¶ 636.) Yes, if true, that is an astonishing fact – but there is not even a suggestion in the Complaint of a theory of how this gives rise to the inference of a knowing misrepresentation. Rather, the Complaint offers only the conclusory statement that "the figures themselves . . . demonstrate that Defendants never had any intention of properly assigning the Mortgage Loans as represented in the Offering Materials." (Compl. ¶ 637.) The 43% figure, while surprisingly high, does not give rise to a strong inference that Defendants never had any intention of effecting proper title transfer. If 43% were not properly assigned, then it would appear that 57% *were* properly assigned. This at best suggests sloppiness or negligence. In context, it does not evidence an intent not to assign the loans.

Furthermore, as Defendants observe, the Complaint points to language in the Pooling and

13

Servicing Agreements ("PSA") that promises to convey title[5] – not in the Offering Materials. (Compl. ¶¶ 134, 135.)  The only quote from Offering Materials related to conveyance of title begins: "As to each Mortgage Loan, the following documents are generally required to be delivered . . . in accordance with the Pooling and Servicing Agreement . . ."  (Compl. ¶ 136.) This does not support an intentional misrepresentation claim, for two reasons.  First, as Defendants contend, this reads as a description of the Pooling and Servicing Agreement rather than as a firm commitment to follow a certain procedure.[6]

As to the claims of fraud by making false statements about title transfer, the Complaint fails to plead sufficient facts to give rise to a plausible claim for relief, and such claims will be dismissed without prejudice.

D.      Do Plaintiffs fail to adequately plead a misrepresentation relating to appraisals?

Defendants contend that the allegations in the Complaint regarding appraisals fail to state a valid claim for relief.  The Complaint makes two assertions related to appraisals: 1) Defendants made statements which fraudulently misrepresented the appraisal process used; and 2) property

---

[5] As Defendants contend, the quoted PSA language is a statement that, with the execution of the PSA, the Depositor conveyed to the Trust all right, title, and interest in the subject mortgage loans.  (Compl. ¶ 135.)  This in itself makes an intentional fraud theory implausible.  It indicates, instead, that the Defendants intended to convey title to the mortgage loans, since it states unmistakably that, in executing the PSA, they were doing so.  Also, as one court observed, the "[i]nvestors' remedy for alleged violations of the PSA is to sue the trusts for breach of contract and breach of fiduciary duties."  Bank Hapoalim B.M. v. Bank of Am. Corp., 2012 U.S. Dist. LEXIS 184540, *31 (C.D. Cal. Dec. 21, 2012).

[6] As one court explained, an investor reading such a statement in a prospectus "would understand that the 'pursuant to the pooling and servicing agreement' language indicates that the section is meant as a description of the PSA rather than an independent manifestation of present intent."  W. & S. Life Ins. Co. v. Countrywide Fin. Corp. (In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.), 2012 U.S. Dist. LEXIS 184429, *16 (C.D. Cal. June 29, 2012).

values generated by a computerized automated valuation model ("AVM") fail to make plausible

the claim that Defendants made knowing misrepresentations about loan-to-value ratios ("LTVs").

Defendants make a number of arguments about both assertions.

First, Defendants argue that use of the AVM to show that the original appraisals were

inflated is classic fraud by hindsight.  Defendants contend that the AVM used property data from

2013 and thus provides only a retrospective view of property values during 2004 through 2007.

Plaintiffs, in their opposition brief, contend that the AVM used contemporaneous data

(presumably from whatever time a mortgage was originated).  The problem here is that the

Complaint does not provide any answer to this question.  The description of the AVM in the

Complaint says practically nothing about the methodology used in this study, and it does not

speak to the question of the time frame from which the data came.  This Court thus has no basis

to infer that the AVM makes plausible the claim of fraud with regard to LTVs.  The Complaint

has so little explanation of the AVM methodology that this Court has no idea of how the

computer used what information to generate property appraisals.[7]  The two paragraphs describing

the AVM in the Complaint say little more than, "We had something automated done that

generated tables of numbers."  This is a conclusory assertion, lacking a basis in supporting

---

[7] This Court recognizes that at least two other district courts, in somewhat similar cases,
have declined to find AVM-based allegations inadequate to support a claim at this juncture.  See
Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC, 843 F. Supp. 2d 191, 204 (D. Mass.
2012) ("These arguments regarding the methodological flaws of the AVM, however, are
premature at the motion to dismiss stage. . .");  CMFG, 2013 U.S. Dist. LEXIS 116933 at *30
("the court harbors doubts about its ability to undertake the task of substantively critiquing the
model at this stage of the case. . .")  While this Court agrees that it is premature at this stage to
substantively critique the AVM methodology, it is not premature to require Plaintiffs to make
their claim plausible by saying more than, "we have some computer research."

factual allegations.[8]  On this basis alone, the motion to dismiss this claim must be granted, and the LTV fraud claim dismissed without prejudice.  Plaintiffs will be granted leave to submit an amended Complaint that provides enough information about the AVM to allow consideration of the inference that it makes plausible the LTV fraud claim.

The other serious problem with the Complaint, as regards the LTV fraud claim, is the failure to make plausible allegations of scienter – that Defendants knew at the time of making the representations that they were false.  The AVM study is of no help in this regard.  Even if it were sufficiently described to be credited at this juncture, it might support an inference that the LTV figures were false, but it is not possible to infer from this that Defendants knew that the figures were false.

Supplementing the AVM allegations are a few anecdotal and general statements.  Some are very general statements about the mortgage industry and make no reference to any particular defendant in this case.  (See Compl. ¶¶ 624-627.)  Others are general statements made by former low-level employees of various Defendants.  The Complaint alleges that witness BOACW2, a former BofA loan processor, stated that it was well-known that, during the period at issue, loan officers would call appraisers to tell them that a certain appraisal amount was needed.  (Compl. ¶ 609.)  Similarly, the Complaint alleges that witness FFCW1 said that her managers at First Franklin would request re-appraisals if "they didn't get exactly what they wanted" and would continue "until they received a satisfactory figure."  (Compl. ¶ 610.)  Of greater concern is the allegation that former First Franklin employee FFCW3 stated that "her branch instructed

---

[8] This Court agrees with Plaintiffs that challenges attacking research methodology should be reserved for trial or summary judgment.  This does not, however, provide a protective cloak on a 12(b)(6) motion for pleadings which offer too little factual detail to support claims.

appraisers to change their appraisals." (Compl. ¶ 611.) Yet the one specific example reported

concerns a manager telling an appraiser to remove a detail about an old roof from a report. (Id.)

None of this goes so far as to say that the managers and appraisers actually colluded and cooked

the numbers.

The Complaint contains statements from one higher-level employee, Patricia Lindsay, at a

third-party originator, New Century, alleging that that company's appraisers would find

comparable properties to support a "needed value" rather than the best properties to produce the

most accurate value. (Compl. ¶ 313.) No facts are alleged to make this relevant to the pleading

of scienter of any employee of any Defendant. The Complaint contains other similar kinds of

allegations about problems with appraisal processes at third-party originators, lacking any

assertion that any employee of any Defendant had knowledge of these alleged facts. (See, e.g.,

Compl. ¶¶ 381, 436, 441.)

This case is worth comparing to the case against JPMorgan Chase in the Southern District

of New York, Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 493

(S.D.N.Y. 2012), in which the Court granted a motion to dismiss a similar claim of fraudulent

misrepresentation of LTV ratios. The Court explained its decision as follows:

> FHFA's only basis for alleging scienter is the apparent disparity between the . . .
> LTV figures reported in the Offering Documents and the results of the Agency's
> own analysis. It is true, as FHFA notes, that the magnitude of inaccuracy can
> sometimes provide circumstantial evidence that a fraud defendant made her false
> statements knowingly or recklessly. Generally, however, such evidence must be
> supported by additional circumstantial evidence in order for the plaintiff to carry
> her pleading burden, particularly where the originator of the false information is a
> third-party.
>
> FHFA has not put forth any such supporting evidence with respect to its . . . LTV
> allegations against JPMorgan. The Agency alleges that the LTV figures in the

offering documents were false because appraisers knowingly and systematically over-reported the value of the underlying properties. But the Amended Complaint does not indicate any basis for believing that JPMorgan was aware of such over-reporting, if it occurred, other than the fact that the bank represented to investors that it reviewed a sample of the securitized loans to verify, inter alia, 'appraisal valuation.'

Id.  Similarly, in the instant case, the Complaint does not provide a basis to plausibly infer that Defendants knew about the appraisal problems alleged.  Ultimately, Plaintiffs' factual support for the inference of scienter consists of isolated, anecdotal information and purely generalized assertions; this is simply insufficient.

The Complaint asserts that "Defendants' extensive due diligence processes, described above, also revealed the systemic appraisal problems found by Prudential's loan-level analysis here." (Comp. ¶ 607.)  Where?[9]  The summary of Clayton's due diligence work provided in paragraph 503 does not mention examination of appraisals.  Paragraph 505 does mention that the Clayton Loan Analysis System had a field for notes, which could say whether a loan had received a failing grade for "faulty appraisals," among other things.[10]  That does not suffice to provide a

---

[9] As the Third Circuit has stated: "Judges are not like pigs, hunting for truffles buried in the record."  Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

[10] Later, in paragraph 614, the Complaint states that Clayton reviewers might review the appraisal report to see whether the comparable properties cited had "the same or similar features (such as the number of bedrooms and bathrooms)."  A reviewer could make a note that an appraisal was unreliable.  (Id.)  This provides no support: it does not go so far as to say that any Defendant actually received a report from Clayton that noted an unreliable appraisal and then ignored it.  Similar allegations appear from witnesses BCW1 (Compl. ¶ 616),  CCW8 (Compl. ¶ 617-18), and CCW10 (Compl. ¶ 619-20).  These allegations support the assertion that the due diligence reviewers might have reviewed appraisal reports and may have flagged ones that raised questions – but not more than that.  The Complaint alleges that witness CCW5 said that he always "kicked" loans with high LTV ratios, but that his Clayton manager woud instruct him not to reject the loan.  (Compl. ¶ 622.)  This says nothing about Defendants.  Consistently, the Complaint offers innuendo about the due diligence review that fails to make plausible a claim of

factual basis supporting the assertion that the due diligence process revealed systemic appraisal problems.

In opposition, Plaintiffs offer a number of arguments.  First, Plaintiffs contend that Defendants' argument does not address the issue that Defendants made representations about the appraisal process which are verifiable facts which were false.  The Complaint, however, alleges misrepresentations about the appraisal process in two short paragraphs.  (Compl. ¶¶ 127, 128.)  This is followed by a conclusory statement that Defendants knew that appraisals underlying the mortgages did not follow the identified procedures.  (Compl. ¶ 129.)  No specific factual allegations are offered to support this conclusory statement.

Plaintiffs next argue that the LTV claim is supported by the factual allegations involving abandonment of underwriting guidelines: "that the Originators systematically ignored their underwriting guidelines helps make it plausible that they also ignored their appraisal guidelines." (Pls.' Opp. Br. 21.)  Again, the Complaint simply does not articulate a factual basis to support any claim that Defendants ignored appraisal guidelines.  Plaintiffs then argue that this claim is supported by witness statements of "industry-wide corruption in the appraisal processes" in paragraphs 623-37 of the Complaint.  (Pls.' Opp. Br. 21.)  These allegations, at best, are very general  characterizations of a very large industry and are not sufficient to make plausible fraud claims against these specific Defendants.

As to the claims of fraudulent misrepresentation of LTV ratios and of the appraisal process, the Complaint fails to meet the Third Circuit's heightened standard for pleading

---

appraisal fraud.  The Complaint contains no factual support for the suggestion that the due diligence reviewers alerted any Defendant and were ignored.

scienter: the Complaint does not plead facts giving rise to a strong inference that Defendants

knew that the LTV figures were based on inflated appraisals and therefore false.  Furthermore,

the Complaint's scant description of the AVM methodology fails to make plausible its assertion

that the falsity of the LTV ratios is demonstrated by empirical research.  Nor does the Complaint

make plausible the claim that Defendants fraudulently misrepresented the appraisal process.  The

Complaint fails to state a valid claim that Defendants fraudulently misrepresented the LTV ratios

and appraisal process, and those claims will be dismissed without prejudice.

> E.   Do Plaintiffs fail to adequately plead a misrepresentation relating to due
> diligence?

There is no need to discuss this point extensively because it appears to stem from

Defendants' misreading of the Complaint.  This Court does not find in the Complaint an

independent claim that Defendants misrepresented their use of due diligence firms, such as

Clayton, or the findings of those firms.  Rather, the Complaint states, and both parties seem to

understand this, that "Defendants' representations were understood . . . to mean that Defendants

had taken appropriate measures to ensure that non-compliant loans would not be included in the

mortgage pools."  (Compl. ¶ 123.)  This point is subsumed within the broader claim that

Defendants systematically abandoned their underwriting standards, to be discussed below.

> F.   Do Plaintiffs fail to adequately plead a misrepresentation relating to underwriting
> standards?

The claim that Defendants' representations about the underwriting practices and

standards used in the issuance of the underlying mortgage loans were fraudulent because of a

systemic abandonment of such underwriting standards is perhaps the central claim in this case.

In brief, this Court has carefully examined the Complaint and finds that it states an abundance of

factual allegations supporting this claim.  The factual support for this claim is too extensive to review in detail in this Opinion.  The Complaint points to, *inter alia*: 1) the high default rates among the underlying mortgages; 2) the downgrade of all but three securitizations to junk bond ratings; 3) the reports of due diligence firms, such as Clayton, showing low rates of compliance with underwriting standards, and the finding that, of the 23% of loans Clayton reviewed for Merrill which failed to meet underwriting guidelines, Merrill waived in almost one third (with similar findings for BofA); 4) the listing of some loan originators on the OCC's "Worst Ten" list (Compl. ¶ 205); 5) the FCIC report noting the increase in volume in "irresponsible loans" in 2005 at a group of lenders which included BofA (Compl. ¶ 211); 6) the 2007 public statement by the BofA CEO that "[b]roker [loans] tends to be toxic waste" (Compl. ¶ 212); 7) the statements from confidential witnesses that BofA regularly approved loans to unqualified borrowers, and systematically abandoned underwriting standards in other ways (Compl. ¶ 213); 8) the forensic analysis found a material defect rate of almost 52% (Compl. ¶ 21); and there is more.  Rather than repeat the allegations in the Complaint, this Court will address in detail Defendants' arguments for dismissal under Rule 12(b)(6).

Defendants first argue that the Complaint does not adequately connect the particular loans at issue to the particular defects in underwriting practices alleged.  They contend that the loan-level analysis is insufficient.  This Court does not agree.  As alleged in the Complaint, the "forensic analysis" examined 20,906 mortgage loans from 30 of 54 offerings at issue.  (Compl. ¶ 153.)  Very simply, this Court finds that this is a sufficiently large sample to make plausible inferences about all of the offerings, particularly when it is considered together with the other factual support offered.  Defendants argue that this Court should find that the Complaint fails to

support claims regarding the 24 offerings not examined in the forensic analysis.  Plaintiffs, in opposition, respond that this is sampling, and this Court concurs, as discussed earlier, that sampling suffices to give rise to plausibility at this stage.  This in no way constitutes any kind of determination about the ultimate validity of such sampling as proof; it is merely a determination that, at the pleading stage, a sample of almost 21,000 mortgage loans drawn from 30 offerings makes plausible some inferences about the loans underlying all 54 offerings.

Defendants also contend that, as to the 30 offerings included in the forensic analysis, the method used was so biased that it cannot give rise to any plausible claim.  As already discussed, the Complaint alleges that, for each offering, the forensic analysis examined 400 defaulted loans and 400 randomly sampled loans.  (Compl. ¶ 149.)  It may well be true, as Defendants argue, that, in such a sample, bad loans are overrepresented, and Defendants will surely argue that criticism at trial.  At this juncture, however, this Court requires plausibility rather than proof, and finds that even if such samples are viewed as biased, the forensic analysis nonetheless makes plausible certain general inferences about the underlying mortgages.  This Court rejects the argument that such sample bias precludes finding general inferences to be plausible.  Plausibility and statistical proof are very different things.

Defendants suggest, without discussion, that their sampling argument is especially true when considering the heightened pleading requirements of Rule 9(b).  This unexplained suggestion does not persuade this Court.  The Third Circuit's formulation of the pleading requirements imposed by Rule 9(b) is well-known:

> Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged.  To satisfy this standard, the

> plaintiff must plead or allege the date, time and place of the alleged fraud or
> otherwise inject precision or some measure of substantiation into a fraud
> allegation.

Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (citations omitted).  Defendants have

not identified how the Complaint fails to meet these requirements, as to the underwriting

abandonment fraud claim.  Defendants have not argued that they are unsure about the alleged

circumstances constituting fraud in regard to the 24 issues not included in the forensic analysis.

Defendants have not argued that they are unsure about the date, time, or place of any of the

fraudulent statements alleged.[11]

Furthermore, the Third Circuit has instructed courts that Rule 9(b) should not be applied

with formalistic inflexibility:

> [I]n applying Rule 9(b), focusing exclusively on its 'particularity' language is too
> narrow an approach and fails to take account of the general simplicity and
> flexibility contemplated by the rules.  We conclude that the district court subjected
> Seville's allegations of fraud to too strict a scrutiny.  Rule 9(b) requires plaintiffs
> to plead with particularity the 'circumstances' of the alleged fraud in order to
> place the defendants on notice of the precise misconduct with which they are
> charged, and to safeguard defendants against spurious charges of immoral and
> fraudulent behavior.  It is certainly true that allegations of 'date, place or time'
> fulfill these functions, but nothing in the rule requires them.  Plaintiffs are free to
> use alternative means of injecting precision and some measure of substantiation
> into their allegations of fraud.

Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir.

1984) (citations omitted).[12]  This Court finds that, as to the underwriting abandonment claims,

---

[11] The circumstances constituting the alleged fraud are clear here.  The fact that certain
securitizations were included in the forensic analysis and certain ones were not does not change
the fact that the Complaint gives clear notice to Defendants of what statements are alleged to be
false and why.

[12] See also Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure §
1298 (3d ed. 2013) ("Perhaps the most basic consideration for a federal court in making a

the requirements of precision and some measure of substantiation have been met.[13]  Defendants'

argument – to the very limited extent that they have articulated it – would appear to target the

substantiation element.  As this Court explained above, this Court finds that the allegations about

the sample of 30 securitizations, supported by the ample additional factual assertions, are

sufficient to provide "some measure" of substantiation of the allegations of fraud for all 54

securitizations.  The theory of the case here is that there was a widespread and longstanding

institutional abandonment of underwriting standards, such that statements in the Offering

Materials about such standards were false and fraudulent.  This Court finds that the Complaint

provides more than sufficient factual support for this theory.

    Defendants' second argument in favor of dismissing the underwriting standards fraud

claim is that the allegations about the due diligence firms "add nothing."  (Defs.' Br. 24.)

Defendants point to paragraphs 192 through 202 in the Complaint which, in short, allege that

Defendants used third-party firms, such as Clayton, to review and check their underwriting, and

that Clayton reported to Defendants on a daily basis which loans that it had reviewed did or did

not meet underwriting guidelines.  The Complaint alleges that Clayton reviewed nearly one

million loans and found that only 54% met underwriting guidelines.  (Compl. ¶ 196.)  Moreover,

an internal Clayton document shows that Clayton reported to Merrill that 23% of the loans it

reviewed failed to meet underwriting guidelines, and that, of that 23%, Merrill included 30% in

_____

judgment as to the sufficiency of a pleading for purposes of Rule 9(b)—a consideration that is
reflected in many of the decided cases— is the determination of how much detail is necessary to
give adequate notice to an adverse party and enable that party to prepare a responsive pleading.")

    [13] As our sister court stated: "The particularity requirement does not mandate that
plaintiffs prove their case in the complaint."  Prudential Ins. Co. of Am. v. Credit Suisse Secs.
LLC, 2013 U.S. Dist. LEXIS 142191, *21 (D.N.J. Sept. 30, 2013).

RMBS securitizations.  (Compl. ¶ 197.)  Similarly, Clayton reported to BofA that 30% of reviewed loans failed to meet guidelines, and BofA included 27% of that 30% in RMBS securitizations.  (Compl. ¶ 198.)  Contrary to Defendants' position, the Clayton allegations provide a nearly sufficient factual foundation on their own.  Far from adding nothing to Plaintiffs' case, these allegations are astonishing, highly relevant, and strongly support the plausibility of the underwriting abandonment theory.

Third, Defendants object that allegations regarding the subsequent history as to default rates of the underlying loans and changes in the credit ratings of securitizations have not been connected to the securitizations at issue.  (Defs.' Br. 24.)  This is simply untrue: the Complaint states in precise detail which securitizations had what default rate and what credit rating change. (Compl. ¶¶ 189, 190.)  Defendants then contend that this is classic "fraud by hindsight."  This Court does not agree.  When a substantial proportion of securitizations shows default rates above 40%, systemic abandonment of underwriting guidelines appears to be a plausible theory.  While the default rates may not be sufficient as proof of fraud, again, these allegations are astonishing, highly relevant, and strongly support the plausibility of the underwriting abandonment theory. They become significant when viewed in the light of the allegations concerning the extent to which Defendants included loans that Clayton found had failed to meet underwriting guidelines. The allegations regarding high default rates do not constitute a theory of fraud based on hindsight; rather, considered together with the allegations concerning the regular inclusion of loans which Clayton found failed to meet underwriting standards, they help make plausible the claim that the systemic abandonment of underwriting standards was a substantial factor in causing Plaintiffs' loss.

Fourth, Defendants contend that allegations concerning loan file reviews in unrelated litigation should be ignored.  This Court has not relied on those allegations in making the decisions stated in this Opinion.

Fifth, Defendants argue that the allegations about specific originators do not plead falsity with particularity.  Defendants argue that the Complaint fails to link the specific securitizations at issue in this case with the allegations drawn from the statements of confidential witnesses, from public reports, and from pleadings in other cases.  As discussed above, this Court has found that the forensic analysis has sufficiently sampled the loans underlying the particular securitizations at issue to make plausible, in combination with the other factual support in the Complaint, the underwriting abandonment claims.

Defendants also argue on several grounds that, as to the underwriting abandonment claims, the Complaint fails to adequately plead scienter.  As discussed, Defendants contend, and this Court agrees, that the Third Circuit has clearly stated that "a plaintiff alleging securities fraud must still allege specific facts that give rise to a 'strong inference' that the defendant possessed the requisite intent."  Burlington, 114 F.3d at 1418.  Although two non-precedential Second Circuit decisions have raised the question of whether the Supreme Court's interpretation of the requirements of the PSLRA, as stated in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), applies to common law fraud claims, this Court need not enter into that thicket.  See Stephenson v. PricewaterhouseCoopers, LLP, 482 Fed. Appx. 618, 622 n.5 (2d Cir. 2012); Meridian Horizon Fund, LP v. KPMG (Cayman), 487 Fed. Appx. 636, 641 n.3 (2d Cir. 2012).  This Court finds that, as to the underwriting abandonment claims, the Complaint adequately pleads scienter under either heightened pleading standard.  Whether the Burlington or the Tellabs

26

formulations are applied, the allegations in the Complaint are sufficient to raise a strong

inference of the requisite fraudulent intent.

Defendants make seven arguments about the pleading of scienter that largely repeat the

arguments already discussed regarding the pleading of falsity.  In addition, Defendants contend

that the allegations are too general to raise the requisite strong inference.  Again, as just

discussed, this Court has not been persuaded.

The First Circuit's decision in Plumbers' Union Local No. 12 Pension Fund v. Nomura

Asset Acceptance Corp., 632 F.3d 762, 773-774 (1st Cir. 2011) provides a useful comparison.  In

that case, the First Circuit reversed the district court's decision granting a motion to dismiss

similar RMBS misrepresentation/underwriting abandonment claims: "While this case presents a

judgment call, the sharp drop in the credit ratings after the sales and the specific allegations as to

[one key loan originator] offer enough basis to warrant some initial discovery aimed at these

precise allegations."  Id.  The instant Complaint provides far more factual support for the

underwriting abandonment claim than this statement suggests the complaint provided in Nomura.

See also CMFG, 2013 U.S. Dist. LEXIS 116933 at *37 (following Nomura); FDIC v. Chase

Mortg. Fin. Corp., 2013 U.S. Dist. LEXIS 142123 (S.D.N.Y. Sept. 26, 2013) ("Those claims are

adequately supported by the amended complaint's allegations about high rates of delinquency

and default, and the certificates' subsequent downgrades to below investment grade"); N.J.

Carpenters Health Fund v. Residential Capital, LLC, 2010 U.S. Dist. LEXIS 32058 (S.D.N.Y.

Mar. 31, 2010)  (underwriting abandonment claim adequately supported by allegations of "credit

rating downgrades, a rapid increase in delinquency rates, and the allegedly 'faulty' due diligence

of the mortgage originator.")

Defendants have failed to demonstrate that the Complaint does not state any valid common law fraud claim with regard to representations about the underwriting practices and standards used in the issuance of the underlying mortgage loans.  As to these claims, the motion to dismiss will be denied.

G.      Do Plaintiffs fail to adequately plead a misrepresentation relating to credit ratings?

Defendants contend that the allegations in the Complaint about misrepresentations related to credit ratings fail to state a valid claim for relief.  The Complaint alleges, in short, that Defendants knowingly gave the credit rating organizations the same false data already described, and "fraudulently omitted that the ratings process was being rigged with false data."  (Compl. ¶ 147.)  Similar claims were dismissed by the district court in <u>VNB Realty, Inc. v. Bank of Am. Corp.</u>, 2013 U.S. Dist. LEXIS 132250, *35-*36 (S.D.N.Y. Sept. 16, 2013), on the ground that the complaint failed to adequately allege the underlying false statements to the credit rating organizations.  This is true in the instant case as well: the Complaint fails to provide any factual support for the assertion that Defendants knowingly gave credit rating organizations false data. The Complaint fails to plead sufficient facts to support these credit rating claims, which will be dismissed without prejudice.

H.      Do Plaintiffs fail to adequately plead actual reliance, causation?

Defendants contend that none of the common law fraud claims are valid because the Complaint fails to sufficiently plead reliance.  Defendants make two arguments.  First, they contend that the Complaint fails to plead reliance with sufficient particularity, given the requirements of Rule 9(b), because the Complaint does not specifically state that Plaintiffs

actually read the specific statements they allege to be fraudulent misrepresentations.  This is unpersuasive and could succeed only by elevating form over substance.  As Plaintiffs argue, in paragraph 659, the Complaint alleges that Plaintiffs reviewed the representations contained in the Offering Materials and relied on them in making the investments at issue.  What more should the Complaint have said?  As to reliance, what questions are Defendants left with?  This Court simply cannot credit Defendants' assertion that they are left with this key question: "Did Plaintiffs read the challenged statements or not?"  (Defs.' Br. 37.)  Defendants also assert that they wonder how the statements at issue factored into Plaintiffs' decisionmaking.  Again, this Court cannot credit the idea that Defendants have any material uncertainty about the role that Defendants' representations about underwriting practices played in Plaintiffs' decisions to invest in the mortgage-backed securitizations at issue.

Defendants next argue that, as to 121 of 264 purchases, the fraud claims fail because the Complaint alleges that Plaintiffs made those purchases before the dates the relevant prospectus supplements were issued.  In opposition, Plaintiffs observe that the Complaint alleges that the representations appeared in drafts of the Offering Materials which Plaintiffs routinely received and reviewed earlier.  (Compl. ¶ 660.)  Defendants' argument fails, however, because it relies on facts outside the Complaint – the dates of the prospectus supplements.  To state a valid claim, the claim for relief need only be "plausible *on its face*."  Twombly, 127 S. Ct. at 1974 (italics added). Defendants have failed to demonstrate that any claim at issue does not plausibly allege reliance on its face.

Defendants contend that none of the common law fraud claims are valid because the Complaint fails to sufficiently plead proximate causation.  Defendants have conflated pleading

requirements with proof.  The Complaint adequately alleges that Defendants' fraudulent

misrepresentations caused a loss: the theory, in a nutshell, is that Defendants knowingly

concealed the fact that a substantial proportion of the mortgages underlying the securitizations

did not meet the underwriting standards represented, and that, subsequently, the value of the

securities has fallen as many mortgages have defaulted, among other things.  This plausibly

pleads loss causation.  The question of whether Plaintiffs can adequately prove this theory is a

matter for determination at trial.  See EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 884

(3d Cir. 2000) ("The causation issue becomes most critical at the proof stage.")

## II.    Fifth Count: NJRICO

As a threshold issue, the parties dispute which state's law should apply to the RICO

claims in the Complaint: the Complaint pleads RICO claims under New Jersey law, but

Defendants argue that New York law should apply.  The Third Circuit has set forth the principles

relevant to this choice of law inquiry as follows:

> [I]n a diversity action, a district court must apply the choice of law rules of the
> forum state to determine what law will govern each of the issues of a case.
> *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941).  New Jersey has
> accepted the "governmental interest" choice of law test.  *Warriner v. Stanton*, 475
> F.3d 497, 500 (3d Cir. 2007) (citing *Veazey v. Doremus*, 103 N.J. 244 (1986)).
> Under this inquiry we must determine "the state with the greatest interest in
> governing the particular issue" and apply the laws of that state.  *Id.* at 500
> (quotations omitted). The governmental interest analysis is fact-intensive: Each
> choice-of-law case presents its own unique combination of facts -- the parties'
> residence, the place and type of occurrence and the specific set of governmental
> interest-that influence the resolution of the choice-of-law issue presented.

Thabault v. Chait, 541 F.3d 512, 535 (3d Cir. 2008).  "New Jersey now adheres to the method of

analysis set forth in Restatement [(Second) of Conflict of Laws] sections 6 (Section 6) and 145

(Section 145)."  P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453, 460 (2008) (quotation omitted.)

This method of analysis is no less fact-intensive than that cited in Thabault.

The Court will not conduct a choice of law analysis here because it would be premature to do so at this point in the case, prior to the development of the factual record.  See Harper v. LG Electronics USA, Inc., 595 F. Supp. 2d 486, 491 (D.N.J. 2009) (declining to engage in fact-intensive choice of law analysis at motion to dismiss stage and deferring analysis until parties presented sufficient factual record).  The Court may postpone a choice of law analysis yet proceed to evaluate the sufficiency of the claims on a Rule 12(b)(6) motion under the assumption that New Jersey law applies, given that Plaintiffs have argued that their RICO claims are viable under New Jersey law.  Id.; see also Snyder v. Farnam Cos., Inc., 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (finding that, on a Rule 12(b)(6) motion, choice of law determination on tort claims would be premature but nevertheless proceeding to evaluate whether claims survived motion to dismiss by applying New Jersey law because the plaintiffs presented their claims under that state's laws).  The Complaint pleads the RICO claims under New Jersey law, and this Court will evaluate their sufficiency as pled.

Defendants next argue that the Complaint fails to state a valid claim under NJRICO because "a corporation generally cannot conduct an enterprise consisting of an association-in-fact between the corporation and its wholly owned subsidiary."  (Defs.' Br. 42, quoting In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, 2009 U.S. Dist. LEXIS 58900, *100 (D.N.J. July 10, 2009)).  Defendants here allude to the distinctiveness requirement contained in federal RICO jurisprudence, and contend that the Complaint has failed to plead a RICO person who is distinct from a RICO enterprise, as required by Hirsch v. Enright Refining Co., 751 F.2d 628, 633 (3d Cir. 1984), and Jaguar Cars v. Royal Oaks Motor Car Co., 46 F.3d

31

258, 268 (3d Cir. 1995). Plaintiffs, in opposition, assert that NJRICO does not have such a distinctiveness rule. Rather, Plaintiffs argue, NJRICO has a broader concept of the enterprise than federal law, without a distinctiveness requirement. As explained below, the Court is persuaded that the New Jersey Supreme Court would follow federal jurisprudence on the issue of a distinctiveness requirement under NJRICO.

At issue in the distinctiveness inquiry is whether there is a RICO "person" who is distinct from the "enterprise." The fifth count in the Complaint contains a number of statements that bear on the matter of who is the person and who is the enterprise in this case. The Complaint gives an express definition of the enterprise, and two are alleged: The "Merrill Enterprise" and the "BofA Enterprise." (Compl. ¶ 747.) The Complaint alleges that the Merrill Enterprise included at least: Defendants First Franklin, Merrill Lynch Mortgage Capital, Inc., Merrill Lynch Mortgage Lending Inc., Merrill Lynch Mortgage Investors Inc., Merrill Lynch, Pierce, Fenner & Smith, and Merrill Lynch & Co. (Compl. ¶ 749.) It also alleges that the BofA Enterprise included at least: Bank of America, N.A., First Franklin Financial Corp., Banc of America Mortgage Securities, Inc., Asset Backed Funding Corporation, Bank of America, Funding Corporation, and Merrill Lynch, Pierce, Fenner & Smith. (Compl. ¶ 755.)

The Complaint alleges:

[T]he Merrill Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of residential mortgage loans and then processed the underlying loans into mortgage-backed securities so that the Merrill Defendants could sell certificates at inflated values to investors such as Prudential on the basis of false and fraudulent Offering Materials (the "Merrill Enterprise").

(Compl. ¶ 748.) The Complaint contains the same paragraph about the BofA Enterprise, but

32

referring to the "BofA" Defendants.

There is no express definition of the "BofA Defendants" or of the "Merrill Defendants." The first and prefatory paragraph does give express definitions of the defendant parties.  "BofA" is Bank of America National Association, Asset-Backed Funding Corporation, Banc of America Mortgage Securities, Inc. (by way of its successor, Merrill Lynch, Pierce, Fenner & Smith Inc.), Banc of America Funding Corporation, and Banc of America Securities LLC.  "Merrill" is defined as Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Mortgage Investors, Inc.; Merrill Lynch Mortgage Capital, Inc.; Merrill Lynch Mortgage Lending, Inc., and First Franklin Financial Corporation.   It is therefore apparent that the defendants defined in the prefatory paragraph as the Merrill Defendants are the persons who are alleged to have participated in the Merrill Enterprise, and likewise for the BofA Enterprise.  It is uncontested by Plaintiffs that the BofA Defendants consist of BofA and its subsidiaries, and the Merrill Defendants consist of Merrill Lynch and its subsidiaries.  It is also uncontested by Plaintiffs that, under federal RICO jurisprudence, a RICO enterprise cannot consist of an enterprise-in-fact composed of the corporation and its wholly-owned subsidiaries, where it is alleged that they are the "persons" who participated in the enterprise through a pattern of racketeering.  See Gasoline Sales v. Aero Oil Co., 39 F.3d 70 (3d Cir. 1994).  Thus, the key question before this Court is whether the New Jersey Supreme Court would follow federal precedent on this issue.

The Court turns to the question of whether NJRICO has a distinctiveness requirement. The applicable provision of the federal RICO statute states:

It shall be unlawful for any person employed by or associated with any enterprise

33

> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  The text of N.J. Stat. Ann. § 2C:41-2(c) is nearly, but not completely,

identical:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in or activities of which affect trade or commerce to conduct or
> participate, directly or indirectly, in the conduct of the enterprise's affairs through
> a pattern of racketeering activity or collection of unlawful debt.

The textual analysis which underlies the federal RICO distinctiveness requirement is simple and

well-known:

> We do not quarrel with the basic principle that to establish liability under §
> 1962(c) one must allege and prove the existence of two distinct entities: (1) a
> "person"; and (2) an "enterprise" that is not simply the same "person" referred to
> by a different name.  The statute's language, read as ordinary English, suggests
> that principle.

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).  The Supreme Court's

conclusion suggests that the distinctiveness requirement derives from the plain language of the

statute, and is obviously predicated on the assumption that one cannot participate in one's own

affairs.  But does New Jersey law have the same requirement?  Plaintiffs argue that it does not.

This Court, however, predicts that the New Jersey Supreme Court would follow federal RICO

law in interpreting whether or not there is a distinctiveness requirement under NJRICO.

Plaintiffs contend that a number of courts in the District of New Jersey and trial-level

state courts have held to the contrary.  In doing so, these courts appear to have relied almost

exclusively on case law following the New Jersey Supreme Court's decision in State v. Ball, 141

N.J. 142 (1995).  In particular, these courts appear to have relied considerably on language in that

decision about construing "enterprise" broadly:

> Our understanding of the term "enterprise" is derived from the extensive
> legislative history and decisional law dealing with both the State and federal
> RICO statutes.  Those sources support the following conclusions.  First, the RICO
> statute itself in using the term "enterprise" contains no express or implied
> requirement for a distinct ascertainable structure; rather, it is framed broadly to
> include any group of persons "associated in fact."  Second, the legislative history
> shows that the term "enterprise" was meant to be construed broadly.  The statute
> itself, N.J.S.A. 2C:41-6, commands the liberal construction of "enterprise."  The
> drafters intended New Jersey RICO to encompass more than traditional
> organized-crime families, which commonly contain an internal command system
> or structure. Rather, the Legislature intended its statute to reach less organized and
> non-traditional criminal elements as well.

Id. at 160-161.  Somehow, in the cases cited by Plaintiffs, courts have interpreted this language in

Ball as demonstrating a conflict between the federal courts' interpretation of "enterprise" and

New Jersey's.  Furthermore, these courts have understood this to imply a conflict in the

application of a distinctiveness requirement.  A close analysis of decisions from both federal

courts and the New Jersey Supreme Court persuades this Court that such conclusions are

unwarranted.

The Supreme Court, like the New Jersey Supreme Court, has consistently held that the

RICO statute is to be broadly interpreted to achieve the intent of Congress:

> RICO is to be read broadly.  This is the lesson not only of Congress'
> self-consciously expansive language and overall approach, but also of its express
> admonition that RICO is to "be liberally construed to effectuate its remedial
> purposes."

Sedima v. Imrex Co., 473 U.S. 479, 497-498 (1985) (citations omitted).  Furthermore, the

Supreme Court has stated that the term, "enterprise," is to be construed broadly:

> The statute does not specifically define the outer boundaries of the "enterprise"
> concept but states that the term "includes any individual, partnership, corporation,
> association, or other legal entity, and any union or group of individuals associated

in fact although not a legal entity." § 1961(4).  This enumeration of included enterprises is obviously broad, encompassing "any . . . group of individuals associated in fact."

Boyle v. United States, 556 U.S. 938, 944 (2009) (citations omitted.)  See also National

Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 257 (1994) ("RICO broadly defines

'enterprise. . .'")  This Court does not see how Ball says anything on the subjects at issue about

NJRICO that differs from what the Supreme Court has said about RICO.  Rather, this Court finds

striking agreement between the New Jersey Supreme Court, regarding NJRICO, and the United

States Supreme Court, regarding RICO, on the broad interpretation of the term, "enterprise."

More significantly, the Third Circuit has made this exact point:

> To support this claim, plaintiffs rely on *State v. Ball*, 141 N.J. 142, 661 A.2d 251
> (N.J. 1995), in which, according to plaintiffs, the New Jersey Supreme Court
> declined to interpret NJRICO coextensively with federal interpretations of RICO,
> instead opting to interpret NJRICO as governed by state law principles. We
> disagree.  A close reading of *Ball* suggests, contrary to plaintiffs' contention, that
> the New Jersey Supreme Court believed the New Jersey RICO statute was and
> should be consistent with the federal RICO statute.  *Ball*, 661 A.2d at 258
> ("[B]ecause the federal statute served as an initial model for [the NJRICO statute],
> we heed federal legislative history and case law in construing our statute.").
> Moreover, subsequent New Jersey cases belie plaintiffs' contention that the New
> Jersey RICO is somehow divergent from the federal RICO statute.  *See, e.g.,*
> *Interchange State Bank v. Veglia*, 286 N.J. Super. 164, 668 A.2d 465, 472 (App.
> Div. 1995) ("There is no state decisional law on this aspect of civil RICO law.
> Therefore, parallel federal case law is an appropriate reference source to interpret
> the RICO statute.").

Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494, 510 (3d Cir. 2006).  It is very difficult to accept

Plaintiffs' argument, given the Third Circuit's view stated in  Cetel.

Moreover, the Third Circuit and the New Jersey Supreme Court have both held

consistently that the NJRICO statute should be interpreted in conformity with the federal RICO

statute, absent a clear demonstration that there is a divergence.  Thus, the Third Circuit recently

held: "Since the TPP Complaint's federal and New Jersey RICO claims parallel each other, and because the two RICO statutes are intended to be coextensive, we follow the District Court's approach and analyze the two claims concurrently." In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 245 (3d Cir. 2012). In the same year, the New Jersey Supreme Court reiterated: "because our New Jersey RICO statute is modeled upon its federal counterpart, it is appropriate to accept guidance from the federal RICO cases." State v. Cagno, 211 N.J. 488, 508 (2012).

Thus, while a number of courts[14] have somehow concluded that the Ball decision constituted a repudiation of the Third Circuit's holding in Enright, this Court is unpersuaded. Ball does not deal with any of the issues discussed in Enright. Rather, Ball stands for the proposition that, in determining whether an enterprise-in-fact has been demonstrated, a court is to interpret the enterprise requirements broadly and may consider the pattern of racketeering established by the evidence in determining whether the existence of an enterprise has been established. It is worth noting that, years after the New Jersey Supreme Court's decision in Ball, the United States Supreme Court reached nearly the same conclusion about the enterprise requirement in Boyle.[15] There is not the slightest mention or discussion in Ball about whether or

---

[14] This Court notes two decisions by sister courts: Prudential Ins. Co. of Am. v. Goldman, Sachs & Co., 2013 U.S. Dist. LEXIS 50788, *32-*33 (D.N.J. Apr. 9, 2013); and Prudential Ins. Co. of Am. v. Credit Suisse Secs. LLC, 2013 U.S. Dist. LEXIS 142191, *62 (D.N.J. Sept. 30, 2013). For the reasons stated, this Court respectfully disagrees with these court's analyses of the distinctiveness requirement under NJRICO.

[15] Compare Ball with Boyle:

In short, Boyle holds that the RICO statute defines an "enterprise" broadly, such that the "enterprise" element of a § 1962(c) claim can be satisfied by showing a "structure". . . After Boyle, an association-in-fact enterprise need have no formal

not the "person" participating in a NJRICO enterprise must be distinct from the enterprise itself. Indeed, there are no New Jersey appellate decisions which discuss this issue.  At the trial level, two New Jersey Superior Court cases have held that <u>Ball</u> repudiated the Third Circuit <u>Enright</u> analysis without any discussion analyzing this conclusion beyond asserting that <u>Ball</u> established a broader interpretation of the term, "enterprise," under New Jersey law than it could be accorded under federal law.  Neither opinion explains how this conclusion leads to a determination that NJRICO jurisprudence does not  require an enterprise to be distinct from the "person," within the meaning of N.J. Stat. Ann. § 2C:41-2(c).[16]  A third Superior Court case reached a contrary

---

> hierarchy or means for decision-making . . ."

<u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 368 (3d Cir. 2010).

> We hold, further, that because the enterprise is distinct from the incidents constituting the pattern of activity, it must have an "organization."  The organization of an enterprise need not feature an ascertainable structure or a structure with a particular configuration.

<u>Ball</u>, 141 N.J. at 162.

[16] In <u>State v. Passante</u>, 225 N.J. Super. 439, 442 (N.J. Super. Ct., Law Div. 1987), the court based its decision on the breadth of the NJRICO definition of "person:" "'Person' includes any individual or entity or enterprise as defined herein holding or capable of holding a legal or beneficial interest in property."  N.J. Stat. Ann. § 2C:41-1(b).  Without a doubt, this definition is broader than the federal RICO definition, and it does include an enterprise within its scope.  Nonetheless, that does not mean that it is permissible under NJRICO for a "person" and an enterprise to be identical.  It is still true that the plain language of N.J. Stat. Ann. § 2C:41-2(c), like 18 U.S.C. § 1962(c), implies that the "person" and the enterprise may not be the same thing, no matter how broad the scope of "person" or "enterprise" may be.

Indeed, Plaintiffs rely on <u>Maxim Sewerage Corp. v. Monmouth Ridings</u>, 273 N.J. Super. 84, 95-96 (N.J. Super. Ct., Law Div. 1993), which also reasons that the broader NJRICO definition of "person" eliminates the distinctiveness requirement.  As authority, <u>Maxim</u> points, without citation, to the Appellate Division decision in <u>State v. Ball</u>, 268 N.J. Super. 72 (N.J. Super. Ct., App. Div. 1993).  This appears to be in error.  The Appellate Division made no such argument in its <u>Ball</u> decision.

conclusion based on a "plain language" textual analysis of the New Jersey statute.  State v. Kuklinski, 234 N.J. Super. 418, 420 (N.J. Super. Ct., Law Div. 1988).  The court in Kuklinski looked to the language of the statute, which states that it shall be unlawful for a defined "person" "to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  N.J. Stat. Ann. § 2C:41-2(c).  This analysis is virtually identical to that of the Supreme Court in Kushner.  Kuklinski, like the Third Circuit in Jaguar, concluded that the distinctiveness requirement "originates in the statute's textual directive that § 1962(c) liability requires conduct by defendant 'persons' acting through an 'enterprise.'"  Like the state court in Kuklinski, the Third Circuit here relied heavily on the plain language of the statute.

In view of the foregoing analysis, and since no intermediate state courts have spoken on the issue since the New Jersey Supreme Court decided Ball, this Court predicts that, on the issue of NJRICO distinctiveness, the New Jersey Supreme Court would follow its established approach to the NJRICO statute, which is to conform to the federal interpretation of the federal RICO statute, to the extent consistent with the language of the NJRICO statute – and it would therefore apply the Enright distinctiveness test.

This Court now turns to the questions of whether, applying the Enright distinctiveness rule, the Complaint pleads a valid NJRICO claim.  As to the NJRICO claim against Merrill, because the "person" and the enterprise are identical, they are not sufficiently distinct to state a valid claim.  As to the NJRICO claim against BofA, however, the "person" and the enterprise are nearly identical.  Plaintiffs have not argued, however, that the NJRICO claim is valid if the Enright distinctiveness requirement is applied.  It is undisputed that, if this Court applies Enright

and <u>Jaguar</u>, the Complaint does not state a valid NJRICO claim.

In conclusion, this Court has applied the distinctiveness requirement contained in Third Circuit law, and finds that the Complaint fails to plead any NJRICO claims which validly distinguish the "person" from the enterprise. As to the NJRICO claims, the motion to dismiss will be granted, and the NJRICO claims will be dismissed without prejudice.

**III.    Counts Two - Four: other common law claims**

Defendants move to dismiss the second count of the complaint, for aiding and abetting common law fraud. The Complaint alleges that Defendants substantially assisted in various parts of the fraud, such as "structuring the Trusts" and "preparing the Offering Materials." (Compl. ¶ 719.) Setting aside for the moment the particularity requirements of Rule 9(b), the Complaint fails to plead sufficient facts to state a valid claim for relief. The second count offers only conclusory assertions to support the claim that Defendants aided and abetted fraud. These conclusory assertions are barely more than a "formulaic recitation of the elements of a cause of action" and are insufficient to raise the right to relief above a speculative level. <u>Twombly</u>, 127 S. Ct. at 1965. It is not at all clear who did what to aid and abet the making of which misrepresentations in the Offering Materials. Under <u>Twombly</u>, this claim must be dismissed without prejudice.

Defendants next move to dismiss the third count in the Complaint, for equitable fraud, on several grounds. This claim seeks rescission of the securities purchases, and Defendants contend that an equitable remedy is unavailable when there is an adequate remedy at law, and that it is inappropriate when it is impossible to return the parties to the *status quo ante*. The New Jersey Supreme Court has characterized "rescission as an equitable remedy, which properly depends on

the totality of circumstances in a given case and resides within a court's discretion." First Am.

Title Ins. Co. v. Lawson, 177 N.J. 125, 143 (2003).  Because rescission properly depends on the

totality of the circumstances, it is premature to rule on its availability at the pleading stage.  As to

the third count, the motion to dismiss will be denied.

Defendants next move to dismiss the fourth count, for negligent misrepresentation,

contending both that the Complaint fails to plead the required elements of such a claim, and that

the Complaint fails to plead facts to support the inference, under New Jersey law, that

Defendants owed Plaintiffs a duty of care.  Plaintiffs disagree, contending that New Jersey law

would recognize a duty of care.

Neither side cites controlling authority on this question.  Of the cases cited, this Court

finds most the most persuasive to be Westmont Dev. Group, LLC v. Twp. of Haddon, 625 F.

Supp. 2d 178 (D.N.J. 2009).  That court cited dicta in which the New Jersey Supreme Court

discussed the "special relationship" exception to the rule of nonrecovery for purely economic

loss and noted:

> Importantly, the cases do not involve a breach of contract claim between parties in
> privity; rather, they involve tort claims by innocent third parties who suffered
> purely economic losses at the hands of negligent defendants with whom no direct
> relationship existed.

Westmont, 625 F. Supp. 2d at 198 (quoting People Express Airlines v. Consol. Rail Corp., 100

N.J. 246, 256 (1985)).  Although this is dicta from the New Jersey Supreme Court, this Court

agrees with its sister court that this states a crucial limitation to the special relationship exception

under New Jersey law: it is limited to parties not in privity, parties who lack a direct relationship.

See also Thrivent Fin. for Lutherans v. Countrywide Fin. Corp., 2012 U.S. Dist. LEXIS 71376,

41

*20-*21 (C.D. Cal. Feb. 17, 2012) (observing that Minnesota and other jurisdictions require that a negligent misrepresentation claim be predicated on more than an arms-length business transaction).  In the instant case, the Complaint alleges that Plaintiffs and Defendants were on opposite sides of various securities sale transactions.  Black's defines privity as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property)."  Black's Law Dictionary (9th ed. 2009).  The Complaint thus pleads facts that support the inference that the parties were in privity; the special relationship exception under New Jersey law is unavailable.  This Court concludes that New Jersey law would not recognize a duty of care running from Defendants to Plaintiffs, and the negligent misrepresentation claim must therefore be dismissed with prejudice.

Defendants also argue that certain of these common law claims, for certain Plaintiffs, are time-barred, depending on the applicable state law.  As already discussed, this Court declines to make choice of law determinations, which rely on factual determinations, at this early stage.  As to these arguments, the motion to dismiss will be denied.

## IV.    Counts Six - Eight: 1933 Act claims

Plaintiffs concede that Defendants are correct that the § 12(a)(2) claim for the MLMI 2006-MLN1 Offering is not valid; that claim will be dismissed with prejudice.  (Pls.' Opp. Br. 57 n.62.)

Defendants move to dismiss the three 1933 Act claims on a number of grounds.  First, Defendants repeat their argument that Plaintiffs have failed to adequately plead falsity, which has already been dealt with.  Defendants next argue that the § 12(a)(2) claims fail because the Complaint fails to allege that the purchases were made as part of the initial public offering rather

than in the secondary market; as Plaintiffs observe, the Complaint alleges that Plaintiffs

purchased the securitizations at issue from Defendants, which is sufficient.  (Compl. ¶ 819.)  To

the extent that this Court has not dismissed the § 12(a)(2) claims, the argument for dismissal of

the § 15 claims for lack of a predicate violation fails.

Defendants next argue that 1933 Act claims for four securitizations included in the

"MissPERS" litigation should be dismissed as released in that case.  Plaintiffs dispute the

release.  This Court need not reach this dispute at this time because the Complaint, as written,

does not show that these claims have been released; Defendants rely on facts external to the

Complaint and on the argument that the name of a non-party in an external document should be

read to mean some Defendants.  This Court takes the Complaint as it is written.

Lastly, Defendants argue that the 1933 Act claims are barred by a three-year statute of

repose because <u>American Pipe</u> tolling does not apply to the 1933 Act, citing the Second Circuit's

decision in <u>Police & Fire Ret. Sys. v. Indymac MBS, Inc.</u>, 721 F.3d 95 (2d Cir. 2013).[17]  The

parties do not dispute the absence of any controlling authority on this issue, and this Court is not

persuaded by the Second Circuit's reasoning, for all the reasons stated by this Court when it

rejected this argument in reference to the 1934 Act, in <u>In re Merck & Co.</u>, 2012 U.S. Dist. LEXIS

___

[17] Defendants also contend that claims on the MLMI 2006-WMC1 Offering are untimely regardless of tolling.  As Plaintiffs ask, this Court takes judicial notice under Federal Rule of Evidence 201 of the fact that the MLMI 2006-WMC1 Offering was listed in the class certification order entered by the United States District Court for the Southern District of New York on June 16, 2011, in <u>Pub. Emp. Ret. Sys. v. Merrill Lynch & Co.</u>, No. 08-cv-10841, Docket Entry No. 149.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.")  This Court rejects Defendants' argument for dismissal of 1933 Act claims on the MLMI 2006-WMC1 Offering, for the reasons stated by Plaintiffs in their opposition.  (Pls.' Opp. Br. 58 n.64.)

180707, *44 (D.N.J. Dec. 20, 2012).  As this Court explained in that opinion, it follows the

decision of the Tenth Circuit in <u>Joseph v. Wiles</u>, 223 F.3d 1155 (10th Cir. Colo. 2000).  None of

the purposes of the 1933 Act will be served by barring these claims; Defendants cannot contend

that they were not on notice of them.  The filing of a class action suit was sufficient to preserve

these claims.  This Court rejects Defendants' argument that the claims are barred by the statute of

repose.  Except as to the § 12(a)(2) claim for the MLMI 2006-MLN1 Offering, the motion to

dismiss the 1933 Act claims will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Complaint for failure to

state a valid claim for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6), is granted in

part and denied in part.  As to the common law fraud claim on the underwriting abandonment

theory, and the third count, for equitable fraud, the motion to dismiss is denied.  As to the 1933

Act claims, the motion to dismiss is granted as to only the § 12(a)(2) claim for the MLMI 2006-

MLN1 securitization, and that claim is dismissed with prejudice; the motion to dismiss is denied

as to the other 1933 Act claims.  As to the fourth count, for negligent misrepresentation, the

motion to dismiss is granted, and that claim only is also dismissed with prejudice.  As to any

other claims not specifically mentioned, the motion to dismiss is granted, and such claims are

dismissed without prejudice.  Plaintiffs are granted leave to file an Amended Complaint within

45 days of the date of entry of this decision.


    s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

Dated: April 17, 2014

44